## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RACHEL DELOACHE WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | C.A. No.:  1:22-cv-01132-CFC |
| v. | : | |
| | : | The Hon. Colm F. Connolly |
| NETFLIX, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM

Dated:  November 4, 2022

Thomas E. Hanson, Jr., Esq. (#4102)
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
Phone: (302) 300-3447
Email: thanson@btlaw.com

Rachel F. Strom (*pro hac vice*)
Chelsea T. Kelly (*pro hac vice*)
Lindsey B. Cherner (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Email: rachelstrom@dwt.com
          chelseakelly@dwt.com
          lindseycherner@dwt.com

*Attorneys for Defendant Netflix, Inc.*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................1

NATURE AND STAGE OF PROCEEDINGS ........................................3

SUMMARY OF ARGUMENT .................................................................3

STATEMENT OF FACTS .......................................................................3

    I.     PLAINTIFF'S VERSION OF HER FRIENDSHIP WITH SOROKIN ....3

    II.    THE NETFLIX SERIES .................................................................8

    III.   COMPLAINT .................................................................................9

ARGUMENT .........................................................................................10

    I.     PLAINTIFF'S DEFAMATION CLAIM FAILS. ...................................10

          A.   Courts Offer Broad Protection for Docudrama. .......................11

          B.   None of the Statements Are Verifiably and Materially False. .12

          C.   Alternatively, None of the Statements Are Defamatory...........21

    II.    New York Does Not Recognize False Light. ...........................24

CONCLUSION .....................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001) ...............................................................................10

*Blair v. Inside Ed. Prods.*,
   7 F. Supp. 3d 348 (S.D.N.Y. 2014) ...................................................................15

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014) ...............................................................................21

*Cummings v. City of N.Y.*,
   2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ......................................................18

*Davis v. Costa-Gavras*,
   654 F. Supp. 653 (S.D.N.Y. 1987) .....................................................................11

*DeIuliis v. Engel*,
   2021 WL 4443145 (S.D.N.Y. Sept. 27, 2021) ...................................................24

*Diaz v. NBC Universal, Inc.*,
   536 F. Supp. 2d 337 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009) ..12

*Fairstein v. Netflix, Inc.*,
   553 F. Supp. 3d 48 (S.D.N.Y. 2021) ....................................................11, 18, 21

*Greene v. Paramount Pictures*,
   340 F. Supp. 3d 161 (S.D.N.Y. 2018), *aff'd*, 813 F. App'x 728 (2d Cir. 2020) 12

*Heller v. NBCUniversal, Inc.*,
   2016 WL 6583048 (C.D. Cal. June 29, 2016)..............................................15, 20

*John E. Reid & Assocs. v. Netflix, Inc.*,
   2020 WL 1330657 (N.D. Ill. Mar. 23, 2020) ...............................................12, 15

*Johnson v. Warner Bros. Entm't*,
   2017 WL 588714 (D. Del. Feb. 14, 2017)..........................................................10

*Kesner v. Dow Jones & Co.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021) ..................................................10

*Klein v. McQueen*,
    2019 WL 6307770 (D. Del. Nov. 25, 2019) .........................................4

*Lovingood v. Discovery Commc'ns*,
    800 F. App'x 840 (11th Cir. 2020) ......................................................12

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ................................................................................13

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
    2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ...................................24

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ..............................................11, 14, 18

*Rapaport v. Barstool Sports, Inc.*,
    2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021), *appeal docketed*, No. 22-2080
    (2d Cir. Sept. 22, 2022) ......................................................................17

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017) ...............................................................13

*Triestman v. Slate Grp.*,
    2020 WL 1450562 (D. Del. Mar. 25, 2020) .......................................10

**State Cases**

*Aronson v. Wiersma*,
    483 N.E.2d 1138 (N.Y. 1985)..............................................................21

*Attas v. Park E. Animal Hosp., Inc.*,
    652 N.Y.S.2d 280 (App. Div. 1997)....................................................22

*Bement v N.Y.P. Holdings*,
    760 N.Y.S.2d 133 (App. Div. 2003)....................................................23

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995)..............................................13, 14, 18

*Carey v. Carey*,
  2022 WL 571412 (Sup. Ct. N.Y. Cty. 2022)......................................................22

*Covino v. Hagemann*,
  627 N.Y.S.2d 894 (Sup. Ct. Richmond Cty. 1995) ...........................................18

*De Havilland v. FX Networks, LLC*,
  230 Cal.Rptr.3d 625 (Cal. Ct. App. 2018).........................................................11

*Delaney v. Int'l Union UAW Local 94 of John Deere Mfg. Co.*,
  675 N.W.2d 832 (Iowa 2004) ..............................................................................16

*Foster v. Churchill*,
  665 N.E.2d 153 (N.Y. 1996)...............................................................................21

*Franklin v. Daily Holdings, Inc.*,
  21 N.Y.S.3d 6 (App. Div. 2015)..........................................................................13

*Gross v. N.Y. Times Co.*,
  623 N.E.2d 1163 (N.Y. 1993)........................................................................13, 14

*Millus v. Newsday, Inc.*,
  89 N.Y.2d 840 (1996) ..........................................................................................13

*Rappaport v. VV Publ'g Corp.*,
  618 N.Y.S.2d 746 (Sup. Ct. N.Y. Cty. 1994), *aff'd*, 637 N.Y.S.2d 109 (App.
  Div. 1996) ............................................................................................................21

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
  366 N.E.2d 1299 (N.Y. 1977).............................................................................13

*Roth v. United Fed'n of Teachers*,
  5 Misc. 3d 888 (N.Y. Sup. Ct. Kings Cty. 2004) ...............................................16

*Roth v. United Fed'n of Teachers*,
  787 N.Y.S.2d 603 (Sup. Ct. Kings Cty. 2004) ...................................................13

*Stepanov v. Dow Jones & Co.*,
  987 N.Y.S.2d 37 (App. Div. 2014)......................................................................12

**Rules**

F.R.C.P. 12(b)(6)...........................................................................................................3

## PRELIMINARY STATEMENT

Plaintiff Rachel Williams repeatedly shared the story of her friendship gone awry with famed fraudster Anna Sorokin, for great personal financial gain. She sold her story to HBO, published a 290-page book on the topic, and wrote the aptly-titled *Vanity Fair* article: "'As an Added Bonus, **She Paid for Everything**'…."

By her own account, Williams, the daughter of a congressional candidate, grew up in the "debutante" crowd, studied "haute couture" in Paris, craved hanging out with an exclusive crowd who "knew the guy at the door – the one who decides if you're tall enough, rich enough, or attractive enough to enter," and easily rattles off exclusive brands of champagne (wanting to drink "Pouilly-Fumé like it was water") and clothes (describing her "patent-leather Marni platform sandals") as if everyone knows these brands. Williams details how she became a "pawn" in her friendship with Sorokin, who paid for "everything" – including spa treatments, meals at exclusive restaurants, and fitness sessions with a celebrity trainer. Once it was clear Sorokin was having financial troubles, Williams decided to "give the relationship some space;" and when she realized Sorokin was a fraud, Williams worked with law enforcement to orchestrate Sorokin's arrest.

But even the jury who found that Sorokin was a criminal did not find Williams to be one of her victims. Indeed, the judge at Sorokin's criminal trial noted that Williams "made a heck of a lot [of] money" from telling her story, and Sorokin's

1

counsel could "certainly show that this idea that she's having an intellectual experience in her journal is bologna, what she really wants to do was make money." Ex. 3 at 2115:6-9.

Williams now comes before this Court and claims Netflix defamed her in its fictionalized dramatization of the Sorokin scandal, ironically, in large part, by portraying Williams as Williams has portrayed herself: as accepting expensive gifts from Sorokin and as a snob who is unaware of her own privilege. Given Williams' own public statements, her claims must fail. Williams cannot plead and prove that Netflix's series is materially false – rather, the "gist" and "sting" of her portrayal is true. Also, the Netflix series does not defame Williams; rather it takes pains to show her perspective. While some characters reasonably debate the morality of Williams' real-life decisions – *i.e.*, working with law enforcement and profiting from Sorokin's downfall – others defend Williams, referring to her as "a good person," "a sweetie," and "a real friend." These viewpoints expressed in the series, whether positive or negative, all constitute First Amendment-protected opinion.

Courts routinely dismiss defamation claims based on docudrama, particularly those with prominent disclaimers (as here), noting the average viewer understands docudrama comes with a dose of the creator's "literary license." Indeed, to allow constitutionally-protected artistic expression to flourish, content creators like Netflix must be allowed some breathing space to interpret the actions and decisions of those

involved in a public controversy like the Sorokin trial. This Court should reject Williams' attempt to use the court to stifle the expression she does not like in favor of her own version of events. Her Complaint should be dismissed.

## NATURE AND STAGE OF PROCEEDINGS

On August 29, 2022, Williams filed this defamation and false light invasion of privacy lawsuit. The parties agreed Netflix would respond to the Complaint by November 4, 2022. Netflix now moves to dismiss pursuant to F.R.C.P. 12(b)(6).

## SUMMARY OF ARGUMENT

1.    New York law applies because Plaintiff is domiciled in New York and the relevant events occurred there.

2.    Plaintiff's defamation claim fails because: (1) all of the alleged defamatory statements constitute constitutionally protected opinion based on substantially true facts; or (2) alternatively, none of the statements are capable of defamatory meaning.

3.    Plaintiff's false light claim must be dismissed because New York does not recognize such a claim.

## STATEMENT OF FACTS

### I.    PLAINTIFF'S VERSION OF HER FRIENDSHIP WITH SOROKIN

*Meeting Anna:*  In February 2016, Williams – a photo editor for *Vanity Fair* who grew up in a politically-connected family surrounded by "cotillion-trained

debutantes," studied haute couture in Paris, and socialized mostly within the New York high-end fashion world – met Anna Sorokin, a 25-year-old Russian-born German citizen. Compl. ¶6; Ex.1 at 27, 35, 38, 158.[1] Sorokin was pretending to be an heiress named Anna Delvey, but in reality, she had little money, and was attempting to defraud banks, friends, and the New York elite. Compl. ¶6. Sorokin and Williams became friends and went out with "publicists, models, musicians, and designers," accessing "exclusiv[e]" circles in New York. Ex.1 at 35.

In February 2017, Sorokin started living at the 11 Howard hotel in Manhattan, and befriended Neff Davis – a young woman who worked at the hotel. Compl. ¶7; Ex.1 at 79-80. Eventually, Williams stopped by 11 Howard most days, where she and Sorokin regularly dined at Le Coucou – an expensive Michelin-starred restaurant that Sorokin paid for. Ex.2 at 5. Sorokin also paid for drinks at an exclusive lounge, $300/hour fitness sessions with celebrity trainer Kacy Duke as often as 3-4 times per week, spa treatments, a pair of shoes, and a pair of pants. *Id.*; Compl. ¶¶33 n.10, 56(c); Ex.1 at 69-70. As Williams would later write, in their friendship, Sorokin "paid for everything." Ex.2 at 5.

---

[1] This Statement of Facts is based on the Complaint and sources incorporated by reference in the Complaint: Plaintiff's book (Ex.1, the "Book"), Plaintiff's *Vanity Fair* article (Ex.2, the "Vanity Fair Article"); Plaintiff's witness testimony from Anna Sorokin's trial (Ex.3, "Trial Tr."); and the Netflix series *Inventing Anna* (Ex.4, the "Series"). The Court may consider these items on a motion to dismiss because they are referenced by and integral to the Complaint. *See* Compl. ¶¶1, 18, 33 n.10, 56; *see also Klein v. McQueen*, 2019 WL 6307770, at *1 n.1 (D. Del. Nov. 25, 2019).

*Trip to Morocco:* In April 2017, Sorokin asked Williams to accompany her on a trip abroad to renew her visa. Compl. ¶9. Sorokin and Williams together decided on one of the "most expensive hotels in the world," La Mamounia in Marrakech, Morocco (the "Hotel"). Ex.3 at 2046:18-2051:22, 1873:15-16, 1892:8-19. Sorokin booked a $30,000 private riad at the Hotel with a pool and butler. *Id.* Sorokin promised to pay for the whole trip, and Williams viewed that as "an extremely generous gift." Ex.1 at 108. Sorokin also invited Kacy and a man named Jesse to film the trip. Compl. ¶10. After they arrived, the Hotel asked Sorokin for a credit card, but none of her cards worked. *Id.* ¶11. After making up excuses, Sorokin asked Williams if she would put down her credit card as security, promising to pay the bill. *Id.* Ultimately, Williams gave the Hotel her personal credit card ("Personal Amex").

Later, Sorokin, Williams, and Jesse toured a famous garden and private museum, which required a $1,640 donation. *Id.* ¶12; Ex.1 at 7. When Sorokin was unable to pay, Williams agreed to pay, but the Hotel had her Personal Amex. Compl. ¶12. In order to persuade the Hotel to return that card so that she could pay the museum, Williams gave the Hotel a card provided by her employer ("Business Amex") to hold, with instruction not to charge it. *Id.* Williams returned to the museum with her Personal Amex and, after several anxiety-provoking failed attempts to scan her card, under the threatening gazes of stern employees, the scan

went through. Ex.1 at 18-19. Williams says that, at the time, she could "barely hold[] it together, ready to collapse into a heap of self-pity and despair." *Id.* at 18-20.

Williams left Sorokin in Morocco to fly to France, where she learned the Hotel had charged both her Business Amex and Personal Amex. Compl. ¶14. Combined with other trip-related expenses, Sorokin owed Williams approximately $62,000. *Id.* ¶13. Williams then decided to take a break from her friendship with Sorokin, but kept in contact while she (unsuccessfully) tried to get reimbursed. Ex.1 at 121.

***Williams Brings Anna to Justice:*** Rather than promptly telling her employer about the charges, Williams hoped that if she "received [Sorokin's] wire promptly, [she could pay off her] corporate statement ***before anyone noticed***." *Id.* at 122. After weeks passed, Williams texted Sorokin that she would "have to explain to corporate accountants why I have such a huge overdue personal charge on my corporate AmEx." Ex.3 at 1952:25-1953:1; *see also id.* at 1938:17-18 (text to Sorokin: "My employer is able to see my corporate statement, which is extremely high and past due"); Ex.1 at 139, 206 ("I'm in huge trouble. My job is on the line.").[2]

---

[2] Williams alleges she marked the Business Amex charge as "personal" on her expense report and informed a finance manager about it. Compl. ¶94. But she does not say *when* she did this. It is clear from the above she did not do this promptly. And in trial testimony, she was unable to recall when, if ever, she informed her work. Ex.3 at 1958:20-23 ("Q. And had you told anybody at work about your nonprofessional use of the corporate card at this point [weeks after the charges]? A. It's hard to remember the exact chronology. I told a colleague. I'm not sure.").

On August 1, 2017, Williams informed the police about her situation; and began working closely with prosecutors who were investigating Sorokin. Ex.1 at 173; Compl. ¶15. Williams provided the prosecution with a timeline of Sorokin's activities, screenshots of Sorokin's social media posts, Williams' text messages with Sorokin, and audio recordings of a conversation with Sorokin that Williams secretly recorded. Ex.1 at 207-08. Williams made sure to "keep [Sorokin] in the dark," making her believe they were still friends, so she could keep tabs on her for prosecutors. *Id.* at 205.

Williams informed prosecutors that Sorokin was staying at a rehabilitation facility in California, and helped to arrange her arrest there. *Id.* at 238-39; Compl. ¶17. Williams invited Sorokin to meet her for lunch in Los Angeles, knowing the police would arrest Sorokin when she left the facility. *Id.*; *see also* Ex.1 at 237-46. Williams did not tell Kacy or Neff about her involvement in Sorokin's prosecution or arrest. Compl. ¶17. Williams described how the experience "weigh[ed]" on her, as it "felt unnatural" to break Sorokin's trust. Ex.1 at 234. In August 2017, Williams testified at Sorokin's grand jury hearing; and the jury indicted Sorokin on several charges. *Id.* at 219-22.

In April 2019, Sorokin stood trial and Williams testified on behalf of the prosecution. Compl. ¶20. Sorokin was convicted on eight counts, but acquitted of

larceny against Williams. *Id.* ¶21. After the trial, American Express cleared Williams from responsibility for the outstanding Hotel charges. Ex.1 at 272.

**Williams Is Paid to Tell Her Story**: In April 2018, Williams published the Vanity Fair Article. Compl. ¶18. She also signed a deal with Simon & Schuster to write her Book, *My Friend Anna*, which was published in 2019. *Id.* And she sold an option to purchase the rights to the Vanity Fair Article and the Book to HBO. *Id.* In total, Williams received approximately $332,300. Ex.3 at 1979:25-1980:12.

## II.   THE NETFLIX SERIES

On February 11, 2022, Netflix released *Inventing Anna* (the "Series"), a dramatization of Sorokin's story, which was inspired by the reporting of *New York* Magazine journalist Jessica Pressler and created by critically-acclaimed producer Shonda Rhimes. Compl. ¶¶19, 25, 98. The Series was nominated for three Emmy Awards. *Id.* ¶25. Each episode displays a prominent disclaimer, stating, with minor variations: "This (whole) story is completely true, except for all the parts that are total bullshit/ is totally made up." *Id.* ¶24. The Series follows Sorokin's time in New York; and introduces characters based on her real-life friends, including Williams, Kacy, and Neff, all three of whom are identified by their real names.[3] *See generally* Ex.4. The Series depicts Sorokin's downfall as she is unable to pay her bills,

---

[3] Netflix refers to Kacy, Neff, Jesse, and "Noah" (a fictionalized character) by their first names because the Complaint does so.

continues living extravagantly at others' expense, and grows indifferent to the effects of her behavior on others. *See id.* Episode 6 of the Series shows the events in Morocco, including the fact that Williams is forced to put down her credit cards, which end up getting charged when Sorokin fails to pay. *Id.*, Ep.6.

Most of the nine episodes focus on the perspective of a different character, which the Series makes clear by flashing that character's name at the beginning of the episode. *See id.* Episode 7 is told from Williams' perspective, and portrays her as a woman taken advantage of by Sorokin, struggling to deal with a financial crisis, and ultimately choosing to stand up for herself. *Id.*, Ep.7. In the final episode depicting Sorokin's trial, Williams' testimony brings the jury to sympathetic tears; and on cross, she defends her decision to turn in Sorokin while benefitting financially, saying: "It's not about entertainment; it's about law and order and a crime." *Id.*, Ep. 9 at 26:14-27:50, 41:40-42:50.

## III.   COMPLAINT

Plaintiff claims that 16 sets of statements from the Series are defamatory – or put her in a false light – because they allegedly portray Williams as: (1) a "freeloader and/or a false friend" (Nos. 1-7); (2) a "snob" (No. 8); (3) "abandoning Sorokin in Morocco" (Nos. 9-10); (4) "deceiving friends about her role in the arrest or benefitting from it" (Nos. 11-14); and (5) "misusing her Business Amex" to pay for Morocco expenses (Nos. 15-16). *See* Compl. ¶¶ 31-95.

## ARGUMENT

Because Plaintiff's claims take aim at Netflix's constitutionally-protected right to tell the story of a public controversy, it is especially important that this Court take an exacting look at her claims at the pleading stage "so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 166-67 (S.D.N.Y. 2021).[4]

## I.   PLAINTIFF'S DEFAMATION CLAIM FAILS.

To state a claim of defamation under New York law, a plaintiff must plead defendant published: (1) a false, (2) defamatory statement of fact, (3) to a third party, (4) about the plaintiff, (5) made with the applicable level of fault, (6) either causing special harm or constituting defamation *per se*, and (7) not protected by privilege. *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). Here, the statements all fail to give rise to a defamation claim because they are either not: (1) materially false; (2) statements of fact; or (3) defamatory.

---

[4] Delaware federal courts sitting in diversity apply the state law of plaintiff's domicile for defamation and false light claims. *Triestman v. Slate Grp.,* 2020 WL 1450562, at *2 (D. Del. Mar. 25, 2020); *Johnson v. Warner Bros. Entm't*, 2017 WL 588714, at *4 (D. Del. Feb. 14, 2017). Williams is a New York citizen. Compl. ¶27.

## A.       Courts Offer Broad Protection for Docudrama.

As the Series is a docudrama – not a documentary – the Court must analyze the allegedly defamatory statements in that context. *See Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 63-64 (S.D.N.Y. 2021). Courts have long recognized the role docudramas play in bringing historical events to a wider audience. *Davis v. Costa-Gavras*, 654 F. Supp. 653, 658 (S.D.N.Y. 1987) ("docudrama . . . [s]elf-evidently . . . partakes of author's license—it is a creative interpretation of reality"). To accomplish this goal, "[d]ocudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes." *Id.* The format "often rel[ies] heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience"; and courts have found viewers of docudramas "would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Partington v. Bugliosi*, 56 F.3d 1147, 1154-55 (9th Cir. 1995).[5]

That is particularly true here, where Netflix made clear the Series was a docudrama with the disclaimer starting each episode: "This (whole) story is

---

[5] For this reason, "the First Amendment simply does not require" "[p]roducers of films and televisions programs" to "enter into agreements with individuals portrayed in those works." *De Havilland v. FX Networks, LLC*, 230 Cal.Rptr.3d 625, 639 (Cal. Ct. App. 2018).

completely true, except for all the parts that are total bullshit/ is totally made up."
Compl. ¶24. This cheeky language reflects the dramatized tone of the Series, putting
viewers on notice the Series is not a purely factual documentary. Courts rely on such
disclaimers in dismissing defamation claims that target docudramas. *See Greene v.
Paramount Pictures*, 340 F. Supp. 3d 161, 171 (S.D.N.Y. 2018), *aff'd*, 813 F. App'x
728 (2d Cir. 2020); *Lovingood v. Discovery Commc'ns*, 800 F. App'x 840, 847 (11th
Cir. 2020).[6]

### B. None of the Statements Are Verifiably and Materially False.

Plaintiff has not identified a single statement that is *verifiably* and *materially*
false. Rather, Williams cherry-picks 16 statements from the Series and claims these
scenes depict her as "greedy, snobbish, disloyal, dishonest, cowardly, manipulative
and opportunistic." Compl. ¶2. Even if that is the takeaway (and as Section C below
makes clear, it is not), these terms are non-actionable opinions based on the
substantially true facts that Williams herself has detailed.

"Because the falsity of the statement is an element of the defamation claim,
the statement's truth or substantial truth is an absolute defense." *Stepanov v. Dow
Jones & Co.*, 987 N.Y.S.2d 37, 42 (App. Div. 2014). "A statement is substantially
true if the statement would not have a different effect on the mind of the reader from

---

[6] *See also Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 339 (S.D.N.Y.
2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009); *John E. Reid & Assocs. v. Netflix, Inc.*,
2020 WL 1330657, at *2 (N.D. Ill. Mar. 23, 2020).

that which the pleaded truth would have produced." *Franklin v. Daily Holdings, Inc.*,
21 N.Y.S.3d 6, 12 (App. Div. 2015). A statement is not false so long as the "gist" or
the "sting" is accurate. "Courts typically compare the complained of language with
the alleged truth to determine whether the truth would have a different effect on the
mind of the average reader." *Franklin*, 21 N.Y.S.3d at 12. A "plaintiff in New York
courts generally must identify how the defendant's statement was false to survive a
motion to dismiss." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d
236, 245 (2d Cir. 2017).

Further, a defamation lawsuit must be based on statements of fact, not
expressions of opinion. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).
This is so because "only assertions of fact are capable of being proven false." *Brian
v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). "Opinions, . . . libelous or not,
are constitutionally protected and may not be the subject of private damage actions,
provided that the facts supporting the opinions are set forth." *Rinaldi v. Holt,
Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1306 (N.Y. 1977). They are protected,
"no matter how vituperative or unreasonable the opinions may be." *Roth v. United
Fed'n of Teachers*, 787 N.Y.S.2d 603, 611 (Sup. Ct. Kings Cty. 2004). Whether a
particular statement is opinion is a question of law for the court; and courts applying
New York law routinely dismiss defamation claims at the pleading stage on these
grounds. *See Millus v. Newsday, Inc.*, 89 N.Y.2d 840, 842 (1996); *Gross v. N.Y.*

13

*Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) (noting New York's "more flexible" and "decidedly more [speech] protective" test for non-actionable opinion).

In drawing this line, the "dispositive inquiry . . . is whether a reasonable [viewer] could have concluded that [the statement at issue] convey[s] facts about the plaintiff." *Gross*, 623 N.E.2d at 1167. New York courts look to the following factors in making this inquiry:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact[s] . . . ."

*Brian*, 660 N.E.2d at 11291.

Where, as here, a docudrama is at issue, the combination of "substantial truth" and opinion protects the creators' artistic license. In these settings, statements "about a controversial occurrence [that] fairly describes the general events involved and offers [a creator's] personal perspective about some of its ambiguities and disputed facts . . . should generally be protected by the First Amendment. Otherwise, there would be no room for expressions of opinion by . . . others whose perspectives might be of interest to the public." *Partington*, 56 F.3d at 1154. Thus, the media should be protected when they depict a "public controversy . . . , dramatizing some details, excluding others . . . , and implicitly expressing their opinion in favor of [one side],"

14

because "[i]f the Court were to rule that a defamation claim based on such activity is actionable, then virtually any docudrama on a controversial topic could be defamatory." *Heller v. NBCUniversal, Inc.*, 2016 WL 6583048, at *6-7 (C.D. Cal. June 29, 2016).[7] Here, the 16 statements identified in the Complaint are substantially true and/or protected opinion as set forth below[8]:

**"Freeloader" Statements (Nos. 1-7 and 10)**: Plaintiff takes issue with the portrayal of her accepting gifts and meals from Sorokin, even though she admits Sorokin essentially "paid for everything" in their friendship. Williams concedes she accepted months of fancy dinners, drinks, $300/hour fitness sessions, spa treatments, and some clothing from Sorokin. Compl. ¶¶33, 56; Ex.2 at 5; Ex.1 at 69-70. The fact that some of these scenes depict Williams as accepting some slightly different items than she did in reality (*i.e.*, a haircut instead of a spa treatment) is exactly the kind of "minor inaccurac[y]" courts have found do not amount to falsity. *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 357-59 (S.D.N.Y. 2014).

---

[7] Thus, a depiction of "a classic difference of opinion over whether [music group] N.W.A.'s contracts [with the plaintiff] were 'favorable' or 'unfavorable,' whether N.W.A. was being paid its 'fair share' or not, and whether [plaintiff] was a 'sleazy' manager or a good businessman," constituted non-actionable opinion. *Id.* "While it is true that the producers of the Film took the side of N.W.A. in this controversy, any reasonable viewer watching the scenes would understand that the implications constitute opinion, not provable facts." *Id.*

[8] Exhibit 5 details further evidence from Exs.1-4 that the 16 statements are substantially true, opinion, or non-defamatory.

Neff's characterization of Williams as a "user" who "took and took and took" constitutes opinion based on these true facts. *See Delaney v. Int'l Union UAW Local 94 of John Deere Mfg. Co.*, 675 N.W.2d 832, 843 (Iowa 2004) (dismissing defamation claim based on references to plaintiffs as "freeloaders" where plaintiffs had, in fact, "impose[d] upon another's generosity . . . without sharing in the cost or responsibility involved").[9]

**"False Friend" (Nos. 1-3 and 10)**: Plaintiff complains she was portrayed as "dropping" Sorokin when she had financial trouble. But Williams' own statements make clear she not only ceased socializing with Sorokin after the financial issues in Morocco (saying she needed to "give the relationship some space," Ex.1 at 121), she actively orchestrated Sorokin's arrest and prosecution while lying to Sorokin. *Id.* at 205-08, 238-47. Thus, these statements too are substantially true.

While one can argue that Williams' actions were justified after Sorokin stole from her – and that viewpoint is also portrayed in the Series – others are entitled to view these decisions more harshly, which constitutes protected opinion. Indeed, Neff's lines about Williams in these scenes are perfect examples of such protected

---

[9]The Complaint alleges the title of Episode 2, "The Devil Wore Anna," refers to Williams and implies she is the "devil." Compl. ¶34. But Williams only appears for a few minutes in Episode 2 (out of an hour-long episode); thus, no reasonable viewer would understand the title to apply to her. Even if it did, referring to someone as "Satan" or "from hell" is "nothing more than exaggerated hyperbole," which cannot support actionable defamation. *Roth v. United Fed'n of Teachers*, 5 Misc. 3d 888, 898 (N.Y. Sup. Ct. Kings Cty. 2004).

opinion. *See Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *14 (S.D.N.Y. Mar. 29, 2021) (terms like "'fraud' (someone who is not the type of person they present themselves to be), a 'hack' (someone who is motivated entirely by money, often at the expense of integrity or professional standards), or a 'wannabe' (someone who aspires vainly to emulate or attain success) . . . are readily understood as inherently subjective assessments that are incapable of being proven objectively false"), *appeal docketed*, No. 22-2080 (2d Cir. Sept. 22, 2022).

**"Snob" (Nos. 1, 2, and 8)**:  Plaintiff also claims these scenes are defamatory because they portray her as a "snob" or a "Becky" (a "white woman who is ignorant of both her privilege and her prejudice")[10] who refers to Neff as a "paid bitch." But Williams' own statements support the fact she is a white woman who lives a privileged life and, at least at the time, socialized predominantly with the exclusive New York fashion world – all of which can support a reasonable opinion of her as a "snob" or "Becky." *E.g.*, Ex.1 at 27 (studied haute couture in Paris); *id.* at 35 (socialized with those who had access to "exclusiv[e]" circles); *id.* at 38 (grew up with "cotillion-trained debutantes"). Despite her privilege, Williams claims she is just "a hardworking young woman from Knoxville, Tennessee, who had moved to the city with nothing but an entry-level job," *id.* at 258, supporting an implication that she is still unaware of her own privilege.

---

[10] https://www.merriam-webster.com/words-at-play/words-were-watching-becky.

Also, it is *Neff's* character who refers to Williams as a "Becky" (a term incapable of being proven true or false); and Neff is depicted in the Series as at odds with Williams, making clear the statement is the opinion of a biased character as opposed to a factual assertion from a "disinterested observer." *Brian*, 660 N.E.2d at 1131 (where speaker "was not a disinterested observer," reasonable readers would understand the "accusations . . . [were not] assertions of fact"); *Partington*, 56 F.3d at 1153 (statement is opinion where it is clearly a "personal viewpoint"). In fact, Neff's opinion is immediately contrasted by Kacy referring to Williams as a "sweetie." Ex.4, Ep.2 at 29:10-31:15.

Likewise, portraying Williams as calling Neff a "paid bitch" is not defamatory where, as here, viewers of docudrama know that most dialogue contains rhetorical flourish; the statement was made in the context of a heated argument; and a reasonable viewer would understand it to refer to the fact that Neff worked for Sorokin, not the fact that Neff is Black. *See Fairstein*, 553 F. Supp. 3d at 81-82 (not defamatory to portray plaintiff, in a docudrama, as referring to certain children of color as "animals" where the term reflected the character's opinion that the children were violent).[11]

---

[11] Netflix does not concede the Series portrayed Williams as racially insensitive, and certainly not racist. Even if it did, calling someone racist is a matter of opinion incapable of being proven true or false. *See Cummings v. City of N.Y.*, 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24, 2020) ("terms like racist' constitute nonactionable opinion."); *Covino v. Hagemann*, 627 N.Y.S.2d 894, 895-96 (Sup. Ct. Richmond

**"Leaving Sorokin in Morocco" (Nos. 9-10)**:  Plaintiff did leave Morocco before Sorokin to go to France for work and vacation. Ex.1 at 108-18. And, before knowing Sorokin was a fraud, Williams also decided to "give the relationship some space." *Id.* at 121. Thus, these scenes are substantially true. And debating if this makes Williams "disloyal," cannot be proven true or false.

**"Deceiving Friends" (Nos. 11-14)**: Plaintiff takes issue with the portrayal of her character pretending not to know about Sorokin's prosecution when she talks to Kacy or Neff. But she admits she could not have told Kacy or Neff about her role in the investigation because the authorities asked her to keep it confidential. Compl. ¶17. Plaintiff also concedes she made over $300,000 from selling her story to the media. Ex.3 at 1979:25-1980:12. Portraying Williams as someone who "claimed to be a victim when in fact she benefitted financially" is classic protected opinion based on substantially true facts.

**"Misusing Her Business AmEx" (Nos. 15-16):**  The scenes depicting Vanity Fair confronting Williams about the charges on her Business Amex are also substantially true: (1) the Hotel did charge Williams' Business Amex for over $16,000 (Compl. ¶14); (2) Williams did not immediately disclose the situation, hoping instead she could pay off the bill "***before anyone noticed***" (Ex.1 at 122

---

Cty. 1995) (characterizing one's behavior as "racially insensitive" amounted to protected opinion, noting that allegations of "prejudice and the like" are incapable of being proven true or false).

(emphasis added)); and (3) she was very anxious about how these charges would affect her employment. *See* Ex.3 at 1938:16-18 ("My employer is able to see my corporate statement, which is extremely high and past due"); Ex.1 at 139, 141, 206 (stating her job was on the line). The sting, if any here, is that Williams used her Business Amex for a non-business expense and then hoped she could handle the payment "before anyone noticed." That is true. Whether that makes Williams an "unethical employee" is a matter for debate. *See Heller*, 2016 WL 6583048, at *6 ("statements regarding Plaintiff's professional performance" are protected opinion).

At bottom, Williams in real life, and the character in the Series, accepted unbelievable luxuries from Sorokin (someone she found to be so "rude" she was "ashamed," Ex.1 at 83, 101), distanced herself as soon as Sorokin's financial failures came to light, did not immediately tell her employer about the personal charges on her business card, worked with law enforcement to bring Sorokin to justice, and made over a quarter of a million dollars on the saga even though AmEx ultimately never made her pay a cent for the hotel charges on her cards. Debating if this makes Williams brave or cowardly, disloyal or a "sweetie," is precisely what the law allows docudramas to do. The Court should dismiss Plaintiff's defamation claim.[12]

---

[12] Williams is by no means the "villain" of the Series, as her Complaint makes her out to be.  Rather, the Series allows viewers to reasonably debate the actions of all the characters. But even if "the average viewer would likely view [the plaintiff] as the principal villain in the series," courts have found that "such an interpretative gloss is the opinion-based prerogative of the defendants as speakers," so long as the

### C.     Alternatively, None of the Statements Are Defamatory.

Alternatively, Plaintiff's claim should be dismissed because the statements are not defamatory. When considering whether a statement is defamatory, courts must decide whether the statement tends to "expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society . . . ." *Foster v. Churchill*, 665 N.E.2d 153, 157 (N.Y. 1996). "[T]he statement must do more than cause discomfort or affront; . . . [it] is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject." *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014) ("Not all (or even most) maligning remarks can be considered defamatory."). On a motion to dismiss, a court must evaluate challenged statements "in the context of the entire statement or publication as a whole," and "if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1138 (N.Y. 1985); *see also Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 748 (Sup. Ct. N.Y. Cty. 1994) ("A defamatory implication must be present in the plain and natural meaning of the words used."), *aff'd*, 637 N.Y.S.2d

---

gloss is based on substantially true and/or non-defamatory accounts, as here. *Fairstein*, 553 F. Supp. 3d at 77.

109 (App. Div. 1996).

Within this context, *all* of the statements identified in the Complaint are not defamatory. Williams claims eight of these sets (Nos. 1-7 and 10) are defamatory because they portray her accepting gifts from Sorokin. Compl. ¶¶31-57, 66-70. But it is not defamatory to accept gifts from a rich friend – unless those gifts constitute an illegal bribe in someone's workplace, which they clearly did not here. *Carey v. Carey*, 2022 WL 571412, at *9 (Sup. Ct. N.Y. Cty. 2022) ("[T]he mere loaning of money is not reasonably susceptible to a defamatory meaning."). Nor is it defamatory to state (as alleged in Nos. 1, 2, and 14) that, despite Williams' prior eagerness to socialize with Sorokin, she did not want to visit Sorokin in prison after Sorokin tried to take tens of thousands of dollars from Williams and was completely callous to the situation she had put Williams in. Rather than exposing her to contempt, it is entirely understandable why one would not want to visit someone who stole from them. Similarly, it is not defamatory for a 20-something to complain about her boss (as in No. 8) – who among us has not done that? *Attas v. Park E. Animal Hosp., Inc.*, 652 N.Y.S.2d 280, 281 (App. Div. 1997) (supervisor's statement that her differences of opinion with her employee "made it impossible . . . to continue her as an employee" is not defamatory). Finally, Williams complains that Statement Nos. 11-12 show her "lying" to her friends to conceal her role in Sorokin's arrest. Compl. ¶¶71-78. But the Series is clear she did so to assist with Sorokin's

prosecution, and lying "on behalf of her government" is not defamatory. *Bement v N.Y.P. Holdings*, 760 N.Y.S.2d 133, 137-38 (App. Div. 2003) (wrongly claiming former beauty queen "slept" with foreign officials and committed espionage is not defamatory as the "conduct amounted to a sacrifice for the good of her country").

Additionally, in the context of the Series as a whole, most of the statements Plaintiff has identified are preceded or followed by context that negate any defamatory meaning Plaintiff tries to ascribe to them.  For example:

- **2nd Set**: Episode 2 shows Neff expressing frustration to Kacy that Williams does not want to visit Sorokin in prison.  But Kacy, (who, as Williams admits is the "moral compass" of the show) responds that Williams "has her reasons" for not visiting Sorokin and adds that she too will not be visiting her – removing any inference that Williams' decision not to visit Sorokin was improper. Ex.4, Ep.2 at 29:10-31:15. Indeed, in the Series, Kacy would not even let Sorokin sleep on her couch when Sorokin had nowhere else to go. *Id.*, Ep. 6 at 52:45-54:10.

- **5th Set**: Episode 6 shows Williams suggesting that Sorokin book two suites at the Hotel, but ***Sorokin*** suggests they book "the private riad" instead so they have even more space. *Id.*, Ep. 6 at 6:17-6:42. While suggesting a rich heiress pay for two suites is not defamatory in the first place, the fact that Sorokin then decides on an even larger space negates any possible defamatory meaning.

- **6th Set**: Plaintiff claims Episode 6 shows Williams "pressuring Sorokin to 'treat' their group with a private tour of the private museum and garden . . . ." Compl. ¶¶50-51. This is inaccurate. The episode shows Williams talking excitedly about the garden, but not once does she ask Sorokin to cover that cost. Ex.4, Ep.6 at 31:38-33:00.

- **9th and 10th Sets**: Plaintiff alleges these scenes are defamatory because they show Williams "abandon[ing] Sorokin" in Morocco. That is not what happens. When "Noah" suggests to Williams they leave Morocco because it seems unsafe, Williams pushes back, not wanting to leave Sorokin. *Id.*, Ep.6

at 46:01-46:38. But the Series shows Sorokin wholly unconcerned and uncaring as guards seem to threaten Williams and watch her every move. *Id.* at 33:42-40:15. A reasonable viewer would not fault Williams or Noah for taking their safety seriously and ultimately choosing to leave. In this episode, Kacy also refers to Williams as "a real friend" and a "good person," further eliminating any defamatory meaning. *Id.* at 53:53-54:10. And, while Neff criticizes Williams for leaving, the journalist character (based on Pressler) defends her, asking: "But does a friend charge another friend's credit card without permission?" *Id.* at 54:39-54:45.

- **15th and 16th Sets**: The challenged scenes showing Williams' interactions with her employer over the charges on her Business Amex depict Williams in a sympathetic light – eager to rectify the financial situation, but also courageously protective of Sorokin and unwilling to automatically turn her in, even if it would help Williams' situation with her employer. *Id.*, Ep.7 at 14:30-15:03; 19:15-19:46; 45:34-46:30.

Because none of the statements are plausibly defamatory, they must be dismissed.

## II.    New York Does Not Recognize False Light.

Williams' false light claim fails because New York does not recognize that tort. *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *13 (S.D.N.Y. Sept. 29, 2018); *DeIuliis v. Engel*, 2021 WL 4443145, at *11 (S.D.N.Y. Sept. 27, 2021). A court sitting in diversity and applying New York law must dismiss the false light claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

Dated: November 4, 2022                    BARNES & THORNBURG LLP

                                         */s/  Thomas E. Hanson, Jr.*
                                         Thomas E. Hanson, Jr. (No. 4102)
                                         222 Delaware Avenue, Suite 1200
                                         Wilmington, DE 19801-1050
                                         Tel: 302-300-3474
                                         Fax: 302-300-3456
                                         Email:  Thanson@btlaw.com

                                         DAVIS WRIGHT TREMAINE LLP
                                         Rachel F. Strom (*pro hac vice*)
                                         Chelsea T. Kelly (*pro hac vice*)
                                         Lindsey B. Cherner (*pro hac vice*)
                                       1251 Sixth Avenue, 21st Floor
                                         New York, New York 10020
                                         Tel: 212-402-4069
                                         rachelstrom@dwt.com
                                         chelseakelly@dwt.com
                                         lindseycherner@dwt.com

                                         *Attorneys for Defendant Netflix, Inc.*

## <u>TYPEFACE REQUIREMENT, PAGE LIMITATION,</u>
## <u>AND WORD COUNT CERTIFICATION</u>

Pursuant to the Standing Order regarding briefing in all cases, I, Rachel F. Strom, counsel for Defendant, hereby certify that the text for this memorandum of law in support of Defendant's motion to dismiss uses 14-point font in Times New Roman. This filing also complies with the page and word limitations as set forth in this Court's Standing Order, and as supplemented by this Court's So-Ordered Stipulation (D.I. 13), granting the parties' request for a limited extension of 1,250 words for Defendant's motion to dismiss brief and Plaintiff's opposition brief thereto—for a total limit of 6,250 words. This brief complies with the Order, containing 24 pages double-spaced and 6,248 words, as counted by the word processing system used to prepare this motion.

*/s/ Rachel F. Strom*
Rachel F. Strom
