# EXHIBIT 3

1836

```
 1   SUPREME COURT OF THE STATE OF NEW YORK.
     COUNTY OF NEW YORK:  CRIMINAL TERM      PART 31
 2   ------------------------------------
     THE PEOPLE OF THE STATE OF NEW YORK
 3                                         IND. NO.
                                           2441/18
 4                   -against-

 5   A N N A   S O R O K I N, a.k.a.,
     A N N A   D E L V E Y,
 6
                 Defendant.
 7   ------------------------------------      TRIAL

 8                 111 Centre Street
                   New York, N.Y. 10013
 9

10                 April 17, 2019

11   B E F O R E:   HONORABLE DIANE KIESEL,
                    JUSTICE OF THE SUPREME COURT
12

13                   A P P E A R A N C E S

14   FOR THE PEOPLE:

15                 ROBERT M. MORGENTHAU, ESQ.,
                   District Attorney, New York County
16                 BY:  CATHERINE McCAW, ESQ.,
                   ALSO:  KAEGAN MAYS-WILLIAMS, ESQ.
17                 Assistant District Attorneys
                   ALSO:  Lotus Ho, New York County, TPA
18

19   FOR THE DEFENDANT:

20                 SPODEK LAW GROUP P.C.
                   85 Broad Street, 30th Floor
21                 New York, New York
                   BY:  TODD SPODEK, ESQ.
22

23

24

25
                         Denise Y. Taylor,
```

PROCEEDINGS                              1837

1           THE CLERK:  Case on trial continued.  All parties

2      are present.

3           THE COURT:  Good morning, Ms. Sorokin.

4           THE DEFENDANT:  Good morning.

5           THE COURT:  Good morning, counsel.

6           MR. SPODEK:  Good morning, your Honor.

7           THE COURT:  We can't bring the jury in through the

8      other room because the other judge is working.

9           Is there anything we need to discuss?

10          MS. MAYS-WILLIAMS:  Briefly, your Honor.  Today,

11     two things.

12          First, the People are going to read in the American

13     Express stipulation because part of the American Express

14     records are Rachel Williams' records, so we will ask to

15     publish the exhibits at a later date, but I need to be able

16     to publish Exhibit 28 and 29 during her testimony.  So,

17     that's the first thing we need to do.

18          The second issue, your Honor, and I just spoke with

19     defense counsel, is while I understand defense counsel is

20     going to inquire, during cross-examination, as to Ms.

21     Williams' book deal and her deal with H B O, Ms. Williams

22     has informed me, she has actually signed a nondisclosure

23     agreement, meaning that while she can say, of course, that

24     she has these deals and that she is, in fact, receiving

25     compensation, she is not permitted to disclose publicly the

                          Denise Y. Taylor,

PROCEEDINGS                                    1838

1    terms of that agreement, or the terms of her deal and, so,

2    I've just alerted Mr. Spodek to that information.

3         MR. SPODEK:  Your Honor, I did just find out about

4    it.  I asked the People to get a copy of the N D A,

5    nondisclosure, so I could view it, or at a minimum, have

6    your Honor in-camera make a determination, but it seems

7    material and relevant to be able to be asked about the

8    finances of the deal.

9         And there was communication with me, as I

10   represented Ms. Sorokin, which Ms. Williams was trying to

11   make a deal.  So, these are all relevant to her credibility,

12   her motivation, her potential bias, and I certainly would

13   want to be able to inquire about it.

14        MS. MAYS-WILLIAMS:  Your Honor, it's the People's

15   position, while Mr. Spodek is free to inquire about bias, as

16   to the fact that she does have a deal, I'm not sure how the

17   specific amount that she is being paid is relevant.

18        The second issue --

19        THE COURT:  If they are paying her $1,500 or a

20   million-and-a-half, I think there is, there is a big

21   difference there.  You don't think so?

22        MS. MAYS-WILLIAMS:  I understand.

23        THE COURT:  I understand that you need to make this

24   argument because you wanted to avoid humiliation and

25   possible embarrassment and difficulty for a witness, but I

                        Denise Y. Taylor,

1       think this is a relevant area for cross-examination and I

2       don't know, what's the nondisclosure?  I mean, what?

3                   MS. MAYS-WILLIAMS:  My understanding, your Honor --

4                   THE COURT:  What's the problem with disclosing?  I

5       really don't understand.

6                   MR. SPODEK:  It's not about the underlined project

7       or detail of who is involved and plots, or anything like

8       that.  It's strictly --

9                   THE COURT:  One, company doesn't want another

10      company to know how much they are paying her?  Is that

11      what's going on here?

12                  MS. MAYS-WILLIAMS:  I am not sure exactly the

13      reasons they asked her to sign this nondisclosure agreement,

14      but before Mr. Spodek will have an opportunity to

15      cross-examine the witness, can I ask for a brief recess

16      after her direct?  Not to speak to her, of course, about her

17      cross, but so that she can reach out to whoever she needs to

18      reach out to get that permission and give your Honor a copy

19      of the nondisclosure?

20                  THE COURT:  The fact of the matter is -- let's

21      think this through for a second.

22                  Is she here under subpoena?

23                  MS. MAYS-WILLIAMS:  I mean --

24                  THE COURT:  You don't subpoena every single

25      witness?  Every witness who gets called in to a court of law

                            Denise Y. Taylor,

PROCEEDINGS                                        1840

1   should be subpoenaed, quite frankly.  I don't know.  You

2   don't do that?  If she's here under subpoena, then I don't

3   know, she's got, she has to answer any lawful question.

4          MS. MAYS-WILLIAMS:  Your Honor, I just ask for --

5          THE COURT:  So, the answer is, I guess she is not

6   here under subpoena?

7          MS. MAYS-WILLIAMS:  Your Honor, I know that she's

8   received subpoenas during course of this case.  I am not

9   sure whether she's been specifically subpoenaed for this

10  day.

11         I just ask for a brief moment?  I assume there will

12  be a break between the direct and cross, just a brief moment

13  to give her the opportunity to reach out.  I know that the

14  court would like to start as soon as possible.

15         THE COURT:  We need to move the jurors through so

16  they are not out in the hall and then, we can continue this

17  discussion, okay.  So, why don't you have seats, everybody,

18  and let's get the jurors into the jury room and then we can

19  talk, okay.

20         COURT OFFICER:  Jury entering.

21         THE COURT:  Look, you can go out and talk to her,

22  but I don't, I'm not bound by what her publisher may be

23  saying to her about a nondisclosure agreement, and neither

24  is Mr. Spodek.  I mean, the way that I see that this should

25  go down is that she testifies on direct.  Mr. Spodek asks

                        Denise Y. Taylor,

PROCEEDINGS                                    1841

 1    her whatever he wants to that is relevant --

 2               MR. SPODEK:  Of course.

 3               THE COURT:  -- and material to the issue at hand,

 4    including her credibility.  He says, how much are you making

 5    on this deal, she says, I can't answer because there is a

 6    nondisclosure agreement, and either the jury is left with

 7    the idea that she may be trying to hide something, or Mr.

 8    Spodek asks me to direct her to answer, and we take it from

 9    there.

10               MR. SPODEK:  And your Honor, I would submit, she is

11    under subpoena because any subpoena she received earlier is

12    going to save for any recessed date, any adjourned court

13    date.  And in addition, the N D A does not override the

14    authority to explore these things.  It's not, it can't

15    override.

16               MS. MAYS-WILLIAMS:  Your Honor, I only ask for a

17    brief moment to give her an opportunity to reach out to the

18    entities, to alert them so that we don't put her in a

19    precarious position.  I understand the Court's ruling that

20    she is going to have to answer the questions.

21               THE COURT:  I don't know how my ruling is going to

22    happen in this case.  This happens a lot in this case, which

23    is, the objection is made at the time the incident comes up,

24    so you are kind of asking me to make a decision a little bit

25    out of context and I actually think that having her testify

                           Denise Y. Taylor,

PROCEEDINGS                    1842

1    on direct and then you telling her, you know, make a phone

2    call is almost too late.  We probably should resolve this

3    issue now if it's going to be problematic.

4            Maybe it is not problematic for her.  So yes, your

5    suggestion is a good one, but I suggest you talk to her now

6    before you put her on to give her enough time and, quite

7    frankly, to give me some time to think about what I am going

8    to do when the situation comes up because this is a new one

9    for me too, okay.

10           MS. MAYS-WILLIAMS:  And the second issue I wanted

11   to speak about, as defense counsel said, I do believe there

12   was a time during the pendency of this case where the

13   witness did reach out to Mr. Spodek.  It's the People's

14   position it would be improper questioning for the defense

15   attorney to speak about a conversation that only the two of

16   them were a part of, considering he's an officer of the

17   Court, should she find his recount of the situation

18   inaccurate.  She will be put in a very precarious position

19   to be, you know, it just seems very precarious to me, your

20   Honor.

21           THE COURT:  He's the one that's in the precarious

22   position because if she contradicts, he is making himself a

23   witness in this case and may be withdraw from this

24   proceeding.

25           MR. SPODEK:  It was a minimal conversation, but it

                         Denise Y. Taylor,

PROCEEDINGS                                         1843

1    was followed up by e-mail.  I will state that.

2              THE COURT:  And again, I don't know what this

3    conversation was about and I, again, it's sort of a

4    statement out of context.  So, I don't know what I am

5    precluding here.

6              Do you intend to ask her about a conversation you

7    had with her?

8              MR. SPODEK:  I do intend to ask that she reached

9    out to me for a particular purpose.  It's not so much about

10   the contents of the conversation, about why did she reach

11   out to me.

12             THE COURT:  And the purpose of all of this would be

13   to show a possible bias, a possible motive to be untruthful?

14   What does it show?

15             MR. SPODEK:  Well, judge, I had received a phone

16   call from Ms. Williams.  I then followed up, saying that I

17   don't represent you, you have no obligation to speak to me,

18   you called me, you'd like to speak to me?  And I said, if

19   you would like to help Ms. Sorokin, you should write a

20   letter of support to your Honor.  That's what I said.  I

21   said, if you'd like to help, this is what I ask you to do,

22   your choice, whether you do it or not.

23             I then received a call from an agent who said,

24   perhaps, they were working together, a letter could be

25   provided.

                          Denise Y. Taylor,

PROCEEDINGS                                    1844

1              THE COURT:  If who was working together?

2              MR. SPODEK:  Your Honor, I have the e-mail.

3              THE COURT:  Who is the "they?"

4              MR. SPODEK:  Ms. Williams was selling her story,

5       was going to collaborate with Ms. Sorokin, who is

6       incarcerated, and perhaps a letter could be provided.

7              That is in the e-mail.  I have it.  I have a copy

8       for the People, a copy for your Honor.

9              MS. MAYS-WILLIAMS:  Just to clarify, I have not

10      seen this e-mail and I would absolutely like to see it.

11             To clarify, is this a statement that the witness

12      made, or someone representing the witness made because I

13      think that's absolutely different.  It's improper for the

14      attorney to cross-examine the witness on something that

15      someone else said.

16             MR. SPODEK:  Well, it's an e-mail that she is a

17      part of.

18             THE COURT:  Who is "she?"  The witness?

19             MR. SPODEK:  The witness is a party to an e-mail

20      and says, speak to my agent, and the agency blah, blah,

21      blah.  She's on the e-mail.  I'm on the e-mail.  And again,

22      I could provide a copy to everybody.

23             MS. MAYS-WILLIAMS:  Can I at least see it?

24             MR. SPODEK:  Sure.

25             MS. MAYS-WILLIAMS:  Your Honor, I don't know if

                              Denise Y. Taylor,

PROCEEDINGS                                      1845

1    your Honor would like to see a copy of the e-mail.  So, what

2    I see in this copy --

3                    MR. SPODEK:  May I?

4                    THE COURT:  Do you want me to see it?

5                    MR. SPODEK:  I don't mind.  We don't have anything

6    to hide here.  We're friends.

7                    MS. MAYS-WILLIAMS:  You know, it appears to me, the

8    witness' representative made a representation as to the

9    conversation that Mr. Spodek had with the witness.  I think

10   it's more than fair for defense counsel to ask if that was

11   her understanding, but for her to be further cross-examined

12   after she says, if she says, yes, well then obviously it's

13   fair game, your Honor, but if she says, no, then I don't

14   think, again, that we can use the representative's words as

15   the witness' words.

16                   MR. SPODEK:  Not my intention, judge, but there is

17   a good faith basis for the line of questioning.

18                   THE COURT:  It seems there is a good faith basis

19   for the line of questioning.

20                   I am giving that back to Mr. Spodek.

21                   MS. MAYS-WILLIAMS:  Your Honor, at this time I will

22   step out and talk to the witness.

23                   THE COURT:  And look, again, I am happy to give you

24   time to talk to her before we get started.

25                   What's going to happen first here today?

                                 Denise Y. Taylor,

PROCEEDINGS                                    1846

1          MS. MAYS-WILLIAMS:  Rachel is going to testify this

2     morning.

3          MS. McCAW:  We have one further legal issue to

4     discuss with your Honor.

5          THE COURT:  Okay.  But the first thing is, you are

6     going to do your Amex stipulation.

7          You know, the last stipulation was, maybe you two

8     could edit down your stipulations.  The stipulation was

9     longer than the witness who testified.  Two lines, if

10    somebody stipulates, they do X and Y, yeah.

11         MS. McCAW:  I believe the last one was a chain of

12    custody.

13         THE COURT:  There was one that went on quite some

14    time.

15         MS. MAYS-WILLIAMS:  That would have been seven

16    witnesses.

17         MS. McCAW:  We narrowed it down.

18         THE COURT:  You put on the stipulation and then you

19    put on Ms. Williams, then you say you have another issue?

20         What is that?

21         MS. McCAW:  Yes, your Honor.  The final issue is

22    that when Ms. Williams was in conversations with the

23    defendant regarding the planning of this trip, at one point

24    in time, the defendant offered Ms. Williams, as a form of

25    payment, a debit card that was linked to a particular Chase

                         Denise Y. Taylor,

PROCEEDINGS                                 1847

1    account.  The Chase account, at that point in time when she

2    offered the debit card, had a zero balance in it.  So,

3    therefore, that is a fact the People would like to bring out

4    in order to establish that the offer of the credit card was

5    not a good faith offer of a credit card.  It was something

6    to deceive her.

7             The issue the People are having is, the defendant

8    shortly before offering this credit card to Ms. Williams,

9    had attempted to kite checks through this, and the People

10   had sought permission in their Molineux application to bring

11   out the fact she had kited checks, and your Honor did not

12   grant that request.

13            At this point in time, I have now attempted, you

14   know, in order to honor your Honor's ruling to redact the

15   information that would reveal that she had attempted to kite

16   checks through the account.  Unfortunately, in terms of the

17   particular way that the Chase records are arranged it's

18   impossible to show that there is a zero balance in the

19   account without also revealing the information that would

20   suggest that she had kited checks.  And I have provided a

21   copy of an unredacted version and the redacted version,

22   which I've also provided to defense counsel to illustrate to

23   your Honor what I am referring to.

24            THE COURT:  So, which one is which?

25            MS. McCAW:  Well, the one that has a big black mark

                         Denise Y. Taylor,

PROCEEDINGS                                1848

1      on the front.

2                THE COURT:  That's a good hint.  Okay.

3                MS. McCAW:  So, the issue, it's a lot of bank

4      statements, and I am sure your Honor is aware, will have

5      something along the lines of a side-by-side with the

6      attempted transactions in the account, a running balance, or

7      at the end of the day will have a daily balance in the

8      account, which I believe was the case with these records

9      before a closer examination.

10               Unfortunately, these particular records do not have

11     such a running tally of the balance, and as you can see from

12     the redacted version, basically in order to sanitize the

13     fact that there was check kiting that occurred in this

14     account, or attempted check kiting, if I show there was a

15     beginning balance on April 29th of $4.79, on April 29th, and

16     ending balance of zero on May 31st, that doesn't actually

17     say anything as to what the balance was on the date when

18     miss, when the defendant proffered the card to Ms. Williams.

19               THE COURT:  All right.  So, the deposits and

20     credits at $669,000, and settling, are the checks that get

21     deposited and then returned?

22               MS. McCAW:  Yes.

23               THE COURT:  And then, she's left what, a negative

24     $4,871 balance?

25               MS. McCAW:  I think that what ultimately happens

                              Denise Y. Taylor,

PROCEEDINGS                                  1849

1    here is the account was closed and, honestly, it's a

2    difficult record to understand.

3              I think that what happened is, you can see on

4    May 30th, that there was a reversal of overdrafts on the

5    deposits and C section.

6              THE COURT:  Yes.  I see that, but that's only for

7    $9,000.

8              MS. McCAW:  Yeah.  So, basically, if you look at

9    the deposits and credits, right, you see three checks worth

10   $660,000 going in.  Those are the first three items and

11   then, if you go to the third page of the statement you see

12   on May 3rd, and then two on May 8th, three deposited items

13   that were returned.

14             THE COURT:  Right.

15             MS. McCAW:  And so, without understanding the whole

16   picture here, it's hard to show that there was a zero

17   balance in the account, impossible to show there was a zero

18   balance in the account.

19             MR. SPODEK:  And your Honor, I would just submit

20   that the cards didn't go through.  She is going to testify

21   that the card didn't go through.  I am not sure of the issue

22   of showing a zero balance.  Ms. Williams was proffered the

23   card.

24             THE COURT:  It wasn't honored.

25             MS. McCAW:  The defendant, after Ms. Williams said

                         Denise Y. Taylor,

1    the card didn't go through, the defendant said she was on

2    the phone with Chase, that she was trying to clear it up.

3         Additionally, when they were in Morocco, the

4    witness realized the reason the card did not go through is

5    because she had neglected to tell her card company that she

6    was going to be traveling abroad.  In fact, the reason why

7    the card did not go through was because there was no money

8    in the account.

9         THE COURT:  Well, there is an interesting issue

10   here, Mr. Spodek, and that is, you know, there are plausible

11   explanations for why when you are abroad your card might not

12   go through.

13        MR. SPODEK:  They weren't abroad.  They were here.

14        MS. McCAW:  There were two times when she offered

15   excuses.  One, indeed, was when they were within the United

16   States, and then subsequently, she said that her cards were

17   not going through because they were abroad.

18        She also represented to Rachel that she was on the

19   phone with Chase, trying to clear up the issue with respect

20   to her card, when they were in the United States.  I mean, I

21   think that, that excuse also seems significantly less

22   plausible, I'm trying to work this through with Chase, when

23   understanding the particular issue was that she attempted to

24   commit a crime with respect to Chase, and that there was a

25   zero balance in the account.

                    Denise Y. Taylor,

PROCEEDINGS                              1851

1          MR. SPODEK:  She attempted to use her debit card.

2     That is not a crime in its own.  And regardless whether it

3     goes through or not, that's a determination for the bank.

4     As we've seen through witnesses, it went through and it was

5     prior to the trip.

6          THE COURT:  The problem here, I do understand the

7     People's concern.  Again, there are a number of legitimate

8     reasons why your credit card might not be honored, and the

9     People's position is that they got a bank statement which

10    indicates what they assert is the real reason the cards

11    didn't go through, which is that your client attempted to

12    deposit $600,000 in checks.

13         MR. SPODEK:  And your Honor ruled on that issue and

14    said it couldn't come out.

15         THE COURT:  I understand that.  And I said it

16    couldn't come out because that was not one of the crimes

17    charged.  I felt that it was overly prejudicial, but I also

18    can't allow there to be some type of argument, explicit or

19    implicit, based on what we know is not necessarily facts.

20         So, maybe you can stipulate to the fact that there

21    was no money in the account?  I mean, maybe there is a

22    stipulation you could both agree to that would, would be

23    fair to your client and, yet, would not put the People in

24    the position of having to prove something that both sides

25    know isn't necessarily fact.

                         Denise Y. Taylor,

PROCEEDINGS                                    1852

1          MR. SPODEK:  Your Honor, if the People are calling

2     the representative of Chase, that individual could testify

3     as to what the account balance was on a certain day.

4          MS. McCAW:  I believe that's hearsay, your Honor.

5     Without the business record, the business record is the

6     document.  The Chase representative has no independent

7     knowledge of what the balance in the account was through the

8     business record.

9          THE COURT:  Why can't a Chase representative

10    testify as to a record kept in the normal course of

11    business?

12         MR. SPODEK:  Of course.

13         MS. McCAW:  Without putting the business record

14    into evidence?

15         THE COURT:  Why can't you put the business record

16    into evidence?

17         MS. McCAW:  Well, we would put the business record

18    into evidence.

19         The issue is, this is the business record we would

20    put into evidence without the, with the redaction.  If we

21    put in the redacted copy of the business record that does

22    not show the fact there was a zero balance in the account,

23    if he wants to stipulate there was a zero balance in the

24    account --

25         THE COURT:  That's what I am suggesting.

Denise Y. Taylor,

PROCEEDINGS                            1853

1          MS. McCAW:  -- the People are satisfied.

2          MR. SPODEK:  Judge, can't the witness testify with

3     the business record, with the redaction, saying there was a

4     zero balance in the account?  They don't need to know about

5     the checks.  They could just testify to the balance, or they

6     could refresh the recollection with the document.

7          THE COURT:  Look, a stipulation is a voluntary

8     thing.  I am not going --

9          MR. SPODEK:  Judge, they've given me 10

10    stipulations.

11         THE COURT:  -- I am not going to force you.  I

12    never do.  I am not going to strong arm any party into

13    stipulating, but it seems to me that a witness gets on the

14    witness stand and testifies through business records and

15    says, there is a zero balance in the account, or stipulate

16    there is a zero balance in the account.  I mean, it doesn't

17    seem, to me, to be all that different, but maybe I am not

18    understanding.

19         It's your case, not mine, some strategy reasons why

20    you'd rather have the witness come in here, but it seems to

21    me, the fact there is a zero balance in the account, the

22    People have a right to have that fact presented to the jury.

23         I still think the check kiting situation is

24    somewhat prejudicial, which is why I didn't allow it, but I

25    am not going to allow there to be an impression, a false

                        Denise Y. Taylor,

PROCEEDINGS                                  1854

1    impression left with the jury that there was some legitimate

2    basis, if that's not the case.

3             MR. SPODEK:  Judge, they've heard from a number of

4    banks and financial institutions about these issues.  I

5    don't see, suddenly, testimony that she is calling the bank,

6    going to inject into them, which is this misunderstanding,

7    the narrative the People have provided through 20 plus days

8    of testimony, but I will speak to my client about the issue.

9             Judge, if we could have a few minutes?

10            THE COURT:  Of course.

11            MS. McCAW:  We can resolve it later, as well, your

12   Honor.

13            THE COURT:  All right.  So, what's the next thing

14   we are doing, besides just talking all morning?

15            MAYS-WILLIAMS:  Your Honor, I recommend that we

16   have the jury come in.  I'll read the stipulation, and Ms.

17   Williams is ready to testify.

18            Thank you for the opportunity to speak with her.  I

19   have spoken to her as to the nondisclosure agreement.

20            THE COURT:  I am not sure.  Did we resolve this?

21            MS. MAYS-WILLIAMS:  I mean, I told her that the

22   Court has said that he may be able to inquire and that she

23   has to answer the questions that are put before her, and she

24   is going to answer them to the best of her ability.

25            THE COURT:  All right.

                         Denise Y. Taylor,

PROCEEDINGS                                1855

1          MR. SPODEK:  I guess when she is under cross, if I

2     may need your Honor's intervention, I'll ask for it.

3          THE COURT:  You'll ask for it.

4          MS. MAYS-WILLIAMS:  She is more than willing to

5     answer the questions, if he asks.

6          THE COURT:  All right.  Are we ready to go?

7          MS. MAYS-WILLIAMS:  Yes.

8          THE COURT:  Oh, wait a minute, and then what?  Are

9     we finishing today?

10         MS. McCAW:  Finishing all of our witnesses today?

11         THE COURT:  Yeah.

12         MS. McCAW:  No, your Honor.

13         THE COURT:  Okay.

14         (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

15

16

17

18

19

20

21

22

23

24

25

Denise Y. Taylor,

Proceedings

1856

1          COURT OFFICER:  Jury entering.

2          (Whereupon, the jurors enter the courtroom and

3    the following occurred:)

4          THE CLERK:  Case on trial continued.  All parties

5    are present.  All jurors are present.

6          THE COURT:  Good morning.  Welcome back.  I hope

7    you had a nice day off.

8          Are you ready?

9          MS. MAYS-WILLIAMS:  Yes.

10         Your Honor, at this time the People are going to

11   read the Court Exhibit No. 30, the American Express

12   stipulation into the record.  And we would ask to publish

13   the exhibits at a later time.

14         THE COURT:  Okay.  This is People's 30, you said?

15         MS. MAYS-WILLIAMS:  Yes.

16         THE COURT:  And this these are stipulated

17   records?

18         MS. MAYS-WILLIAMS:  Yes, your Honor.

19         THE COURT:  Okay.

20         MS. MAYS-WILLIAMS:  It is hereby stipulated and

21   agreed by and between the parties, that if a representative

22   from American Express Company, AmEx, was called to testify,

23   the representatives testimony would be as follows:

24         No. One, I am an employee of AmEx and am familiar

25   with the recordkeeping practices of AmEx.

*C. Edwards*

Proceedings

1857

1   No. two, I have reviewed People's Exhibit 24, 25,

2   26 and 27, which contained records pertaining to American

3   Express credit card account held in the name Anna Delvey,

4   the account number 373909241071001.

5   Specifically, these exhibits contain the

6   following AmEx records.

7   A, People's Exhibit 24 contained nine pages of

8   accountholder's and billing information related to the

9   credit card account, page one, bates stamp PX01425,

10  entitled change cardholder data, reflects the cardholder's

11  name, address, telephone number and date of birth.

12  Page two, bates stamp PX01426 is entitled,

13  Plastic Creation Reason, shows that accountholder ordered a

14  physical credit card on June 7, 2017.

15  Page three, bates stamp PX01427, reflects the

16  account billing status as of August 8, 2017, including the

17  at account balance and payment due.

18  Pages four through nine entitled, the American

19  Express Charged Summary, bates stamp PX01428, through

20  PX01433 reflect all charges to the credit card from June 9,

21  2017 through June 26, 2017.

22  Each charge appears on a separate line which

23  includes the following information:

24  Date and time, the date and time of the credit

25  card charge, SE number, and SE name, the merchant

*C. Edwards*

Proceedings

1858

1   identifier, location, the address of record for the

2   merchant regardless of where the charge was made.  Mode

3   indicates swiped, if the physical card was used to make the

4   card or key, if the card information was made and only

5   entered by the merchant.  The amount, the charged amount;

6   resolution indicates whether the charge was approved,

7   declined or reversed.

8          No. 3, AmEx made and kept the record containing

9   in Exhibit 24 in the regular course of business.  And it

10  was the regular course of AmEx business to make such

11  records at the time of the recorded act, transaction,

12  occurrence or event or within a reasonable time thereafter.

13         The person who made the entries and recorded the

14  information was under a business duty to do so accurately.

15         No. 4, People's Exhibit 25 is a disk containing

16  audio recordings of calls to the AmEx customer service line

17  related to credit card account described above.

18         From June 9, 2017 through June 26, 2017, the

19  recording system is designed to fairly and accurately

20  capture the conversations being recorded.

21         The conversations recorded were recorded

22  automatically and simultaneously at the time they occurred,

23  and the recordings were maintained by AmEx and in the

24  regular course of its business.

25         The audio recording contain the entirety of the

*C. Edwards*

Proceedings

1859

1    conversations and have not been altered or modified in any

2    way.

3            No. five, People's Exhibit 26 contains 12 pages,

4    including a fax cover sheet bates stamp PX01434, through

5    PX01445.  The documents faxed to AmEx by the cardholder,

6    Anna Delvey, on May 30, 2017.

7            As proof of a assets is the afforded application

8    for the credit card.  These are exact copies of the

9    documents received by AmEx, which were maintained by AmEx

10   in the regular course of its business.

11           No. Six, People's Exhibit 27 contains two pages,

12   including a fax cover sheet bates stamp PX01446, through

13   PX01447, of documents faxed to AmEx by the account holder

14   Anna Delvey, on June 12, 2017.

15           And four page, including a fax cover sheet bates

16   stamp PX01448 through PX01451 of documents faxed to AmEx by

17   the account holder, Anna Delvey on January 15, 2017, which

18   were submitted to AmEx in support of the account holder's

19   request to remove a block that had been placed on the

20   credit record.

21           These are exact copies of the documents received

22   by AmEx, which were maintained by AmEx in the regular

23   course of its business.

24           I have also reviewed People's Exhibit 28 and 29,

25   which contained records pertaining to AmEx credit card in

                                                    *C. Edwards*

Proceedings

1860

1    the name of Rachel D. Williams, specifically these exhibits

2    contain the following AmEx records.

3           A, People's Exhibit 28 contains the monthly

4    account statement for the billing period, April 30, 2017

5    through May 29, 2017.

6           For credit card number 379626108559001, issued to

7    Rachel D. Williams on a corporate AmEx account.

8           B, People's Exhibit 29 contains monthly account

9    statements for the billing period April 14, 2017 through

10    June 13, 2017, for credit card number 376763945403003 held

11    by Rachel D. Williams.

12           No. Eight, AmEx represented the recording

13    contained in Exhibits 28 and 29, in the regular course of

14    its business.

15           And it was the regular course of AmEx business to

16    make such records at the time of the recorded exact

17    transaction or occurrence or event or within a reasonable

18    time thereafter.

19           The person who made the entries and recorded the

20    information was under a business duty to do so accurately.

21           The parties further stipulate and agree that

22    number one, the redacted materials in Exhibits 28 and 29

23    are not relevant and should not be considered by the jury.

24           And number two, the records contained in People's

25    Exhibit 24, 25, 26, 27, 28 and 29, will be entered into

*C. Edwards*

Williams - People - Direct/Mays-Williams

1861

1      evidence.

2                    So stipulated.  Dated April 17, 2017.

3                    All right.  At this time, your Honor, the People

4      call Rachel Williams to the stand.

5                    COURT OFFICER:  Witness entering.

6                    Ms. Williams, right this way, please.

7                    Be careful on the metal strips.

8                    Take the witness stand.  Remain standing.  Raise

9      your right hand.  Face the Court clerk.

10            RACHEL WILLIAMS, after having first been duly sworn

11     was examined and testified as follows:

12                   COURT OFFICER:  In a loud, and clear voice, for

13     the record, please state your name, spelling your last

14     name.

15                   THE WITNESS:  Rachel DeLoache Williams

16     D-E-L-O-A-C-H-E.

17                   COURT OFFICER:  County of residence?

18                   THE WITNESS:  New York.

19                   THE COURT:  Good morning, ma'am.  Welcome.

20     DIRECT EXAMINATION

21     BY MS. MAYS-WILLIAMS:

22        Q    Now, Ms. Williams, if you could put the microphone a

23     little closer to your mouth.

24                   Could you tell us what neighborhood do you live in?

25        A    I live in the West Village.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1862

1   Q   Are you originally from New York city?

2   A   I am not.

3   Q   Where are you from?

4   A   Knocksville, Tennessee.

5   Q   And who did you grow up with?

6   A   I grew up with my parents, my mother and my sister.

7   Q   Where did you go to college?

8   A   I went to Kenyon College.

9   Q   Where did you study there?

10  A   I double majored in English and Studio Arts.

11  Q   Did you engage in any internship while you were in

12  college?

13  A   During the summers, while I entered in New York City

14  at a photography agency and in the photo department of magazine.

15  Q   Which magazine?

16  A   Harper Bizarre.

17       THE COURT:  The acoustics are terrible in here.

18  You got to yell kind of, okay.

19       THE WITNESS:  Okay.

20  Q   Now, what year did you graduate from college?

21  A   I graduated in 2010.

22  Q   What did you do after you graduated from college?

23  A   I moved to New York City where I entered into for a PR

24  firm before, while looking for a job.

25  Q   What type of job were you looking for?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1863

1    A    I wanted to work specifically at Vanity Fair, that's

2    my goal or in the department of a magazine.

3    Q    Why did you want to work for Vanity Fair,

4    specifically?

5    A    I admired their journalism and the photography in that

6    magazine.  And it aligned nicely with what I studied in school.

7    I am passionate about writing and about visual art.

8    Q    Now, how long did it take you to find a job after you

9    moved to New York City?

10    A    Three months.

11    Q    Could you tell us where did you end up working?

12    A    At Vanity Fair.

13    Q    Could you tell us how you ended up getting that job?

14    A    It was in combination of lucky timing and hard work.

15    I had wanted to enter in there while I was still in

16    college, and I had picked a name off the map tab, the magazine

17    where they list the name.  I picked the name of a senior

18    photographer producer and I figured out how to send her an email

19    expressing my interest, and how much I wanted to enter in there.

20    And, she responded, she liked my letter.  She tried to

21    help me, but the internship for that summer was full.

22    Anyway, after I moved to New York, after I graduated,

23    I got an informational interview, just by asking if I could come

24    in to ask some questions to learn more and to meet someone

25    there.

C. Edwards

Williams - People - Direct/Mays-Williams

1864

1    The woman I met with liked me, wanted me to come meet
2  with Human Resources.  There weren't any jobs available at the
3  time.  But two weeks went by and my meeting with HR wasn't being
4  scheduled, and I just decided it was time to follow-up.

5    So I sent a handwritten note, forget me not, with like
6  this kind of durkie poems and a box of tea.

7    And at the bottom I said, if any opportunities arise,
8  please keep me in mind.  And it just so happened an assistant
9  position had opened up with the woman, who I had emails the year
10 before, who remembered my letter.

11   So I came in and interviewed the next day and I
12 started the day after that.

13   Q    And when you started with Vanity Fair, what was your
14 position?

15   A    I was assistant to the senior photography producer.

16   Q    What was some of your duties and responsibilities in
17 that role?

18   A    A lot.  It was a lot.  I got thrown in deep and kind
19 of had to figure it out fast.

20   My responsibilities included booking cars, booking
21 travel, booking caterers, booking hair and makeup artist,
22 booking locations, making calls shoots, so everybody knew where
23 to be when, making sure everybody had what they needed.
24 Creating budgets, processing invoices, kind of the nitty-gritty
25 stuff.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1865

1    Q    Now, could you tell us what was some of the most

2  interesting assignments that you had during your time at Vanity

3  Fair?

4    A    Every assignment was interesting for different

5  reasons, some of the most memorable or interesting, I guess,

6  would be putting together the logistics and travel and Visa if

7  they needed to go to Havana for any eve event.   To photograph

8  Rihanna.  I worked, I worked in Northern Island with the cast of

9  Game of Thrones.  It was interesting.  It was interesting.  And

10  Bruce Springsteen in Paris.  Lady Gaga in New York.

11    Q    Now, outside of your career, you have any time for

12  social life?

13    A    I do some, yes.  I do.

14    Q    And what is it that you do for fun?

15    A    When I see my friends who live in New York, we usually

16  go out to eat or go out for drinks.

17    Q    Now, do you have a particular social group that you

18  hang out with?

19    A    Today?

20    Q    Yes, today.

21    A    Yes, I do.  I have a few close friends, most of my

22  best friends don't live in New York, but, yes.

23    Q    Now, directing your attention to 2016, did you hang

24  out with a different social group at that time?

25    A    I did.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1866

1    Q     And could you tell us who made up your social group

2  during that time period?

3    A     During that time period, they were girls that mostly

4  worked in various fashion-related positions, via a fashion

5  writer or a publicist for a fashion company in the PR world.

6    Q     Now, did there come a time that you met with a woman

7  who went by the name of Anna Delvey?

8    A     There did.

9    Q     And when did you meet her?

10   A     I met her in February of 2016.

11   Q     How did you meet?

12   A     One night when I was out with friends.

13   Q     And how did she introduce herself to you?

14   A     As Anna Delvey.

15   Q     Now, are the two of you still friends?

16   A     We are not.

17   Q     How long were the two of you friends?

18   A     Roughly a year and a half.

19   Q     Now, when you were friends, how much time did you

20  spend together?

21   A     Until 2016, some.  I am sorry.  Some, like I said, a

22  bit of time together in 2016, not everyday, but then she went

23  away, came back in 2017, and for several months I saw her very

24  frequently at times, almost daily.

25   Q     Now, if you were able to see your former friend again,

*C. Edwards*

Williams - People - Direct/Mays-Williams

1867

1  you think you might recognize her?

2      A    I would.

3      Q    I would like you to look around the courtroom, if you

4  see her, please point to her and identify an article of clothing

5  that she's wearing?

6      A    Right there wearing glasses.

7              MS. MAYS-WILLIAMS:  Your Honor, let the record

8      reflect that the witness has identified the defendant.

9              THE COURT:  The record will so reflect.

10     Q    Now, could you please explain to the members of the

11 jury how your friendship with the defendant began to grow?

12     A    When Anna came back from away, wherever she was in

13 early or February of 2017, she checked into 11 Howard, which is

14 a hotel roughly 15 minutes walking from where I lived.  And the

15 day she arrived, she invited me to lunch.

16             So I met her then and moving forward from that point

17 in time, when she was in touch with me very regularly, asking if

18 I wanted to hang out, if I wanted to come by, and our friendship

19 intensified during that period of time.

20     Q    And what types of things did you two do together for

21 fun?

22     A    We would work out together.  We would go to the

23 infrared sauna together.  We would sometimes get pedicures.  We

24 would eat dinner, drink.

25     Q    Could you tell us what an infrared sauna is?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1868

1       A     It was new to me at the time too.

2             The one we went to was in this like the basement of

3    this place on the east village.  It sounds like a spa treatment.

4    I guess it is.  You walk in.  It's like you go into this sort of

5    cubical, like private room, and there is a wooden box that's

6    kind of like a microwave.  And two people can sit in this, sit

7    in it together.  They have different color lights.  You plug in

8    your phone and listen to music.  It's supposed to make you sweat

9    and detox and maybe lose calories.

10      Q     So, would the defendant and you sit in this box

11   together?

12      A     We sat in the box together and listened to music

13   mutually, yes.

14      Q     And you mentioned that you worked out together.  Could

15   you tell us a little bit about that?

16      A     Initially, I think that from that first night, Anna

17   mentioned she wanted to try working out with, with this APP,

18   True Fit, which I don't think exist anymore.  But allowed you to

19   request a personal trainer to come to you, kind of like you

20   would on Uber.

21            So one of the, maybe like two days after, I saw her

22   for lunch.  She had arranged that so a trainer would come to the

23   hotel.  And I met her there.  And we would workout in an empty

24   guess room with a personal trainer there.  And we worked out

25   with him for a few times, maybe two or three times after that.

C. Edwards

Williams - People - Direct/Mays-Williams

1869

1    Q    And in addition to using this True Fit APP, did you

2   have any other workout dates?

3    A    We did.  I went on a work trip and while I was gone,

4   Anna started seeing a celebrity fitness trainer named Kacy Duke

5   and she invited me to join her when I got back.

6         And we started going -- at first I thought it was

7   going to be that first time.  And then I, I got to learn a few

8   things, I could do it by myself.  But after that, she invited me

9   to join them more regularly, which, yes, I did.

10    Q    Now, you also mentioned that you would eat together.

11   What type of places would you go to eat?

12    A    At the beginning of our friendship, it was like a

13   place like LaMoo, L-A-M-O-O, West Broadway, just kind of a

14   restaurant.  We went to Blue Rubin Sushi once.  But as we became

15   closer friends, Anna generally stayed within 11 Howard.  So we

16   ate on the second floor in this place called The Library or we

17   went to the La Cou Cou, which was on the ground floor, which is,

18   which is a fantasy French restaurant?

19    Q    Now, could you tell us a little bit more about La Cou

20   Cou.

21    A    It's hard to get a reservation.  It's got white table

22   cloths on every table.  The waiters are wearing really starch

23   shirts.  It's where you would go for a special occasion, where I

24   could go for a special occasion.  It's expensive.  The food is

25   rich, like buttery.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1870

1    Q    Now, when you all would do these things together,

2   would you pay for yourself individually?  How would you guys pay

3   for these activities?

4    A    At the beginning of our friendship, it kind of went

5   back and forth, like whoever made the books.  A lot of what we

6   did was booked through APPS.  Whoever made the booking would

7   pay.  But as our relationship progressed, which happened

8   quickly, Anna would pay for everything within 11 Howard

9   including the La Cou Cou, and Kacy Duke.

10   Q    Now, how would the defendant pay for Kacy Duke, you

11  recall?

12   A    I was never made aware of how she paid for Kacy Duke.

13  I am not sure.  It was always arranged in advance.

14   Q    And how would she pay for your decadent dinners at the

15  La Cou Cou?

16   A    It was charged to her.  It was charged to her room at

17  11 Howard.

18   Q    And when you went to the library, how did the

19  defendant pay for that?

20   A    It was also charged to her room.

21   Q    Now, spending some time at 11 Howard, did you ever

22  leave the hotel and get drinks with other members of the 11

23  Howard staff?

24   A    We did on several occasions.  We especially, Anna had

25  become friends with the staff that worked at 11 Howard and times

*C. Edwards*

Williams - People - Direct/Mays-Williams

1871

1   we go out with drinks for, with them after their shift.

2        There was a few times where we would go somewhere

3   nearby and Anna would offer to buy everybody a round of drinks.

4   And then she had her hotel key but not her credit or debit card

5   and she would discretely ask me to cover the cost and saying she

6   would pay me back, which she never did, which I also never asked

7   because she was so generous in other places, that it never felt

8   appropriate.

9        Q    Now, how much were workouts at Kacy Duke?

10       A    I believe they are $300 per session.

11       Q    Now, did you ever offer to pay, to pay for the

12   dinners, the workout or anything like that?

13       A    I will start with the workout for Kacy Duke.  No, I've

14   never offered to pay.  This was not something I could have

15   afforded.  It wasn't something I would have sought out

16   individually.

17       It was, I would definitely like to be there.  It was

18   fun.  I enjoyed working out with Kacy and with Anna.

19       As for the dinners at first, like, any remote person,

20   I pulled out my card to pay, but Anna pushed it away and said,

21   you work harder for your money than I do.  And I am paying,

22   which I was grateful.  I accepted and she was very generous.

23       Q    Now, why did you allow your friend to pay for all

24   these things for you?

25       A    I understood from Anna that, that she came from family

*C. Edwards*

Williams – People – Direct/Mays-Williams

1872

1   money, and she made it seem as though it is easy for her to make

2   that gesture, and I work really hard.  I don't have a lot of

3   money, and I accepted the gesture, and was grateful and thought,

4   and thought that was okay.

5        Q    Now, what was your understanding of what the defendant

6   did for a living?

7        A    I believe that she was working on an art foundation.

8        Q    And did you have any sense of whether that foundation

9   generated any income?

10       A    I don't believe it did.  I did not believe, no.  I

11   didn't believe it generated any income.  I thought it was still

12   in the planning stages.

13       Q    And how did you think that she had the wherewithal to

14   pay for all these activities that you participated in?

15       A    She told me that she had a trust fund and received

16   money through disbursements.

17       Q    Directing your attention to April, 2017, did you and

18   the defendant discuss going on vacation together?

19       A    We did.

20       Q    Now, could you just explain the context of that

21   conversation to the jury?

22       A    Anna said that she needed to leave the United States

23   to reset her Esta Visa and instead of running back home to

24   Germany, she wanted to take a trip somewhere warm.

25       Q    And where did you all ultimately decide to go?

                                              C. Edwards

Williams - People - Direct/Mays-Williams

1873

1     A     To Marrakech.

2     Q     And Marrakech is in Morocco?

3     A     Yes, it is.

4     Q     Now, did you two discuss who would pay for that trip?

5     A     Yes, we did.

6     Q     And what did you discuss?

7     A     Anna said that she would be paying for the trip.

8     Q     Now, why did you even offer, allow her to offer to pay

9  for the trip, or allow her to pay for the trip?

10    A     Well, when it started, initially we considered going

11 other places.  And I did think that I would be booking my own

12 airfare, when I asked her.  We even picked out flights.  When I

13 asked her should I book it.  She said, no, I will book

14 everyone's.

15          And then the place that she decided she wanted to go

16 was the most, one of the most expensive hotels in the world.

17          So at that point, it was clear that Anna was going to

18 be paying for the trip, and I let her, because it sounded like a

19 wonderful opportunity, it sounded great.

20    Q     Now, I am showing you what's been marked for

21 identification as People's 38.

22          Do you recognize the contents of this binder?

23    A     I do.

24    Q     Could you tell the members of the jury what's inside

25 the binder?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1874

1    A    Text messages between myself and Anna, email exchanges

2  between Anna and myself, the photographs from Morocco, receipts.

3              (Whereupon, the following was recorded by

4    Official Court Reporter Denise Taylor:)

5                    *              *              *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*C. Edwards*

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1875

1      Q      Now, are those all fair and accurate copies of e-mails,

2   their attachments, receipts and photographs that you acquired

3   during this time period?

4      A      They are.

5      Q      Do the e-mails fairly and accurately reflect your

6   communication with the defendant?

7      A      They do.

8             MS. MAYS-WILLIAMS:  Your Honor, at this time the

9   People offer People's 38 for identification into evidence?

10            MR. SPODEK:  No objection, your Honor.

11            THE COURT:  People's 38 in evidence.

12     Q      Now, directing your attention to P X 2362 -- at the

13   bottom of the page there are little red numbers.

14      Specifically April 6, 2017, at 11:58 p.m., did you receive

15   an e-mail from the defendant?

16     A      I did.

17     Q      Okay.  And what did that e-mail say?

18     A      It says "La Mamounia reservation" It's a confirmation

19   e-mail from the hotel in Marrakech.  It says, "Dear Ms. Anna

20   Delvey, thank you for your reservation.  We look forward to

21   welcoming you and making your stay with us unforgettable.  Below

22   you will find the details of your booking.  Please review these

23   carefully and do not hesitate to contact us for any changes or

24   additions that you may wish."

25     Q      What is the first name listed on this reservation?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1876

1    A    Anna.

2    Q    And the last name?

3    A    Delvey.

4    Q    The arrival date?

5    A    April 29th 2017.

6    Q    And the departure date?

7    A    May 3rd 2017.

8    Q    The number of adults?

9    A    Four.

10   Q    Now, were you and the defendant planning on going on

11   this vacation with other people?

12   A    Anna wanted to invite a videographer on the trip, as

13   well as a personal trainer.

14   Q    Did she explain why she wanted to do that?

15   A    She wanted to the videographer because she was thinking

16   about making a documentary regarding the creation of her art

17   foundation, and she wanted to see what it was like to have

18   someone around with a video camera, and she also thought it

19   would be fun to have video footage from the trip.  And as far as

20   the personal trainer, she wanted to workout while we were there.

21   Q    Now, did she --

22        THE COURT:  We are just discussing raising the

23        microphone so we can hear the witness a little more -- not

24        raising.

25        THE WITNESS:  The volume?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1877

1          THE COURT:  Let's try it, okay.  I'm sorry to

2      interrupt you.

3          MS. MAYS-WILLIAMS:  That's fine.

4      Q    Could you please read the room description for the

5  members of the jury?

6      A    "Re:  At each riad provides an atmospheric view with

7  sophistication and the.  In the height of the wonderful gardens.

8  Their size 700 square meters, king size bed with twin beds,

9  three bedrooms and two living rooms, a marble bathroom.  And all

10 are completed with a Moroccan-style walk-in shower.  Wifi

11 offered.  Complimentary welcoming cocktail, local delicacy and

12 butler service."

13     Q    Okay.  Could you please read the rate description for

14 the members of the jury?

15     A    "Best available suites and villas.  Best available rate

16 includes fact and service charge.  Rate also includes a

17 refreshing drink on arrival and special a man advertise on

18 turndown each evening.  Local taxes not included.  Early

19 departure and no show are invoiced 100 percent."

20     Q    What is the room price?

21     A    "30030000 Moroccan Dirhams."

22     Q    Now, at the time did you know what the conversion was?

23     A    I believe it's roughly, like I think that would be

24 $33,000 U S dollars, actually.

25     Q    Now, directing your attention toward the bottom of the

1    page, who is the credit card owner?

2        A    Anna Delvey.

3        Q    And the credit card type?

4        A    Master Card.

5        Q    And what is the bulk, the total of the booking, excuse

6    me?

7        A    $330,792 M A D.

8        Q    Now, what was your understanding of why the defendant

9    forwarded you this e-mail?

10       A    To show that she had confirmed the villa and had paid

11   for it.

12       Q    Now, directing your attention to P X 2371 through P X

13   2374, could you tell the members of the jury what they are

14   looking at here?

15       A    It's a second confirmation e-mail from Hotel La

16   Mamounia.

17       Q    Now, do you understand, can you please tell the members

18   of the jury why there is a second confirmation?

19       A    The dates of our trip shifted because the videographer

20   who was originally meant to come wasn't available the first set

21   of dates, so it shifted back.

22       Q    And what was your understanding of the date that you

23   would leave for Morocco?

24       A    May the 12th 2017.

25       Q    And directing your attention to P X 02372, could you

1   please tell us the arrival date?

2       A    May 13th 2017.

3       Q    And the departure date?

4       A    May 19th 2017.

5       Q    And directing your attention to P X 2373, what is the

6   total amount?

7       A    "426,188 M A D."

8       Q    What is M A D stands for?

9       A    Moroccan Dirham.

10      Q    And roughly, what is your understanding of the U S

11  equivalency in dollars?

12      A    I believe that's roughly $42,618.

13      Q    Now, directing your attention to P X 2378, specifically

14  May 10th 2017, at 10:09 a.m., did you send an e-mail to the

15  defendant?

16      A    I did.

17      Q    Okay.  And what did you say in your e-mail?

18      A    "Scan attached.  Let me know if I can help with

19  anything.  Thank you, Anna.  I am so excited, X X X.  P S,

20  ignore my awesome passport photo, and a no smiley face."

21      Q    Did the defendant respond to your e-mail?

22      A    She did.

23      Q    What did she say?

24      A    "Got it.  Thanks."

25      Q    Now, why did you send the defendant an image or a copy

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1880

1    of your passport?

2        A    Because she was going to be, I believed she was going

3    to be booking all of the flights for the travelers.

4        Q    Now, you testified a moment ago that you were supposed

5    to leave on May 12th.  Had your tickets not been booked yet?

6        A    They had not.

7        Q    Okay.  Now, directing your attention to P X 2380

8    through 2385, specifically May 12th 2017, at 8:04 a.m.

9    through 2:06 p.m., did you exchange text messages with the

10   defendant?

11       A    I did.

12       Q    Okay.  Now, if you could please start at 8:04 a.m. and

13   let the jury know when you are changing speakers, please read

14   those text messages to us?

15       A    So, I begin, "Hi, A.  I don't see that late flight

16   anymore.  We could leave tomorrow if getting on today is too

17   stressful.  I do think people are slightly anxious about knowing

18   the plan slash flights being ticketed."

19        The next text is an image file that contains a flight

20   option.  For this option night, and then another image file that

21   contains a flight option.

22        Anna respond, "Okay, let me check.  9 p.m. one is fine

23   too."

24        Then I say, "I think it will be hard for Jesse to make that

25   one, but if he needs to, you should let him know, or I can.

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1881

1   Only because I know he's on set today and will need to leave

2   early."

3       Anna says, "Getting a call back from flight people.

4   There's 11:25 p.m. available."

5       I say "Cool."  I say, "Shall we do it?"

6       She says, "Only economy, though."

7       I say, "Up to you.  Whatever you think.  Going to try to

8   sleep the whole way."

9       Anna sends a flight screen shot and then another flight

10  screen shot.

11      I say "It looks good to me."  And then, I am not sure what

12  made me think of an emoji that is missing.

13      Anna says, "Will need to change the pick up from airport as

14  well.  Just did."

15      I respond "Good call.  I'm so excited."

16      I'm sorry.  I don't know how far I'm supposed to go?

17  Q    Keep going.

18  A    Okay.  Anna says, "You busy?"

19      I say, "I can talk."

20      She says, "I get interrupted all the time and about to get

21  into meeting.  Could you finish our flights booking.  Just one

22  way economy for everyone."

23  Q    Okay.  I'll stop you for just one moment.

24      What was your understanding of what the defendant was

25  asking you to do?

1      A     I understood that she was asking for my help to finish

2    booking, or to book, I guess the flights for our group because

3    she was stuck in meetings.

4      Q     Please continue?

5      A     "With what card?"  I say, "She sent me an image file of

6    a, I can't -- a debit card, front and back."  I reply, "Do you

7    have Kacy D O B, meaning, date of birth.  Never mind, I can text

8    her."  Anna says, "I have it."  I say, "K, yes, I now need to

9    help, just forward me Kacy and your info."  She sends me her

10   passport.  I respond "I have guests."

11     Q     When you say she sent you her passport, whose passport

12   did she just send you?

13     A     Oh, I'm sorry.  That's Kacy's.  It's very small.  I say

14   "I have Jesse's."  And then she sent me her passport.

15     Q     I'll stop you right there.

16      When the defendant sent you her passport, what if any

17   questions did you have for her at the time?  Well, you know,

18   what, why don't you continue reading.

19     A     Anna says, "They left out Delvey on my he is that, so

20   maybe just leave it out on the ticket as well.  Billing is 11

21   Howard Street, 10013, New York."  I replied, "Got it, booking

22   now."  Anna says, "Thanks.  It kicks me off the site after one

23   minute."  I say, do you have Kacy's e-mail address."  Anna says,

24   "No." I reply, "Hi, Anna.  Card was declined.  Can you call bank

25   to authorize the charge?"  Anna says, "Will do."  I say, "Text

1  me when done because he asked me to call him back once

2  authorized.  Sorry for the hassle."  Anna says, "I'm on phone

3  with bank."  I say, "K" Anna says, "They say they will call me

4  back once the block is lifted and I need to raise my limits

5  since La Mamounia preauthorized today as well."

6        Q    What was your understanding what she means when she

7  said, La Mamounia was preauthorized today as well?

8        A    I understood that it meant that maybe the total I had

9  seen in the e-mail had been taken from her card, or

10  preauthorized on her, the card, that she paid for that on the

11  same account, I guess.

12        Q    Continue please.

13        A    Anna says, "Airline people calling me saying they are

14  leaving in 10."  I reply, "Should I put on my card and you pay

15  me back?  Or, I said pack.  I meant back."  Anna says, "Only if

16  that's okay for you.  You can invoice me for everything and I'll

17  wire on Monday."  I say, "As long as you can pay me back next

18  week.  I'm on the phone with him now.  He is running my card.

19  All set."  Anna says, "Thanks.  Just canceled on my res with 11

20  Howard."  I say, "Fuck them."

21        Q    Okay.

22              THE COURT:  She'll stop you there.

23        Q    You can stop right there.

24         Now, did the defendant discuss with you why she wanted to

25  book only a one-way-flight to Morocco?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1884

1        A    She said that she would take care of the return flight

2   later.  I understood because she wanted increased flexibility on

3   the return travel just to leave it open because it might change.

4        Q    Now, you understood it to mean flexibility for her

5   return ticket.  Did she explain why she was not going to book a

6   roundtrip ticket, or the trainer and the videographer?

7        A    No.

8        Q    Now, what date -- so, now directing your attention to

9   P X 2386, specifically May 12th 2017, at 2:00 p.m., did the

10  defendant forward an e-mail to you?

11       A    She did.

12       Q    Okay.  Can you tell us, can you tell us about this

13  e-mail?

14       A    It is her credit card receipt from the flight bookings,

15  including confirmation information.

16       Q    Now, considering you are the one that booked the

17  flights?  Why were these tickets sent to the defendant's e-mail

18  address?

19       A    I book travel for people a lot through work and I was

20  streamlining it, but I still thought she should be the one who

21  received the receipts and information and she was the one

22  responsible for the bookings.

23       Q    Now, directing your attention to P X 2391 and 2392, did

24  the defendant send you another e-mail?

25       A    She did.

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1885

1      Q    What did this e-mail contain?

2      A    It's another confirmation, but attached to it were the

3   tickets, the four tickets.

4      Q    And this ticket was for you?

5      A    For all four travelers.

6      Q    For all four travelers?

7       Okay.  Now, directing your attention to P X 2399, at

8   5:02 p.m., did you send the defendant an e-mail?

9      A    2399?

10     Q    Yes.

11     A    I did.

12     Q    Okay.  What did you say?

13     A    I said "Hi, A.  Total charged $4,513.76 U S dollars,

14  J P Morgan Chase, Rachel D. Williams" with my bank routing and

15  bank account number.

16     Q    Did the defendant respond to your e-mail?

17     A    She did.

18     Q    What did she say?

19     A    "Got it."

20     Q    Okay.  And why did you send this e-mail to the

21  defendant?  What was the purpose?

22     A    So she can wire reimbursement for the flights.

23     Q    Now, directing your attention to the same page,

24  specifically May 12th 2017, at 5:23 p.m. -- sorry.  Excuse me.

25  We've already discussed that.

```
 1       Now, did you and the defendant discuss logistics of getting
 2   to the airport?
 3       A    We did.
 4       Q    And did you end up going to the airport together?
 5       A    We did.
 6       Q    Okay.  And what were those logistics?
 7       A    I was supposed to meet her at 11 Howard to pick her up
 8   at a certain time, and I arrived in an Uber.  When I got there
 9   she was out finishing, I guess, a blow out, just getting her
10   hair done, and she wasn't back yet, so she said, go ahead and
11   I'll get the big car.  She needed to move all of her belongings
12   from 11 Howard where she was no longer going to be staying to
13   the Mercer, where she was going to be staying when we got back,
14   but I was nervous about time.  So, I said, let's just stay in my
15   car, it's big, it would be fine, thinking that she would be back
16   soon.  She wasn't.
17       She asked me to help pack her stuff, asked the doorman to
18   pack her stuff into the trunk.  So, we got the car loaded and
19   then she appeared and we got in the car and drove to the Mercer
20   where she offloading the stuff she wasn't bringing to Morocco,
21   and then we drove to J F K from there.
22       Q    Now, directing your attention to May 12th 2017, P X
23   2405, did you receive an e-mail from Uber containing the cost of
24   the ride to the airport?
25       A    I did.
```

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1887

1    Q    Okay.  And what was the total cost of the ride to the
2  airport?
3    A    $154.40 cents.
4    Q    Does it typically cost you that much to take an Uber
5  from the airport from your apartment?
6    A    No, it doesn't.
7    Q    How much does it typically cost?
8    A    Probably like 70, 70 bucks, 80 bucks.
9    Q    What is your understanding of why it cost so much more?
10   A    It was quite a lot of -- well, a fair amount of wait
11 time both at the 11, well, mostly at 11 Howard, and then we had
12 to make the tour to the Mercer, to head toward the airport.
13   Q    Okay.  In addition to waiting for the defendant to
14 finish getting her hair done and going to the Mercer, about how
15 long would you say you waited before you actually took off for
16 the airport?
17   A    Maybe 45 minutes, half an hour.
18   Q    Now, considering you did the defendant this favor, did
19 she say that she planned to take care of this bill, as well?
20   A    She did.
21   Q    Now, directing your attention to when you finally
22 arrived at the airport, could you please describe what happened
23 once you arrived to the airport?
24   A    When we arrived, Kacy, the personal trainer had already
25 gone through security inside the gate.  The videographer, whose

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1888

1    name was Jesse, was waiting for us just inside, so Anna and I

2    waited in line to check in with him.  I went ahead first to

3    check in my bags and when I finished, I saw that Anna and Jesse

4    were checking in together, but there seemed to be some kind of

5    an issue, so I walked over to see what was happening and

6    discovered that Anna had accidently checked her wallet and Jesse

7    was traveling with photo equipment that needed to be checked and

8    Jesse was a freelancer, he was expecting Anna to cover his

9    expenses from the get-go.  Anna said, since I already owe you

10   money, will you just take care of this and add it to the card

11   and flights, so I did.

12       Q    Now, directing your attention to P X 2407, can you tell

13   the members of the jury what they are looking at here?

14       A    This is a receipt from one of the pieces of checked

15   equipment, checked baggage.

16       Q    And what is the total cost of that checked bag?

17       A    "$81.53."

18       Q    And directing your attention to P X 02408, could you

19   tell the members of the jury what they are looking at here?

20       A    This is another receipt for an additional checked bag.

21       Q    And how much, what was the total here?

22       A    "$120."

23            MS. MAYS-WILLIAMS:  Now, your Honor, if the jury

24       needs a break, this is a good time.

25            THE COURT:  This is a good place?

```
 1              Okay, ladies and gentlemen, we are going to take
 2       our morning recess.  Please don't discuss the case.  Follow
 3       the court officer.
 4              If I can ask you to step off the stand and step
 5       outside?
 6              Thank you.  Just don't trip.
 7              All right.  Anybody need a break?
 8              (PAUSE)
 9              THE CLERK:  Case on trial.  All parties are
10       present.
11              THE COURT:  Are you ready to bring in the jury?
12       Any issues?
13              Witness first, please.
14              COURT OFFICER:  Witness entering.
15              Jurors entering.
16              THE CLERK:  Case on trial continued.  All parties
17       are present.
18              The witness will be reminded that she is still
19       under oath.
20       Q    All right.  Before the break, you were testifying about
21  your time in the airport with the defendant and the two other
22  people.  Did there come a time that you had dinner at the
23  airport?
24       A    There did.
25       Q    Now, directing your attention to P X 2409, can you tell
```

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1890

1    the members of the jury what they are looking at here?

2         A    This is a receipt from a sushi restaurant in J F K.

3         Q    And who paid for the sushi dinner for everyone?

4         A    I did.

5         Q    And how much did it cost?

6         A    "$111.09 cents."

7         Q    Now, was there a layover during the trip to Morocco?

8         A    There was.

9         Q    Where was the layover?

10        A    Lisbon, Portugal.

11        Q    Did you eat there too?

12        A    We did, with also a 6 to 8 hour layover.

13        Q    Did you pay for everyone's food there as well?

14        A    I did.

15        Q    Okay.  Now, do you recall how much you paid for that?

16        A    Roughly $80 total.

17        Q    Now, directing your attention to when you finally
18   arrived to Morocco, could you tell us about your experience
19   trying to leave the airport?

20        A    Sure.  When we got to our gate there was a V I P
21   greeter from La Mamounia who escorted us to immigration.  Once
22   you go through that, pass that part, we got to the baggage claim
23   area, checked our bags, and then you go through customs after
24   you've checked your baggage.  The customs line was very long.
25   The four of us, Kacy, Jesse, Anna and I stood sort of eyeballing

1    the back of the cue because it was that long that you kind of

2    need a second to process it.  And while we were standing there,

3    Anna just sort of walked off by herself, straight through the

4    front of the line, pass the customs checkpoint, which you can't

5    really -- it was just strange.  It was something -- Kacy and I

6    were both yelling her name.  She didn't really even acknowledge

7    us, she just walked right through and once she got to the far

8    side, she turned around and kind of smiled, like, we had tried

9    to follow, but a gate, security guard stopped us and just made

10   us go to the back of the line.  It was just a strange thing that

11   happened.  It seems like a weird place to test limits.

12       Q    And so, after you left the airport was there somebody

13   from La Mamounia to escort you to the hotel?

14       A    There was.  So, there was a driver waiting with a sign.

15       Q    And did, how did you finally get to La Mamounia?

16       A    The hotel had provided two cars Land Rovers, maybe.  I

17   can't remember, two cars.  We went to the hotel in two cars.  It

18   was a 10 minute drive.  You enter La Mamounia, in this walled

19   palace.  It's got like a giant, tall wall around the entire

20   grounds.  Your car is searched, like underneath for explosives

21   when you drive in, and then you pull up and there are men at the

22   doors wearing traditional Moroccan attire who open the doors for

23   you and then you -- should I keep going?

24       Q    Yes.

25       A    You go into the lobby and there are these other men

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1892

1    waiting for us to show us around the hotel.  It wasn't like any

2    hotels that I had been to before where you check in and you are

3    like, here is my I D, and here is the credit card.  I believed

4    it may have been done in advance.  There was no pause there.  We

5    also didn't have traditional keys because our villa had a

6    butler, it was like they knew who we were.  We never had to

7    unlock a door.

8          Anyway, so when we walked in we were asked if we'd like,

9    they asked Ms. Delvey if we'd like to go for a tour and a

10   representative from the hotel showed us around, which sounds --

11   it was, so the lobby was, it was like a mall.  I was gigantic.

12   There were multiple bars, multiple restaurants.  There were a

13   couple of stores.  There was, there were courtyards.  There was

14   a spa.  And then when you go through the back of the main

15   building, there is a gigantic pool.  There is tennis courts.

16   There was a gym, gardens, and you have to walk through the

17   gardens to get to our riad, which is its own private house,

18   essentially, and when we got there, there was a butler waiting

19   for us.  We met him.  His name was Adid.

20         Q    Now, directing attention to the page after, P X 02409,

21   did you take photographs while you were getting the tour of the

22   grounds of La Mamounia?

23         A    I did.

24         Q    Okay.  Now, could you tell the members of the jury what

25   they are looking at here?

MAYS-WILLIAMS-DIRECT-WILLIAMS                1893

1      A      This is an example of one of the courtyards within the

2  main hotel building.

3      Q      Now, moving to the next photograph, could you tell the

4  members of the jury what they are looking at here?

5      A      That's the center of the lobby.

6      Q      The next page?

7      A      This is the back of the main hotel building.  So, if

8  you walked out into the garden and then turned around to look at

9  where you came from, that's the main building.

10     Q      The next photograph?

11     A      This is walking through the gardens towards our villa.

12  Those are the walls.  That giant flowered colored wall is the

13  exterior of the hotel.

14     Q      The next photograph?

15     A      Oh, also the wall.

16     Q      Does it show the top of the wall?

17     A      Yes, it does.

18     Q      What is the next picture showing?

19     A      Those are the tennis courts where Anna took private

20  tennis lessons, well, she made appointments for most mornings.

21  She didn't always go.

22     Q      Could you tell us what we are looking at in this next

23  photograph?

24     A      That's the hotel's main pool.

25     Q      Next photograph?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1894

1     A     Those are the gardens.

2     Q     Next photograph?

3     A     This is the exterior of our private villa through that

4  portal there on the left.

5     Q     So, the green awning, that is the entrance to your

6  villa?

7     A     Correct.

8     Q     And could you tell us what we are looking at in this

9  next photograph?

10    A     The front door of the private villa.

11    Q     The next photograph?

12    A     That is a detail in the courtyard of the private villa.

13    Q     Now, are you familiar with what any of the details are

14  for this particular structure?

15    A     Like the tile, I mean, zellige tile.  It's Moroccan

16  tile.

17    Q     Is it fair to say it's a relatively exclusive material?

18          MR. SPODEK:  Objection, your Honor.

19          THE COURT:  Sustained.

20          (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

21

22

23

24

25

Williams - People - Direct/Mays-Williams

1895

1  DIRECT EXAMINATION

2  BY MS. MAYS-WILLIAMS:

3     Q    All right.  Next photograph.  What are we looking at

4  here?

5     A    Those are some of the fruits and pastries that were

6  awaiting us when we arrived.

7     Q    Next photograph.

8     A    This is standing in the hallway, facing the master

9  bedroom, which is the bedroom we shared with Anna.

10    Q    Next photograph?

11    A    This is a picture of the living room in the private

12 villa and the foreground is the dining room space, which was

13 waiting for us when we checked in.

14         The far side is a lunch area.  To the left is the

15 front door the villa.  To the right is a courtyard.

16    Q    And what were some of the items that were waiting for

17 you when you arrived on that table there?

18    A    It showed there was, it showed wine, I think on the

19 other side.  Wine, roses, pastries, rock and pastries, fruit,

20 fresh fruit.

21    Q    I direct your attention to the next page.  What are we

22 looking at here?

23    A    This is the back of the private villa that is the

24 courtyard, along with our private pool and patio.

25    Q    Next page.

                                                    *C. Edwards*

Williams - People - Direct/Mays-Williams

1896

1    A    The pool of the private villa along with the gate and

2  the back that leads to the gardens.

3    Q    The next photograph.

4    A    That is Anna in the pool, and if you're looking,

5  that's looking back towards the door to the villa.

6    Q    Next page.

7    A    This is, if you are standing in the garden, facing the

8  villa, or rod iron gate, going into our property.

9    Q    Now, after you took a tour of the property, can you

10  tell the members of the jury what you did next?

11    A    The hotel representative took our passports to scan,

12  link it. I guess that happens at international hotels. I heard

13  Anna say, we got the wire.

14         I didn't really pay attention to his response, so I

15  don't know what happened there.

16         We settled in and then changed clothing and decided to

17  go to the hotel in the Moroccan restaurant for dinner. There

18  are four of us in the dinner, which is, we chose Moroccan, we

19  were in Marrakech?

20    Q    And who paid for the meal at the Moroccan restaurant

21  at the hotel?

22    A    It was charged to the hotel reservation.

23    Q    And so directing your attention to May 14, 2017, was

24  this your first full day there?

25    A    Yes, it was.

C. Edwards

Williams - People - Direct/Mays-Williams

1897

1     Q     Could you just describe to the jury what happened on
2    that day?
3     A     So this was Sunday.  We spent the entire day within
4    the resort.  We didn't leave.  Anna took a private tennis lesson
5    in the morning.  We met her for breakfast at the buffet by the
6    pool for breakfast.
7          We went to the Hammams, which is like a steam room.
8    We walked around in the garden.  We swam in the villa private
9    pool.  We spent the entire day just sort of exploring what was
10    there at the hotel.
11     Q     Now, in order to take private tennis lessons, how is
12    that purchased, do you know?
13     A     It was billed to the hotel reservation.
14     Q     And the meals that you subsequently ate that day, how
15    were those paid for?
16     A     Also to the hotel.  Everything within the compound of
17    the hotel was charged to the hotel reservation.
18     Q     Now, directing your attention to Monday, May 15, 2017.
19          Could you please tell the jury about that day in
20    Morocco
21     A     That was the only day we worked out with the personal
22    trainer.  After that Anna and trainer took naps.  Jessie and I
23    walked around the garden.  We were kind of feeling ready to get
24    out and do something besides the hotel.
25          Midday, we, our group, the four of us, went to what's

*C. Edwards*

Williams - People - Direct/Mays-Williams

1898

1  called the Medina at the market place that you walk around in on

2  foot.  Like, tight alleyways and lots of shops.

3          We went with a car, and driver from La Mamounia, along

4  with a tour guide.  And Anna went in to buy some Kaftan, like

5  Moroccan dresses.  She had in New York black clothing, and she

6  wanted something more appropriate for Morocco.

7          So we, sorry, on the way to do that, we went into an

8  antique store and looked around and we went into a carpet store

9  because Morocco is famous for their rugs.  And we spent some

10 time there.

11         And then from there, we went to the Kaftan store and

12 we both tried on dresses and had fun, had fun trying things on.

13         When Anna went to pay, her debit card or credit card,

14 whatever she was using, didn't work.

15         I asked her if she had let her bank know that she was

16 traveling.  She told me, no.  She asked if I would cover the

17 cost of that.  And she was going to add it to what she already

18 owed me.

19     Q    Now, directing your attention to PX02428, could you

20 please tell the members of jury what you're looking at here?

21     A    This is a receipt from, from the Kaftan store, the

22 dress shop.

23     Q    And did you end up paying for the clothes for the

24 defendant?

25     A    I did.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1899

1    Q    Could you tell the members of the jury what the total
2  amount was for the clothes?
3    A    13,140 Moroccan Dirham.
4    Q    Now, generally, what was the conversion to the US
5  dollars at that time?
6    A    That is roughly $1,314.
7    Q    Now, after you went shopping, did there come a time
8  that you all had dinner?
9    A    Yes, we went to a restaurant also within the Medina.
10 So we walked straight there after running around.
11   Q    And who paid for that dinner?
12   A    I did.
13   Q    Directing your attention to PX02429.  Could you tell
14 the members of jury what you're looking at here?
15   A    This is the receipt from the dinner?
16   Q    And what is the cost there?
17   A    2,665 Morocco Dirham.
18   Q    And again, what is loosely the currency exchange to US
19 dollar?
20   A    I believe that is roughly $266, and some odd cents.
21   Q    Directing your attention to the photograph after this
22 receipt.
23        Could you tell the members of the jury what they are
24 looking at here.
25   A    That is a photograph I took within the Medina.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1900

1    Q    And is that where you explored on May 15, 2017?

2    A    That is correct.

3    Q    Directing your attention to the next page.

4         Could you tell the members of the jury what you're

5    looking at here?

6    A    This is a picture taken right after we left the Kaftan

7    store, and she is wearing one of the dresses that she had just

8    purchased, that she had changed into.

9    Q    Directing your attention to the next photograph.

10        Could you tell the members of jury what we are looking

11   at here?

12   A    This is Anna in the carpet store evaluating this rug,

13   deciding whether or not to buy one, I guess.  While we were

14   there, she did offer to buy a rug for me.  The rugs are

15   thousands of dollars.  I passed.  Thanked her for the offer.

16   Q    Now, directing your attention to -- apologize.

17        Directing your attention to Tuesday, May 16, 2017.

18   Could you please tell us about what you did at Morocco on that

19   day?

20   A    Yes.  On Tuesday, it was just Jessie, Anna and I.

21   Kacy had gotten sick.  It started some time around Monday.

22        But the three of us went with a tour guy, and a driver

23   in the car, again, to see the YSL garden.  These gardens that

24   are in Marrakech, the garden themselves cost seven dollars per

25   person to see.

                                                    C. Edwards

Williams - People - Direct/Mays-Williams

1901

1      So we went on a tour.  Well, our car guide took us on

2  a tour.  And afterwards, after which we went to lunch at another

3  whole poolside restaurant.  So we went there.  We ate there.

4  And then after that we went to try to find spaces that, like in

5  the Instagram photo, which we found in the Jewish quarters and

6  then we went back to the La Mamounia from there.

7      Q    Now, who paid for the lunch that you had when you were

8  out on that day?

9      A    I did.

10      Q    Now, directing your attention to PX02433.

11          Could you tell the members of the jury what they are

12  looking at here?

13      A    This is the lunch receipt from that day.

14      Q    And what was the cost of this meal?

15      A    1,225.  I think it's Dirham as well?

16      Q    And what is your understanding of what the U.S.

17  currency is?

18      A    I believe that is roughly $122.

19      Q    And when you got back to the hotel, did you eat again?

20      A    Yes, we did.

21      Q    And how is that meal paid for?

22      A    The meal was charged to the hotel reservation.

23      Q    Directing your attention to the next page, the

24  photograph.

25          Could you please tell the members of jury what they

*C. Edwards*

Williams - People - Direct/Mays-Williams

1902

1  are looking at here?

2       A    This is what the food looked like in the hotel Morocco

3  restaurant?

4       Q    Next page:

5       A    This is what a meal looked like within our private

6  villa.  This is the table that was set in the courtyard, and

7  was, I guess -- the food was ordered through room service or the

8  butler.

9       Q    The next page?

10      A    This is breakfast and with the private villa.

11      Q    Now, directing your attention to May 17, 2017.

12           Could you please walk the jury through your day in

13 Morocco.

14      A    Again, Kacy stayed behind because she was not feeling

15 well.

16           Anna, Jessie and I went on a day trip.  La Mamounia

17 arranged a car, which took us to the Richard Branson Resort

18 within the Alice Drive.  It was about an hour drive from La

19 Mamounia, and we went and had lunch there on the back of the

20 terrace outside.

21      Q    Now, directing your attention to PX02437.

22           Could you tell the members of the jury what they are

23 looking at here?

24      A    This is a receipt from that lunch at Kasbah Tamadot,

25 the name of the resort.

C. Edwards

Williams - People - Direct/Mays-Williams

1903

1    Q   Who paid for that lunch?

2    A   I did.

3    Q   During the time you're paying for all of these places,

4  how was the defendant explaining why she is asking you to pay

5  for these meals?

6    A   She said she hadn't called her bank to let them know

7  that she was traveling, and, I guess, she said she had left

8  messages that she was working on it.

9    Q   Now, what was the cost of this particular meal?

10   A   $2,304 Moroccan Dirham.

11   Q   Directing your attention to PX2428.

12      Could you tell us what we are looking at here?

13   A   This is also a charge for Kasbah Tamadot?

14   Q   What is the cost here?

15   A   1,430 Moroccan Dirham.

16   Q   And, generally speaking, in your conversion to US

17  dollar, what is the total cost of the meal that you paid for on

18  that day?

19   A   So, 230 plus 143.

20   Q   All right.  Now, directing your attention to PX02439.

21      Can you please tell the members of jury what they are

22  looking at here?

23   A   We went back into Marrakech from Kasbah Tamadot, we

24  went to dinner.  And between that we took a tour of Tamadot.

25  There was time.  So the time when we got back to Marrakech,

*C. Edwards*

Williams - People - Direct/Mays-Williams

1904

1    that's the receipt from that dinner.

2         Q    And you paid for that dinner as well?

3         A    Yes.

4         Q    And what is the cost of that dinner?

5         A    It 2,100 Dirham.

6         Q    And the currency to US dollar.

7         A    Roughly, $210.

8         Q    Directing your attention to PX02440.

9              Please tell the jury what we are looking at here?

10        A    Oh, this is also, when we had tea in the Cartier after

11   the meal.

12        Q    What is that amount?

13        A    216 Mad Dirham, which I think is 26 US?

14        Q    Now, directing your attention to the next page.  Could

15   you tell the jurors what this photograph is of?

16        A    That is the meal we had at the dinner that evening.

17   That's the restaurant.  It's a restaurant where they, it's five

18   courses.  This is enormous portion sizes.  It's very

19   extravagant.

20        Q    And directing your attention to the next photograph.

21             Could you tell us what we are looking at here?

22        A    That is the bill.

23        Q    Is that the bill that you just showed to the jury a

24   moment ago?

25        A    It is.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1905

1    Q    Why did you take a photograph of it?

2    A    It must have been weighing on me.  I was just trying

3  to keep track of what was happening in the context of what was

4  happening.

5    Q    Directing your attention to the next photograph.

6        What are we looking at here?

7    A    That's the meal.  I don't know if that's one course or

8  all of the courses, either is possible.

9    Q    All right.  Now, directing your attention to May 2018

10  May 18, 2017.

11        Could you please describe this day to the members of

12  the jury?

13    A    May 18.

14    Q    Yes, Thursday, May 18, 2017?

15    A    On Thursday, May 18, I woke up to a bunch of text

16  messages, both from Kacy and Jessie.  Kacy was sick, as we know.

17  And was asking for my help.

18    Q    I am sorry to interrupt you for just a moment.

19        I am actually going to direct your attention back to

20  May 17, 2017, in the evening when you returned to the La

21  Mamounia.

22        Could you tell the members of the jury what happened

23  when you returned to La Mamounia.

24    A    Yes.  On the way we got back rather late after dinner.

25  On the way through the lobby, Anna was stopped by a manager.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1906

1   She stood in front of him, and started to make phone calls and

2   while she was talking to the manager, Jessie and I were standing

3   off to the side.  She then started to walk towards, like,

4   through the lobby, through Riad.  The manager and one other man

5   started to follow her.  So Jessie and I followed suit.  Jessie

6   told me, as we were walking --

7                    MR. SPODEK:  Objection.

8                    THE COURT:  Sustained.

9        Q    So, without saying what Jessie said, what did you do?

10       A    We followed Anna and the men to the villa.

11            When we got to the Villa, Kacy was in her room.

12  Jessie went to bed.

13            The two men stood in our living room while Anna

14  continued to make phone calls.  She told them that it was late,

15  that she couldn't reach her bankers.

16            They didn't leave.  They were standing there.

17            I was trying to defuse detention by offering them,

18  like, water, like, I asked if they'd like to sit down.  I tried

19  to be of help.

20            But at a certain point, I excused myself because it

21  was awkward.  And I thought it may be embarrassing for Anna, the

22  situation.

23            So I went to bed while she was still out there talking

24  to them, and making phone calls.

25       Q    Now, finally directing your attention to the morning

*C. Edwards*

Williams - People - Direct/Mays-Williams

1907

1    of Thursday, May 18 of 2017.  Could you tell the jurors what

2    happened that day?

3         A    I woke up.  Kacy was asking for help.  She didn't feel

4    well and needed help.  She didn't have her flight, so she needed

5    help dealing with logistics, figuring how to get out of there.

6         So, and Jessie had gone to film.  He was the

7    videographer.  He had gone to the tennis part to find Anna.

8         Anna hadn't shown up for tennis lessons.  She was

9    still asleep.  He was texting me.  I was telling him where Anna

10   was.  Meanwhile, Kacy was asking -- I was asking her if she

11   booked the flight already.  She said she hadn't.

12        I started to look into flight options on flight APPS

13   trying to be helpful.  There was a flight leaving at noon, and

14   this was pretty, maybe it was around like 10 or something.  So

15   it was tight, the timing was tight.

16        So while I was in the room, I picked up the phone to

17   call the concierge to see if they could send the car very

18   quickly to see if Kacy could make this flight.

19        So, I left Anna sleeping, went to go help Kacy.

20        Kacy gave me her credit card to make the booking,

21   which I made.  I am good at booking travel.  I guess people

22   often ask me for help for that.

23        So I booked Kacy's flight.  And noticed that the car

24   still wasn't there.  So I was about to call the concierge again.

25   I was going back into the living room to use the phone, when I

*C. Edwards*

Williams - People - Direct/Mays-Williams

1908

1    saw the two men from the Empire had reappeared in the villa.

2         They asked me where Ms. Delvey was.  She was still

3    sleeping.  So I ran to go wake up Anna and tell her that the men

4    were still there.

5         And then I came back to Kacy's room.  I called the

6    concierge again, because I realized at this point they must have

7    thought we were fleeing, because I had called in such a panic

8    asking for a car.

9         So I said, we are not all leaving.  It's just one sick

10   child traveler.  Please send the car.  However, the car appears.

11   Kacy leaves.  Kacy leaves before Anna has come out of the room.

12        I go back to get Anna, because the men are still

13   there.

14        Anna comes out to talk to the men.  I stay in the room

15   for a second, probably to tell Jessie, who at this point is

16   waiting for me by the pool side breakfast area.

17        I tell him, like, I will meet him there.

18        So this day on Thursday, our plan for the day was to

19   go see this private villa on the grounds of the YSL Garden,

20   called Villa Oasis, where the Yves Saint Laurent lived with his

21   partner.  And it's a place you can only see by a special

22   request.  And it requires $1600 donation to the Jardin Majorelle

23   foundation, the YSL foundation, essentially.

24        So we had made arrangements to see that earlier in the

25   week at Anna's request, because the garden had been slightly

*C. Edwards*

Williams - People - Direct/Mays-Williams

1909

1    underwhelming.

2            Anyway, so that was our plan for the day.

3            So while Anna was out talking to these men, I got

4    dressed.  I got my things.  I carried a camera.  I found, like,

5    my wallet I was going to carry for the day.

6            When I went be back out into the living room, the two

7    men were still there.  And Anna was just sitting on the couch,

8    not making a call.  Her phone was just sitting on table in front

9    of her.

10           And, I am sorry, I asked what is going on.  And she

11   said --

12           MS. MAYS-WILLIAMS:  Your Honor, could the witness

13       take a moment?

14           THE COURT:  Yes.

15           Do you need to break, ma'am?

16           THE WITNESS:  No.

17           She said, I am waiting on calls to be returned.

18   I said, okay, how long is that going to take?

19           She said, they should be calling me any minute.

20   I asked, what was the problem, what was needed?

21           And the men said, we need a functioning credit

22   card, thank you.  We need a functioning credit card on

23   file.  They said it's just for the hole that should have

24   been in place.

25           I don't remember the verbatim.  They said it's

                                                    *C. Edwards*

Williams - People - Direct/Mays-Williams

1910

1    for the hole that should have been in place before you

2    arrived.  It's policy to have a functioning credit card on

3    file before you arrive.  They said, do you have a credit

4    card?  Anna, said can we use yours for now.

5            The men said, it's for a temporary hold.

6            I am standing there.  I have my credit card with

7    me.  I believed it would be temporary.  I gave them my

8    personal American Express.

9            And then Anna, I think at this point, maybe

10   wasn't dressed for the day.  The men took my card and left.

11           Anna went to go and get dressed.  I believe it

12   happened while I was still in the villa while I was about

13   to leave to go meet Jesse.  Someone, a manager appeared

14   with a slip of paper, like a receipt.  I said, why would I

15   sign a receipt if the charge hasn't happened yet.  And he

16   said, it's pre-authorization.  So I signed it.

17           And then I went and I met Jessie by the pool and

18   waited -- well, first I went to the concierge desk to see

19   if our plans had even been made, because I wasn't sure what

20   the hotel was or wasn't booking for us at this point,

21   because it was obvious they thought we were a flight risk

22   or they kind of were hesitant to do the things that were

23   requested.

24           So I went to go see if the reservation was

25   actually in place, and then I met Jessie by the pool.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1911

1    That's when Anna came out from the villa to join

2    us, because we were all going to go to this Villa Oasis

3    together.

4    Anna appeared wearing my dress that she had taken

5    out of my side of the closet without asking.  It's fine.

6    It felt petty.  It didn't seem like it should be a big deal

7    in hindsight.  It felt a bigger deal then.  We got in a

8    van.

9    We went to the villa Oasis.  We took a tour.  The

10   director of the foundation took us on this tour of the

11   villa, like very exclusive place.  Sorry, I know a lot of

12   villas.  The YSL Villa.  You aren't even allowed to take

13   pictures inside.  It's a very private home.

14   It was the most ornately decorated beautiful -- I

15   don't even know how to describe it, place I seen.

16   Every surface was a different hand-carved

17   material.

18   Anyway, when the tour was over, after we had like

19   orange juice and pastries, we followed the guide back

20   through the main garden to this museum book shop, where I

21   thought it was like exit through the giftshop, like, here.

22   Now you may buy souvenirs.  He took us to the cash register

23   and said, how would you like to pay for, like, the donation

24   was required.

25   At this point Anna says, oh, I thought it could

C. Edwards

Williams - People - Direct/Mays-Williams

1912

1    be arranged through the hotel.  They booked it, our

2    reservation at La Mamounia.  The director says, no, you

3    have to settle it here.  Of course Anna doesn't have any

4    cards that are working.  Jessie doesn't offer or I don't, I

5    don't think Jessie had a way.  I don't know, Jessie doesn't

6    pay.

7          They both turned to me.  So everyone else turns

8    to me.  I unzip my travel pouch, and I am looking for my

9    credit card.  My personal credit card, and realize I don't

10   have it, which is foreign to me, because I thought that I

11   did.

12         So I tried, I had my debit card and my passport.

13   I tried to give them my debit card.  It didn't go through,

14   because I didn't use my debit card in Morocco or tell my

15   bank I was traveling, I guess.

16         Anyway, when a man from the foundation says that

17   he's going to just come back with us to La Mamounia to

18   collect pay.

19         So he gets in the car drives back with us to the

20   hotel.  I leave everybody in the car.  So, Jessie, Anna,

21   and this tour guy stay in the car.

22         I run out to try to see -- I don't know where my

23   card is.  I wonder if I dropped it.  Did I leave it in the

24   living room when I signed the slip of paper.

25         So I would first go into the villa to search

*C. Edwards*

Williams - People - Direct/Mays-Williams

1913

1    through things.  I look in my suitcase.  I see my corporate

2    card.  My corporate American Express that I pick up.

3              And I put it in my zip pouch because I have a

4    feeling it's an emergency and I am not sure what I am going

5    to do.

6              Then I went to the concierge, the front desk and

7    say, do you still have my credit card.  And they say, yes.

8    And I say, well, I need it.  They say, well, the payment

9    for your villa hasn't been settled yet.  And they refused

10   to give me back my personal credit card.

11             I say, well there's a man from the museum in the

12   car, and he needs payment, and no one else has a way to pay

13   for anything, and this is the only card we have.  And they

14   won't give it back.

15             So I say, okay, you may physically hold my

16   corporate card.  You may not charge it.  I need to take

17   that card back, so I could pay it to the museum.  He takes

18   my corporate card, gives me back my personal card.

19             I then went back to the car.  Oh, he said, I need

20   to speak with Ms. Delvey, also.

21             So I ran back to the car.  At this point Jessie

22   is annoyed.  He says, I am going to go back to the villa.

23             He goes off on his own.  I get to the car.  I

24   tell Anna, she needs to go to the front desk because the

25   hotel needs to speak with her.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1914

1    I go back to the villa alone, the YSL place by
2    myself, with the director.
3    They go to the cashier.  They get to the book
4    shop again, and they tried to run my card and it doesn't go
5    through.  So they tried again, and it doesn't go through.
6    And then the director from the foundation at the shopping
7    point, took me into this back room corridor, it's like a
8    room, a back room.
9    And they said, how do you propose to resolve this
10   situation?  And I said, I need to make an international
11   phone call.
12   And then they tried to call the number on the
13   back of my American Express, and they couldn't get it to
14   work.  And they accused me, maybe it wasn't a real number.
15   Anyway, they let me try.  So I messed around with the
16   country code, and managed to call American Express.
17   And I spoke with a man who had a southern accent
18   and he said responsible lending has -- well, American
19   Express has soft credit limits.  So they said they set caps
20   on your spending, based on your spend patterns, excuse me.
21   Responsible lending had flagged my credit card
22   and blocked it because the hotel had apparently
23   pre-authorized quote/unquote 30 some odd thousand dollars.
24   I said, oh, no, that's just a block.  I explained
25   also, I am in a back room and I need to pay for this museum

*C. Edwards*

Williams - People - Direct/Mays-Williams

1915

1  visit.

2          So he said, ma'am how much money do you need to

3  get safely out of Morocco.  My spending limit has been

4  taken back to the cash register.  When I came out from the

5  back room, Anna and Jesse had appeared.  I assumed they

6  took a car from the hotel and were dropped off.

7          I went to the cash register.  They ran my card.

8  The $1,600 went through.

9          So, we left the museum and then we went -- should

10  I keep going.  It's a long story.

11          (Whereupon, the following was recorded by

12  Official Court Reporter Denise Taylor:)

13                  *            *            *

14

15

16

17

18

19

20

21

22

23

24

25

C. Edwards

1    Q    Stop for a moment.

2    All right.  Now, I am going to direct your attention to P X

3    02445, specifically May 18th 2017.  It says 1:39 p.m.  Do you

4    recall sending this particular e-mail to the defendant?

5    A    I do.

6    Q    Now, was it actually 1:39 p.m.?

7    A    No, it was not.

8    Q    Okay.  So, was there a time difference that accounted

9    for this time that's listed here?

10   A    Yes.

11   Q    Could you please read the e-mail that you sent to the

12   defendant?

13   A    "Hi, Anna.  The total amount is $9,424.52."  And then I

14   gave her my bank account information for the second time.

15   Q    Now, why did you send this e-mail to the defendant?

16   A    For all of the expenses that I had covered on my card

17   that she said she would reimburse me for.

18   Q    Did she ask you to make her a spreadsheet?

19   A    No, I did that on my own.

20   Q    Now, directing your attention to P X 02446, could you

21   please tell the members of the jury what they are looking at

22   here?

23   A    An itemization of the charges that I had put on my

24   card, which Anna said she would reimburse me.

25   Q    Now, directing your attention to P X 24 -- well, excuse

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1917

1  me, 2447, could you please tell the members of the jury what

2  they are looking at hear?

3      A    Oh, that's the Y S L Villa.

4      Q    Directing your attention to the next page, could you

5  tell the members of the jury what this is a photograph of?

6      A    That's the exterior of the Y S L Villa.

7      Q    Now, directing your attention to P X 2452, specifically

8  May 19th 2017, at 9:56 a.m. through 10:03 a.m., did you exchange

9  text messages with the defendant?

10     A    I did.

11     Q    Now, could you please tell the members of the jury,

12 starting at 9:56 a.m., and let the jurors know when you are

13 switching speakers, and please read those texts?

14     A    I go first.  I am talking.  "Okay, great.  Thank you.

15 Do you know how much the hotel charged my Amex?

16     Anna, "I e-mail Rachid, like three hours ago to send me the

17 final bill.  He stopped by briefly before we left, or left.  I

18 gave him your contact.  He said he'd like to e-mail a thank you

19 note.  Will you rather have the whole total wired to your Chase

20 and you decide what you want to take off your Amex?  That way

21 you can e-mail them directly with all instructions?"

22     Me, "Okay, cool.  The whole bill is going on my cards."

23     Anna, "I e-mailed him about that."

24     Q    I'll stop you just for a moment.

25     Why were you asking the defendant whether the whole bill

1   was going on your card?

2       A   I think before, I mean, especially after the visit to

3   the Y S L Villa, I was aware that there was a chance that the

4   $30,000 that had already been applied to my card might stay

5   there, but I thought since, clearly, we had spent so much above

6   that amount through all the different things that we booked

7   through the hotel, that when Anna checked out she would still

8   need to provide another form of payment for everything else,

9   like there was, I didn't think I was -- even if that amount

10  stayed on my card, there was never a time I thought that the

11  whole bill was going to be charged to my cards.

12      Q   Now, did you leave the hotel before the defendant did?

13      A   I did.

14      Q   Okay.  And when did you finally leave the hotel?

15      A   I left on the morning of Friday, May 18th.

16      Q   Now, please continue.  You can go to May 19th 2017, at

17  10 a.m.

18      A   "I e-mailed him about that."

19      Me, "Yes, while bill wired to Chase is best, thank you, so

20  much."

21      Anna, "Yes I will confirm all of that with him."

22      "Me, I will just apply it separately to the Amex."

23      Anna, "That way could you decide what works best for you

24  and also, get all points."  Anna, "Thanks again for stepping in.

25  Greatly appreciated."

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1919

1        "Me, I don't know if the whole bill will go through.  You

2    are welcome.  Thank you for the trip.  Just hoping we can get

3    the wires, etc., sorted today because I'm nervous about my cards

4    not working for the weekend.  Sorry to be a bother."

5        Anna, "I'll wire you $70,000.  That way everything is

6    covered."

7        Me, "Thank you so much, Anna."

8        Anna, "Just make sure it doesn't count --"

9        Q    You can stop.

10        Now, directing your attention to P X 2454, specifically an

11    e-mail sent at 16:11, were you copied on the e-mail that the

12    defendant sent?

13        A    I was.

14        Q    Okay.  Could you please tell us what the e-mail said?

15        A    Subject line is "Final bill.  Rachid, following up on

16    my last e-mail.  Can you please send me the total bill and the

17    summary of all charges that have been put on Rachel's card?

18    Appreciate your assistance.  Rachel was nice enough to provide

19    you her card, but it is my responsibility to make sure all

20    parties are covered.  Looking forward to receiving it before the

21    E O D today.  Thanks."

22        Q    Directing your attention to P X 2456, could you tell

23    the members of the jury what they are looking at here?

24        A    This is the final bill from La Mamounia, the hotel.

25        Q    And could you just give the jury a summary of what the

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1920

1    charges are, that are on this particular bill?

2        A    It's the cost of our room reservation, all of the food,

3    our directees, which is the tour guide, spa, blow out, I guess

4    like hair salon services.

5        Q    Directing your attention to P X 02457, could you give

6    us a summary of these charges?

7        A    It continued, more restaurants, in the hotel, cars,

8    yes, our cars when we had tour guides.

9        Q    Now, directing your attention to P X 02458, could you

10   please tell the members of the jury what the total bill for the

11   La Mamounia was?

12       A    509,025, Moroccan Dirhams.

13       Q    And what is your understanding of what that translates

14   to in U S dollars?

15       A    Roughly 50,900 U S dollars.

16            MS. MAYS-WILLIAMS:  Judge, this may be a good time

17       to break for lunch.

18            THE COURT:  Yeah.  I was going to suggest that, as

19       well.

20            Ladies and gentlemen, we are going to break for

21       lunch.  Please do not discuss the case with one another, or

22       anyone else.  Do not let anyone approach you and try to

23       discuss this with you.

24            If you see any of us outside, please ignore us.  We

25       cannot say anything to you.  Please do not speak to any

PROCEEDINGS                                1921

 1    members of the press.  Do not read or listen to anything

 2    about this case.

 3              If you see something about this at lunch, ignore

 4    it.  Do not engage in any social media postings about this

 5    case, or about any of us.  Most of all, have a nice lunch.

 6              See you at 2:15.

 7              Ms. Williams, I'm directing you to come back at

 8    2:15, okay.

 9              Have a nice lunch.

10              THE WITNESS:  Okay.

11              (WHEREUPON, A LUNCHEON RECESS WAS HELD.  AFTER

12    WHICH, THE FOLLOWING PROCEEDINGS WERE HELD)

13              THE CLERK:  Case on trial continued.  All parties

14    are present.  No jurors present at this time.

15              THE COURT:  Good afternoon, everyone.

16              Are there any matters to discuss before Ms.

17    Williams returns to the stand?

18              Do we anticipate she will finish today or not?  No?

19              MR. SPODEK:  I think so.

20              MS. MAYS-WILLIAMS:  I think she should finish

21    today.

22              THE COURT:  Okay.  All right.

23              COURT OFFICER:  Jurors entering.

24              THE COURT:  Are we ready?  Let's get the witness on

25    the witness stand.  Let's go.

PROCEEDINGS                                    1922

1              Ladies and gentlemen in the audience, it has come

2    to my attention that one of the jurors, that someone from

3    the press was taking pictures outside of the courtroom, not

4    a problem, as long as you are not taking pictures of a

5    juror.  The juror seems to be a little concerned that his or

6    her photograph is being taken.

7              So, if you are taking pictures outside, be extra

8    mindful of the fact jurors are sitting out there.  If you

9    inadvertently took a picture of a juror, I take it you will

10   delete it.  Just be careful you are not taking pictures of

11   jurors.

12             Are you the guilty party?

13             UNIDENTIFIED VOICE:  Yes.

14             THE COURT:  No pictures of the jurors, okay.

15             COURT OFFICER:  Witness entering.

16             THE COURT:  Welcome back.

17             THE WITNESS:  Thank you.

18             THE COURT:  Remember to keep your voice up.

19             THE WITNESS:  Okay.

20             THE CLERK:  Case on trial continued.  All jurors

21   are present.

22             The witness is being reminded she is still under

23   oath.

24             THE COURT:  Good afternoon, ladies and gentlemen.

25   Welcome back.

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1923

1     Q    I am going to direct your attention, very briefly, back

2  to May 12th, when the defendant sent you an image of her debit

3  card.  So, I'm showing you what's been marked for identification

4  as 35 A.

5     Do you recognize this image, 38 A?  Excuse me.

6     A    I do.

7     Q    Okay.  And what is this image?

8     A    This is the image that Anna texted me of a J P Morgan

9  Visa debit card.

10    Q    All right.  Is this a fair and accurate copy of the

11 text message that you received from the defendant?

12    A    It is.

13         MS. MAYS-WILLIAMS:  Okay.  I am now offering this

14 Exhibit 38 A into evidence, your Honor?

15         MR. SPODEK:  No objection, your Honor.

16         THE COURT:  In evidence.

17    Q    Okay.  Ms. Williams, could you please read the debit

18 card number for us, please?  Could you read the number for us?

19    We will publish it to the jury in just a moment.

20         THE COURT:  Well, does she have it to read from it?

21    Does she have it?

22         MS. MAYS-WILLIAMS:  Did we take it back?

23         Sorry.  I apologize.

24    A    4900 7870 2196 7766.

25    Q    And the name on the card?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1924

1      A      Anna Sorokin Delvey.

2             MS. MAYS-WILLIAMS:  All right.  Thank you.  It's in

3      evidence.

4             THE COURT:  There it is.

5      Q      Now, I am going to direct your attention back to

6      May 19th 2017, P X 2460 -- actually, I'm going to direct your

7      attention to 2459, and I am going to ask you to start at

8      12:18 p.m. through one p.m.

9       Did you exchange text messages with the defendant?

10     A      I did.

11     Q      Okay.  Could you please start at 12:18 p.m., and let

12     the jurors know when you are switching speakers and read those

13     text messages?

14     A      Anna, "I e-mail Rachid with you in cc.  He shall send

15     the final bill for your and mine records, correction, my."

16      Rachel, "Great."

17      Anna, "I see they authorized slash charged approximately

18     51,000 U S dollars at Mamounia, plus 10,000 U S dollars outside

19     expenses, so, 70,000 U S dollars shall be enough to cover

20     everything and thank you again for assuming the responsibility."

21      Rachel, "Thank you so, so much, Anna.  It was really, it

22     was a really wonderful trip.  Such a gift.  Thank you, thank

23     you, thank you."

24     Q      Now, directing your attention to P X 2460, specifically

25     May 19th 2017, at 7:56 p.m. through May 26, 2017 at 4:59 p.m.,

1    did you exchange text messages with the defendant during this

2    time period?

3         A    I did.

4         Q    Okay.  Could you please also read these texts and let

5    us know when you are switching speakers?

6         A    Remind me, you want me to read it again?

7         Q    Yes.  So, you are going to start at P X 2460, May 19th

8    at 7:56 p.m.  Read the e-mail, please.

9         A    Anna, "I've initiated everything today.  Will forward

10   you the fed ref as soon as they e-mail it to me.  Hope you are

11   having fun.

12        Thank you, A.  Having fun, yes.  I went to bed so early.

13        Hi, Anna.  My Amex isn't working.  I have enough cash for

14   the weekend, but hoping the wire can be processed on Monday so

15   I'm able to make a payment to Amex.  Thank you, again.  I hope

16   you guys are off riding donkeys."

17        Anna, "It shall be credited on Monday, first half of the

18   day.  I'm still in bed."

19        Me, "Thank you.  Good, you guys needed the sleep.  I

20   crashed so early yesterday too."

21        Anna, "I think we are doing the donkey thing later today.

22   Nothing is around here"

23        Me, "You guys should get one of those tents, no?  And

24   lounge by the pool, or is that too boring?"

25        Anna, "Got you some argon oil from here.  Remind me to give

MAYS-WILLIAMS-DIRECT-WILLIAMS                1926

1    it to you in New York."

2        Me, "Amazing."

3        Anna, "Hope you are good.  Will make sure the wire gets

4    settled today?"

5        Me, "Thanks you, thanks you.  I'm good.  Miss you guys

6    though.  Traveling alone was quiet, but meeting up with

7    colleagues today or tomorrow.  At a market now."

8        Anna, "We hiked a mountain for fourth day yesterday.  I am

9    so dead today."

10       Me, "Wow, so intense."

11       Anna, "Hey.  All good?"

12       This is May 22nd now.  Anna, "All good.  Let me know once

13   you see the wire from your side.  Hope it didn't cause you too

14   much trouble this weekend."

15       Me, "Hi, hi, haven't seen it yet.  Maybe tomorrow.  I'm

16   good, not too much trouble, thank you.  Just using my debit

17   card, but I'm at my last one K.

18       You guys leaving tomorrow?"

19       Anna, "Yes, trying to get a helicopter to go straight to

20   Casablanca."

21       Q    Okay.  And could you just give us a little context as

22   to the last, you mentioned that you were on your last $1,000.

23   Could you just give the jury a little bit of context as to what

24   was going on for you?

25       A    Sure.

1      At this point, you know, American Express had raised my

2   spending limit enough to get out of Morocco, but it was only so

3   much money.  So, I was relying my debit card to pay in France,

4   where I had gone off in Morocco for a work trip -- I maybe had

5   not mentioned that -- and I was relying on the money in my

6   checking account, which was, as I said to Anna, I guess, around

7   $1,000 because I had just, it was just after pay day.

8      Q    Now, directing your attention to P X 2466, specifically

9   May 24th 2017 through May 25th 2017, starting at 6:26 p.m., and

10   ending at 7:13 p.m., did you also exchange text messages with

11   the defendant at this time?

12      A    I did.

13      Q    Could you please read to us what it said?

14      A    "Hi, lady."  This is me talking, "Hi, lady.  Can you

15   forward the fed ref confirmation when you have a second?  I will

16   call Chase in the morning."

17      Anna, "Will do.  It's an e-mail generated by the wire room.

18   I'll give them a call in a little bit to follow up again."

19      Me, "Thank you.  I'm merely out of money I could use, so

20   really hoping it comes through tomorrow.  Sorry to bug you about

21   it."

22      Anna, "Absolutely sorry for the delay.  I promised to have

23   this covered last Friday and it's end of day, Wednesday."

24      Me, "I know these things can take some time in the

25   transfer, it's okay, but thank you for your understanding."

1      Me, "Hi A, the wire still hasn't come through.  Do you have

2   that ref so I can call Chase to check on the status?"

3      Anna, "Hi, getting it any moment now.  It shall come as a

4   secured message with wire remittance letters."

5      Me, "Okay.  Is that something you can forward so that I can

6   call?  I haven't seen anything."

7      Anna, "Yes.  I'll forward with logins.  Last time I got

8   those, they were in a protected e-mail, but I'll figure out a

9   way how to get it to you.  Sorry for the delay.  You shall see

10  it in your account tomorrow before the long weekend."

11     Me, "Thank you."

12     Q    Now, directing your attention to 2467, May 26, 2017, at

13  1:32 p.m. through May 27th 2017, at 2:55 p.m., did you continue

14  to exchange text messages with the defendant.

15     A    I did.

16     Q    Could you please read them for us?

17     A    "Hey, lady, still no luck with the we wore wire?  I'm

18  happy to call if it would help."

19     Anna, "I'm having a call with them at 2:00 p.m. eastern

20  time.  All incoming transfers shall be credited before 5 p.m.

21  eastern time."

22     Me, "Thank you.  Sorry to pester."

23     Anna, "No, sorry for my delay.  They told me, internal

24  transfers happen right away.  I'm on it though."

25     Me, "You the best."

1       Anna, "I might be going to L A now, as I wanted."

2       Me, "Oh, maybe we'll be there at the same time."

3       Anna, "The conference is Tuesday to Thursday.  Do you see

4   the incoming wire in your account?  Still waiting in remittance

5   letters that I will forward to you once I get it.  If the wire

6   still hasn't arrived, your banker can use it to track it."

7       Me, "No, I don't see it quite yet.

8       Hey, Anna, it's still not there."

9       Anna, "I'm forwarding you the fed ref remittance thing as

10  soon as it's here.  My accountant, Bettina also has access to

11  this and will keep an eye.  Sorry for the delay.  I will call

12  them again tonight.  The transaction is on the list of debited

13  amounts, so it's definitely out."

14      Me, "Thank you.  So, sorry this has been a hassle."

15      Anna, "Sorry you have to chase it.  I'll find out if there

16  is an alternative transfer method that would work on the weekend

17  since it's the same  bank.

18      Are you still in France?

19      Me, "Hey, just took off from Paris, but then my plane

20  turned around because of mechanical problem.  Sitting onboard

21  while they fix it.  Back late tonight, I hope."

22      Anna, "Tried calling you earlier.  Sorry for the delay with

23  the wire.  If you need to pay for anything now you can use my

24  card.  Just let me know.  Have a good flight."

25      Me, "Yes, sorry.  Was on the other line.  Thank you for the

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1930

1   offer.  Will let you know.  I think I'm okay for the weekend,

2   but need to pay my rent, etcetera, at the start of next week.

3   Do you think it will come by Tuesday, end of day?"

4        Q    Now, directing your attention to 2471, specifically

5   May 30th 2017, at 6:27 p.m. through 2472 at 5:01 p.m., did you

6   continue to exchange text messages with the defendant?

7        A    I did.

8        Q    Could you please read them for us?

9        A    Me, "Hi, A.  Any luck?  I'm flying out tomorrow and

10  really hoping I can pay my rent, etcetera before I leave."

11       Anna "Sorry, not yet.  I hope it goes through tomorrow

12  morning.  Can I wire it for you, if you want?"

13       Me, "Sorry this is such a hassle.  I pay via mailed check.

14  Don't have account info for wire.  Fingers crossed for tomorrow

15  morning.  I just don't want to mail a check and have it bounce."

16       Anna, "Okay, sure.  Sorry for the delay.  I will check

17  tonight and tomorrow that all is on the way."

18       Me, "Thanks, so much."

19       Anna, "Let me know if you see it this morning."

20       Me, "Will do.  Not there yet."

21       Anna, "What time is your L A flight?"

22       Me, "It's at five.  I'm heading to the airport around 2'ish

23  from the office."

24       Me, "Hey, lady.  Do you really think wire will come through

25  today?  I need to mail my rent.  Could you do a quick pay for

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1931

1    2K?  That will definitely happen today.  So, that I can send a

2    rent check without bouncing?  Unless you're positive the wire

3    will come through.  My Amex bills are also due, but they can

4    wait until Monday."

5        Anna, "Okay, are you enrolled in quick pay?"

6        Me, "Yes."

7        Anna, "Okay, great.  I will try to catch a flight to L A

8    later, assuming I'm done with everything.  I missed over half of

9    that conference now.  I'll let you know if I'm coming to L A or

10   not, A S A P."

11       Me, "Okay.  No pressure.  I'm booked on a redeye back

12   tomorrow, but could adjust."

13       Anna "checking on wire again.  Just enrolled in quick pay

14   as well.  What's your e-mail connected to that?"

15       Me, "Williams dot Rachel dot G mail dot com.

16       I can send a request if it's easier, or if I'm not showing

17   up, just let me know your e-mail."

18       Anna, "I think it should work okay.

19       A Delvey at I Cloud dot com."

20       Me, "Sent the request.  Thank you so much and sorry again

21   to pester you about this.  Trying to be chill, but first of the

22   month equals bills, bills, bills. "

23       Anna, "Got it."

24       Anna, "Not going to L A, unfortunately.  Too much to do and

25   I missed the most conference, but let's still go to Doug Aitkens

MAYS-WILLIAMS-DIRECT-WILLIAMS                1932

1    thing in a cute car some time this summer."

2        Me, "Okeydoke.  Sounds good.

3        Hi, A.  I just landed in L A.  No luck with the wire or

4    quick pay.  Can we make sure one or both happen tomorrow?  I'm

5    nervous about Amex and sent a rent check that will not clear."

6        Anna, "I'll see that it goes through today."

7        Me, "Okay.  Thank you.  When will the wire go through?"

8        Anna, "Also today."

9        Me, "Thank you, so much.

10        You still in London?  When are you back to N Y C?"

11        Anna, "Saturday morning."

12        Me, "Cool.  I'll be back then too.  I really need to get my

13    account squared away.  Amex just called me and I let them know I

14    was expecting a wire today."

15        Anna, "The wire shall cover that, right?"

16        Me, "Yes, it will.

17        We expect summit will sell out.  You should buy your ticket

18    early if you are def wanting to come."

19        Anna, "Will do, thanks.  Can I only buy one ticket with my

20    code?"

21        Me, "I'll find out.  You could buy more than one, two

22    maximum likely.  You just need to e-mail Matt the names."

23        Anna, "Okay, thank two shall be good.  Will do once I'm

24    back in. N Y.

25        Working on finalizing your transfers today.  Hope the delay

1    didn't get you in too much trouble."

2         Anna, "Uh, I see your e-mail calling Bettina now.

3              (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams - People - Direct/Mays-Williams

1934

1    DIRECT EXAMINATION

2    BY MS. MAYS-WILLIAMS:

3              THE WITNESS:  Me.  Thank you.  Really appreciate

4         it.  How is the Mercer?

5              I am still checking.

6              Anna.  I am still traveling.  Someone, whoever

7         worked for my family for 30 years passed away.  So I had to

8         stop by the ceremony.  Can't wait to get back to New York,

9         back to normal.

10        Q    You could stop right there.

11             Now, could you tell the members of jury what is going

12   on for you in your life back in New York, as you exchange these

13   text messages with the defendant?

14        A    Well, my rent is due.  I had to borrow some money to

15   pay it.  I mean, my Amex bill, my personal card, balance, I

16   think was due in early June.  So that was starting to weigh on

17   me more as well.

18        Q    Did you have to you borrow money from more than one

19   person?

20        A    At this stage, I borrowed money from just one person,

21   enough to cover my rent and the minimum amount due on my

22   personal card, which is to pay over time.

23        Q    Now, directing your attention to -- Judge, excuse me,

24   one moment.

25             Directing your attention to PX2477, specifically

*C. Edwards*

Williams - People - Direct/Mays-Williams

1935

1    May 31st, 2017 at 5:37 p.m.  Did the defendant send an email

2    which you were copied on?

3         A    Yes, she did.

4         Q    Could you please read that email to the members of the

5    jury.

6         A    Bettina, can you please complete the verification to

7    send Rachel the requested amount.  I enrolled into quickpay

8    earlier today so that's all set.  AD.

9         Q    Now, directing your attention to a little bit further

10   up on the page, March 31st, 2017 at 2:42 p.m.

11             Did the defendant send another email?

12        A    She did.

13        Q    What does it say?

14        A    Bettina, please make sure it's on your top priority

15   list as Rachel is awaiting this payment today before EOD.

16        Q    Now, did you respond to this last email directing to

17   June 1st, 2017 at 12:05 a.m.?

18        A    I did.

19        Q    What did you say?

20        A    Hi just checking on this.  Thank you.

21        Q    Now, did you see another email from the defendant on

22   June 1st?

23        A    I did.

24        Q    What did it say?

25        A    Bettina, can you complete the verification with the

*C. Edwards*

Williams - People - Direct/Mays-Williams

1936

1   token as I don't have it with me.  I can approve the transaction

2   myself once that's done.  Thank you.  AD.

3       Q    Directing your attention to PX2476.

4            Did you receive another email from the email address

5   Bettina R. at gmail.com

6       A    I did.

7       Q    What did it say?

8       A    Dear All, the verification is being completed as we

9   speak.  I will send out Ms. Williams' payment as soon as

10  possible.  Kind regards, Bettina Wagner.

11      Q    Now, did the defendant send another email on June 1st,

12  2017 at 2:09 p.m.?

13      A    She did.

14      Q    What did it say?

15      A    Bettina, has this been finalized?  Please also follow

16  through on the wire transfer that's been overdue almost two

17  weeks.  Rachel is a personal friend.  Was kind enough to extend

18  her credit to cover my expenses.

19         Confirm cc'ing us both asap.

20      Q    And did you receive anything from quickpay or wire on

21  June 1st, 2017?

22      A    No, did not.

23      Q    Now, directing your attention to PX2479, specifically

24  June 6, 2017, at 7:17 a.m. June 7, 2017 at 3:36 p.m.

25         Did you exchange text messages with the defendant?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1937

1  A    I did.

2  Q    Could you please read those text messages to us?

3  A    Anna, I am really anxious.  This is me talking.

4       Anna, I am really anxious about money.  Is everything

5  okay?  Can we ask Bettina to make sure it goes through today.

6  My rent check will bounce and I cannot pay my outstanding bills.

7       Anna.  Will do.  Everything should be okay by now.  I

8  wasn't made aware of any issues.  I will double check both with

9  banks and her again.

10      Me.  Thank you.  Still haven't read anything from

11 Bettina.

12      Anna, I left her a message to get back to you an hour

13 ago.  Will do.  My wifi is spotty.  I am on my way to the

14 airport.

15      Me.  I can call her if it'd help, since you're

16 traveling.  I know it's getting to be EOD in Germany.  Safe

17 travels xx.

18      Anna.  Did your wire go through?  Sorry, busy day.

19      Me, not yet.  No.

20      Did your flight land?  You in Germany?

21      Anna.  I am landing in New York tomorrow around noon.

22      Me.  Ah, that's great.  I bet you're so ready.

23      Anna, literally hell of past days.  Never traveling

24 again haha.

25      Yikes I'm so sorry.  Sounds awful.  I'm in a tough

*C. Edwards*

Williams – People – Direct/Mays-Williams
                                                              1938

1   situation until this wire goes through.  Is everything okay?  I

2   don't understand what the delay is with Bettina.

3           Anna.  Will call them again.  Sorry craziest day.  I'm

4   still at the airport trying to catch a flight and replace all my

5   cards.  I feel horrible to put you into this situation.

6           Me, I am so sorry.  Are you okay.  Good luck.  We will

7   deal with the wire tomorrow.

8           I know, I am sorry.

9           Anna.  I need to get that flight, otherwise I am stuck

10  for another six hours.  Nightmere.  I will be in touch.

11          Me.  K, good luck.

12          Anna.  Wifi goes out every hour.

13          Just landing in Frankfurt.  I shall be back in

14  New York around 2:00 p.m. today.

15          Me.  Anna, I really need this wire to be paid today.

16  I don't understand the delay.  I cannot afford to have this

17  delayed any further.  My employer is able to see my corporate

18  statement, which is extremely high and past due.

19          I am at the point where I am losing sleep because I am

20  so stressed about it.

21          Anna.  Following up now.  I left all my bankers a

22  voicemail/email.  I'll try to get on wifi during my flight.

23          Taking off in 30.  I will do my best to keep in touch

24  with them during the flight.  I'm landing at 2:00 p.m and I will

25  follow through with everyone involved right away.

                                                          *C. Edwards*

Williams - People - Direct/Mays-Williams

1939

1    Me.  I really didn't think the wire would be this
2    complicated.  Are you sure everything is okay?  I really need
3    this to be sorted today.
4    Anna, I am landing in about 30 minutes.  Just got
5    reception.  Did it come through.
6    Me.  No.  And haven't heard anything from Bettina.
7    Anna.  I will call as soon as I can.  I had to submit
8    tax papers about three weeks ago.  And I have a team of lawyers
9    who confirmed everything that is resolved.  There is no reason
10   for the wire to be delayed.  So sorry for this.
11   I will stop at my branch on my way in the city, on my
12   way to the city.
13   Other solution, I got my own Amex.  Is there a way to
14   do an immediate balance transfer to you or similar?  I am not
15   quite familiar with how this works yet.
16   Me.  If you could do the wire today, that would be
17   best.  The balance transfer may be complicated, since the cost
18   are split on two cards, one of which is my corporate card.  Let
19   me know how it goes.
20   Anna.  Okay.  I just landed.
21   Me.  Welcome back.
22   Anna.  Will call from immigration line.
23   Thank you.  I actually had a good trip back from
24   Frankfurt.
25   One of my favorite airports.

C. Edwards

Williams - People - Direct/Mays-Williams

1940

1          Me.  Good.  Glad you're back safely.

2          Anna, still in the immigration line.  They don't allow

3   you to use phones.

4          Anna, I will stop at my branch on my way back to the

5   city to get this involved.

6          Me.  Thank you.  Standing by if you need anything from

7   my end.

8          Anna.  I have your banking details.  All I need.  I

9   can PayPal as well.  Will that help short-term.

10         Only works for smaller amounts like Chase quickpay.

11         Will send the 80K via wire.

12         Let's see how long.

13         Me, let's see how long the wire will take to go

14   through.  Ideally we just do that and get everything settled

15   because my Amex bill is too high for PayPal.

16         2k would be helpful for rent if the wire will take a

17   day to process.  Thank you so much.

18         Anna, okay, what is your PayPal email?

19         Me, Venmo might be better if you have it.  I may be

20   locked out of PayPal.  I will check.

21         Anna, I think Venmo has a 1500 limit, no.

22         Me.  Oh, it seems to work.

23         My email is a rachel_williams.@ncondenast.com.

24         Anna, I have it, but I have no social security number

25   for Venmo.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1941

1          Me.  PayPal is okay.

2          Anna.  K.

3          Me.  Thank you.

4          Anna.  They are really strict with phone use here.  I

5   am hiding it in my bag.

6          Me, you through, all clear.  Welcome back.

7          Yes, all good.

8          Me.  That's great.  I bet you're relieved to be back.

9          Anna.  Oh Jesus what's up in New York today.  All my

10  hotels are sold out.

11         Anna.  I have to go to the smyth or something.

12         Me.  CFDA.

13         Anna.  It's over, no.

14         Starting tomorrow everything's available.

15         What else is good?  I am going to mercer starting

16  Monday.  We tried edition, Nomad, Bowery, Greenwich.

17         Me, hmmmmmmmm.

18         Anna.  The Beekman?  Good?  They're available.

19         Me, yes.

20         Rooms are small but it's cute and good restaurants.

21         Anna.  K I'm going there till Monday.

22         Me.  Nice.

23         Anna I'm waiting for luggage and getting a car right

24  after.

25         Will stop at the bank.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1942

1        If you feel like stopping by after work for a bite,

2    you're welcome.

3        Me.  Thank you.  This stress is getting to me.

4        Let's do tomorrow.  If you're free.  I am out of town

5    this weekend and next week.

6        Anna.  Okay.  Sure.  I will do Kacy tomorrow probably,

7    if you want to join.

8        Me.  Thanks.  Depends on time.

9        Anna.  Early morning?

10       Me.  I am actually a bit too stressed out with all I

11   have going on.  Let's just meet for dinner.  Anna okay.

12   Q    You could stop right there.

13        Now, did you eventually meet the defendant for dinner?

14   A    No.

15   Q    Why not?

16   A    I, I was much too stressed to meet the defendant until

17   the wire transfer came through, which never happened.

18   Q    Now, directing your attention to PX2486, June 8, 2017

19   at 8:00 a.m.   Your June 9th 2017 at 2:40 p.m.

20        Did you continue to exchange text messages with the

21   defendant?

22   A    I did.

23   Q    Please tell us what they said.

24   A    Me, Hi Anna, please, please, please take care of the

25   wire this morning.  I know the banks are open now.  The earlier

*C. Edwards*

Williams – People – Direct/Mays-Williams

1943

1   the better.  My automatic payments are bouncing.

2           Anna, yes will do.

3           Rachel.  In case you need my bank address for the wire

4   is JP Morgan Chase, 111 Polaris Parkway, Columbus, Ohio 43240.

5           Please let me know the reference number.

6           Anna.  Okay.  I shall have the reference this

7   afternoon.  I will be in touch as soon as I get it.

8           Me, please call the bankers to get the wire reference

9   before this afternoon.  It needs to happen now, please.

10  Otherwise I will not have the funds same day and I am in serious

11  trouble.

12          I hate being put in the position to make these

13  requests, but I am really up against the wall.

14          Anna.  Cut-off time is no earlier than 4m ET and the

15  wire shall clear before 6:00 p.m.

16          I know it's urgent and needs to happen today.

17          Me.  Can you speak to someone to have it done before

18  noon.  I really just can't afford to get pushed again by another

19  day.  I sent my account details to you so long ago.  All of my

20  bills are past due.  My rent is a full week late.  As of Amex

21  and other payments are bouncing.  I am so stressed.

22          Anna.  Will do.

23          Anna.  They say it's in the queue to be processed.  I

24  cannot do anything more at this point to expedited.  Wire

25  department will reach out to my banker with confirmation in the

*C. Edwards*

Williams - People - Direct/Mays-Williams

1944

1  next hours, but it's out of my control to make it happen before

2  12:00 p.m.

3          Me, who is they, your bankers?  Can you just go to a

4  bank and in person to complete the transfer.  They will give you

5  a reference number immediately.  This really needs to be

6  priority.  Wires do not take this long.

7          The bank was open at 8:00 a.m.  This absolutely has to

8  happen today.

9          When we spoke to a banker in Marrakech, I was told

10  this could happen in four days.  It's been weeks.

11          I am delinquent on all of my accounts.  I hate being

12  this person and having to ask you like this.  It's so awkward.

13  I am just in a very serious situation.

14          Anna.  I have a wire reference nr G0871010031505.  Not

15  sure if that helps.

16          Me.  Thank you.  It's not in Chase's system yet.

17          Anna.  Also I am checking out PayPal right now.

18          Anna.  Screen shot of something on PayPal.

19          I put, Anna, I put in Rachel_ Williams@condenast.com.

20          Me.  I had a feeling my PayPal was whack.  I'll call

21  them.

22          Sent another PayPal screen shot.  That should work

23  immediately.

24          Making sure this would work as backup option.

25          My PayPal is email is annadelvey@icloud.com

*C. Edwards*

Williams - People - Direct/Mays-Williams

1945

1        If you want to try to send me money to request, that
2  will work as well.
3        Me.  I am calling them to get my account unlocked, but
4  my Amex is higher than that amount.  So the wire still needs to
5  go through today.
6        Q    You could stop for just a moment.
7        Now, the defendant references sending you money by
8  PayPal.
9        Did you ever receive any money from her by PayPal?
10       A    I did, I received $5,000 via PayPal.
11       Q    Now, did receiving this sum of money give you any
12  comfort that you might receive the rest of the money that the
13  defendant owed you?
14       A    I mean, I always had believed that I was going to
15  receive the rest of money the defendant owed me.  It wasn't
16  because of the, because of the $5,000.  I mean, I needed in the
17  immediate.
18       Q    Okay.  All right.  So I am going to direct your
19  attention to a little bit further into your email.  Your text
20  messages exchange with the defendant.  I am going to direct your
21  attention to PX2490, specifically June 8, 2017 at 2:54 p.m.
22       You could start there and continue to tell the members
23  of the jury what you discussed via text message?
24       A    Me.  At this point you really could have walked into a
25  bank and just done the transfer yourself.  It's been a full

C. Edwards

Williams - People - Direct/Mays-Williams

1946

1   business day and wires take under 30 minutes.  You know this has
2   to be done today and here we are with one hour left until the
3   wire room closes and there is nothing.  Please help, Anna.
4           Anna.  I did it with my city account the way I always
5   do it.  I have assigned bankers who work on my accounts and
6   walking into random branch wouldn't make it any faster.
7           Me.  Okay.  Can you call them for a fed ref #.
8   They've had all day.  They should really have it by now.  It's
9   an emergency at this point.
10          Anna.  I just did.  I am about to get into my
11  3:00 p.m. meeting.  Will forward you any emails as soon as it
12  comes in.
13          Me.  What did they say on the phone?
14          Anna.  This is legit.  It's an emergency.
15          Come on, you said it would be today.
16          Anna.  That I will be receiving fed ref as soon as
17  it's generated.
18          I called them about 20 times today.
19          Me, okay.  Anna, sorry for the delay.  None of my own
20  cards came in yet, and I don't even have the numbers that I can
21  use on-line.
22          Me.  You mean for PayPal.  I am so concerned with the
23  wire.
24          Anna.  For PayPal and everything else that requires
25  the card.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1947

1       Me.  It takes ten minutes for a wire transfer when you
2   walk into a bank.  I really don't understand why it's taking
3   this long.  I am beyond stressed and actually, in real trouble
4   at this point.
5       My rent isn't paid.  My Amex isn't paid.  Everything
6   is late.
7       Anna.  How much needs to get paid right now?
8       Me.  I am usually so calm about this stuff.  It's just
9   gotten so far down the line.  The full wire transfer.  My Amex
10  is due in full.  What is the problem with the transfer?
11      Anna.  There is no problem.
12      Anna.  So PayPal wouldn't help at all?
13      Me.  It would help with my rent and I put it towards
14  the Amex bill, but the balance is much larger as we know.
15      Anna.  Okay.  Because that's one thing I have control
16  over.  I just need to get my card numbers quickly.
17      Anna.  Actually, it's 6:00 p.m. the domestic cut-off
18  time.
19      Me.  Okay my fingers are crossed.  Sorry to be so
20  hard.
21      I am just really at the limit.  I really don't
22  understand why the wire transfer hasn't happened already when
23  the bank was opened at 8:00 a.m.
24      I've been waiting for this number since Marrakech.
25  Everyday it's processing.  This cannot keep happening.  I feel

*C. Edwards*

Williams - People - Direct/Mays-Williams

1948

1   so sick and I'm legit crying at work.  Can you please send me

2   the fed ref to show that the wire transfer is actually going

3   through.

4           Anna.  Forwarded me.  Thank you so much.

5           Anna.  I am in meetings until 8:00 p.m. today if you

6   want to do dinner around 8:15.

7           Me.  I will see when I get out of here and we will

8   keep touch.

9           Anna.  Sorry again for getting you into this

10  situation.  I should be more organized moving forward.

11          Me.  Thank you.  It's okay.  Glad we are almost

12  through it.  Unpleasant for everyone, but it will work out.  The

13  vacation was wonderful, and I am really grateful for that.

14          Anna.  I sent you a bit more than owed as a thank you

15  and apology for the delay.

16          Me.  Thank you, Anna.  I really appreciate it.

17          Anna.  Anything in yet?

18          Me.  Not yet.  I spoke with someone in Chase, though,

19  who said it should process hopefully today or tomorrow the

20  latest.

21          I will let you know when I see it come through.  Let's

22  go to dinner tomorrow, when we both feel more relaxed and can

23  toast to be back in NYC.

24          I should have the funds by then, and should be so much

25  more calm, happy and normal.

C. Edwards

                    Williams - People - Direct/Mays-Williams
                                                              1949

1           Anna.   Okay.   As you want.   When are you leaving?

2           Me.   Early on Saturday morning.   I will text you if

3    the wire comes through today and I feel up for coming by.   I am

4    just pretty beat for the day.   Heading home to shower and

5    unwind.   Will text you later.

6           Anna.   Okay.   I am back around 8:15.

7           Me.   Okay cool.

8           Anna.   Just finishing here.   Heading back if you feel

9    like stopping by, let me know.

10          Me.   Thanks.   I am in for the night, but love to see

11   you tomorrow for sure.

12          No luck with the wire yet.   I'll keep checking and

13   will keep you posted.

14          Anna.   Okay.   It's been debited from my account.

15          Me.   You said that before.   Still nothing.   I am

16   really losing sleep over this.   So sick to my stomach.   This

17   must post to my account this morning or something is seriously

18   wrong.

19          Anna.   Anything I could do to help with this?

20          Me.   Can you check the status of the wire from your

21   end using the fed ref numbers?

22          Anna.   Not that I know of.   I will call my bank again

23   once they open.   What did they say from your side?   It's not

24   unusual for transfers to take a while, especially for higher

25   amounts.

                                                          C. Edwards

Williams - People - Direct/Mays-Williams

1950

1      Me.  My bank domestic wires happen, usually happen
2  same day, and almost always within 24 hours.
3      I will call them again.
4      Anna.  Someone is calling me back.  Once they come in
5  this morning, I will let you know if there is any update.
6      Me.  You also said the funds are posted by 6:00 p.m.
7  yesterday.  You should be able to track it through your bank
8  using fed ref #.
9      Anna.  I said the cut-off time is 6:00 p.m.  I have no
10  options tracking, anything other than getting a transfer
11  confirmation number.
12      One of my cards will arrive today.
13      Sent a screen shot of the PayPal confirmation, I
14  believe.
15      If the wire takes longer for some reason, they are
16  sending me PayPal.
17      Me.  Thank you, Anna.  I am sorry for texting in the
18  middle of the night.  Just so stressed.
19      Anna.  No problem.  I understand it's no fun being in
20  the situation and I caused it.  You have all reasons to be
21  upset.
22      Me.  Can you ask Ryan or your banker to send the proof
23  of transfer/confirmation.  That put my mind at rest.
24      The email with the fed ref from yesterday doesn't have
25  my name or date or anything?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1951

1    I can at least share that with my landlord.

2              (Whereupon, the following was recorded by

3        Official Court Reporter Denise Taylor:)

4                         *           *           *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*C. Edwards*

1    Q    I'll stop you there for a moment.

2        What was your understanding of who Ryan was?

3    A    I guess, I guessed that he was a banker, but I had no

4    way to know who Ryan was.  There was no last name or e-mail

5    address, or anything else associated with Ryan.  I assumed he

6    was a banker or accountant.

7    Q    The defendant didn't speak to you about who Ryan was?

8    A    Not that I remember.

9    Q    All right.  You can continue.

10   A    Anna, "Okay.  I requested, will forward as soon as I

11   receive it.  Keeping an eye on my e-mails for this."

12       Me, "Thank you.  Nothing yet, right?  If this went through

13   yesterday, shouldn't they be able to get this to you quickly?"

14       Anna, "He said fed ref is, has all the info for the bank to

15   see.  I e-mailed his supervisor to get some other confirmation

16   format, but didn't get back yet.  I'll give them a call after

17   this meeting.

18       Me, "Thanks.  The e-mail didn't you forwarded didn't have a

19   date or anything on it.  So, if I forward that, there's no way

20   to be sure it actually applies to me and was sent yesterday."

21       Anna, "Yes, I get what you're asking for."

22       Me, "We left Marrakech on May 19th.  I would never have

23   agreed to this if I thought it would take this long.  I'm in

24   such a bad situation.  Every day this gets pushed, it gets

25   worse.  I have to explain to corporate accountants why I have

1    such a huge overdue personal charge on my corporate Amex."

2        Anna, "I requested what you asked for.  My card is being

3    delivered between now and 4:15 p.m., and will send you as much

4    as Pay Pal will allow me right away."

5        Anna sends a screen shot of something.

6        Me, "Can you forward me the full thread with Ryan,

7    including date slash time info?"

8        Anna, "There was no thread.  It's one message with

9    confirmation.  I will forward the full wire order with your

10   name, date and account details as soon as they send it."

11       Me, "Okay.  Thank you, A S A P, please.  I need to confirm

12   with accounting here the money is en route and they close for

13   summer, Friday at 2.

14       Didn't you ask for this confirmation yesterday?  Why is it

15   taking that long?  They work for you.  My job is on the line

16   here and I'm being told the fed ref number is not valid."

17       Anna, "Give me a moment.  I'm in a meeting."

18       Me, "Anna, what is going on?  Question mark."

19       Anna, "Just finished here.  Will call them now.

20       They are in a meeting.  I'm getting a call back by

21   2:30 p.m."

22       Me, "Why is it always something?  I feel like you've been

23   stalling on this for weeks and it's finally gotten to this point

24   I can't cover anymore.  I'm out of backup options."

25       Anna, "I just got my card.  I'm on my way to pick it up.

1      Will Pay Pal help, as I suggested earlier?  I also offered

2  you to do Amex balance transfer.  I'm really trying here.  Not

3  everything is in my control."

4      Me, "It feels like there is a problem.  Something is

5  holding this up.  Obviously everything is not okay.  The wire

6  does not take weeks.  A wire does no take days even.  I feel

7  like you're not being straight with me and I can't afford to

8  keep chasing you like this."

9      Anna, "Also, if you'd like me to confirm your employer's

10 accounting that I assume the responsibility for outstanding

11 balance and confirm what led to it, I can do that.  I resolved

12 any outstanding issues this Wednesday."

13     Me, "I just don't understand why it can't be as we

14 discussed.  I've yet to receive a wire confirmation and it's

15 been two business days since Wednesday."

16     Anna, "Wire just got sent yesterday.  I'm sorry I don't

17 have the confirmation in the format you want it, so I cannot

18 forward it."

19     Me, "Did you speak with them slash, are they sending

20 confirmation?  Was it a wire or an A C H transfer?  Do you have

21 proof that it was processed yesterday?  I don't care what format

22 confirmation is in, so long as it proves a wire was sent to my

23 name and account yesterday.  Please just be straight with me.  I

24 do not understand why this should be so complicated."

25     Q    All right.  I am going to stop you right there.

1      Now, directing your attention to P X 2498.  Is this the

2  e-mail that you referenced in your text messages that you

3  received from a person by the name of Ryan?

4      A    It is.

5      Q    Okay.  And could you please read that e-mail?

6      A    Again, forwarded message, "Hi, Anna.  The fed ref

7  number is 0112L2LFCK1C003179.  The recipient should see the

8  funds hitting the account shortly.  Best Ryan."

9      Q    Had you reached out to your bank with this fed ref

10 number?

11     A    Yes, I did.

12     Q    And what did the bank say?

13     A    They told me that that format was invalid, or not

14 something they recognized.

15     Q    Now, directing your attention to P X 2513, specifically

16 June 14th 2017, at 5:16 p.m., did the defendant forward you an

17 e-mail with the subject line, "wire confirmation?"  2513.

18     A    She did.

19     Q    Okay.  And what did this e-mail contain?

20     A    It didn't have anything in the body.  There is an

21 attachment.  It was a P D F that I was unable to open.  It

22 required a password and said it was encrypted.

23     Q    Did you ask the defendant for a password?

24     A    I did.

25     Q    And what happened?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1956

1    A    She told me she was getting it and I never got it.

2    Q    Now, directing your attention to P X 2518, June 15th

3  2017, at 3:54 p.m., to the same day at 5:37 p.m., did you

4  exchange text messages with the defendant?

5    A    I did.

6    Q    Can you please tell us what they said?

7    A    Do you mind telling me where to start again?

8    Q    2518, and June 15th at 3:54 p.m.

9    A    Me, "Has Citi confirmed that it's actually being sent

10 now?"

11    Anna, "I have M M A accounts with Citi with a preset cap on

12 outgoing transactions.  I had to lift those before sending

13 anything cause I usually don't use these accounts for anything.

14 Otherwise, I would have sent it last week.  Everyone is asking

15 for completely different things.  It's so frustrating.

16    My lawyers are 2K per hour for this, useless back and

17 forth.  I can't wait for this to be over.  Yes, for Citi wire."

18    Me, "Totally frustrating.  Still nothing in my account."

19    Anna, "Hum, I can send bitcoin too.  Smiley face."

20    Me, "Hum, no thank you.  Don't know how to pay Amex with

21 that."

22    Anna, "Anything showing up now?"

23    Me, "Nope."

24    Anna, "You still want to do a cash deposit or wait for the

25 wire to clear?  I can pick up cash at Citi and come downtown to

1    you."

2        Me, "Cash is fine if you think it will work, but all the

3    Chase banks close at six.  It will be tight."

4        Anna, "Oh.  All Citi branches are closed at five, but there

5    is one open 'till 5:30 at 127 Hudson.  I can be there in 15 max,

6    and it's 10 minutes away from Chase."

7        Me, "Okay.  Let's do that.  Which Chase?"

8        Anna, "Barclay Street."

9        Me, "Let me know if you can make it.  I can then meet you

10   at Chase.  It's right by my office."

11       Anna, "Okay.  I'm in a car from uptown.

12       I thought all Citi would be open till six, as well, uh.

13   They just told me to come back tomorrow.  They don't have enough

14   currency that's opened now, ooo."

15       Me, "K.  I won't be in town tomorrow, so if there is not a

16   wire tomorrow will do cash on Monday a.m.  Does that work?"

17       Anna, "It's like the 10th time someone tells me to go fuck

18   myself today.  I can't."

19       Me, "Still nothing in my account, frustrating.  You really

20   need an assistant or something."

21       Anna, "They open at 8:30 a.m.  When are you leaving?  I

22   hope it goes through tonight.  So embarrassing."

23       Me, "Me too.

24       I leave at 6:00 a.m. to be at Amherst by noon."

25       Anna, "When are you back?"

1      Me, "Sunday evening some time."

2      Anna, "Haven't seen you in like a month."

3      Me, "We keep traveling at opposite times."

4      Anna, "I did nothing fun the whole time since I am back.

5  Let's plan something Monday.  I shall be at Mercer then."

6      Me, "I really need this to be over with before I can have

7  fun and I'm too stressed out."

8      Sorry.

9      Q    That's okay.  You can stop there.

10      Now, I am going to direct your attention to P X 2523,

11  June 19th 2017, at 8:41 in the morning to 11:27 at night.

12      So, at this point could you give the jury a little bit of

13  context of what's going on in your daily life while you are

14  having these interactions or text exchanges with the defendant?

15      A    I'm losing it.  I'm like up every night having panic

16  attacks and I am late for work and I'm getting phone calls from

17  Amex, even which causes more panic attacks because I am telling

18  them the same thing that Anna is telling me, it should be any

19  day now, it should be any day now.

20      Q    Okay.  And had you told anybody at work about your

21  nonprofessional use of the corporate card at this point?

22      A    It's hard to remember the exact chronology.  I told a

23  colleague.  I'm not sure.

24      Q    Okay.  So, I am going to direct your attention to P X

25  2523, June 19th 2017, at 8:41 a.m., and I'll tell you when to

1  stop.

2      A    You said 8:41?

3      Q    8:41, yes.

4      A    Me, "Hi, Anna.  What time can you meet me this morning

5  to do the cash deposit?  Still no update in my account."

6      Anna, "Yes, let me check on everything right now."

7      Me, "Hey, what's the update?  Question mark.  We need to

8  sort this out this morning, please."

9      Sorry, you guys.  I am grossing myself.

10     Anna, "I'm on the phone, will give everyone a call after

11 this."

12     Me, "I thought we were just doing take cash deposit since

13 nothing has come through?  I can't keep waiting 24 to 48 hours,

14 on and on.

15     Anna, I'm sorry it's frustrating, but we absolutely must

16 sort this out today.  I'm past the point where it was urgent and

17 have been in this situation for weeks now.  We need to find a

18 time for the cash deposit this morning.  It cannot wait."

19     Anna, "Yes.  I will be in touch shortly.  They promised me

20 to have this resolved today.  I have no other outstanding wires

21 waiting to go out after yours, so I am trying to get this

22 settled today."

23     Me, "I can't wait any longer.  Can you either send

24 confirmation in the form of a swift code or federal ref, or

25 let's do the cash deposit.  This cannot get pushed any later."

1     Q     I'll stop you right there.

2     Now, during this conversation that you had with the

3  defendant, did you ever meet her in order to get cash from her?

4     A     Not cash specifically, but at a certain point she told

5  me she had picked up a cashier's check.

6     Q     Okay.  And can you explain what your understanding was

7  with the cashier's check?

8     A     My understanding, that it was cash that had already

9  been deposited.  It was essentially cash, I guess, is my

10 understanding of what it was.

11    Q     Okay.  And so, can you please explain to the members of

12 the jury the contacts around trying to get the cash, the

13 cashier's check from the defendant?

14    A     Yes.  Anna told me that she had to go, she had to go

15 upstate for a work emergency of some sort and was late getting

16 back to the Citi, but she said she had made it to a bank branch

17 up there before it closed.  And she told me she had picked up

18 the check before it closed and then, she had gotten back to the

19 city and said we could meet the next morning so that she could

20 give me this cashier's check.  And so, of course I was up very

21 early in the morning, and this time -- and so I, in the morning,

22 texted her.  I don't remember if she responded or not, but I

23 knew that she was staying in the Beekman, which was very close

24 to my office, so I just thought I would show up, so, I did, and

25 I called her from my cellphone to tell her I was on, from my

1    cellphone and I texted her, she didn't answer.  So, I went to

2    the concierge and I asked him to call up to a guest room.  She

3    answered the phone.  She told me her room number.

4        I went up.  I can't remember what floor, but she answered

5    the door and invited me into the room and then started looking

6    for this cashier's check.  I clearly had woken her up.  She was

7    kind of like ruffling through suitcases and papers and piles of

8    things, like looking underneath suitcases, and then she said,

9    oh, I must have left it in the car that I drove back from

10   upstate yesterday, and she told me that she had driven back in a

11   Tesla, from a Tesla dealership.  So, she called the Tesla

12   dealership in front of me to say, I think I left an $80,000

13   cashier's check in a shopping bag in the Tesla.  I couldn't hear

14   the other end of the phone call, but I heard her having the

15   phone call.

16       It wasn't there, so then she was like, oh, my lawyer Scott

17   must have it.  I didn't know who Scott was, but she then told me

18   she was calling Scott's office where she said that she had

19   spoken to Scott's assistant who said, oh, yes, Scott mentioned

20   it, he does have the bag, he's out running errands.  She told me

21   that Scott would come find me where I worked in the One World

22   Trade Center.  She was like, Scott will bring it over to you

23   there, and I was like, could I please have Scott's cell phone

24   number, I don't have faith someone walking into that building is

25   going to find me and she said, oh, I don't have his cell phone

1    number.  And I said, I bet his assistant does.  And she said,

2    his assistant won't give out that information.  And I said, I am

3    going to wait here for Scott, so I waited with Anna for Scott to

4    drop off this check that she said was coming all day.

5         I went with her from the Beekman to a business meeting she

6    had at Le CouCou.  I sat with them at the table.  It was Anna's

7    lawyer, whose name I can't remember, and a private wealth

8    manager, whose name I can't remember.  The lawyer was

9    introducing Anna to the private wealth manager.

10        The men, one of the men picked up the tab and then after

11   that, I followed Anna back to the Beekman where she said, oh, I

12   have to get on a conference call, and I said, by all means, and

13   I stayed there.  She then takes the call.  She sat in the lobby

14   of the Beekman.  There is like a restaurant area in the hotel

15   lobby.  I sat with her working from my phone.  This is a workday

16   where I just have not gone to work and I'm sitting there sending

17   e-mails.

18        She ordered oysters.  She ordered wine, kept saying Scott

19   was on the way.  She said, Scott was on the way until like about

20   after 10:00 p.m., Scott was still on the way.  She said, he's

21   like 60 years old, he would tell me if he wasn't going to come,

22   like he would let me know and I think some time between 10 and

23   11:00 p.m., I was like, Scott is not coming.  I said, I'll be

24   back here tomorrow morning at 8:00 a.m. and we can go to the

25   bank and she said, I won't be awake at 8:00 a.m., and I just

1   gave her this look that she caught herself really quickly and

2   she was like, yes, of course I'll be up.  So then, the next

3   morning I showed up on time, went to her room and she wasn't

4   there and I, I started texting her, like, I told you I was going

5   to be here, like this was the plan and she said, I am not

6   getting the check and I was like, you knew we planned to meet

7   and go to the bank and she said, I, I don't know what to do, I'm

8   getting the check and I'm like, I'm pretty sure you are in your

9   hotel room and she was like, if you don't believe me you can

10  wait for me, and I was like, I already missed one workday, or I

11  can't keep missing workdays, I have better things to do, and she

12  was like, I'll let you know when I have it and I'll drop it off

13  at the office and, of course, at the end of the day, I never got

14  the check.

15        Q    Did you end up going to work that day?

16        A    I did.

17        Q    Now, directing your attention to P X 2561, specifically

18  June 27th 2017, at 1:03 p.m., did the defendant send you any

19  confirmation of payment?

20        A    She did.

21        Q    What did she send you?

22        A    There are four screen shots of a, what looks like a

23  wire confirmation from Deutsche Bank.

24        Q    I'll direct your attention to these next four screen

25  shots.  You can turn the page in your binder.  Now, can you tell

1    the members of the jury, is this one of the screen shots that

2    you saw?

3        A    It is.

4        Q    Okay.  I'll direct your attention to the next page as

5    well.  Is this the second half of the Deutsche Bank wire

6    confirmation that you saw?

7        A    It is.

8        Q    Directing your attention to the next page, is this the

9    other screen shot that the defendant sent you?

10       A    It is.

11       Q    And then finally, the final page, is this the other

12   portion of what the defendant sent you?

13       A    It is.

14       Q    Okay.  Now, did these confirmation sheets assist you

15   with receiving any payment from the defendant?

16       A    They did not.

17       Q    What happened when you reached out to your bank with

18   these wire transfer confirmations?

19       A    I didn't actually see any sort of actionable

20   confirmation number to even reach out to my bank with, so I

21   actually just consulted a friend who spoke German and he looked

22   at them and thought they looked legitimate, but no money ever

23   came through.

24       Q    Now, how long did you continue to contact the defendant

25   in order to try to get your money back?

MAYS-WILLIAMS-DIRECT-WILLIAMS                    1965

1      A     Through early, very late September, early October,

2    2017.

3      Q     Did the defendant ever pay you?

4      A     She did not.

5      Q     What are some of the other reasons that she gave you

6    that you weren't getting payment?

7      A     Oh God.  Well, there is the tax issue, to start.  She

8    told me that mostly it was her banker's and lawyer's fault

9    because she kept being promised things every day that weren't

10   happening.  She told me that she needed to get money out of an

11   escrow account.  I don't even understand what that means.

12   She -- that the banks didn't have enough cash, just on and on,

13   I'm sorry.  I can't actually even think of all of them.

14     Q     All right.  Now, directing your attention to P X 2613,

15   July 26, 2017, at 11:59 a.m. through 12:41 p.m., did you

16   exchange text messages with the defendant?

17     A     2613?

18     Q     Yes.

19     A     I did.

20     Q     Okay.  Can you tell us what they said?

21     A     Starting where?

22     Q     11:59 a.m.?

23     A     Anna, "That's already sorted."

24         Me, "Then why do you tell me you have a call at 1:00 p.m.

25   if it's irrelevant to my reimbursement?  Where is the

1   confirmation?  Where is the wire?  Where is the reimbursement?

2   I'm not waiting every day for the afternoon and then nothing

3   happens.  Fuck, Anna, I'm in trouble over here.  I need to be

4   reimbursed.  Your meetings and calls are leading to nothing.

5   Help me here.  I can't pay my rent.  I'm so freaked out."

6        Q    Do you need a moment?

7        A    I just got to see.

8             THE COURT:  Are you all right?

9             THE WITNESS:  I'm okay.  Excuse me.

10            THE COURT:  It's all right.  If you need a break

11   you'll let us know.

12            MS. MAYS-WILLIAMS:  Your Honor, it might just be a

13   good time to take a break.

14            THE COURT:  That's fine too.

15            Ladies and gentlemen, don't discuss the case.

16   Please follow the court officer.

17            (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

18

19

20

21

22

23

24

25

Williams - People - Direct/Mays-Williams
1967

1   DIRECT EXAMINATION
2   BY MS. MAYS-WILLIAMS:
3              THE CLERK:  Case on on trial continued.
4              All parties are present.
5              COURT OFFICER:  Witness entering.
6              (Whereupon, the witness takes the stand.)
7              THE COURT:  All right.  Ready to proceed.  We
8       will bring in the jury.
9              COURT OFFICER:  Jurors entering.
10             THE CLERK:  Case on trial continued.  All parties
11      are present.  All jurors are present.  The witness is
12      reminded, you're still under oath.
13      Q    Ms. Williams, before we took our break, you were
14  reading text messages between yourself and the defendant on
15  July 26, 2017 at 11:59 in the morning through 12:41 in the
16  afternoon.
17          Could you please start again and read your text
18  messages?
19             THE COURT:  What number, please.
20             MS. MAYS-WILLIAMS:  I am sorry, it's PX02614.
21             THE WITNESS:  But starting again at 11.
22      Q    Fifty-nine, yes, please.  Excuse me, I am sorry.
23          You could start at 2613.  I think that you read until
24  2614.  We could start any noon.  Why don't you just start at
25  noon, since you already read the others?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1968

1      A    I need to be reimbursed.  Your meetings and calls are

2  leading to nothing.  Help me here.  I can't pay my rent.  I am

3  so freaked out.

4          Anna.  I asked you yesterday if you need any money at

5  all before the main wire comes through.

6          Me.  You said before this afternoon when it sounded

7  like I received funds.  Yes, I need money.  Don't you realize

8  that this is so totally and completely unacceptable.  I don't

9  have the money to front you for months like this.

10         Anna.  I know and I am sorry.  I didn't know this will

11 take so long.

12         Me.  Thanks for apologizing but I need you to fix this

13 immediately.  I can't afford to wait.  Everything is so shifty

14 and vague.

15         Nothing you say comes through.  You come off like a

16 fraud.  I am extremely panicked.  I am in trouble, Anna.

17         Anna, how so?

18         Me.  How am I in trouble.  I can't pay any of my

19 credit cards, for my rent, for my bills, for living expenses.

20 Nothing you say contains clear information and every time line

21 you give, it turns out to be false and it's been over two

22 months.  You are in over your head.  This needs to be solved

23 now.

24         Anna.  What makes me a fraud here?

25         Me.  I didn't say you were.  I said all of shifting

*C. Edwards*

Williams - People - Direct/Mays-Williams

1969

1    and vagueness comes off fraudulent.  Everything I have been told

2    thus far hasn't come to fruition.  I am surprised you even have

3    to ask.  I am trying to keep up -- I am trying to keep the faith

4    up, Anna.  I really am, but I am unable to work.  I am so

5    freaked out.  I am a total mess.

6                Anna.  I am trying to be transparent and responsive.

7    I am sorry I got you into this situation.  It was never my

8    intent and I am doing everything to settle the payment.

9                I have the money.  It's just the administrative

10   issues.

11               Me.  Do you have the money in a US account?

12               Anna.  Yes, it's on tracking being resolved.

13        Q    All right.  You could stop right there.

14               Now, after you exchanged these text messages with the

15   the defendant, did there come a time when you saw her in person

16   again?

17        A    I did.

18        Q    When did you see her in person again?

19        A    I want to say maybe August the 1st, 2017.

20        Q    And what was the context of your meeting with the

21   defendant?

22        A    It was a day that I had decided to go to the police

23   that morning.  Shall I explain the full day?

24        Q    Yes. please.

25        A    While I kept in touch with Anna, I began to pursue an

*C. Edwards*

Williams - People - Direct/Mays-Williams

1970

1   alternate resolution, because I wasn't sure what to do.

2         So I had gone to the police that morning and explained

3   the situation and a lieutenant finally told me that he couldn't

4   help.  But with my face, I could go start a go-fund-me page to

5   get my money back, which wasn't helpful.  I went outside and

6   cried.

7         And then I met a colleague of mine.  While I was

8   sitting with her trying to strategize about what to do next.

9         I got a phone call from Kacy who was our personal

10  trainer, saying that Anna had showed up in her lobby crying and

11  she suggested it was time for us to do an intervention, to try

12  to learn the truth, to get some sort of truth.  We weren't sure

13  whether that was just like, going through, like, I didn't know

14  what was really going on.  We were going to try to reach her

15  parents.  We were going to try to get some sort of information

16  that we could use to figure out how to move forward.

17        So I went, I met Kacy and a friend of Kacy's with Anna

18  who was already there.  We went to the Frying Pan, which is a

19  bar off of the westside highway on a pier.

20   Q    And what happened once you got to the Frying Pan, did

21  you have a conversation with the defendant?

22   A    The group of us, we sat there, four of us at the

23  table.  And I was very quiet, because I had already asked all of

24  these questions for two months, but Kacy and her friend really

25  approached the conversation from a place of trying to help Anna

                                                    *C. Edwards*

Williams - People - Direct/Mays-Williams

1971

1    to start.  And then it began to sort of escalate into more of

2    like accusations and questions, and just trying again and again

3    to get some truth.

4        Q    How did the defendant respond to these questions?

5        A    She had an answer for everything.  I didn't.

6        Q    What was some of her responses?

7        A    When we asked who her banker was, she had a name

8    Peter, like, Bracket, I think it was, when we asked her.  At a

9    certain point the pending job for me, I sort of started to

10   really double the entire foundation of her identity, and I

11   blurted out, do you even have a family.  Do you even have family

12   that's living.  And she said, yes, I have my father.

13        And someone asked her what's your father's name.  And

14   she said, she said it twice and slowly, she said like Daniel,

15   Daniel Decker Delvey.  And then she started to say that she said

16   the reason for the problems, I mean, it's gibberish.

17        But she said the reason for the problem was she had

18   disbursements.  She's being promised everyday, like, endless

19   securities until my 25th birthday, which was supposed to be in

20   April.  But it keeps being pushed.  Everyday I am told it's

21   going to be everyday.  There was nothing.  There was nothing.

22   She didn't say anything that meant anything.

23        Q    Did the defendant express any remorse?

24        A    She was crying, but she was crying because it was the

25   same day?

C. Edwards

Williams - People - Direct/Mays-Williams

1972

1      MR. SPODEK:  Objection, your Honor.

2      THE COURT:  Sustained.

3      Q    Now, now after you had this conversation with the

4  defendant, did there come a time that you reached out to law

5  enforcement again?

6      A    There did, the next day.

7      Q    Now, before we get to that, I am showing you what has

8  been marked for identification as People's 28 and 29.

9          Sorry.  What is already in evidence as People's 28 and

10  29.  Do you recognize those exhibits?

11     A    I do.

12     Q    What do you recognize them to be?

13     A    My credit card statements, both from my corporate card

14  and my permanent card.

15     Q    Did you have a chance to review these statements

16  before testifying today?

17     A    I did.

18     Q    First, I am going to direct your attention to Exhibit

19  No. 29, specifically the statement covering April 14, 2017

20  through May 13, 2017.

21          Could you tell us what was the balance on this card at

22  the time that statement was issued?

23     A    $18,000.09.

24     Q    And when was the next payment due?

25     A    June 9, 2017.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1973

1      Q      And what is the minimum amount that you were required

2  to pay by the due date?

3      A      $1,922.66.

4      Q      Now, I am directing your attention to PX2000.

5             Can you please tell the members of the jury what the

6  first charge on May 12, 2017 is?

7      A      Colville Travel Agency.  It is a charge to $559.76 for

8  Kacy Dukes' flight to Marrakech.

9      Q      Now, directing your attention to the first charge on

10  May the 13th, 2017.

11             Could you tell us what this charge is?

12      A      That's $120 to pay for one check baggage for the

13  videographer.

14      Q      And what is the next charge?

15      A      $81.53 for the second piece of checked baggage.

16      Q      And, directing your attention to the bottom of the

17  page, May 13, 2017, can you tell us what this charge is?

18      A      $10,011.09 for the Sushi restaurant in J.F.K.

19      Q      Now, directing your attention to the statement

20  covering May 12, 2017 through June 13, 2017, PX2005.

21             What was the balance on this card at the time that

22  this statement was issued?

23      A      $62,498.60.

24      Q      And when was the next payment due?

25      A      July 9, 2017.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1974

1    Q    And what is the minimum amount that you were required

2    to pay by the due date?

3    A    $32,870.60.

4    Q    Now, directing your attention to PX2007.

5         Could you please tell us what the first charge on the

6    page on May 12, 2017?

7    A    Colville Travel $988.50 for Kacy's flight.

8    Q    What is the next charge?

9    A    Colville Travel $988.50 for Jessie's flight.

10   Q    Directing your attention to the next page.

11        What is the next charge?

12   A    988.50 for Anna's flight.

13   Q    And the next charge?

14   A    $988.50 for my flight.

15   Q    Next?

16   A    The Kaftan store on May 15, for $1,339.24.

17   Q    And that is for the, what is that for?

18   A    The first purchase is for the dresses and like junk

19   food that Anna wanted to buy in the Medina.

20   Q    And the next charge, is that related to what the

21   defendant asked of you?

22   A    That's a personal charge.

23   Q    So, we will skip that charge.

24        And can you tell us what the third charge is on

25   May 15, 2017?

*C. Edwards*

Williams - People - Direct/Mays-Williams

1975

1    A    That's the restaurant in the Medina from a shop in the

2  Medina.

3    Q    And what is the value?

4    A    I am sorry, it's $272.49.

5    Q    Next charge?

6    A    Is the lunch after the YSL Garden for $125.25.

7    Q    Directing your attention to May 17, 2017.

8         You could tell us what charges were made on your card

9  that day?

10   A    At the Kasbah Tamadort, there's a charge for $146.62.

11   Q    At the pool bar Marrakech, there's a charge for

12  $236.24.

13        At a restaurant Yacout.  There is a charge for

14  $215.32.

15        At a restaurant Yacout, there's a charge for $26.66.

16   Q    And are all of these charges, charges that the

17  defendant had promised to reimburse you for?

18   A    They are.

19   Q    Directing your attention to May 18, 2017, could you

20  tell the members of the jury what charges are here?

21   A    Jardin Majorelle, the YSL Villa, for 1,640.54.

22        Hotel La Mamounia for $30,865.09.

23        Hotel La Mamounia for $5,144.30.

24   Q    Now, directing your attention to Exhibit 28,

25  specifically PX01992.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1976

1          Could you tell the members of the jury what, first of
2    all, which card is this?
3          A    This is my Corporate American Express?
4          Q    Now, directing your attention to May 23rd, 2017.
5          Could you please tell the jury what charges are here?
6          A    The first is hotel La Mamounia for $12 $654.96.
7          The second is also hotel La Mamounia for $4,115.49.
8          Q    Now, during the time that you were dealing with all
9    the consequences of the defendant's behavior, did you tell your
10   parents what was going on?
11         A    Not until the day after the Frying Pan confrontation.
12         Q    Did you tell your brother?
13         A    I did not.
14         Q    Okay.  Now, you testified earlier that you were
15   worried about paying rent.
16         Did you have to borrow any money in order to pay your
17   bills?
18         A    I did.
19         Q    And who did you borrow money from?
20         A    I borrowed money from my boyfriend at the time, and I
21   also borrowed money from a family friend.
22         Q    Now, approximately how much money did you borrow?
23         A    Approximately $30,000.
24         Q    Now, in addition to speaking with your boyfriend and
25   your colleague, could you tell the members of the jury how often

*C. Edwards*

Williams - People - Direct/Mays-Williams

1977

1    did you cope with the situation?

2        A    As I am seeking, filing law, filing complaint with law

3    enforcement, I was late on my credit card bills.

4            Oh, I guess, the day again, the same day that I told

5    my parents, I also began to write, finding the, my way to the

6    District Attorney's office and kind of, especially after the

7    Frying Pan and relating that, everything I believed about this

8    person was a lie, was very jarring.

9            So I found that I am kind of like, stuck in my head,

10   replaying scenes again and again.  So I thought the only thing

11   to do is to just to get it down on paper.

12           So it felt important to remember, but I also didn't

13   want to hold onto it anymore.  So I kind of needed to get it

14   out.  So I started to write around that time.

15       Q    Now, what did you do with the material that you wrote?

16       A    Well, for a long time, that was in August of 2017, for

17   a long time I kept it to you myself.  I kind of, it was a longer

18   story than I realized.  So I just continued to write.

19           But eventually, I want to say, March of 2018, I was

20   contacted by a journalist and became aware that the story also

21   pertaining to my experience with Anna was going to come out,

22   sort of with or without me.

23           And it felt really important to me that I be the one

24   to tell my story, especially because I've been rehashing to

25   myself so long and trying to understand it.

*C. Edwards*

Williams - People - Direct/Mays-Williams

1978

1          So at that time I, I guess, I mean, I worked in a

2     magazine, so I had the resources and the platform and the

3     support I needed in ordered to publish an article explaining or

4     telling my story of, a small part of my story of what happened

5     with Anna.

6          Q     And who published your article?

7          A     Vanity Fair.

8          Q     And did you receive any compensation for the

9     publishing of this article?

10         A     I did.

11         Q     How much did you receive?

12         A     I believe it was roughly $1,300.

13         Q     Now, after your article was published in Vanity Fair,

14    did any other organizations reach out to you about your article?

15         A     It did.  I received a lot of interest.

16         Q     Now, did you, did you ultimately agree to any business

17    with any of those organization?

18         A     I did.

19         Q     Which organization did you decide to do business with?

20         A     With HBO.  And also with, Simon & Schuster.

21         Q     Now, let's start with HBO.  What is it that, what

22    business did you have or do you have with HBO?

23         A     They have options, the rights to make some sort of

24    project, based on my story.

25         Q     And when you say that they have options, the right,

C. Edwards

Williams - People - Direct/Mays-Williams

1979

1  could you just explain that a little bit, so we make sure

2  everybody understands what you mean?

3      A    They have paid an amount of money to hold the

4  exclusive rights to make something based off my story, kind of

5  like holding a base, dibs on this.  We are going to work on it

6  for this amount of time.  Here is the money we will give you

7  during that amount of time.  That's an option.

8      Q    So did you receive compensation from HBO for this?

9      A    Yes, I did.

10      Q    And how much did HBO give you?

11      A    The total before, like, all the, whatever fees and

12  stuff that come out of it was $35,000.

13      Q    And you just mentioned fees.  So HBO gave you $35,000,

14  but did you actually take home $35,000?

15      A    I took home closer to $31,000, I believe.

16      Q    And with this money, did you have to pay back some of

17  the people that had loaned you money during this time?

18      A    I did.

19      Q    Did you use the money to pay people back?

20      A    I did.

21      Q    All right.  Now, you also mentioned Simon and

22  Schuster.

23           Can you tell the members of the jury what you're

24  talking about here?

25      A    As we know, I had a lot of writing.  I received a book

*C. Edwards*

Williams - People - Direct/Mays-Williams

1980

1   deal, the long and short of it, and an entrusted colleague who

2   worked at Vanity Fair had gone to Simon & Schuster and kind of

3   took a chance on me.  And I trusted her, and we decided to move

4   forward with the book project in addition to the HBO.

5       Q    Did you receive any compensation for this book?

6       A    I did.

7       Q    How much did you receive?

8       A    I have received, it was $75,000.

9       Q    And that's the amount you received so far?

10      A    I received $63,000.

11      Q    Now, what is the amount that they promised you?

12      A    Grand total $300,000.

13      Q    And of that $300,000, will you have to pay other

14  people as well?

15      A    I will, yes.  In terms of like percentages off of it?

16      Q    Yes.

17      A    I don't know how much, though.  I can't do that math

18  that fast.

19      Q    Now, could you just tell the members of jury why have

20  you chose to monetize this awful experience?

21      A    For several reasons.  Not the least of which is the

22  enormous debt I was left holding.  I guess more importantly,

23  though, I just wanted to tell the story.

24          I feel it is an important story.  I feel it's a more

25  complex story than it might seem, if you hear the bear bones

*C. Edwards*

Williams - People - Cross/Spodek

1981

1   facts from, like some tabloid.  There are people.  There are

2   complex emotions involved.  I just wanted to make something that

3   maybe people could relate to.

4       Q    Now, did there come a time that you reached out to the

5   Manhattan District Attorney's office to file a complaint about

6   the defendant's behavior?

7       A    Yes.

8       Q    Now, did there also come a time when you came into

9   contact with the detective by the name of Michael McCaffrey?

10      A    Yes.

11      Q    And did Detective Michael McCaffrey reach out to you

12  about the defendant's whereabouts?

13      A    He did.

14      Q    And did you tell him where she was?

15      A    I did?

16      Q    Now, to date, has the defendant ever repaid you any of

17  your money?

18      A    Aside from that $5,000, no.

19      Q    I have no further questions.

20           MR. SPODEK:  May I, your Honor?

21           THE COURT:  Yes.

22  CROSS-EXAMINATION

23  BY MR. SPODEK:

24      Q    Good afternoon, Ms. Williams.

25      A    Good afternoon.

*C. Edwards*

Williams - People - Cross/Spodek

1982

1    Q    Excuse me.  If you need to take a break any time, let

2  us know.

3         I want to bring you back when you first met Ms.

4  Sorokin, in early 2016, right?

5    A    That's correct.

6    Q    So you first met Ms. Sorokin at a nightclub in

7  New York, right?

8    A    That is right.

9    Q    And that was the Happy Ending nightclub.

10   A    Yes.

11   Q    Okay.  Now, you and Ms. Sorokin shared some mutual

12  friends, right?

13   A    We did.

14   Q    Mariella Everett, (ph.) is that correct?

15   A    That's correct.

16   Q    Okay.  And she does, like a fashion PR, something

17  along those lines?

18   A    I believe so.

19   Q    And what about Ashley Simpson, someone who worked at

20  Vogue?

21   A    I don't know that she worked at Vogue.  I do know

22  Ashley, I believe she was a freelance writer.

23   Q    Do you know if Ms. Sorokin was friends with Ashley?

24   A    They seemed to be friends, when I was around both of

25  them, yes.

*C. Edwards*

Williams - People - Cross/Spodek

1983

1       Q     So how did you come to interact with Ms. Sorokin at

2    Happy Ending?  Did you approach where she was?  Did she approach

3    where you were?

4       A     She approached where I was.  I was with friends and

5    she knew, friends of mine.

6       Q     Okay.  And who were those friends that she knew?

7       A     I believe she knew Mariella, but like I said, I was

8    just with my friends and Anna approached us and joined us.

9       Q     Okay.  What did Ms. Sorokin say to you when she

10   approached?

11      A     She told me her name.  This was a long time ago?

12             (Whereupon, the following was recorded by

13      Official Court Reporter Denise Taylor:)

14                    *           *           *

15

16

17

18

19

20

21

22

23

24

25

*C. Edwards*

SPODEK-CROSS-WILLIAMS                    1984

1      Q    Sure.  Prior to, prior to when you met her at Happy

2   Ending, did you see her on social media?

3      A    I did, yes.

4      Q    Okay.  So, you were familiar with Ms. Sorokin prior to

5   meeting her in person?

6      A    In that I saw her on social media.

7      Q    Okay.  And did you see her at other fashion events, or

8   when did you see her?

9      A    The only reason I found my way to her profile was I had

10  seen her in photos with my friends and wondered who she was

11  because I didn't recognize her.  Her profile was photos of art,

12  some travel, the editor and chief, I guess, at Purple Magazine.

13     Q    Okay.  Did you know about Purple Magazine?

14     A    I did.

15     Q    And what is Purple Magazine?

16     A    It's a, I think it's a fashion magazine and I don't

17  know it that well.

18     Q    You are in a better position than we are, for sure.

19          MS. MAYS-WILLIAMS:  Objection, your Honor.

20          THE COURT:  Overruled.

21     Q    Was it fair to say that you wanted to be introduced to

22  Ms. Sorokin when you met her?

23     A    She knew my friends and I was interested in meeting a

24  new friend, so, yes.

25     Q    And that evening that you first met her, did she

SPODEK-CROSS-WILLIAMS                    1985

1    purchase any bottles of alcohol at all?

2        A    That is my memory.

3        Q    And she paid for those bottles?

4        A    I don't remember bottles, plural.  I wasn't counting.

5        Q    Okay.  Did you pay for it?

6        A    I did not.

7        Q    And you do recall Ms. Sorokin paying for it, though?

8        A    I do.

9        Q    Okay.  After that first evening -- withdrawn.

10           After that evening did you exchange information with Ms.

11   Sorokin?

12       A    I don't believe it was immediately after that evening.

13   If I saw her with friends or another time, maybe a little

14   further along.

15               THE COURT:  Let her finish up.

16       Q    I'm sorry.  Please continue.

17        Are you finished?

18       A    I am finished.  Thank you.

19       Q    Second time that you met Ms. Sorokin where was that?

20       A    My memory is that we went to a steak house called

21   Harry's and she was there with Mariella.  Mariella invited me to

22   join them.

23       Q    Okay.  Is this the first time that you saw her after

24   that evening at Happy Ending?

25       A    To the best that I can remember, yes.

1    Q    Okay.  Do you recall who paid for dinner at Harry's?

2    A    We split it three ways.

3    Q    Okay.  Do you recall if Ms. Sorokin told you about her

4   business plans at Harry's?

5    A    She did.

6    Q    Okay.  What did she tell you?

7    A    She told me that she was working on her art foundation,

8   and she said that she had money from a family trust, and I think

9   she described the foundation a bit.

10    Q    Okay.  How did you feel about the foundation after you

11   heard about it?

12              MS. MAYS-WILLIAMS:  Objection, your Honor.

13              THE COURT:  Sustained.

14    Q    Did she give you any specific details about the

15   foundation?

16    A    In concept, I guess.  Not like, I mean defined

17   specifics.  She said that she wanted to do a member's only club

18   want art gallery concept, something along those lines.  It's

19   been a long time.

20    Q    Okay.  After that second dinner, did you see her again

21   in 2016?

22    A    I did.

23    Q    Okay.  Do you recall when the next time you saw her was

24   after Harry's?

25    A    I don't know when is the next time, but I remember

SPODEK-CROSS-WILLIAMS                    1987

1   seeing her out with friends who go out.  Aside from the first

2   time I met her, that same group would go out the same way we did

3   that first night.  She and I went one day to Hyde Park.

4        Q    Okay.  And is that in Long Island?

5        A    No.  I think it's just slightly upstate.

6        Q    Okay.  And just the two of you went?

7        A    Just the two of us.  We took the train.

8        Q    Okay.  And at this point where did you understand Ms.

9   Sorokin was living?

10       A    At that point I believed that she was living in the

11  Standard hotel.

12       Q    Okay.  And after the Hyde Park excursion, did you see

13  her again?

14       A    Maybe just once or twice.

15       Q    Okay.  Do you recall where you were when you saw her?

16       A    I saw her once at the Standard.

17       Q    Okay.  Now, when you two spent time together at this

18  point, did you share the cost of the activities, or did Ms.

19  Sorokin pay for them?

20       A    We definitely shared them.  And in some instances, like

21  the train ticket, for instance, I purchased them.  Travel seems

22  to be my thing.

23       Q    Okay.  And did you, after Hyde Park, did Ms. Sorokin

24  leave then because she had to leave the United States, or she

25  was still in New York?

1    A    Some time after that.  I was traveling a lot in the

2  summer and when I got back, she had gone, so I don't know like

3  if it was in the fall.  I don't know exactly when she left, but

4  after Hyde Park, yes.

5    Q    Okay.  Did you two stay in touch when she was abroad?

6    A    Not often.  I did hear from her on occasion.  It's hard

7  to know because I don't have those text messages anymore.

8    Q    Okay.  At this point your relationship hasn't blossomed

9  to the relationship you testified about at 11 Howard, right?

10   A    We hung out a few times, like I would say she was a

11 friend at this point, but it wasn't as intense as when she

12 returned.

13   Q    Do you recall when she returned?

14   A    February 2017.

15   Q    Okay.  And this is when she checked into the 11 Howard

16 Hotel, correct?

17   A    To the best of my knowledge.

18   Q    Okay.  Well, how did you know that she was at 11

19 Howard?

20   A    What do you mean at?  Like that she was staying there?

21   Q    Yeah.

22   A    Well, she told me, for starters.  I also subsequently

23 saw her there.

24   Q    Okay.  So, when she came back to the United States, she

25 reached out to you?

1     A     That is correct.

2     Q     Okay.  And she invited you to come to 11 Howard Hotel,

3   correct?

4     A     At a certain point, not immediately, but yes.

5     Q     Okay.  So when was the first point that you saw her at

6   11 Howard Hotel?

7     A     It would have been after lunch on whatever day that was

8   in February, in February, when she had gone to lunch, after

9   lunch and for a drink.

10    Q     Where did you go to lunch for that?

11    A     Mamo, on West Broadway.

12    Q     Okay.  When you went back to the hotel, did you have

13  drinks at the hotel?

14    A     We did.

15    Q     At the Library Bar?

16    A     Excuse me, yes.

17    Q     Okay.  And did Ms. Sorokin put those drinks on her

18  bill?

19    A     She did.

20    Q     Okay.  Now, you testified on direct that you started to

21  spend more time with her at this point, right?

22    A     I did.

23    Q     Okay.  So, how many times would you say that you had

24  drinks with Ms. Sorokin at the Library Bar, at her hotel?

25    A     You know, that's a really hard thing to guess.  I would

1    say from March through early May, maybe two to three times a

2    week, at most.

3        Q    Two to three times a week from March of 2017,

4    April 2017 and May of 2017?

5        A    I think because I like kind of mapped it out based on

6    text messages, I believe in March it was almost daily, it

7    trickled off through May -- I'm sorry, through April, April into

8    May, yes, at least once a week.

9        Q    Okay.  So, in the beginning your recollection is that

10   it was almost every day and then it tapered off, right, as time

11   went on?

12       A    Almost every day.

13       Q    Okay.  When you had drinks at the Library Bar at the

14   hotel, did Ms. Sorokin pay for it all the time?

15       A    In the hotel, yes.

16       Q    Okay.  Did you ever pay for a drink at the 11 Howard

17   Hotel through March, through April, through May?

18       A    Yes.  When Anna wasn't with me.

19       Q    Okay.  When you were with Ms. Sorokin, did you ever pay

20   for a drink?

21       A    Not that I recall.

22       Q    Okay.  Now, did you ever have drinks with other people

23   at the hotel with Ms. Sorokin and third parties?

24       A    Probably, yes.

25       Q    Okay.

1      A    I think so.

2      Q    Do you recall if Ms. Sorokin paid for all of your

3    drinks when you were at the hotel?

4      A    In the Library, I don't think we would have had drinks

5    with anybody because I think most of her, from what it seemed,

6    her other friends were employees and they wouldn't be drinking

7    in the Library.  So, I feel like it was the two of us and Le

8    CouCou, it was different.

9      Q    Well, you mentioned she had the two friends that we

10   talked about earlier, right?

11     A    In 2017, she was no longer friends with those two

12   girls.

13     Q    So, did you ever offer to pay for the drinks at the

14   Library Bar with Ms. Sorokin?

15     A    Yes.

16     Q    And she refused the payment?

17     A    She did.

18     Q    Okay.  Now, sometimes you would go to have dinner at

19   the hotel with Ms. Sorokin, right?

20     A    That is correct.

21     Q    Actually, let's backtrack for a minute.

22      How much are drinks at the Library Bar?

23     A    I imagined they are --

24     Q    If you know?

25     A    I don't know.  I imagine like a $10 glass of wine, like

1    a normal New York drink might cost.

2        Q    Okay.  Now, how many times did you go to Le CouCou with

3    Ms. Sorokin at the 11 Howard Hotel?

4        A    I'm not sure.

5        Q    Okay.  Would you say it's more than five?

6        A    I would say more than five.

7        Q    Okay.  Would you say it's more than ten?

8        A    I would say close to ten.

9        Q    Okay.  Now, on direct you testified that it's a very

10   fancy restaurant, right?

11       A    It's a very fancy restaurant.

12       Q    White table cloths?

13       A    It's beautiful.

14       Q    Waiters are in their whites, very elegant place, right?

15       A    It is.

16       Q    Would you say that is an expensive meal there at Le

17   CouCou?

18       A    Would I say it's expensive, yes.

19       Q    And again, did Ms. Sorokin pay for all of your meals up

20   to the ten times that we know of?

21       A    No, she did not.

22       Q    Did you pay sometimes?

23       A    Did I?

24       Q    Did you pay for Ms. Sorokin sometimes?

25       A    I did.

1    Q    Okay.  How many times did you pay for Ms. Sorokin?

2    A    I would say, once or twice.

3    Q    Okay.  So, it's safe to say the other eight times Ms.

4    Sorokin paid it?

5    A    Yes.

6    Q    Do you recall how much those meals were?

7    A    I would say breakfast was probably $40.  I would say

8    dinners are probably closer to $200.

9    Q    Okay.  Do you recall how many times you had dinner

10   versus having breakfast?

11   A    I really don't.  I would approximate we had breakfast

12   five times, and maybe dinner, we could still say ten dinners, to

13   make it safe.  That sounds like a reasonable guess.

14   Q    Now, you stated that sometimes you came by for drinks

15   at the Library Bar with Ms. Sorokin, right?

16   A    Uh hum.

17   Q    So, were there days that you had dinner or breakfast

18   with Ms. Sorokin and then had drinks at the bar?

19   A    Yes, they were.

20   Q    There were a number of days like that?

21   A    Yes, I would say there were.

22   Q    Okay.  And on those occasions that you came by twice,

23   or went to two separate places at the hotel, did Ms. Sorokin

24   pick up the tab for that?

25   A    Yes, she did.

SPODEK-CROSS-WILLIAMS                    1994

1    Q    Okay.  So, is it safe to say that the vast majority of

2  the time you were at the 11 Howard Hotel, Ms. Sorokin paid for

3  everything then?

4    A    I would never say everything.  I would say most of the

5  time.

6    Q    Okay.  Well, you just stated you paid for one of the

7  ten times, right?

8    A    Which makes it not everything.

9    Q    So, the vast majority would be at least nine out of

10 ten, right?

11   A    I would say, yes.

12   Q    Okay.  Now, you stated on direct that Ms. Sorokin had a

13 private trainer, right?

14   A    She did.

15   Q    Okay.  And I believe you called her some sort of

16 celebrity trainer, right?

17   A    Yes, I did.

18   Q    What does that mean exactly?

19   A    It means that -- well, I know this because Anna

20 mentioned that Kacy had trained Dakota Johnson for 50 Shades of

21 Grey, and that is the way Anna found her.

22   Q    Now you stated on direct that -- withdrawn?

23    When did you first learn that Ms. Sorokin was bringing on,

24 I believe her name is Kacy, right?

25   A    Uh.

SPODEK-CROSS-WILLIAMS                          1995

1      Q    For this personal training regimen, when did you learn

2   about this?

3      A    I learned about this, she had mentioned it in person,

4   but I learned she had done it while I was traveling for work and

5   I was in Los Angeles.

6      Q    And when is the first time she invited you to

7   participate in these training sessions?

8      A    She said that she had booked Kacy.  I believe it was

9   Monday, Tuesday, Friday, and I was going to be coming back from

10  Los Angeles, on that Monday, she said come either Tuesday or

11  Friday.  I said, it will be too hard to come on Tuesday, but

12  that it sounds great.

13     Q    Okay.  So, when is the first time you participated in

14  these training sessions?

15     A    On Friday, early March.

16     Q    Early March.

17      Now, did you start going to these training sessions

18  frequently?

19     A    I did.

20     Q    Would you say you went three to four times a week?

21     A    No.  I would say the first, the following week.  So, we

22  started on a Friday, Anna invited me to join her moving forward

23  and I said, are you sure you're paying for this time.  It's

24  yours.  I don't want to take Kacy's attention.  She said, I'm

25  paying for the time, so it's kind of mine to do whatever I want

SPODEK-CROSS-WILLIAMS                    1996

1    to do with and I think it's boring to do it by myself, I'd

2    rather have company, so the following week we did go, I don't

3    know, four days.

4        Q    Okay.  So, this is early March, you're referring to?

5        A    Yes, it is.

6        Q    Okay.  So, at this point, just so we are all clear,

7    some days you are going to the hotel for breakfast, right?  Some

8    days you are going to the hotel for breakfast?

9        A    Yes.

10       Q    Some days you're going go to the hotel for dinner?

11       A    Some days, I am, yeah.  Some days we spend a lot of

12   time together, yes.

13       Q    Some days you are going to the bar at the hotel for

14   drinks with Ms. Sorokin, right?

15       A    Uh hum, yes.

16       Q    Okay.  And now you are going to training sessions at

17   the hotel with Ms. Sorokin, right?

18       A    Anna was very generous, yes.

19       Q    Okay.  So, you stated on direct, I believe it was maybe

20   3 to $400 a sessions?

21       A    I believe it was $300 a session.

22       Q    $300 a session, and at a minimum you went at least

23   three times a week at some point, right?

24       A    I actually think I tried my best to count the number of

25   times.  I believe I may have gone a total of 12 times to see

1    Kacy with Anna.

2         Q    Did you pay for any of those times?

3         A    I did not.

4         Q    Did Ms. Sorokin pay for any of the those times?

5         A    Anna did pay for all of those times, yes.

6         Q    Do you know if Ms. Sorokin charged Kacy to the room or

7    paid Kacy directly?

8         A    I did not get involved in the payment with Kacy.  I

9    imagine she had to pay Kacy directly.

10        Q    Did you find it uncomfortable that Ms. Sorokin was

11   paying for your breakfast, for your dinner --

12             MS. MAYS-WILLIAMS:  Objection, your Honor.

13             THE COURT:  Let him finish his question.

14        Q    -- for drinks at the hotel bar and now for your

15   personal training sessions with the special celebrity trainer?

16             MS. MAYS-WILLIAMS:  Objection.

17             THE COURT:  Sustained.  Sustained.

18             You want to step up a second, please, counsel.

19             Ladies and gentlemen, we have to break for the day

20   and come back tomorrow to complete this witness.  You know,

21   I say this every day and, by the way, I don't say this every

22   day because I don't think you'll remember, or I forget, the

23   law requires me to give you what's called separation

24   instructions.  That's why I do it every time you separate.

25             So, we begin, do not discuss this case with anyone.

PROCEEDINGS                              1998

1    Do not let anyone approach you in an attempt to talk to you

2    about the case.  Do not, if you see any of us outside,

3    please don't speak with us.  Please don't speak to anyone

4    from the press.

5              If there is a -- and please don't read anything

6    about this.  Please don't watch anything about this.  Do not

7    engage in any, on your own investigation about this on the

8    internet.  Don't post anything on social media about this.

9              Most importantly, enjoy your evening.  Please come

10   back bright and early tomorrow at 9:30, and we will

11   continue.  At the end of the day tomorrow, I will give you

12   our final scheduling so you know what the situation will be.

13             Okay.  Have a good evening.

14             Ms. Williams, I have to ask you to return tomorrow

15   at 9:30 and now that you are on cross-examination, you can't

16   discuss the case any longer with the District Attorney,

17   okay?

18             THE WITNESS:  Thank you.

19             THE COURT:  All right.  Have a good evening.  We'll

20   see you tomorrow.

21             (FURTHER PROCEEDINGS WERE ADJOURNED)

22

23

24

25

1999

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK:   CRIMINAL TERM:   PART 31
     - - - - - - - - - - - - - ---- - - - -
3    THE PEOPLE OF THE STATE OF NEW YORK

4                                        Indictment No.

5        -against -                      2441 of 2018

6    ANNA SOROKIN, aka,,
     ANNA DELVEY                         JURY TRIAL

7
                          Defendant.
8    - - - - - - - - - - - - - - - - - -
                              111 Centre Street
9                             New York, New York 10013
                              April 18, 2019
10
     B E F O R E :
11
             THE HONORABLE DIANE KIESEL,
12
                              J U S T I C E AND JURY
13
     A P P E A R A N C E S :
14
     For the People:
15
         CYRUS R. VANCE, JR.,
16           DISTRICT ATTORNEY - NEW YORK COUNTY
             One Hogan Place
17           New York, New York  10013
         BY:  CATHERINE McCAW & KAEGAN MAYS-WILLIAMS, ESQ.
18           Assistant District Attorney

19   For the Defendant:

20       SPODEK LAW GROUP PC
         85 Broad Street, 30th Floor
21       New York, NY 10004
         BY:  TODD A. SPODEK, ESQ.,
22

23

24                            CELENA EDWARDS, & DENISE TAYLOR
                              Senior Court Reporters
25

                                              *C. Edwards*

Proceedings

2000

1        THE CLERK:  Case on trial continued.  All parties

2    are present.

3        THE COURT:  Good morning, Counsel.

4        Good morning, Ms. Sorokin.

5        We are awaiting jurors, but I am informed by Ms.

6    Williams, that there was something you wanted to discuss.

7        MS. MAYS-WILLIAMS:  Yes, your Honor.

8        Mr. Spodek and I just spoke again about the email

9    that he informed me about yesterday.

10        When I went out to speak with the witness when

11    the Court gave me some time to speak with her about the

12    fees that she received from her book deal in HBO, I asked

13    her also about this email during the lunch break.

14        She forwarded me her communications about that

15    email with her agent.

16        So after speaking with Mr. Spodek, he does seem

17    as though there's a conflict in their memories of how this

18    conversation unfolded, and I had a concern that if cross

19    examined on this topic, Mr. Spodek may make himself a

20    witness.

21        So he has agreed, and he can speak for himself,

22    but he has agreed to only ask if she called him, which we

23    both agree that she did, and if she called about Anna's

24    life rights, and that the questioning should end there.

25        MR. SPODEK:  And that the agent also called me a

*C. Edwards*

Proceedings

2001

1    number of times.
2              THE COURT:  The thing is, how does she know
3    whether the agent called you?
4              MR. SPODEK:  What happened was, the agent was
5    calling me.  I was not calling back and she called me.
6    Please talk to the agent regarding Ms. Sorokin.
7              THE COURT:  Okay.  You're saying she's got
8    first-hand knowledge.
9              MR. SPODEK:  I could say -- I could ask her, do
10   you know if your agent called me?
11             THE COURT:  If she knows the answer is, yes or
12   no, right.
13             MS. McCAW:  Right.
14             MS. MAYS-WILLIAMS:  But I ask that we not go any
15   further, as there's a dispute to how everything unfolded
16   and we don't want -- we don't want to try this case again.
17             THE COURT:  So you are both in agreement that
18   this is the way it will go down?
19             MS. MAYS-WILLIAMS:  Yes.
20             THE COURT:  Fine with me.
21             Anything else?
22             MS. MAYS-WILLIAMS:  No.
23             THE COURT:  While we are here, can we talk
24   schedule, what happens next?
25             MS. MAYS-WILLIAMS:  Next after Ms. Williams is

*C. Edwards*

Proceedings

2002

1    done, I believe Ms. McCaw will be directing a relatively

2    short JP Morgan Chase witness.

3            THE COURT:  We need to walk the jurors through

4    for a second.  Let's do that, so they are not stuck in the

5    hall, and I will finish listening.

6            All right.  So you got one small witness.

7            MS. McCAW:  We got three main representatives,

8    essentially.

9            MS. MAYS-WILLIAMS:  Very well.  Three bank

10   representatives.  Then we have, we still have to play some

11   AmEx calls at some point in time.

12           We have two D.A.'s office witnesses from, one,

13   from HTAU to testify, and a paralegal witness and then we

14   are done.

15           THE COURT:  So you finish today?

16           MS. McCAW:  We want to.

17           THE COURT:  Okay.

18           MR. SPODEK:  Yes, your Honor.

19           THE COURT:  And still no case?

20           MR. SPODEK:  No case.

21           THE COURT:  Okay.  So as soon as they get

22   organized, we will be ready to go.

23           Is Ms. Williams here, you saw her.  Great.

24           Are they getting organized?  We could get ready.

25   So let's have Ms. Williams come in.

*C. Edwards*

Proceedings

2003

1        MR. SPODEK:  Previously we had a conversation on

2    the record about the questions I asked Ms. Williams,

3    regarding her telephone call.  And what was it about, what

4    I proposed a moment ago.

5        In addition, if I just asked her about this

6    email, it's true and accurate you remember sending it and

7    it is what it is, and put it into evidence, and not ask any

8    questions about it.  And they could read it, the email for

9    themselves.

10       MS. MAYS-WILLIAMS:  I told them I would object to

11   this, obviously.  This is the email the witness forwarded,

12   this email to me.  And it starts here, Hi Rachel.

13       So she thanks him and she calls her agent.

14       MR. SPODEK:  She responds, thank you to adding

15   Michelle.  Who had called Michelle.  She writes, hi, we are

16   not quite clear on what your request is here, though, I

17   didn't hear from you last week.

18       My understanding from your conversation of

19   Rachel, this letter was suggested in response to a

20   collaboration, which is exactly what happened.

21       THE COURT:  I have to say, I am a little confused

22   about what is going on.  I don't understand why you would

23   want to introduce this.

24       MR. SPODEK:  Because they had called me and they

25   were calling me a lot, because they wanted to collaborate

*C. Edwards*

Proceedings

2004

1    with Ms. Sorokin, because they wanted to increase the value

2    of Ms. Williams directional property.  So they wanted to

3    get Ms. Sorokin involved.

4            I said, I am not so involved in this aspect.

5    Maybe you could help me regarding a plea.  What I tried to

6    do, and, as you could see from the agent, they were only

7    interested in the agent, maybe not Rachel, but the agent,

8    as is clear in her own regards.  If there was a

9    collaboration, that may be something.

10           THE COURT:  What concerns me about, I am going to

11   hear you, don't worry, this is what concerns me about this.

12           This is the agent.  This is hearsay, and also

13   quite, frankly, we all know this case inside and out.  And

14   I am looking at this.  And I don't know what the heck it

15   means.

16           If this is introduced into evidence, I don't know

17   how the juror is going to evaluate this.  I prefer your

18   former method.  I will let you explore it, and you could

19   even ask the question, if, to your knowledge, did you

20   and/or your agent contact me verbally.

21           MR. SPODEK:  Can I ask, did I ask you to write a

22   letter or recommendation?

23           MS. MAYS-WILLIAMS:  There is no witness.

24           MR. SPODEK:  She could say, no.

25           THE COURT:  The thing is, remember making her a

*C. Edwards*

Proceedings

2005

1   witness, this is not really a small little chunk.  It's

2   four questions.  I just think the problem is, you know,

3   you're going to be stuck with an answer.

4          MR. SPODEK:  Then I will take the risk.  If she

5   says, no, she says no.

6          MS. MAYS-WILLIAMS:  I mean --

7          MR. SPODEK:  I am not going to try to -- I won't

8   try to, I am sorry, introduce.

9          MS. MAYS-WILLIAMS:  I don't know if this is going

10  to clarify information, but she forwarded me, she doesn't

11  believe that, no.  There's a dispute that's the problem,

12  that he doesn't think that you ever called.

13         THE COURT:  What on earth is he thinking.  He

14  never called you.  Who is that to?

15         MS. MAYS-WILLIAMS:  So when Rachel receives this

16  email from Todd --

17         THE COURT:  She called her agent.

18         MS. MAYS-WILLIAMS:  What's going on here?

19         It sounds like you could read it yourself.  It

20  sounds like they don't agree that he ever called.

21         MR. SPODEK:  I didn't call.  I've never called

22  the agent.

23         MS. MAYS-WILLIAMS:  You see why this is so

24  confusing.

25         MR. SPODEK:  How about I ask her if she called

*C. Edwards*

Proceedings

2006

1   me, and if I ask her, she considers writing the letter.

2   She said, no.

3           THE COURT:  But let's play this out.  In addition

4   to being a videographer, Paul -- you could feel free to

5   jump in.  In addition to, in addition to being an advocate

6   you're an officer of the court, okay.

7           And if she says something that you know or have

8   reason to believe is false, don't you have an ethical

9   obligation to correct the record, and here is where the

10  People's concern is, that this turns into, you being a

11  witness comes into play.

12          MS. MAYS-WILLIAMS:  Correct.

13          THE COURT:  So it seems to me --

14          MR. SPODEK:  What about if I say, do you remember

15  I sent you an email asking about since, there is definite

16  emails, she disputes there is these emails.

17          MS. MAYS-WILLIAMS:  But if you're not able to

18  explore it, what is the point of asking it.

19          MR. SPODEK:  I think it's relevant.

20          MS. MAYS-WILLIAMS:  Did you send an email?

21          MR. SPODEK:  Now, I could just say Ms. Williams,

22  you contacted me directly and you asked that I speak to

23  your agent, right.  In fact, I emailed you, right, and I

24  asked you to write a letter of recommendation.

25          And she will say, no.

*C. Edwards*

Proceedings

2007

1          MS. McCAW:  What is the point of the fact you

2    asked her to write a letter of recommendation?

3          MR. SPODEK:  Because they made it contingent on

4    them working together.

5          MS. MAYS-WILLIAMS:  Your Honor, if I could

6    explain the context the way the witness has explained it.

7          So, I was like, she told me already that she had

8    called Todd.  I was just like, there is the email

9    explaining to me what is going on.  So she said that HBO, I

10   guess was interested in also getting Anna's life rights.

11   HBO had been reaching out to Todd.  Todd had not been, you

12   know, returning their calls, so they say.

13         Hey, Rachel, could you do us a favor, maybe he

14   will return your call.  You could reach out to him.

15         She said, sure.  She probably shouldn't have done

16   it.  But she said, sure.  She reached out to Todd and she

17   asked him who owns Anna's life rights.

18         I don't think he answered that question, but

19   brought up his on suggestion.  He was just like, hey, would

20   you be interested in writing a character letter for this is

21   all true.

22         Would you be interesting in writing a character

23   letter for the defendant?  She said, to who owns the

24   defendant's life rights.

25         So Mr. Spodek answered a different question

*C. Edwards*

Proceedings

2008

1    because, obviously, he had different interest.

2            So she is going to say that it was never her that

3    was interested in collaborating with the defendant.

4            She was asking a particular question and it seems

5    that she would say you were trying to leverage your answer

6    on her writing a letter of recommendation, which she was

7    not willing to do.

8            So that's where the dispute comes in.  She says

9    she was never ever going to collaborate with the defendant.

10          MR. SPODEK:  Out of the kindness.

11          MS. MAYS-WILLIAMS:  This was not kindness.  It

12    was a request.  They asked her to do it.  She said I will

13    try.

14          THE COURT:  This is the problem.  HBO is afraid

15    they were going to pay her a significant amount of money

16    and then she was not going to be able to write the story,

17    because your client was going to assert that she owned her

18    own life rights.

19            So before they want, this is my guess, that

20    before they wanted to go forward with the project of hers,

21    they wanted to be sure they were going to get what they

22    paid for.  That's what's going on here.  Are all these

23    questions all about who, to the life rights, who's got the

24    life rights.

25          MR. SPODEK:  Again, I don't need to go into --

*C. Edwards*

Proceedings

2009

1          MS. MAYS-WILLIAMS:  Details.  All I could ask,

2    can he call me?  Your agent called a number of times and I

3    asked you to write a letter and she said, no.

4          THE COURT:  Now, remember, you're asked to ask a

5    question like this to show some type of motive to be

6    untruthful, a motive to exaggerate, bias against your

7    client.  Tell me how this conversation about life rights

8    shows that.

9          MR. SPODEK:  They were aggressively contacting me

10   about this issue, as you could see.  I've never responded

11   to the agent.  Her concern was to maximize the potential

12   windfall in selling whatever it is they are selling.

13         And she was interested in having my client assist

14   her in doing that, as they were obviously in their

15   precarious situation being decadent and compliant.

16         I said, I wrote her an email saying, you don't

17   have to talk to me.  I spoke to the -- I didn't talk to the

18   agent.  I didn't care to get involved.  I was trying to be,

19   work out a disposition myself.  And they were excessively

20   calling me, the agent.

21         THE COURT:  Okay.  But you already told me the

22   potential for bias or exaggeration.  That's what I see.

23   This is a potential for Ms. Williams to exaggerate what

24   happened to her.  Because it will bring her in more money

25   and a book deal.

*C. Edwards*

Proceedings

2010

1    You already established that the woman made

2    $300,000 so far in advance.  I mean, to me it's out there.

3    And I am not sure what all these questions about who called

4    whom, when and how many times, has anything to do with

5    bias.

6    You could ask her if she in some way, I

7    understand you're getting 300,000, it's a much better

8    story.  What happened to you is terrible, isn't it.  Why is

9    any of this relevant?

10    MR. SPODEK:  That's fine.

11    MS. MAYS-WILLIAMS:  If you could stay away from

12    the email, let's stay.

13    (Whereupon, all parties return from the bench and

14    the following took place.)

15    THE COURT:  Are we ready to proceed?

16    MS. McCAW:  Yes.

17    MR. SPODEK:  Yes.

18    THE COURT:  Bring in the jury.

19    (Whereupon, the jurors enter the courtroom and

20    the following occurred:)

21    THE CLERK:  Case on trial continued.  All parties

22    are present.  All jurors are present.  The witness is being

23    reminded, you're still under oath.

24    THE COURT:  Good afternoon, ladies and gentlemen.

25    Welcome back.  You're done.

*C. Edwards*

Williams - People - Cross/Spodek

2011

1          MR. SPODEK:  Thank you, Judge.

2    CROSS-EXAMINATION

3    BY MR. SPODEK:

4          Q    Good morning, Ms. Williams.

5          A    Good morning.

6          Q    Yesterday before we broke for the day, we were talking

7    about the training sessions, remember?

8          A    Yes.

9          Q    Okay.  And you stated that you were going to 11 Howard

10   for training, three to four times a week, right?

11         A    No.  We would go to Kacy Duke gym in Chelsea.

12         Q    Did you ever have training at 11 Howard?

13         A    Through an APP, maybe three times, two times.

14         Q    Was that with Ms. Duke or someone else?

15         A    With someone else.

16         Q    Well, so there was two or three times at 11 Howard,

17   did Ms. Sorokin pay for those training sessions?

18         A    No, we split the cost.

19         Q    You split the cost for the two at 11 Howard?

20         A    That is my memory.  That we booked through an APP.

21   Whoever made the booking would have paid for it.  It was

22   approximately $80 for the two of us for those sessions.

23         Q    Do you recall booking a session at 11 Howard for a

24   trainer?

25         A    It's a long time ago.

*C. Edwards*

Williams - People - Cross/Spodek

2012

1      Q    I am aware.

2      A    I believe I did book at least once.  Again, we only

3  worked out with that trainer three times total, is my memory.

4      Q    So the other two times Ms. Sorokin booked from your

5  member, right?

6      A    Yes, I believe that is correct.

7      Q    So that means Ms. Sorokin --

8           THE COURT:  Speak a little louder, please.  Thank

9  you.

10     Q    That means Ms. Sorokin paid for those two times,

11  right, because she used the APP to book it, correct?

12     A    Correct.  I offered to pay and she covered the cost.

13     Q    Okay.  And then one time you covered the cost?

14     A    I believe so.

15     Q    You believe so, okay.  You can't say 100 percent that

16  you covered the cost?

17     A    I believe so, yes.

18     Q    Now, when you went to have the sessions with Ms. Duke,

19  where was her studio?

20     A    In Chelsea.

21     Q    Okay.  And how many times total did you have sessions

22  with Ms. Duke?

23     A    I believe it was approximately 12 times.

24     Q    Okay.  And all 12 of those times Ms. Sorokin paid for,

25  correct?

*C. Edwards*

Williams - People - Cross/Spodek

2013

1    A    I did not pay for them, I believe Ms. Sorokin paid for

2    them.

3    Q    Okay.  Now, did you ever go to the UFC gym or any

4    other gyms?

5    A    Once with a personal trainer.

6    Q    Okay.  And who was that personal trainer?

7    A    The same one that was booked through the APP.

8    Q    Was that Justin?

9    A    Yes.

10   Q    And when you went to the UFC gym, did Ms. Sorokin pay

11   for that particular session?

12   A    I believe so.

13   Q    Now, you stated on direct that you were a fan of

14   infrared sauna, correct?

15   A    I am not sure I said I was a fan, but we did used to

16   go to the infrared sauna.

17   Q    How many time did you go?

18   A    I would say approximately ten times.

19   Q    Okay.  Did you enjoy going to the infrared sauna?

20   A    I did.

21   Q    Would you say you're a fan of infrared sauna?

22   A    Sure.

23   Q    And you used to go and listen to music with Ms.

24   Sorokin at the sauna, right?

25   A    Yes.

C. Edwards

Williams - People - Cross/Spodek

2014

1    Q    Okay.  And what was the cost of those sessions at the

2  sauna?

3    A    I believe it was $40 per person.

4    Q    Okay.  Now, did you split the cost for those sessions

5  or did Ms. Sorokin pay?

6    A    We shared the costs.

7    Q    For all ten of them?

8    A    Whichever of us made the booking, paid for the

9  sessions.  So I didn't count how many each of us paid for, but

10 it was sometimes I got it and sometimes she got it.

11   Q    So, at this point you're not keeping track of the pace

12 for things, right?

13   A    I am aware that we are sharing the costs.  I am not

14 tabulating how many times she paid and how many times I paid.

15   Q    Right.

16        Now compared to when you went to Morocco you were

17 keeping track.  You actually created a spread sheet, right?

18   A    That is correct.

19   Q    So the infrared sauna trips that you went to, how many

20 do you believe that you paid for?

21   A    I would say approximately five.

22   Q    Five.  And Ms. Sorokin paid for the other five?

23   A    I would say approximately five, yes.

24   Q    Okay.  Now, when you two were spending a lot of time

25 together, did you ever take taxis to these places?

*C. Edwards*

Williams - People - Cross/Spodek

2015

1     A    We often took Ubers.

2     Q    Did Ms. Sorokin sometimes pay for the Ubers?

3     A    I believe so.

4     Q    Okay?

5     A    I didn't pay for them.  I believe she paid for them.

6     Q    Well, if you didn't pay for them, who else could have

7 paid for them?

8     A    There are a lot of things I question about what Anna

9 did and didn't pay for, for the time we were friends.

10     So I can't say with complete confidence that she paid

11 for things just because I saw her.

12     Q    Well, let's go through it then.

13     You remember getting into Uber with Ms. Sorokin?

14     A    I do.

15     Q    How many times did you take an Uber with Ms. Sorokin,

16 ten times?

17     A    I would say more than ten.  Less than 30.

18     Q    You never paid for one of those times, though, right?

19     A    That's not accurate.  I did.

20     Q    So how many did you pay for then?

21     A    It wasn't something I was counting.  I could

22 approximate maybe, 15 of those times.

23     Q    Okay.  And the other 15 Ms. Sorokin paid for them,

24 right, because there was only you two in the taxi?

25     A    Not always.  Sometimes there were other people in the

*C. Edwards*

Williams - People - Cross/Spodek

2016

1  taxi?

2      Q    So of the potential 30 trips, did the Uber driver ever

3  say who is going to pay?

4      A    The way Uber works, is whoever has requested the ride

5  pays for it.  So the driver could never have discussed payment

6  with us in the car.

7      Q    Okay.  So then Ms. Sorokin is the one who requested

8  Uber, it would be charged to her account, correct?

9      A    That is the way it has meant to work.

10      Q    Now, did you ever, did you ever go to a tanning salon

11  with Ms. Sorokin?

12      A    No, I did not.

13      Q    Did you ever go for a facial with Ms. Sorokin?  If you

14  remember.  It's a long time ago.

15      A    I believe I did go to a facial one time, yes.

16      Q    Did you talk about the facial in your book proposal?

17              MS. MAYS-WILLIAMS:  Objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  I don't believe I did.

20      Q    Okay.  So when you went to the facial, where was it?

21      A    The Greenwich Hotel.

22      Q    When you went to that facial, did Ms. Sorokin pay or

23  did you pay?

24      A    Ms. Sorokin was in the Greenwich Hotel for a night.

25  She needed to go to 11 Howard.  She made two spa reservations,

*C. Edwards*

Williams - People - Cross/Spodek

2017

1   which she told me when she was checking in.  She paid through

2   her reservation at the Greenwich Hotel.

3        Q    Did you pay for anything at the Greenwich Hotel?

4        A    Not that I remember.

5        Q    Okay.  What else did you do at the Greenwich Hotel?

6        A    We both got messages.

7        Q    So you got facials, right?  You got massages right?

8        A    That is correct.

9        Q    You stayed there that evening?

10       A    I did not.

11       Q    Did you eat anything while you were at the hotel?

12       A    I did have dinner.

13       Q    Where did you have dinner?

14       A    In the hotel.

15       Q    Was it at a restaurant or in the room?

16       A    It was in the drawing room on the ground floor.

17       Q    And you're a fan of the drawing room, right?

18       A    I am.

19       Q    And Ms. Sorokin paid for dinner at the drawing room,

20   right?

21       A    She did.

22       Q    You have anything to drink when you were at the

23   Greenwich Hotel?

24       A    I can't remember.  It was after a message.  I may not

25   have.  There is also a chance I did.

C. Edwards

Williams - People - Cross/Spodek

2018

1    Q    Okay.  Did you share a bed with Ms. Sorokin at the

2  Greenwich Hotel?

3    A    I did not.

4    Q    Did you go to the room that Ms. Sorokin had at the

5  Greenwich Hotel?

6    A    I did.

7    Q    Now, during your time with Ms. Sorokin, did you ever

8  go shopping with her?

9    A    I did not.

10   Q    All right.  Okay.  Did she ever give you any clothes?

11   A    She did.

12   Q    Can you tell us what she gave you?

13   A    She gave me a pair of workout pants, that did not fit

14  her to her liking.  She gave me a pair of shoes that she thought

15  made her look --

16   Q    Well, let's just talk about what she gave you instead

17  of what she did.

18            MS. MAYS-WILLIAMS:  Could the witness --

19            THE WITNESS:  She gave me a pair of shoes she

20       didn't care for.

21   Q    So what kind of shoes were those?

22   A    They were like lazy black high heels that she thought

23  made her look promiscuous.  And she thought I could pull them

24  off.  I've never actually worn them, but it was a nice gift.

25   Q    I appreciate that information.

*C. Edwards*

Williams - People - Cross/Spodek

2019

1          What was the company?

2     A    I don't recall.

3     Q    What about the sweatpants, you know the company to

4  that?

5     A    I don't.

6     Q    So got the sweatpants.  You got the promiscuous shoes.

7  What else you got?

8     A    She gave me the garments that were purchased in

9  Morocco at the end of our trip, which the dresses and Kaptans

10 that were purchased in Morocco, she gave them to me at the end

11 of the trip.  She said I don't think I will be wearing them

12 again, and gave them to me.

13    Q    And that was four dresses, right, two for her, two for

14 you?

15    A    I am actually not sure.  I didn't keep them and I

16 didn't, I didn't count at the time.

17    Q    But you kept the receipt?

18    A    I did keep the receipt.

19    Q    And you created a spread sheet detailing the expense,

20 right?

21    A    I did.

22    Q    And you included it in your book, right?

23    A    I am sorry, the purchase?

24    Q    Correct, the purchase?

25    A    That is correct.

*C. Edwards*

Williams - People - Cross/Spodek

2020

1    Q    But you don't remember how many dresses there were?

2    A    I don't.

3    Q    So we got the sweatpants, the shoes.

4         Now, we have some amount of dresses from Morocco.

5    What else did Ms. Sorokin give you?

6    A    I believe that is all.

7    Q    Okay.  So at this point would you say your

8    relationship is growing?

9    A    I am sorry, at what point?

10   Q    At this point that she is giving you the clothes that

11   you're going to have facials with her, when you stay at the

12   Greenwich Hotel, would you say that your relationship with Ms.

13   Sorokin is growing?

14           MS. MAYS-WILLIAMS:  Your Honor, I am going to ask

15       that the defense attorney be more specific as to the time

16       period.

17           THE COURT:  That is fair.

18           MR. SPODEK:  Sure.

19   Q    When did you go to the Greenwich Hotel?

20   A    I guess it would have been in mid-April.

21   Q    Okay.  In mid-April 2017?

22           THE COURT:  What year?

23           THE WITNESS:  I am sorry, 2017.

24   Q    In mid-April of 2017, would you describe your

25   relationship with Ms. Sorokin as growing?

*C. Edwards*

Williams - People - Cross/Spodek

2021

1      A    I would say that we were close friends.  I guess

2   growing is a term you may use.

3              (Whereupon, the following was recorded by

4       Official Court Reporter Denise Taylor:)

5                      *          *          *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*C. Edwards*

1    Q    How would you describe it, how would you describe your
2    relationship at that time period, April 2017?
3    A    My trust in Anna as a friend was increasing.  Our
4    friendship was close.  We spent a lot of time together.
5    Q    Okay.  Did you text every day?
6    A    I would say almost every day.
7    Q    Okay.  Did you speak to her on the phone frequently?
8    A    Not as frequently as we texted.
9    Q    Okay.  You saw each other at breakfast sometimes,
10   right?
11   A    That is accurate.
12   Q    You saw each other at dinner sometimes, right?
13   A    Yes.
14   Q    You went to see a personal trainer together, right?
15   A    Yes, we did.
16   Q    You went to have facials at a different hotel, right?
17   A    One time, yes.
18   Q    Okay.  You had massages at that hotel, right?
19   A    One massage, yes.
20   Q    Okay.  She's giving you clothes, right?
21   A    One pair of pants, one pair of shoes, yes.
22   Q    And the dresses from Morocco, don't forget those.
23   A    That was not in April.  That was much later, but yes.
24   Q    Okay.  In April, after all of this, would you say she's
25   one of your closest friends?

1      A      Close in terms of time spent together, yes.

2      Q      Okay.  Now, you described her on direct as generous,

3  right?

4      A      Yes.

5      Q      Okay.  And you, in the beginning of the relationship,

6  sometimes you paid for things, right?

7      A      Yes.  And -- excuse me.  In the beginning, yes, and

8  also up to May, yes.

9      Q      Okay.  Yesterday you testified that early on, sometimes

10  you would go to drinks with Ms. Sorokin and some people from the

11  hotel and you would pay, right?

12     A      Sometimes yes.

13     Q      Okay.  Not all the time though, right?

14     A      I don't have any memory of being outside of the hotel

15  and paying.

16     Q      Okay.  Well, how many times do you remember going out

17  to drinks with Ms. Sorokin and people from her hotel and you

18  paying?

19     A      Two to three.  I think like one instance very

20  specifically at The Ship, in I believe it was mid March.  I

21  believe the total was approximately $1,030.  I remember other

22  instances where that happened, although I can't remember the

23  specific location.

24     Q      Okay.  Now, did you pay for the other people that was

25  there as well?

1     A     I paid for everyone to whom Anna offered to buy a

2     drink, yes.

3     Q     And did you pay with your corporate card, or your

4     personal card, or cash?

5     A     I would have used my personal card.

6     Q     Okay.  Now, after those times that you went out with

7     her for drinks outside of the hotel, when you spent time with

8     Ms. Sorokin in the hotel she was paying for everything, right?

9     A     Sorry.  In the hotel.

10    Q     Right.  When she was in the hotel with you she was

11    paying for everything, right?

12    A     At 11 Howard.  And Anna paid for almost everything,

13    yes.

14    Q     Okay.  And you stated that you had, I think it was ten

15    dinners with her at the hotel, right?

16    A     It's an approximation, yes.

17    Q     Approximate.  Okay.

18          And as time increased, Ms. Sorokin was paying for more

19    things, right?

20    A     Yes.

21    Q     Okay.  At the exact same time that the relationship is

22    growing, right, you're getting closer, just like you just

23    testified, right?

24    A     I would say that Anna and I got close within a very

25    succinct amount of time, over the course of what, two to

1    three months.

2        So, our relationship did grow closer over that period of

3    time and, yes, Anna did at the same time pay for a lot.

4        Q    Okay.  Those initial times that you paid, what did you

5    think -- withdrawn.

6        Those initial times that you were out for drinks with Ms.

7    Sorokin and hotel employees, what did Ms. Sorokin say about why

8    she couldn't pay?

9        A    Oh, on the nights that we were out, she said that she

10   had forgotten her debit or credit card.

11       Q    Okay.  And what did -- how did you think Ms. Sorokin

12   had any money?  What did you think her source of wealth was?

13       A    I believed that she came from family money.

14       Q    Okay.  And did you have an idea of how much she was

15   allegedly worth?

16       A    I did not.  I never asked and she never told me.

17       Q    Did you find it strange that she didn't have any source

18   of payment for one to $200 bill at a bar?

19               MS. MAYS-WILLIAMS:  Objection.

20               THE COURT:  Overruled.

21       A    I did not.

22       Q    Okay.  Did you find it strange, the second time that

23   you paid for drinks, that she also didn't have her credit or

24   debit card?

25       A    Anna was slightly disorganized throughout our

1    friendship.  It was not strange to me.

2         Q    Okay.  What about the third time, did you find it at

3    all strange at that point?

4         A    I found a lot of Anna's actions strange.

5         Q    I understand.

6         Did you find it strange she didn't have a credit or debit

7    card on that third time?

8         A    No.  I guess, no.

9         Q    Okay.  Now, when you first met Ms. Sorokin at Happy

10   Ending, is that when you told her, you worked at Vanity Fair?

11        A    That is my memory.

12        Q    Okay.  Now, did Ms. Sorokin ever ask you for any favors

13   due to your work?

14        A    Yes.

15        Q    Okay.  What did she ask you for?

16        A    She wanted to attend the New Establishments Summit,

17   which is a business, entertainment, technology conference that

18   Vanity Fair hosts annually.  She asked me to connect her to

19   someone who could help her purchase tickets, and I did reach out

20   to a colleague who sent her an invitation to purchase tickets.

21        Q    Okay.  And can anyone purchase tickets to that event?

22        A    I am actually not sure.  Tickets cost around $6,000.

23        Q    Okay.  Did she ask you to cop for tickets?

24        A    She did not.

25        Q    Besides her asking you to connect her to whoever has

1    the tickets to this event, did she ask you for any other favors?

2        A    Yes.

3        Q    Tell me?

4        A    She asked me to ask our beauty editors for

5    recommendations.  She asked me to ask our travel agents for

6    recommendations.

7        Q    Okay.  And did you ask for the recommendations?

8        A    I did ask our beauty editors.  I did not ask our travel

9    agents.

10        Q    Besides asking about the tickets and asking about the

11    beauty editor, did she ask for any other favors?

12        A    Yes.

13        Q    Okay.  What was that favor?

14        A    She would be stuck in meetings.  On occasion she'd ask

15    me to call and make an appointment to get her hair blown out.

16    One time I called trying to get an appointment for her.

17        Q    Very thoughtful.

18             MS. MAYS-WILLIAMS:  Objection.

19        Q    Referring to favors regarding your employment, not you

20    individually, did she ask you for any additional favors for your

21    clients at Vanity Fair?

22        A    Not that I remember.

23        Q    Just so we are clear, she asked to purchase tickets for

24    events and asked for you to get a recommendation from someone in

25    the beauty department, right?

1      A     That's my memory.

2      Q     Okay.  Did she ever ask you to introduce her to anyone?

3      A     She did ask me to invite people to dinner on occasion.

4      Q     You said that she asked sometimes for you to invite

5  people to dinner?

6      A     That is correct.

7      Q     Did she ask, specifically, for people from Vanity Fair,

8  or just anybody?

9      A     Friends of mine, I guess, would have been her

10  qualification, and invite your friends.

11      Q     Okay.  But not anything specific to Vanity Fair, right?

12      A     I did invite a colleague.  She didn't specifically ask

13  me to invite a colleague.

14      Q     Okay.  Did she ask to go to your offices at Vanity

15  Fair?

16      A     She did.

17      Q     Okay.  When was this?

18      A     She multiple times asked to have lunch at the Conde

19  Nast cafeteria over the course of our friendship.  She later

20  asked, after Morocco if she could come work in the One World

21  Trade Center offices.

22      Q     When she asked you to come work, could you describe

23  exactly what she said to you?

24      A     I can't describe exactly.  She said that she couldn't

25  stay in her hotel, she had to check out, she needed a place to

1    do work.

2         I didn't want to see the defendant.  I had a colleague go

3    down and escort her up to a shared workspace where she sat and

4    did work on her own.  I never saw her.  She was then, she had to

5    leave the building.  It was just a cafe.

6         Q    Okay.  When you and her would talk about your work at

7    Vanity Fair, did she ever ask you about how much you are paid,

8    or what kind of work do you do?

9         A    She did.

10        Q    Okay.  So, what did she ask you?

11        A    She asked me how much money I made in a year and

12   laughed at my response.

13        Q    Okay.  Did she also tell you that she understood you

14   worked very hard for your money and she was going to pay for

15   things for you?

16        A    She said, you work harder for your money than I do

17   work, or ever did.  I don't remember if she said, you work

18   harder for your money than I do, or you work harder for your

19   money than I ever did.  I don't know.  One those two things.  I

20   do remember, vaguely, and she said, I would offer to pay.

21        Q    Okay.  Was she aware that you had a Vanity Fair

22   corporate card?

23             MS. MAYS-WILLIAMS:  Objection.

24             THE COURT:  Sustained.

25        Q    Okay.  Did you tell her that you had a Vanity Fair

SPODEK-DIRECT-WILLIAMS                    2030

1    corporate card early on in your relationship?

2        A    I don't believe that would have been information that

3    I'd just brought up.

4        Q    Okay.  Did she ever ask you about a credit limit on

5    your card?

6        A    Not that I remember.

7        Q    Okay.  Did she ever ask you any details about how a

8    corporate card works at Vanity Fair?

9        A    Not that I recall.

10       Q    Okay.  Now, you were issued a work credit card, right?

11       A    That is correct.

12       Q    Okay.  A work American Express, right?

13       A    That is correct.

14       Q    Now, you stated on direct that sometimes you have to

15   book travel for people, right?

16       A    That is correct.

17       Q    And hair appointments, haircuts?

18       A    No.  I have a hairstylist.

19       Q    Okay, hairstylist.

20        What else did you book on your corporate card?

21       A    I don't know.  They are just hired to work on photo

22   shoots through Conde Nast directly.

23       Q    So, explain to us how the corporate card works.  Is

24   there set things you are allowed to spend it on?

25       A    There are set things I may be reimbursed for.

1     Q     So, how does the process work?

2     A     So, say I need to book a caterer or car service,

3  something that needs a credit card for payment upfront, I then

4  use my corporate card to cover those costs, while keeping track

5  of the receipts.  After that time, I then, like, take down the

6  receipts and enter them into the accounting software and I

7  submit those expense reports to Conde Nast.  Conde Nast then

8  reimburses me for business appropriate expenses, which I pay

9  directly to my -- sorry, it changed.  They pay the business

10  appropriate expenses.

11      There are occasionally times when a personal charge may go

12  on my corporate card, I would not submit that for reimbursement.

13  I would pay that directly to American Express.  So, Uber, for

14  example, was linked to my corporate credit card.  So, there

15  were, at times, expenses charged on my corporate card that were

16  personal.  I would merely mark those expenses as personal and

17  not submit them for reimbursement.

18      Q     If you were traveling, are you allowed to spend your --

19  withdrawn.

20      When you are traveling, do you have the right to use your

21  corporate card for personal expenses, if it's a work trip?  For

22  example, you testified about some trips you took yesterday,

23  right, not Morocco.

24      A     On work trips?

25      Q     Yes, work trips.

 1        A    I would use my corporate card.

 2         I'm sorry.  I don't understand your question.

 3        Q    Okay.  You testified that you went to France for Vanity

 4   Fair, right?

 5        A    I went to France, partially for Vanity Fair.  I had a

 6   few days in between when I was due in Oriel, and my trip to

 7   Marrakech took maybe only, or the first vacation I had alone.

 8   So, part of that trip was personal.  I stayed in two or three

 9   hotels on my way to AR LIN.

10        Q    Okay.  So, when you were on a work trip like France, do

11   you pay for your meals on your work credit cards?

12        A    When I was on my own?

13        Q    On your own.

14        A    I would say, the France trip was a very unique

15   situation.  I believe I did use my personal credit card and my

16   debit card, but my cards had stopped working.  So, at that

17   point, I was trying to use whatever cards I could to get through

18   my travel for personal expenses.  I wouldn't have submitted them

19   to the company for reimbursement?

20        Q    Are you permitted to use your corporate card for your

21   own expenses when you are traveling for work, yes or no?

22        A    Yes.  I wouldn't be reimbursed for those expenses,

23   however.

24        Q    Okay.  Well, let's talk about another trip.  I think

25   you said you went to Ireland, right?

1    A     Yes, I did, Northern Ireland.

2    Q     This is long before you knew Ms. Sorokin, right?

3    A     Yes, it was.

4    Q     So, when you were in Ireland, did you have your

5    corporate card with you?

6    A     I'm not sure if I had a corporate card at that time.

7    If I did, I would have had it with me.

8    Q     How would you pay for your meals in Ireland?

9          MS. MAYS-WILLIAMS:  Objection, your Honor.  What is

10      the relevance of this line of question?

11         MR. SPODEK:  Judge, this is a corporate card.  It's

12      in issue here.

13         THE COURT:  Overruled.

14   A     If I were the one needing to pay, I would have used my

15   corporate card.

16   Q     Did Vanity Fair give you some details as to how much

17   you can spend for you and your traveling, or anything like that?

18   A     It's complicated.  I would often pay from a crew of

19   people.

20   Q     Okay.  Well, explain it to us.  Did they say you have a

21   per diem that you can spend per day for your own use?

22   A     Conde Nast does have a per diem.

23   Q     Okay.  Can you explain what the policy is, or was?

24         MS. MAYS-WILLIAMS:  Objection.

25   A     I actually can't.

1                    THE COURT:  I'm sorry.

2                    MS. MAYS-WILLIAMS:  Objection to per diem.  I mean

3       --

4                    THE COURT:  Overruled.

5       Q    So, can you spend as much as you'd like?

6       A    No.

7       Q    Okay.  Well, how do you know what the limit is that you

8    could spend?

9       A    As a Conde Nast employee, I was trusted to use my

10   discretion and to use my corporate card where deemed

11   appropriate.

12      Q    Okay.  Were you able to use your corporate card for

13   some personal expenses that were reimbursed by Vanity Fair?

14      A    I used my corporate card for business expenses

15   exclusively.

16      Q    Well, not exclusively, right?

17      A    I'm sorry.  I was reimbursed --

18      Q    Okay.

19      A    -- for business expenses.

20      Q    Now, you know Jesse Paul, right?

21      A    I did.

22      Q    And he worked with you with and Annie Lebowitz, right?

23      A    Jesse was a photo assistant.  He didn't work

24   exclusively for Annie, nor did I.

25      Q    Did you both work with Annie Lebowitz at some point at

SPODEK-DIRECT-WILLIAMS                          2035

1   the same time?

2       A    He assisted Annie.  He assisted Annie as a photo

3   assistant and I was onset with Annie.

4       Q    Okay.  Now, when did you first meet Jesse.

5       A    Jesse, I would say 2013.

6       Q    Okay.  Prior to you introducing Jesse to Ms. Sorokin,

7   Ms. Sorokin did not know Jesse, right?

8       A    Correct.

9       Q    And you knew Jesse from working with Annie, right?

10      A    Not just from Annie, through working in the photo

11  world.

12      Q    Okay.  Now, did you also work with Nick Rogers, I

13  believe, your boyfriend?

14      A    My boyfriend at the time did work for Annie, yes.

15      Q    Okay.  Did the three of you have an opportunity to work

16  together at one time?

17      A    Jesse, Nick and I did work together, yes.

18      Q    Did you ever use your corporate card, your corporate

19  Vanity Fair card for dinners for you, Jesse and Nick?

20      A    Only where appropriate.

21      Q    Okay.  But you did use it, right?

22      A    I don't recall.

23      Q    But you just said only when appropriate, right?

24      A    If I did, it would have been only when appropriate.  I

25  don't recall specific instances.

 1        Q    Did you have dinner with the three of them -- I'm

 2   sorry, you and the two of them?

 3        A    Not that I recall.

 4        Q    Do you recall going to Nobu with them?

 5        A    I do not.

 6        Q    Okay.  Do you recall ever having drinks with them?

 7        A    I do not.

 8        Q    Okay.  Do you recall using your corporate card at any

 9   point for the expenses of you, Nick and Jesse?

10        A    Specifically the three of us, I do not.

11        Q    Okay.  Now, you never told Ms. Sorokin that you were

12   bringing your corporate card on the trip, right?

13        A    I don't recall.

14        Q    Okay.  Did Ms. Sorokin ask you if you were bringing

15   your corporate card on the trip?

16        A    I don't recall.

17        Q    Okay.  How does it work with the corporate card and

18   American Express with reward points, do you earn points for

19   using the card?

20        A    Yes.

21        Q    Do those points accrue to your benefit, or to Vanity

22   Fair's benefit?

23             MS. MAYS-WILLIAMS:  Your Honor, relevance?

24             THE COURT:  Overruled.

25             You may answer.

1    Q    Did you hear the question?

2    A    Yes -- actually, can you repeat it?

3    Q    Sure.

4     The American Express card you have with Vanity Fair, we've

5    confirmed you have one, right?

6    A    Currently I don't.

7    Q    At the time period in question 2016, 2017, yes?

8    A    Yes.

9    Q    Okay.  Did that card have the ability to earn reward

10   points?

11   A    It did.

12   Q    Okay.  Did those points accrue to your favor or to

13   Vanity Fair's favor?

14   A    To my favor.

15   Q    Okay.  So, whatever you spent on the card, personal or

16   professional, gained points, right?

17   A    That is correct.

18   Q    And you could use those points for whatever you want

19   to, right?

20   A    Excuse me.  I believe so.

21   Q    Okay.  You don't know how you could use the points on

22   your credit card?

23   A    I haven't actually used them.  They do transfer, I

24   guess, to travel or -- yeah.

25   Q    How long did you work for Vanity Fair?

SPODEK-DIRECT-WILLIAMS                          2038

1      A     Eight-and-a-half years.

2      Q     And once you made the book deal you left?

3      A     I was laid off in mid-February.

4      Q     Okay.  So, during those eight years did you ever check

5  your points balance with Vanity Fair?

6      A     Yes.

7      Q     Okay.  So, at some point you were aware of how many

8  points you had, right?

9      A     I was.

10     Q     Okay.  Did you ever book a flight with your points?

11     A     Once.

12     Q     Okay.  Did you ever buy anything else with your points?

13     A     I did not.

14     Q     Okay.  Did you lose the points when you left the job?

15     A     I did not.

16     Q     Okay.  Did they transfer over to your personal American

17  Express card?

18     A     It did.

19     Q     Do you know now how many points you have from the eight

20  years you were with Vanity Fair?

21     A     Not off the top of my head.

22     Q     Okay.  Now, when you first spoke to Ms. Sorokin about

23  traveling out of the United States, do you remember that?  This

24  is in 2017.

25     A     Yes.

1    Q    Okay.  Now, Ms. Sorokin told you that she had to leave

2    the U S, right?

3    A    Yes.

4    Q    Okay.  And she told you that she had to leave due to

5    her Esta Visa process, right?

6    A    Yes.

7    Q    And this was April of 2017?

8    A    I believe we discussed it in person slightly prior to

9    April.  It came up in a text message prior to April 1st.

10   Q    Now, is it your testimony that Ms. Sorokin was the one

11   who said, we should go to Morocco?

12   A    It's my memory that Morocco was Anna's idea.

13   Q    Okay.  Do you recall if Ms. Sorokin said, we should go

14   anywhere else besides Morocco?

15   A    There was discussion of other places, yes.

16   Q    Okay.  So, if we could pull up, I believe the book is

17   in front of you, to P X 02343?

18            MS. MAYS-WILLIAMS:  Your Honor, could we have a

19       sidebar for just a moment?

20            THE COURT:  Yes.

21            (WHEREUPON, AN ON THE RECORD SIDEBAR CONFERENCE WAS

22       HELD)

23            MS. MAYS-WILLIAMS:  Now, are you trying to impeach

24       her?

25            MR. SPODEK:  I'm just trying to bring out the

1      evidence you put in.

2              MS. MAYS-WILLIAMS:  That is fine.  I just want to

3      make sure it's not improper impeachment.  She said she

4      remembered that she discussed a lot of different options,

5      that it sounds like you're trying to impeach her prior

6      answer.  It seems improper.

7              MR. SPODEK:  I haven't even asked her anything yet.

8              MS. MAYS-WILLIAMS:  Todd, I know the case and I

9      know what you're doing, but this is improper.

10             MR. SPODEK:  It's not improper.  I asked her if

11     they spoke about it an she said --

12             MS. MAYS-WILLIAMS:  She said yes.

13             THE COURT:  If you are trying to impeach her in a

14     prior writing, don't you have to give her the opportunity to

15     answer?  It is already in evidence.

16             MR. SPODEK:  Yeah, it's in evidence.

17             MS. MAYS-WILLIAMS:  Okay.  All right.

18             (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

19

20

21

22

23

24

25

                    Williams - People - Cross/Spodek
                                                            2041

1  CROSS-EXAMINATION

2  BY MR. SPODEK:

3              MR. SPODEK:  Okay.  So are we back on the record.

4      Bear with me.

5              I will get this set up, okay.

6      Q    Now, drawing your attention to April, 2017 when you

7  first started talking about a vacation.

8              Do you recall where the other locations that were

9  brought up were?

10     A    I believe it was the Dominican Republic and also Turks

11 and Caicos and Greece.

12     Q    So, I am drawing your attention to, again, 2343, you

13 have that there.  And I just highlighted it?

14     A    I am sorry, yes, I have it.

15     Q    So, drawing your attention to the text message that

16 starts April 1st, 2017, at 10:12.

17             That's from Ms. Sorokin, right?

18     A    Correct.

19     Q    Okay.  So the first time Ms. Sorokin talks about

20 traveling, she says April 28, to May 4, right?

21     A    I believe we discussed it in person but before text

22 messages.  But the first time it appears in text messages, yes.

23     Q    And she says, I have vacay, right?

24     A    She does.

25     Q    She says dom rep, right?

                                                    *C. Edwards*

Williams - People - Cross/Spodek

2042

1      A     Correct.

2      Q     And you interpret Dominican Republic as the Dominican

3  Republic or you don't remember?

4      A     I did.

5      Q     And she says, cheap flights too, right.  That's what

6  she says, Ms. Sorokin?

7      A     That is correct.

8      Q     Okay.  So when you first started talking about

9  traveling, the first option via text, Ms. Sorokin was looking at

10 the Dominican Republic, right?

11     A     That is correct.

12     Q     Not the five star Riad Palace in Morocco, right?

13     A     We didn't discuss hotels.  She did mention the

14 Dominican Republic.

15     Q     At this point in time, April 1st, she didn't discuss

16 anything with you about Morocco, right?

17     A     That appears to be the case.

18     Q     You're on the text messages, right?

19     A     Yes.

20     Q     Okay.  Do you want to review them and see if maybe you

21 have a different interpretation of what she was recommending at

22 this point?

23     A     No thank you.

24     Q     Now, after you two discussed going to Dominican,

25 Republic, ultimately you decided that was not the right place?

*C. Edwards*

Williams - People - Cross/Spodek

2043

1      A     Yes.  I can't quite recall whether the Dominican

2  Republic or Turks and Caicos, because Anna said that is kind of

3  an outlined island and that she would need to go further away to

4  reset her Visa.

5      Q     So, Ms. Sorokin decided that Dominican Republic

6  wouldn't work or you had no part of that, that decision, right?

7      A     That's correct.

8      Q     Okay.  Now, Ms. Sorokin decided that Turks and Caicos

9  won't work either because of the visa process, right?

10     A     Yes.

11     Q     Now, at this point, was Ms. Sorokin making all the

12  decisions regarding the traveling?

13     A     She was -- yes, and she was talking to a girl named

14  Neff, N-E-F-F.

15     Q     And what is Neff's full name?

16     A     Davis, Neff Davis.

17     Q     Okay.  And were there three of you having

18  conversations about this trip?

19     A     At this stage, there was mostly doing research on

20  their own.

21     Q     Okay.  Did there come a point that Turks and Caicos

22  was no longer an option to go because of the Visa issue?

23     A     There did.

24     Q     Do you recall when that was?

25     A     I would have to check off the top of my head.

*C. Edwards*

Proceedings

2044

1    Q    Okay.  Could you check.

2              THE COURT:  While we are looking through this, we

3    need to take a little recess.

4              Ladies and gentlemen, please follow the court

5    officer.  Don't discuss the case.

6              (Whereupon, the jurors exited the courtroom and

7    the following occurred.)

8              THE COURT:  If you could please step off the

9    stand, thank you.

10             (Whereupon, the witness exited the courtroom and

11   the following occurred.)

12             THE CLERK:  Case on trial continued.  All parties

13   are present.

14             COURT OFFICER:  Jury entering.

15             (Whereupon, the jurors enter the courtroom and

16   the following occurred:)

17             THE CLERK:  Case on trial continued.  All parties

18   are present.  All jurors are present.  The witness is being

19   reminded, you're still under oath.

20   Q    Ms. Williams, did you review your text?

21   A    I did.

22   Q    Do you recall now when you decided you weren't going

23   to go to the Dominican Republic and Turks and Caicos?

24   A    I didn't decide.  Anna did mention it.  She said she

25   couldn't go there.  She needed to go further on April the 5th.

*C. Edwards*

Proceedings

2045

1      Q    So at some point Ms. Sorokin decided those two were

2    not feasible options for her, right?

3      A    That is correct.

4      Q    And she was in touch with you about the trip, right,

5    the trip that you were going to go on?

6      A    Yes.

7      Q    And she was in touch, you said, Neff as well, right?

8      A    I believe so.

9      Q    Now, were you all making some of these decisions

10   together or was it all Ms. Sorokin?

11     A    I would say we made decisions together.

12     Q    Okay.  Now, after the Dominican Republic and after

13   Turks and Caicos, when you started to look into Morocco, did you

14   look at other hotels besides La Mamounia?

15     A    I didn't actually look at hotels in Morocco that I

16   remember.

17     Q    Do you recall if Ms. Sorokin looked at other hotels in

18   Morocco?

19     A    Not to the best of my knowledge.

20     Q    Okay.  Let's look at PX02358.

21          Okay.  Do you see this conversation on this, PX02358?

22     A    I do.

23     Q    And do you see that Ms. Sorokin sends you a different

24   resort named Amanjena?

25     A    I do.

*C. Edwards*

                            Proceedings
                                                              2046

1        Q    You see your text where you wrote, that looks insane.

2        A    I do.

3        Q    So you did speak with Ms. Sorokin via text about other

4    hotels besides La Mamounia, is that the pronunciation?

5        A    Yes, I did.

6        Q    And, in fact, Ms. Sorokin tried to book that hotel for

7    your trip, right?

8        A    She did.  I am not sure, actually, where that resort

9    is located, which is why I said, no.  I didn't know that was in

10   Morocco or Marrakech.

11       Q    Do you recall now after seeing this text messages

12   having conversation via text with Ms. Sorokin about other

13   hotels?

14       A    Oh, yes, we did.  Okay.

15       Q    Now, do you see Ms. Sorokin's text of, booked out for

16   our gate stuff?

17       A    Yes.

18       Q    So did you believe that Ms. Sorokin reached out to

19   that hotel to see if they had availability?

20       A    Yes.

21       Q    Okay.  Now, you needed to figure out together where

22   you were going to go, right?

23       A    Yes.

24       Q    And it wasn't just Ms. Sorokin that made this

25   decision, you were part of this decision, right?

                                                    *C. Edwards*

Proceedings

2047

1       A     I did help to research options, that is accurate.

2  Ultimately, it was up to Anna to make the final call.

3       Q     Do you see your text there, that is dated April 5th,

4  at 8:07, let's decide tomorrow?

5       A     Yes.

6       Q     So you were instrumental in making the decision,

7  right?

8       A     Instrumental in my commitment to, yes, to go on this

9  trip, and picking the location.

10       Q     So, let's read the text before that one.  What does

11  Ms. Sorokin say to you?

12       A     We have to decide ASAP on Marrakech and book.

13       Q     When she said to you, we have to decide ASAP on

14  Marrakech, you were part of that decision, right?

15       A     Yes, I was.

16       Q     And, in fact, you wrote in your text, let's decide

17  tomorrow, right?

18       A     Yes, I did.

19       Q     So that, that night did you look into the hotel?

20       A     I don't remember.

21       Q     Okay.  Do you recall whether you went into the hotel?

22       A     I am sure I did.

23       Q     Let's turn the page to PX02359.

24            Do you see the text at 11:56?  That says, I'm into

25  Marrakech.

*C. Edwards*

Proceedings

2048

1      A     I do.

2      Q     You sent that text, right?

3      A     She felt I was pushing Greece.  She said, you're

4  really pushing Greece, aren't you.  I responded, I am into

5  Marrakech.

6      Q     Now, you just stated that you said something

7  different.  But the words are what you tested, right, that's the

8  only thing you texted her?

9             MS. MAYS-WILLIAMS:  Objection, your Honor.

10            THE COURT:  Overruled.

11            THE WITNESS:  I said, I said that I said these

12     words, yes.  I did, yes.

13     Q     And, in fact, you were very into Marrakech, right?

14     A     Yes.

15     Q     Okay.  Did you look into the hotels in Marrakech?

16     A     I looked at the hotel Anna suggested in Marrakech.

17     Q     Well, did you look into the prior hotel that I showed

18  you?

19     A     I don't know that's in Marrakech.  Yes, I did look at

20  that hotel as well.

21     Q     Did you look any other hotels in Marrakech?

22     A     Not that I recall.

23     Q     Did you tell Ms. Sorokin, you should find a more

24  expensive hotel?

25     A     I did not.

*C. Edwards*

Proceedings

2049

1    Q    Did you say you should find a cheaper option?

2    A    I did not.

3    Q    And, in fact, you were bringing your friend on the

4    trip, right?

5    A    I was not bringing my friend on the trip.  In fact,

6    Anna had invited my friend, when she had invited herself to a

7    dinner that I told her I wanted to go to alone.  Because I was

8    catching up with my friend.

9         Anna said, I will come to get a bite to eat and leave.

10   She didn't leave during the meal.

11        She invited my friend without asking me.  He agreed to

12   come also, without asking me.  And that is how my friend came on

13   the trip.

14   Q    You had no conversations with Ms. Sorokin about

15   whether your friend should come on the trip or not?

16   A    Not before she invited him, no.

17   Q    Now, I am going to turn your attention to 2360.  You

18   see the text at 12:02?

19   A    I do.

20   Q    Okay.  Could you read that text to the jury?

21   A    Agreed, La Mamounia looks best.

22   Q    Okay.  You and Ms. Sorokin made a decision together,

23   right, that La Mamounia was the right hotel?

24   A    We did.

25   Q    And you looked at other hotels, right?

*C. Edwards*

Proceedings

2050

1      A     I guess we must have -- I don't recall.

2      Q     Okay.  You worked at a bank for eight years, right?

3      A     Eight and a half years.

4      Q     You testified on direct that you booked travel all the

5 time, right?

6      A     I did.

7      Q     You remember laughing and telling the jury how people

8 rely on you to book travel?

9      A     I don't remember laughing.  I do believe that it is

10 true, people often rely on me to book travel.

11      Q     Do you recall the research you did in looking at the

12 hotels in Marrakech?

13      A     I don't.  I am sure I did look at the hotel Anna

14 suggested.

15      Q     Did you have conversations with Ms. Sorokin about

16 inviting other people?

17      A     We did.

18      Q     Okay.  Did you recommend some of your friends who

19 might be able to come?

20      A     She asked me to propose people and I did make some

21 suggestions of people I thought she might get along with.

22      Q     Okay.  Now, at this point you were under the

23 impression that Ms. Sorokin was paying for everything, right?

24      A     I was.

25      Q     Everything for you, every dollar, right?

*C. Edwards*

Proceedings

2051

1    A    Yes.  Travel flights, expenses, yes.

2    Q    You looked at the hotel La Mamounia, right?

3    A    I did.

4    Q    You knew that this was the top hotel, the palace,

5    right?

6    A    I knew it was a very nice hotel.

7    Q    Okay.  Did you know how much it cost when you first

8    looked it up?

9    A    I don't believe, no.

10   Q    Okay.  Did you have a conversation with Ms. Sorokin at

11   any point about the cost of the hotel, before you got to the

12   hotel?

13   A    Yes.

14   Q    Okay.  When was your conversation with Ms. Sorokin

15   about it?

16   A    She said that she had booked a Riad and that it cost

17   around $30,000.  And it had space for six people.  And she

18   wanted to make sure we filled the spaces, so as to not waste

19   that space.

20   Q    Did you say anything to her that we should get a less

21   expensive room?

22   A    I did not.

23   Q    Okay.  Now when you were first contemplating who to

24   bring, you were going to bring your friend, Theo, right?

25   A    I wasn't going to bring my friend Theo.  Theo, I was

                                                    C. Edwards

Proceedings

2052

1  proposing having someone that might have the capability to

2  travel, and that Anna might like.

3       Q    Okay.  Ms. Sorokin didn't know Theo, right?

4       A    She did not.

5       Q    You proposed that he, you proposed that Ms. Sorokin

6  may like Theo and then may want to invite him on the trip,

7  right?

8       A    Yes.  I did, yes.

9       Q    How long did you know Theo?

10      A    Since 2010.

11      Q    Okay.  And it was your understanding that Ms. Sorokin

12 was going to pay for all of Theo's expenses if she was going to

13 allow him to come on the trip?

14      A    No, I didn't assume that.

15      Q    You thought he was going to pay his own way?

16      A    I believe that Anna was paying for the Riad as from

17 the get-go.  And that, I thought maybe Theo would pay for his

18 flights.  I didn't assume that Anna would be paying for his

19 travel, no.

20      Q    Did you assume that she was going to be paying for

21 Jessie's travel?

22      A    Jesse was traveling as the videographer.  So it would

23 have been an assumption that Anna would cover.

24           Well, I also spoke with her about it, that Anna would

25 be covering his flight to the expenses, as just an assumption.

*C. Edwards*

Proceedings

2053

1      Q     Did you speak to Anna, Ms. Sorokin, about covering

2    Theo's expenses?

3      A     No, it didn't get that far in the conversation.

4      Q     At some point, Theo was unable to make it to this

5    trip?

6      A     We didn't even get that far.

7      Q     How far did you get?

8      A     I merely suggested his name, and proposed maybe we

9    could have a dinner, so that Anna could meet him in advance.  We

10   never even had dinner.

11     Q     Did you then ask Anna if your boyfriend could come on

12   the trip?

13     A     I did not ask Anna if my boyfriend could come on the

14   trip.

15     Q     Did you propose that your boyfriend may be able to

16   come on the trip, he may be available?

17     A     I did.

18     Q     Okay.  Did you believe that Ms. Sorokin was going to

19   pay all the expenses of your boyfriend?

20     A     No.

21     Q     Okay.  Did you have a conversation with Ms. Sorokin

22   about what expenses she would pay and what expenses your

23   boyfriend would pay?

24     A     I did not.  It didn't get that far, again.

25     Q     So how far did it get regarding your boyfriend going

*C. Edwards*

Proceedings

2054

1    on the trip?

2        A    I asked if he could come?

3        Q    Okay.

4        A    He decided not to come.

5        Q    So first you asked -- withdrawn.

6             First you had a conversation about Theo being a

7    contender for this trip, right?

8        A    Anna asked me very precipitously to recommend people

9    to bring.  I suggested perhaps my friend Theo would be

10   available.  We did not end up meeting him to invite him.

11            I did invite my boyfriend at the time.  Anna was very

12   insistent in trying to fill the spaces in the villa.  Again, my

13   boyfriend was unable to come.

14       Q    You were merely being courteous?

15       A    I am sorry?

16       Q    You were merely being courteous.  Anna wanted to

17   invite people on the trip, and you were just proposing some

18   names?

19       A    Of course.  I would have loved to have people there I

20   liked.

21       Q    In fact, you did have people there you like, because

22   ultimately you invited Jesse Hawk, your friend, right?

23       A    I liked everyone who was there on the trip at the

24   time.

25       Q    Well, let's talk about Jesse Hawk.  How did Jesse Hawk

C. Edwards

Proceedings

2055

1    come into the equation to go to Morocco?

2         A    As I said, I was going to have dinner with him.  He no

3    longer lived in New York.  We were going to catch up.  I haven't

4    seen him in long time.

5              I stopped by to see Anna on my way there.  I told her

6    I was going to have dinner with an old friend.  She said, well,

7    can I come.  I said, no.  I haven't seen him in a long time.

8              She said, I will just come and get a bite to eat, and

9    then leave.  I got there.  She came along.  She stayed and

10   throughout the dinner, during the meal it came up that Jesse was

11   a photographer.  Anna invited him to Marrakech at the table.

12             He accepted also at the table, and I didn't say

13   anything.

14        Q    Okay.  Ms. Sorokin didn't know Jesse prior to that,

15   right?

16        A    No.

17        Q    Did you have a conversation at dinner about who was

18   going to pay for Jessie's travel?

19        A    At dinner, I don't believe we did.

20        Q    Did you have a conversation at dinner who is going to

21   pay to check the bags?

22        A    Jesse was being hired as a videographer.  We didn't

23   need to have a conversation at the table, but we had the

24   conversation the next day.

25        Q    Okay.  So at dinner, did you tell Ms. Sorokin, I have

*C. Edwards*

Proceedings

2056

1    reservations about Jesse coming, or I don't want him to come?

2         A    Not at the dinner table, I did not.

3         Q    Were you happy he was going to come?

4         A    I felt very conflicted, actually, about Jesse coming.

5         Q    Okay.  Let's turn to PX02379.

6              Now you see the text.

7              You see that text 12:53 p.m.

8         A    I do.

9         Q    Okay.  Could you read it to the jury.

10        A    Hi Anna, you do want to confirm Jesse, right?  He just

11   texted me to double check.

12        Q    Now, were you conflicted when you sent that text

13   message?

14        A    Yes, I was being put in the middle of what felt like a

15   business relationship, and I was frustrated that Jesse was

16   texting me instead of Anna.  And I was, wanting them to

17   communicate directly, taking me out of it.

18              (Whereupon, the following was recorded by

19        Official Court Reporter Denise Taylor:)

20                        *            *            *

21

22

23

24

25

*C. Edwards*

1      Q    Okay.  At any point in your text messages did you say,

2   Jesse, please communicate directly with Ms. Sorokin?

3      A    I can't recall.  I probably did.

4      Q    Okay.  Do you recall if at any point in your text

5   messages you told Ms. Sorokin privately, it's not a good idea

6   for Jesse to come, I'm conflicted?

7      A    I said, it is in the text somewhere, Jesse is a very

8   direct person, he and I often fight like siblings, I think he

9   would be very straightforward when it comes to business and she

10  said that was actually good.

11     Q    Your text messages with Ms. Sorokin, when you refer to

12  a conflict or concern about bringing your friend Jesse to

13  Morocco?

14     A    No, I don't believe I did.

15     Q    Okay.  In fact, you confirmed that Jesse was coming on

16  the trip via text message, right?

17     A    I did not confirm.  I asked Anna to confirm.

18     Q    Okay.  You asked Anna, do you want to confirm Jesse,

19  right?

20     A    I asked Anna if she would like to confirm Jesse.  That

21  is correct.

22     Q    Okay.  So, when you sent this message, what is it that

23  you meant, Ms. Williams?

24     A    When you hire people for assignments, a videographer,

25  for instance, you often put an option on someone, you put them

SPODEK-CROSS-WILLIAMS                    2058

1    on hold and then when you want to confirm them, you're making a

2    commitment that they are coming.  Jesse was asking me verbatim,

3    am I confirmed, because that is the language he would use as a

4    videographer being hired for a job.  I asked Anna, do you want

5    to confirm Jesse.

6        Q    Okay.  Now, you just stated that Jesse is a very direct

7    person, right?

8        A    He is.

9        Q    Okay.  So, why are you relaying Jesse's messages to Ms.

10   Sorokin?

11              MS. MAYS-WILLIAMS:   Objection, your Honor.

12              THE COURT:   Sustained.   Sustained.

13       Q    It's Jesse Hawk, right?  Is that his name?

14       A    That is his name.

15       Q    Okay.  So, he was going to come on the trip to produce

16   a video?

17       A    Jesse was coming as a videographer shooting video

18   footage.

19       Q    Okay.  Was there a specific purpose of what this video

20   footage was going to be for?

21       A    Ostensibly, Anna said that the purpose was to see what

22   it was like to have someone around with a camera.  She also

23   thought it would be fun to have video footage from the trip.

24   She was thinking about making a documentary on the creation of

25   her art foundation.

SPODEK-CROSS-WILLIAMS                    2059

1    Q    Okay.  And how did you feel about your friend doing
2    this work?
3                    MS. MAYS-WILLIAMS:  Objection.
4                    THE COURT:  Sustained.
5    Q    Do you recall if Jesse was in touch with you around May
6    10th?
7    A    Probably.
8    Q    Do you recall talking to him about the trip?
9    A    Probably.
10   Q    Okay.  Were you excited about the trip at this point?
11   A    Absolutely.
12   Q    Okay.  You were very excited, right?
13   A    I was looking forward to the trip.
14   Q    Okay.  Now, you were very excited at this point Ms.
15   Sorokin was paying for all of your expenses, right?
16   A    Yes.
17   Q    And you were very excited Ms. Sorokin was paying for
18   all --
19   A    I'm sorry.  Do you mean paying for my expenses at that
20   time in New York, or going to be paying for my expenses on the
21   trip.
22   Q    I'm referring to the trip.
23   A    Oh, yeah.  I believed Anna would be paying for my
24   flight, hotel, and expenses.
25   Q    And were you very excited about that?

SPODEK-CROSS-WILLIAMS                    2060

1        A      It was very generous.  I was looking forward to the

2   trip, yes.

3        Q      And you conveyed that to Ms. Sorokin via text, right?

4        A      I did.

5        Q      And you conveyed it to Ms. Sorokin by e-mail, right?

6        A      That is correct.

7        Q      Now, earlier you've testified that Ms. Sorokin laughed

8   at your salary, right?

9        A      She did.

10        Q      Okay.  How did that make you feel?

11        A       In some ways, at that time I also felt like my salary

12   was lower than the amount that I was working, so it kind of made

13   me feel supported in a strange way.

14        Q      Okay.  And in fact, you continued the relationship

15   after she allegedly laughed at your salary, right?

16        A      I liked Anna, yes.

17        Q      And you were going on a trip with Anna, right after she

18   allegedly laughed at your salary, right?

19        A      Yes.

20        Q      Okay.  Now, once you decided together you're going to

21   Morocco, Ms. Sorokin asked you to book the tickets, right?

22        A      On the morning we were scheduled to leave she did ask

23   for my help in booking the tickets.

24        Q      Okay.  Now, you've testified that you work at Vanity

25   Fair eight-and-a-half years, a lot of travel, right?

1      A     That is correct.

2      Q     That seemed to strike you as odd that you are just

3  booking tickets that morning?

4      A     Actually, I had that happen on numerous occasions with

5  photo shoots, and I knew Anna to be someone who booked things

6  often at the last minute because her schedule was unpredictable.

7      Q     Even though she was at the hotel all the time?

8      A     I don't know that Anna was always at the hotel.  I knew

9  her to be preoccupied with meetings and phone calls.  She told

10  me she had a lot of meetings and phone calls on that day as

11  well, so she wasn't sure at what time she could leave.

12      Q     Okay.  You testified earlier that to the best of your

13  recollection you went to the bar with her and people at 11

14  Howard, three times she didn't bring her credit card, right?

15      A     That's correct.

16      Q     And she didn't bring any cash to pay for any drinks,

17  right?

18      A     Not that I am aware of.

19      Q     Okay.  So, that information now with the fact that

20  she's booking the tickets last minute on a trip where she is

21  hiring a videographer, anything strange to you, or totally

22  normal?

23      A     I obviously really trusted Anna.

24      Q     Okay.  That unfortunately doesn't answer the question.

25      Was it strange to you, yes or no?

SPODEK-CROSS-WILLIAMS                    2062

1      A    No.

2      Q    Okay.  Because she was paying for everything, right,

3  what difference did it make?

4      A    That's not why it was not strange to me.

5      Q    So, tell us why wasn't it strange?

6      A    It was characteristics of Anna's behavior.

7      Q    Okay.  Did you have concern that maybe something is

8  off?

9      A    No.  If I had, I probably wouldn't have gone.

10     Q    Okay.  Well, let's talk about it then.

11      She then gives you her credit card to charge the airline

12 tickets, right?

13     A    She did.

14     Q    She texted you pictures of the front and back of the

15 card, right?

16     A    She did.

17     Q    Okay.  You processed the tickets, right, you processed

18 the credit card to purchase the tickets?

19     A    I used Anna's credit card to attempt to purchase the

20 tickets, that's accurate.

21     Q    For all four tickets?

22     A    That is correct.

23     Q    It gets declined?

24     A    It goes through and then I get a strange phone call

25 saying it was declined, yes.

1     Q     And why did you get the phone call?  Because you are

2   the contact person?

3     A     I guess so, yes.

4     Q     Well, who called you?

5     A     I think it was a travel agent, yes.

6     Q     Okay.  Did you find it strange now with the fact that

7   she didn't have any money the three times you went out, outside

8   of the hotel, and the fact that she's buying the tickets last

9   minute, and the fact now that the credit card to get the tickets

10  is not going through?

11          MS. MAYS-WILLIAMS:  Your Honor could we have one

12      question at a time just, so the witness knows what she's

13      answering?

14          THE COURT:  That is a lot of questions that she has

15      to find strange.

16          MR. SPODEK:  It is.  Unfortunately it is a lot of

17      questions, your Honor.

18          THE COURT:  Why don't you ask them one at a time.

19          MR. SPODEK:  Sure.

20    Q     At this point in time when the credit card doesn't go

21  through, did you find it strange?

22    A     I did not.  In hindsight it's easy to pick out the

23  times where there may have been red flags, but when you are

24  living through the experience it was mixed into so many other

25  things, I did not find it strange.  I thought $4,500 would have

SPODEK-CROSS-WILLIAMS                        2064

1    set, might have set off an alarm bell at a bank who may have

2    thought that was fraudulent, especially because I tried to book

3    the cheapest flight possible and it went to this strange travel

4    agency, which wasn't maybe what Anna would usually book through,

5    that's why I said, you need to let your bank know this is an

6    authorized charge.

7         Q    Okay.  Now, you told Anna that she has to let her bank

8    know.  Did she ask you to use your card?

9         A    I'm sorry?  Did she ask me to use my credit --

10        Q    Right.  Let's go through the sequence of events?

11        A    I volunteered.

12        Q    She never asked you to use your card?

13        A    She said, only if that's okay for you, I'll borrow the

14   money next week and I said only if you can borrow the money next

15   week, okay.

16        Q    Did Ms. Sorokin ever ask you to use your card, yes or

17   no?

18        A    In booking the flights?

19        Q    Yes.  In booking the flights?

20        A    I don't believe so.

21        Q    Okay.  Let's turn to 2385.  So, let's read the second

22   text down, the one that's timestamp 1:45.

23        A    "Should I put on my card and you pay me back?"

24        Q    Okay.  You offered to use your card, right?

25        A    I did.

1    Q    Okay.  Ms. Sorokin did not ask you to use your card,

2    right?

3    A    Excuse me.  Yes, as I've said.

4    Q    You had no obligation to use your card?

5    A    I did not.

6    Q    Okay.  Now, you could have said to Ms. Sorokin, let's

7    wait until the bank calls back and resolve the issue, right?

8    A    This is late in the day, on the day that we were

9    scheduled to leave.  I felt pressured.  I felt a sense of

10   urgency and she told me that the airline people were leaving in

11   10 minutes, which doesn't make sense, but I believed her.

12   Q    Okay.

13   A    And that is why I volunteered.  I was not under any

14   obligation.

15   Q    Did you find it strange that Ms. Sorokin told you the

16   airline is leaving in 10 minutes and somehow, you were going to

17   make your flight?

18   A    Only in hindsight.

19   Q    Okay.  When you received that text, you thought it was

20   totally normal?

21   A    I did.

22   Q    Okay.  You were excited about the trip?

23   A    And we have established I was excited about the trip.

24   Q    Okay.  Now, this same day is -- withdrawn.

25       When you booked these tickets, you didn't say to Ms.

1    Sorokin, hey, you know what, use a different card, we'll wait it

2    out, we'll get a later flight, right?

3        A    I did not.

4        Q    You didn't speak to Kacy Duke about her paying her own

5    way and sorting it out later, right?

6        A    I did not.

7        Q    You didn't speak to Jesse, talk about paying his own

8    way and we'll sort it out later, right?

9        A    That is correct.

10       Q    On your own volition you agreed to pay for all four

11   flights?

12       A    I did not agree to pay for them.  I agreed to cover the

13   cost with Anna reimbursing me the following week.

14       Q    Okay.  You testified that after you got these tickets,

15   you were taking an Uber to the airport, right?

16       A    That's correct.

17       Q    Okay.  Now, you made your own arrangements to get to

18   the airport for you, right?

19       A    No, Anna said, let's go together.

20       Q    Okay.  Anna said, let's go together and then you booked

21   your own Uber, right, you booked an Uber for you to use.

22       A    I did.

23       Q    Okay.  Did you coordinate with Anna about how the two

24   of you were going to go together?

25       A    I did.

SPODEK-CROSS-WILLIAMS                                    2067

1      Q    Okay.  Do you recall offering to pick up Ms. Sorokin

2   from her hotel?

3      A    I did.

4      Q    Okay.  And do you recall Ms. Sorokin telling you that

5   she has her own car?

6      A    I recall Ms. Sorokin saying that she would get her own

7   car, yes, and I said, no, we can just stay in mine.  I was

8   stressed about the time because Ms. Sorokin is often late.

9      Q    Okay.  So, you remember yesterday you testified about

10  the cost of that car?

11     A    I did.

12     Q    Right.  And it was more than usual to get to the

13  airport, right?

14     A    I was.

15     Q    Okay.  Ms. Sorokin didn't ask you to take her in the

16  car, right?

17     A    She did say, let's go together.

18     Q    Okay.  Did she say, you book the car, I'm coming in

19  your car?

20     A    Oh no, she did not.

21     Q    Okay.  In fact, she said, I have my own car, right?

22     A    That is correct.

23     Q    And you said, come into my car?

24     A    I did.

25     Q    Okay.  Second time you volunteered to pay for

1    something, right?

2        A    That's correct.

3        Q    Okay.  Did you ask Ms. Sorokin, are you going to pay me

4    back for the Uber?

5        A    She said, add it to my invoice with a smiley face, so I

6    didn't have to ask.

7        Q    Okay.  At this point, you started to keep track of all

8    of it, right?

9        A    I did.

10       Q    Okay.  Now, Ms. Sorokin said to you, if you don't mind

11   circling around, then I'll come into your car, right?

12       A    That's correct.

13       Q    Okay.  And again, this was your idea, right?

14       A    To stay in my car, yes.

15       Q    Okay.  Now, you're an Uber V I P, right?

16       A    I use Uber, or I did use Uber quite frequently, that's

17   correct.

18       Q    Uber V I P is a particular status in the Uber world,

19   right?

20       A    Yes.

21       Q    Okay.  And you have that status, right?

22       A    I believe I still do, yes.

23       Q    Did you have it at the time that you decided to pick up

24   Ms. Sorokin?

25       A    I did.

```
 1    Q    Okay.  What did you get for having this status?

 2    A    You just get assigned certain drivers with a certain

 3 rating, so you get nice, like drivers that are rated highly by

 4 their passengers.

 5    Q    Do you need to spend a certain amount to keep up that

 6 status?

 7    A    I don't believe so.  I think you have to use the

 8 service to a certain amount.

 9    Q    So, if you use the service a certain amount, you get

10 the special status with the very nice drivers?

11    A    As I've said, yes, that's true.  I used the Uber a lot

12 for work.  I used Uber frequently.

13    Q    Okay.  So, now you've booked the tickets on your own.

14 You got the car on your own.  Now you're at the airport, right?

15    A    We did, yes, go to the airport.

16    Q    Okay.  Now, you stated on direct that Jesse Hawk is

17 checking in his baggage and there is an issue, right?

18    A    He and Anna were checking in together.  Yes, there was

19 an issue.

20    Q    Okay.  Now, at this point Jesse expected Ms. Sorokin to

21 pay to check in his luggage, right?

22    A    That's my understanding.

23    Q    You were there.  Did you hear them have a conversation?

24    A    No, I walked over as they were checking in.  Yes, I'm

25 sure Jesse expected it.  I can't testify as to what someone else
```

SPODEK-CROSS-WILLIAMS                    2070

1    expects, but that's what I saw, yes.

2        Q    Let's talk about what you saw.  You walked in.  You saw

3    the two of them on line to check in the baggage, right?

4        A    Yes.

5        Q    Okay.  Did you hear any conversation?

6        A    Yes.

7        Q    Okay.  What did you hear Ms. Sorokin say?

8        A    Anna had checked her wallet.

9        Q    Okay.  Now, did you find this odd?

10       A    I did find that odd.

11       Q    Did you have a conversation with Ms. Sorokin saying

12   anything about this?

13       A    I can't recall.

14       Q    Okay.  Did you have a conversation with Jesse about how

15   you are going to pay to check his luggage?

16       A    I can't recall.

17       Q    Okay.  You recall that you agreed to pay to check

18   Jesse's luggage, right?

19       A    I did.

20       Q    Okay.  And do you recall if Jesse offered to pay the

21   $200 it would cost to check his luggage?

22       A    I do not.

23       Q    Okay.  He didn't pay for it, right?

24       A    He did not.

25       Q    He expected someone else to pay for it, as far as you

1   knew?

2       A    That is correct.

3       Q    Okay.  Did Ms. Sorokin ask you to pay for Jesse's

4   luggage to be checked in?

5       A    She did.

6       Q    She asked you that?

7       A    She did.

8       Q    Okay.  Did she ask Jesse to pay his own way?

9       A    She did not.

10      Q    Okay.  Did she ask Kacy if she could pay for Jesse's

11  luggage to be checked in?

12      A    Jesse was -- I mean, Kacy was not with us.  She was

13  already at the gate.  So, no.

14      Q    Okay.  So, what did Ms. Sorokin say to you exactly?

15      A    I already owe you money, will you get this too and add

16  it to the invoice.

17      Q    And why didn't you just ask Jesse to pay his own way?

18      A    Because I agreed to pay for it when Anna asked me to.

19  Anna was either going to reimburse me or reimburse Jesse, and

20  she already owed me money.

21      Q    And Jesse is very direct, as you testified, right?

22      A    That is a character trait.  I would say, yes.

23      Q    And this is what he does for business, right?  He is a

24  videographer?

25      A    No.  He's a photographer, a photo assistant.  On this

SPODEK-CROSS-WILLIAMS                    2072

1    particular trip he was a videographer, yes.

2        Q    Okay.  Does he travel for work sometimes?

3        A    He does.

4        Q    And you've traveled with him with Annie, right?

5        A    I haven't traveled with him with Annie.  I have

6    traveled on assignments where Jesse was working.

7        Q    Okay.  Again, you didn't have any conversation with

8    Jesse about paying $200, right?

9        A    Not that I recall.

10       Q    Okay.  Now, after you checked in, you all had dinner at

11   the airport, right?

12       A    Yes.

13       Q    Now, there are four of you there, or is it just you and

14   Anna?

15       A    Three of us.  It was Jesse, Anna, and me.

16       Q    And do you recall where Kacy was at this point?

17       A    I believe Kacy was at the gate.

18       Q    Okay.  Now, at this point you're under the impression

19   Ms. Sorokin doesn't have a credit card, right?

20       A    I believed she has checked her wallet, yes.

21       Q    And you offered to pay for the dinner, right?

22       A    I guess that is correct.

23       Q    Did you have a conversation with Jesse about chipping

24   in for dinner?

25       A    I did not.

1    Q    And you used your card to pay for dinner?

2    A    I did.

3    Q    Okay.  And then, I believe you testified you had a

4  layover, right?

5    A    We did.

6    Q    And that was in Portugal, I believe?

7    A    It was.

8    Q    And then you had a second meal there, right?

9    A    We did.

10    Q    And were all four of you to go for that meal, or just

11  the three of you?

12    A    All four of us.

13    Q    Okay.  Now, so now you have Kacy, right?

14    A    That's correct.

15    Q    Jesse?

16    A    Yes.

17    Q    Ms. Sorokin?

18    A    Yes.

19    Q    And you?

20    A    Yes.

21    Q    You agreed to pay for that dinner, as well, on your

22  card?

23    A    It was not a dinner.  I believe it was a lunch.  I did

24  pay for it with my debit card, I believe.

25    Q    Did you ask Kacy to contribute?

SPODEK-CROSS-WILLIAMS                         2074

1        A    I did not.

2        Q    Did you ask Jesse to contribute?

3        A    I did not.

4        Q    You kept tabs of this, though, because Ms. Sorokin was

5   going to pay for everyone, right?

6        A    That's correct.

7        Q    You kept the receipt and you were going to put it on

8   your little graft, your inspection?

9        A    I was keeping track, yes.

10            (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams - People - Cross/Spodek

2075

1    CROSS-EXAMINATION

2    BY MR. SPODEK:

3        Q    Okay.  Now, at this point, this is at the sort of --

4    withdrawn.

5            At this point you and Anna are very close, right?

6        A    Anna was a close friends, yes.

7        Q    Would you describe her as your best friend?

8        A    No.

9        Q    You were going to share a bed with her in Morocco,

10   right?

11       A    Yes.

12       Q    Is that something that you do with close friends?

13       A    Sure.

14       Q    Okay.  You spoke to her everyday.

15       A    Yes.

16       Q    Okay.  You visited her all the time?

17       A    I did.

18       Q    Sometimes you saw her two to three times a day, right?

19       A    Occasionally, yes.

20       Q    Okay.  Now, when you get to Morocco at this point, are

21   you excited about the trip still?

22       A    Yes.

23       Q    And at that point you're under the assumption Ms.

24   Sorokin is paying for everybody, right?

25       A    I am.

*C. Edwards*

1      Q    And you know the hotel you're going to, right, because

2   you looked it up?

3      A    I did.

4      Q    And you're very excited at staying at this palace,

5   that's how you described it?

6      A    I was.

7      Q    And your friend Jesse is there?

8      A    Yes.

9      Q    And Kacy is the trainer that you visited at Ms.

10  Sorokin's hotel, right?

11     A    No.  I've never visited Kacy at Anna's hotel.

12     Q    I apologize.  I got mixed up.

13          You visited her in Chelsea.

14     A    We went to work out with Kacy in Chelsea.

15     Q    And was the idea that you and Ms. Sorokin were going

16  to be able to work out with Kacy in Morocco?

17     A    I believe so.

18     Q    Did you have a conversation with Ms. Sorokin about

19  this?

20     A    Anna said we could work out while we were there, I

21  believe, yes, I think.

22     Q    Okay.  It's not true that you and Ms. Sorokin invited

23  Kacy because she was your trainer, and you wanted to continue

24  training with her?

25     A    Ms. Sorokin and I did not invite Kacy together.  Anna

*C. Edwards*

Williams - People - Cross/Spodek

2077

1    invited Kacy separately.  She did tell me she wanted to workout

2    with Kacy while we were there.

3         Q    So this was going to be a lovely trip for you, right?

4              MS. MAYS-WILLIAMS:  Objection.

5              THE COURT:  We established it's a very nice trip.

6         Could you move on, please.

7         Q    Now, when you get to the hotel, you didn't have to

8    check in, right?

9         A    I did not personally.

10        Q    Okay.  Did you see anyone check in?

11        A    Not that I recall.

12        Q    Okay.  The next day, the first day you're there, you

13   had described then, you went out for the town, is that when the

14   Medina --

15        A    No, we spent the entire day within the hotel.

16        Q    The first day of the trip, you stayed on the grounds

17   of the hotel.

18        A    That is correct.

19        Q    Okay.  Are you having a nice time that first day?

20        A    Yes, we had a nice time.

21        Q    Because that first day you were under the impression

22   Ms. Sorokin was paying for everything, correct?

23             MS. MAYS-WILLIAMS:  Objection.

24        Q    That's her state of mind.  What was your impression,

25   was it your impression that Ms. Sorokin was still going to pay

*C. Edwards*

Williams - People - Cross/Spodek

2078

1    for your entire trip?

2         A    That was my impression in October of 2017.

3         Q    Okay.  First day, night.

4              The second day you're going into the town, right, or

5    maybe not town, shopping distinct?

6         A    The Medina, yes, that's correct.

7         Q    Did you have a nice day that second day?

8         A    Yes.

9         Q    If you didn't have a nice day, tell us.

10        A    It was a nice day.

11        Q    Now, you went shopping with Ms. Sorokin for some

12   dresses, right?

13        A    We did.

14        Q    Now, do you remember if Ms. Sorokin brought two

15   dresses for you, for her, and two dresses for you?

16        A    Anna purchased more than -- Anna brought me one dress.

17        Q    Okay.

18        A    And as I said, I can't remember how many she brought,

19   but it was more than one for herself.

20        Q    How were you going to remember all these details for

21   your books, just out of curiosity?

22             MS. MAYS-WILLIAMS:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MS. MAYS-WILLIAMS:  Move to strike, please.

25             THE COURT:  Both of us.  There is nothing to

*C. Edwards*

1      strike.  And the question alone is not evidence.

2      Q    Okay.  So how many dresses did Anna buy to the best of

3  your recollection?

4           MS. MAYS-WILLIAMS:  Your Honor, this is asked and

5      answered.

6           THE COURT:  You may answer if you know, ma'am.

7           THE WITNESS:  I don't remember.

8      Q    Ms. Sorokin's card didn't go through at the shop,

9  though, right?

10     A    That is correct.

11     Q    She offered it though, right?

12     A    She did.

13     Q    And then you offered to pay for the dresses, right?

14     A    I was asked.

15     Q    So Ms. Sorokin said, would you mind paying for it?

16     A    Yes.

17     Q    Did you ask Ms. Sorokin -- excuse me, did you ask Ms.

18  Sorokin to call the bank to figure out the issue on that, you're

19  on the second day of the trip?

20     A    She said that she would.  I don't think I had to ask

21  her.  She said I need to call my bank.

22     Q    Okay.  You then agreed to use your card, right?

23     A    I did.

24     Q    And one of those dresses was for you, right?

25     A    It was a gift Anna was buying for me, that's correct.

*C. Edwards*

Williams - People - Cross/Spodek

2080

1    Q    Did you believe that Ms. Sorokin was going to pay for

2    all of those purchases at any stores for you during the trip?

3    A    Actually, I brought Kaftan or something separately,

4    and I paid for that myself.

5    Q    Okay.  So your answer is, no then; is that correct?

6    A    That's the only time in the trip where that was a -- I

7    made a purchase individually.

8    Q    Okay.  So one instance you made your own purchase,

9    right?

10   A    That's correct.

11   Q    And how much was that purchase; if you remember?

12   A    Maybe $200.

13   Q    Okay.  And everything else you expected Ms. Sorokin to

14   pay, right?

15   A    I didn't shop any additional to that, that I remember.

16   So yes, I did.

17   Q    Well, any food or beverages, correct?

18   A    Yes.

19   Q    Any museum fees or garden fees?

20   A    Yes.

21   Q    Now you created a spread sheet for the expenses that

22   you laid out, right?

23   A    I did.

24   Q    When did you create that spread sheet?

25   A    On May the 18, 2017, I believe.

*C. Edwards*

Williams - People - Cross/Spodek

2081

1    Q    Okay.  So let me draw your attention to it.  It's
2  PX02446.  You have it there?

3    A    I am sorry.

4    Q    It's okay PX02446.

5    A    I have it.

6    Q    Okay.  You are literally keeping track of every single
7  Euro you spent, right?

8    A    Morocco Dirham, I just looked back at my credit card
9  and the statement, yes.

10    Q    I apologize.  You're keeping track of every Dirham you
11  spent, right?

12    A    Absolutely, yes.

13    Q    And you're expecting Ms. Sorokin to pay every single
14  cent, outside of the $200, purchase that you made on the trip,
15  right?

16    A    It's actually not accurate.

17         I also had some cash, which I used and converted,
18  like, some Euros and Dirhams and used that as well.

19    Q    Okay.  Outside of the cash that you spent, you created
20  this spread sheet for reimbursement from Ms. Sorokin, right?

21    A    On that Thursday when my cards kept going down, and I
22  was very stressed out and I had just gotten back to the hotel, I
23  tabulated this spread sheet based on charges that I saw on my
24  various cards.

25    Q    Okay.  This spread sheet was for money that you wanted

*C. Edwards*

Williams - People - Cross/Spodek

2082

1  Ms. Sorokin to reimburse you, right, yes or no?

2       A    This was for money I was -- yes, I wanted and I was

3  told that she would reimburse me for, yes.

4       Q    So could you walk us through the 1159 purchase, what

5  is that?

6       A    I am sorry, where are you looking?

7       Q    You see on the right column there.

8       A    Oh, down on the bottom.

9       Q    You see?

10      A    I don't remember exactly what it is.  It's something

11 in the layover boarding list.

12      Q    Was it something at the airport?

13      A    I am sure.

14      Q    You expected Ms. Sorokin to pay for it, right?

15      A    Yes, I did.  I don't know who it was for.  It could

16 have been for Kacy, Jessie, or Anna, yes.

17      Q    Whoever it was for, Ms. Sorokin was going to be paying

18 that cost, right?

19      A    Yes, that is correct.

20      Q    What about the next thing, that's 619.

21      A    The same applies.

22      Q    Do you recall what that was?

23      A    I don't.

24      Q    You recall purchasing anything during the layover

25 besides your lunch?

                                              C. Edwards

Williams - People - Cross/Spodek

2083

1      A     I recall purchasing a bottle of wine.

2      Q     Do you recall purchasing anything for Kacy or for

3   Jessie?

4      A     I don't.  I don't recall.

5      Q     Okay.  Now, Ms. Sorokin told the hotel in Marrakech

6   that she would be responsible for everything, right?

7      A     I am not sure what was told at the hotel.

8      Q     Okay.  Well, you testified regarding email that you

9   were on, you remember that?

10     A     I am sorry, I don't know where you're referring to.

11     Q     You remember yesterday being here testifying?

12     A     Yes.

13     Q     Do you remember talking about Ms. Sorokin reached out

14  to Rachid regarding the bill of the hotel?

15     A     I do remember that, yes.

16     Q     You remember Ms. Sorokin telling Rachid she's

17  responsible for everything at the hotel, right?

18     A     That is correct, yes thank you.

19     Q     So let me draw your attention to that email.

20           I am going to try to -- this is PX02455.  I am going

21  to try to fix this.

22           Now, do you remember the email?

23     A     I do remember this email, yes.

24     Q     So, Ms. Sorokin put it in writing through the hotel,

25  right, that it's her responsibility to pay for everything,

*C. Edwards*

Williams - People - Cross/Spodek

2084

1    right?

2        A    That is correct.  We were both already gone from the

3    hotel at this time.

4        Q    And she asked for the bill of everything that was -- I

5    am sorry, withdrawn.

6            She asked for itemized bill of everything that went on

7    your card, right?

8        A    That's correct.

9        Q    Okay.  Now, in addition did you ever find out how the

10   credit card wasn't accepted at the hotel, initially?

11       A    You mean on Anna's credit card.

12       Q    Yes.  Let's backtrack for a moment when you first

13   checked into the hotel.  You stated that there was no check-in,

14   right?

15       A    Not that I recall.

16       Q    At some point it came to light, there was no credit

17   card on file for this group of four?

18       A    That's correct.

19       Q    Okay.  Do you know how that happened, if you know?

20       A    I don't.

21       Q    Okay.  Now, you stated earlier today, that Ms. Sorokin

22   had no idea about your Vanity Fair corporate card, right?

23       A    I didn't say she had no idea.  I am saying she didn't

24   ask me.

25       Q    Okay.  Did you have a conversation with Ms. Sorokin

*C. Edwards*

Williams - People - Cross/Spodek

2085

1    prior to this day about your bank having a corporate card?

2         A    She would have seen me with it.  I don't know that we

3    had a conversation about it, as such, I don't recall.

4         Q    Okay.  Did she ever ask you about the limit on your

5    Vanity Fair corporate card?

6         A    No.

7         Q    Did she ever ask you if you brought it on the trip to

8    Morocco?

9         A    Not that I recall.

10        Q    Okay.  So, you testified yesterday that at some point

11   the hotel staff was irate that there was no card on file, right?

12        A    I wouldn't say irate, I would say firm.  I would say

13   insistent.

14        Q    So, what was the first contact with the hotel stay?

15        A    I am sorry, what do you mean, first contact?

16        Q    Well, the hotel is looking for a card for payment,

17   right, that's what we are talking about?

18        A    I am sorry, what is the question?

19        Q    When did the hotel first come to you for payment for

20   the room?

21        A    The hotel didn't come to me, they came to Anna.

22        Q    At some point you were part of that conversation,

23   right?

24        A    I walked into that conversation on Thursday, May 18.

25        Q    So Thursday the 18th is when they first came to you

*C. Edwards*

Williams - People - Cross/Spodek

2086

1   about the balance for the hotel, right?

2       A    I was with Anna, they didn't come to me.  I walked

3   into the room, and she was sitting there with the two men.

4       Q    Okay.  So she's sitting there with the two men.

5            Did you say something to the two men?

6       A    I may have said, what, like what is needed or

7   something.  They said we need a functioning card on file.  It's

8   a card, it's required that we had one.  It's for a temporary

9   hold.  Anna said, can we use your card for now?

10      Q    Did any of hotel employees ask you if they could use

11  your card?

12      A    Yes, they said, do you have a credit card.

13      Q    Who asked you that, if you recall, you said there were

14  two people, there was Rachid?

15      A    I am not sure.

16      Q    So, prior to Anna asking you, the hotel asked you if

17  they could use your card, right?

18      A    The hotel asked me if I had a credit card.

19      Q    The hotel asked if you had a credit card.  What did

20  you say when they asked you that question?

21      A    I looked at Anna.

22      Q    Did you respond verbally?

23      A    No, I looked at Anna first and she said, can we use

24  your card for now.

25      Q    And you agreed to, and then you agreed to use your

*C. Edwards*

Williams - People - Cross/Spodek

2087

1  card?

2       A    I did not feel that I had a choice.

3       Q    Well, did you say to -- withdrawn?

4            Did you ask Anna if there was some other options?

5       A    I had asked Anna what was taking so long.

6            I asked why her banks weren't opened.  I asked whether

7  she was expecting calls back.  The men were not leaving.  It was

8  very clear, there was not another option.

9       Q    Okay.  Did you go to Jesse to ask if he could use his

10 card?

11      A    Jessie was not in the villa at the time?

12      Q    Did you say, hey, could we have a break.  I will go

13 speak to Jesse?

14      A    I would not have asked Jessie.  Kacy was gone at that

15 point, and, no, I did not ask Jessie.

16      Q    So, after they said to you and Anna asked you, you

17 then offered your card.

18      A    I did not offer.  I was -- I did not feel like I had a

19 choice.  They did take my credit card, yes.

20      Q    Did you give it to them or did they take it out of

21 your pocket?

22      A    They took it out of my hand.

23      Q    And how did it get into your hand?

24           MS. MAYS-WILLIAMS:  Objection, your Honor.

25           THE COURT:  Overruled.

                                        C. Edwards

Williams - People - Cross/Spodek

2088

1   Q    Did you take the card out to give it to the hotel?

2   A    I did.

3   Q    This was a voluntary act, right, no one forced you to

4   do this?

5   A    I did not feel I had a choice.

6   Q    Did you verbalize that to anyone?

7   A    Possibly.

8   Q    Do you recall?

9   A    No.

10   Q    Okay.  Now, it was your understanding that they were

11   just going to preauthorize the credit card?

12   A    That was my understanding.

13   Q    Okay.  And just so we are clear, means that, that they

14   put a hold for a certain amount on the card, right?

15   A    I now understand that, yes.

16   Q    Did you know how much credit was available on your

17   card at that time?

18   A    I did.

19   Q    Did you have a conversation with Ms. Sorokin about how

20   much credit was available on your card?

21   A    I couldn't have, because I didn't know.

22   Q    Ms. Sorokin couldn't know either then?

23   A    No.

24              MS. MAYS-WILLIAMS:  Objection.

25              THE COURT:  Sustained.

*C. Edwards*

Williams - People - Cross/Spodek

2089

1      Q     Now, after you put the card, after you put the card

2  down, did you say to them, don't charge it, just put the hold on

3  it?

4      A     They said that the hold would be temporary.  I was

5  assured all through the day.  I was assured even after the phone

6  call at the American Express when I knew it run as a charge.  I

7  was told there would be a credit, I guess, put back on my card

8  for the same amount.

9            Does that answer your question?

10     Q     Well, did at some point, at some point it came to your

11 attention that, that it wasn't a hold that they actually charged

12 the card, right?

13     A     At which time I was told that a credit for the same

14 amount would be put back in my account, yes.

15     Q     And when they told you that they are going to charge

16 the card or -- withdrawn.

17           When they told you that they did charge the card, did

18 you express concerns to Ms. Sorokin?

19     A     I am sure.

20     Q     Do you remember?

21     A     Yes.

22     Q     Okay.  So do you remember saying any words to her or

23 did you just feel it, and hope that she somehow understands it?

24           MS. MAYS-WILLIAMS:  Objection, your Honor.

25           THE COURT:  Sustained.

*C. Edwards*

Williams - People - Cross/Spodek

2090

1       Q    Do you recall the words you said to Ms. Sorokin?

2       A    I believe it was something along the lines of, you

3  will fix this, right?

4            I asked her if her parents knew that she was

5  traveling.  She said, no.  I believed that she needed to call

6  and tell them.  I thought maybe she had run out of monthly

7  disbursements.  Maybe she had spent it on a private jet to

8  Omaha.  I knew she had taken a week before our trip.

9            Maybe she didn't tell them she was traveling, she had

10  run out of whatever allowance or disbursement that she had.

11           I did express my concern, yes, with what was going on

12  and I was lead to believe it would be resolved.

13      Q    But you allowed the charges to stay on your card at

14  this point, right?

15      A    Under the assumption, under the impression that a

16  credit would be put back on my account for the same amount, not,

17  not charges put.  It was just the 30 something thousand at that

18  point in time.

19      Q    Now, did you speak to Jessie about this issue when you

20  were there?

21      A    I don't actually recall.

22      Q    Do you recall if Jessie was there still at the time?

23      A    I do recall.

24      Q    Did you speak to Jessie at all during the trip?

25      A    Yes.

*C. Edwards*

Williams - People - Cross/Spodek

2091

1    Q    Now, how did you feel about Ms. Sorokin at this point,

2    with this new issue on top of all the others issues?

3              MS. MAYS-WILLIAMS:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  I thought I felt uneasy.  I trusted

6         her.  I felt uncomfortable.  I probably didn't express it

7         as much as I maybe should have.

8              I still trusted her as my friend.

9    Q    Okay.  Did you say -- withdrawn?

10             Did you have a conversation with Ms. Sorokin saying,

11   you can't put anything more on the card.  This has to be

12   resolved.  I am going home?

13   A    I mean, this took place on the day before I was

14   leaving.  By the time we got back to the hotel, there was

15   nothing additional to put on my card.

16             So I probably didn't need to have that conversation.

17   It was kind of done.

18             By the time I left, I did, I did understand the

19   $30,000, because it had been charged to stay on my card.

20             So after I left, I do recall being in France and

21   asking her, do you know how much the hotel charged my card or

22   cards.  I knew they had kept both of my cards on file at this

23   point.

24             I had told them not to charge my corporate card.  I

25   did understand that the $30,000 might stay on my account.

*C. Edwards*

Williams - People - Cross/Spodek

2092

1    Q    Okay.  Now, you gave instructions to the hotel staff

2    not to charge the Vanity Fair corporate card, right?

3    A    In person on the day when I was there, I was stressed

4    out.  The only reason they had it, because I need to take my

5    personal card back, and I told them they could physically hold

6    it.  They may not charge it.

7         After I was gone from Morocco, when I landed in Nice

8    France -- sorry, in France.  And both of us were gone from the

9    hotel.  I did, at that point understand that Anna had intended

10   to put the entire amount on my cards.  And I say cards, at this

11   point, because once we were gone, it had become clear that she

12   had talked to Rachid, I guess, about putting the amounts on my

13   card.  And they couldn't put the full amount on my personal card

14   so they charged my corporate card.

15        You may see the email response, please charge my

16   personal card, not my corporate card.

17        I said it very blatantly.  I should have said it

18   firmer.  But after we were gone, again, I didn't feel I had a

19   choice.

20   Q    So it's your testimony that the hotel charged your

21   corporate card on Ms. Sorokin's request?

22   A    I guess so.  I mean, I certainly -- yes.

23        I wouldn't have told them to charge my credit card.  I

24   wouldn't have told them to charge my card for the full bill.

25   Until after I was gone, it was apparent that was the plan.  And

                                                    C. Edwards

Williams - People - Cross/Spodek

2093

1    I didn't feel there was another choice.

2        Q    Okay.  So you testified that you told the hotel staff

3    to hold your corporate card, not to charge it, right?

4        A    When given them the card that is accurate?

5        Q    To physically hold the card?

6        A    That is correct.

7        Q    And you told them, do not charge the card, right?

8        A    That is correct.

9        Q    Did you hear Ms. Sorokin tell them to charge your

10   card?

11       A    That exchange happened after I was gone.

12       Q    Okay.  So you did hear that conversation, right?

13       A    That is correct.

14       Q    Did you see any email with Ms. Sorokin saying, charge

15   the card you were copied on?

16       A    No.

17       Q    You have no independent knowledge Ms. Sorokin ever

18   told this hotel to charge your card, correct?

19       A    That's not entirely correct.  I believe that's what

20   this email says.

21       Q    Okay.  Let's read this email.  Please read it to us.

22       A    Rachid --

23       Q    I could give you the numbers.  You could look at it in

24   the binder?

25       A    Rachid, following up on my last email.  It's something

C. Edwards

Proceedings

2094

1  I didn't see.

2          Can you please send the total bill and the summary of

3  all charges that have been put on Rachel's card.

4          Appreciate your assistance.  Rachel was kind enough to

5  provide you her card, but it's my responsibility to make sure

6  all parties are covered.

7          Looking forward to receiving it before the EOD today.

8  Thanks, AD.

9      Q   Ms. Sorokin did not give Rachid permission to charge

10 your card, right?

11     A   You're right.  I wasn't there when that conversation

12 happened.  I did not hear it.

13                 THE COURT:  Is this a good time?

14                 MR. SPODEK:  Sure, your Honor.

15                 THE COURT:  We are going to take a brief recess,

16     ladies and gentlemen.  Don't discuss the case.

17                 (Whereupon, the jurors exited the courtroom and

18     the following occurred.)

19                 (Whereupon, the following was recorded by

20     Official Court Reporter Denise Taylor:)

21                      *           *           *

22

23

24

25

                                              *C. Edwards*

SPODEK-CROSS-WILLIAMS                     2095

1          COURT OFFICER:  Witness entering.

2          Jurors entering.

3          THE CLERK:  Case on trial continued.  All parties

4    are present.  The jurors are all present.

5              The witness is reminded that she is still under

6    oath.

7    Q    Welcome back, Ms. Williams.

8    A    Thank you.

9    Q    I just want to, I just want to draw your attention to

10   when you are back in New York after the Morocco trip, okay.

11   A    Okay.

12   Q    Now, you were in touch with Ms. Sorokin to collect the

13   money, right?

14   A    That's correct.

15   Q    Okay.  And you were constantly in touch with her by

16   text, e-mail, and calling her, right?

17   A    Mostly text.

18   Q    Okay.  And she always responded to you, right?

19   A    Yes, for the most.  Yes, she did, yes.

20   Q    Okay.  Now, you came by her hotel, I believe, twice

21   looking for her?

22   A    That's correct.

23   Q    Okay.  Now, this was an emotional time for you, right?

24   A    Yes.

25   Q    Okay.  Now, during the time you were texting Ms.

```
 1   Sorokin regarding all of these financial issues, you also was

 2   talking to her about hotels in New York, right?

 3       A    I'm sorry.

 4       Q    Well, we went over all those texts yesterday about you

 5   --

 6       A    When she was coming back to New York.

 7       Q    Let's take it step by step.

 8        You were texting Ms. Sorokin about getting reimbursement

 9   for money you laid out?

10       A    That's correct.

11       Q    You were distraught, right?

12       A    Increasingly so.

13       Q    Everyday getting worse, right?

14       A    Yes.

15       Q    Okay.  And we all saw how emotional it was for you?

16            MS. MAYS-WILLIAMS:  Objection.

17            THE COURT:  Sustained.

18       Q    During this time period that you were trying to get

19   reimbursement, Ms. Sorokin asked you about hotels for her to

20   stay in New York at, right?

21       A    She said, what's going on in New York.  Everything is

22   sold out.

23       Q    Okay.  At this point you were fairly mad at Ms.

24   Sorokin, right?

25       A    No, I wasn't very mad yet.  At this point I was anxious
```

1  about money, obviously.

2       Q    You would describe it as anxious?

3       A    Extremely anxious.  This was only maybe two weeks, I

4  think, after I had come back and when she is just entering the

5  United States, of course I was very anxious.  I was beginning to

6  be, at the first, beginning of the distraught phase, I would

7  say.

8       Q    So, at this very beginning of the distraught phase, you

9  are giving her advice as to what hotels to stay at in New York,

10 right?

11      A    I don't know if I gave her advice.  She said, what

12 about the Beekman, and I said what I said about the Beekman.

13      Q    What you did you say about the Beekman?

14      A    I said the rooms were small, but they had good

15 restaurants?

16      Q    Would you describe that as advice, or how would you

17 describe it?

18      A    I guess, giving an opinion.

19      Q    Okay.  And in fact, you talked to her about other

20 things as well, right, about restaurants at the hotel, right?

21      A    I did.

22      Q    Okay.  Now, in addition, you testified that at some

23 point Ms. Sorokin paid you $5,000 by Pay Pal, right?

24      A    She did.

25      Q    Okay.  Just so I'm clear, that chart that you made,

1    P X 2446, did you fail to include that in your chart?

2        A    I didn't fail to.  It happened after this chart was

3    made.

4        Q    Okay.  Did you adjust the chart to reflect that $5,000?

5        A    I didn't adjust this chart to reflect the hotel bill or

6    the $5,000 because Anna kept saying she was going to be

7    reimbursing $70,000.  I didn't, I didn't update the chart.

8        Q    Okay.  You didn't update.

9         Now, after trying to get Ms. Sorokin to reimburse you, at

10   some point you gave up, right?

11       A    I don't know that I --

12       Q    Gave up on her taking responsibility herself?

13       A    I don't think I ever gave up.

14       Q    Okay.  Well, at some point you went to the 5th precinct

15   in Chinatown, right?

16       A    That was pursuing multiple resolutions at once, but I

17   don't think I ever gave up on contacting Anna with the hope that

18   reimbursement might be forthcoming.

19       Q    Okay.  So, at some point you decided to seek other

20   avenues of getting your money back, right?

21       A    While simultaneously staying in contact with Anna, yes.

22       Q    First of all, while staying in touch with Anna you was

23   going to the police?

24       A    I contacted lawyers.

25       Q    Okay.  Who did you contact for the lawyers?

1      A    I can't remember.

2      Q    Do you remember when you contacted them?

3      A    It would have been before the police.

4      Q    Okay.  So you contacted lawyers.  Did you retain a

5  lawyer?

6      A    I did not.

7      Q    Did you ever sue Ms. Sorokin civilly?

8           MS. MAYS-WILLIAMS:  Objection.

9           THE COURT:  Sustained.

10     Q    Okay.  So you decided to go at some point to the 5th

11  precinct, right?

12     A    I'm not sure about the precinct number, but I did go to

13  a precinct.

14     Q    Okay.  You testified that you spoke to a lieutenant,

15  right?

16     A    I believe he was a lieutenant, yes.

17     Q    Okay.  And you testified that the lieutenant said you

18  should set up a Go Fund Me page, right?

19     A    He said, with your face, you could start a Go Fund Me

20  page to get your money back.

21     Q    Did you file a report at the precinct?

22     A    Not at that stage.

23     Q    When you left the precinct, did you go to civil court?

24          MS. MAYS-WILLIAMS:  Objection.

25          THE COURT:  Sustained.

SPODEK-CROSS-WILLIAMS                    2100

1      Q     After it didn't work out with the precinct, did you go

2   to civil court?

3                    MS. MAYS-WILLIAMS:  Objection.

4                    THE COURT:  Counsel, step over to the sidebar.

5                    (WHEREUPON, AN ON THE RECORD SIDEBAR CONFERENCE WAS

6        HELD)

7                    THE COURT:  Look, did she file a civil suit or not?

8                    MR. SPODEK:  She came here -- listen, she wrote an

9    article about the whole thing, so she talks about it in the

10   article.  She came here to file a suit and was unable to

11   file a suit.

12                   THE COURT:  Listen, if she filed a suit and stand

13   to gain from a civil suit, you have a right to ask that.  If

14   she didn't file a suit, I don't think you have the right to

15   ask that because then you are signalling to the jury that

16   her case has no merit and filing a civil suit is irrelevant

17   as to whether the district attorney --

18                   MR. SPODEK:  She can testify that she came to civil

19   court to inquire about her options.  She testified about her

20   various options and what she's done.  She wrote an article

21   about exactly what she's done and she choose to go a certain

22   route after she exhausted those options.

23                   THE COURT:  If she files a civil suit and gains,

24   again, that goes to motivation.

25                   MR. SPODEK:  But she tried to, your Honor.

1          THE COURT:  But she didn't.

2          MR. SPODEK:  I think it's relevant and material.

3          THE COURT:  Tell me what it's relevant to?  Does it

4    go to her bias?  Does it go to her --

5          MR. SPODEK:  She was unable to find a way to

6    collect the money and then, essentially cooperated with the

7    D A and sold a story and I believe that that motivated her

8    to make certain decisions because she obviously tried to

9    collect it on her own without going to the D A and the story

10   was in the paper for a long time and she had every avenue to

11   explore.

12         She just testified she went to lawyers, she went to

13   the precinct.  She only went to the D A's Office after

14   everything else didn't work out for her as a last resort and

15   that's what her commitment was and her, and her article, she

16   describes it.

17         THE COURT:  She went to the police first.  The

18   first instinct was to get her arrested.  So, I don't know

19   your theory.

20         MR. SPODEK:  It didn't work out.

21         THE COURT:  It didn't work out on her behalf.  It

22   didn't work out because of a lot.

23         MR. SPODEK:  That's the facts of the case.  The

24   facts of the case is, she didn't go to the D A's Office

25   until after all of this.

1          MS. MAYS-WILLIAMS:  Your Honor, I don't think it is

2     appropriate at all to discuss civil remedies that hasn't --

3     it is appropriate for the past witnesses, who your Honor

4     that you was inappropriate, at this time.  It's no more

5     appropriate at this time, as your Honor said, she did not

6     actually file a suit.  It doesn't go to any bias.

7          MR. SPODEK:  The truth is, I don't know that she

8     didn't file a suit.

9          THE COURT:  If you don't know that she didn't file

10    a suit, then you are digging yourself into a hole because

11    then you don't have a good faith basis.

12         MR. SPODEK:  She went to civil court and to file a

13    suit and, in fact, she said the lieutenant told her to do

14    that.

15         THE COURT:  Did she file a civil suit?

16         MS. MAYS-WILLIAMS:  She did not.

17         THE COURT:  No, you can't ask this stuff.

18         (AFTER WHICH, THE FOLLOWING PROCEEDINGS WERE HELD

19    IN OPEN COURT)

20    Q    Ms. Williams, shortly after you went to the precinct,

21    you went to California, right?  Well perhaps I could help jog

22    your memory.

23    Did you have an event in California, the New Establishments

24    Summit?

25    A    That was in October.

SPODEK-CROSS-WILLIAMS                    2103

1        Q     Okay.  Between August and when you went to the precinct

2   and October when you went to California, were you in touch with

3   Ms. Sorokin?

4        A     I was.

5        Q     Okay.  Regularly?

6        A     I think so.

7        Q     Okay.  Did you tell Ms. Sorokin that you were going to

8   the police?

9        A     I did not.

10       Q     Okay.  Now, Ms. Sorokin told you at some point that she

11  was going to be in California, right?

12       A     She had planned to attend the Summit.  So, I knew that

13  she was potentially going to be in California at that time, as

14  well.

15       Q     Did there come a time that you found out that she was

16  at Cedar Sinai Hospital in California?

17       A     No, not specifically.

18       Q     Okay.  Were you aware that she was at a hospital at any

19  point?

20       A     Yes.

21       Q     Okay.  How were you made aware?

22       A     Well, she told me.

23       Q     Okay.  Did she tell you while you were both in

24  California, or you were in New York?

25       A     I was in New York.

1    Q    And she was, Ms. Williams said she was in New York and

2    I was going to ask, and Ms. Sorokin was in California at the

3    time, right?

4    A    When she told me she was in the hospital, I didn't, I

5    didn't first know where it was located and then she said

6    California.

7    Q    Okay.  Now, at this time you were making plans with Ms.

8    Sorokin to meet in California, right?

9    A    That happened later.

10   Q    Okay.  So, do you recall when the first time you spoke

11   with Ms. Sorokin when she was in California?

12   A    I don't know where she was at the time.  She was

13   texting me.  I believe it was when she was in the hospital or

14   told me she was in the hospital.

15   Q    Okay.  Do you recall when that was?

16   A    Early September of 2017.

17   Q    Okay.  And when were you planning to go to California?

18   A    I believe that would have been very late September, if

19   I recall correctly.

20   Q    Okay.  You were in touch with Ms. Sorokin in September

21   of 2017, about meeting in California, right?

22   A    That is correct.

23   Q    Did you come to find out that Ms. Sorokin was at

24   Passages, a rehabilitation center?

25   A    I did.

SPODEK-CROSS-WILLIAMS                          2105

1     Q     Did Ms. Sorokin tell you that?

2     A     She did.

3     Q     Okay.  Now, at the same time this was happening, you

4  were in touch with the District Attorney's Office, right?

5     A     I was.

6     Q     Okay.  And in fact, you made plans with Ms. Sorokin for

7  lunch, right?

8     A     That's correct.

9     Q     But in reality, it was a set up for Ms. Sorokin to be

10 arrested, right?

11    A     That is correct.

12    Q     Okay.  And you were in touch with the detectives from

13 the Financial Frauds Unit in the D A's Office, right?

14    A     I was.

15    Q     Okay.  Detective McCaffrey, I believe?

16    A     Yes, that's correct.

17    Q     Okay.  Now, in your Vanity Fair article, you talked

18 about how Ms. Sorokin was in California, right?

19    A     I did.

20    Q     And you talked about how she was arrested in

21 California, right?

22    A     I did.

23    Q     You failed to mention that you set her up to be

24 arrested though, right?

25               MS. MAY-WILLIAMS:  Objection.

SPODEK-CROSS-WILLIAMS                    2106

1        THE COURT:  Overruled.

2    A    I didn't say it explicitly, no.

3    Q    Is it your testimony that you said it implicitly?

4    A    I can't remember the exact wording.  It may have been

5    vague.  I certainly didn't say it explicitly.

6    Q    Okay.  And why is that?

7    A    I didn't feel that the amount of space an article

8    provided was enough space to tell the whole story.

9    Q    Okay.  Well, you testified yesterday about how

10   emotional it was, that you felt good to get it out on paper,

11   right?

12   A    Writing was cathartic.

13   Q    And writing about this particular relationship was

14   cathartic, right?

15   A    Writing about this particular trauma was cathartic.

16   Q    And obviously, you wanted to be truthful and honest in

17   your story, right?

18   A    Yes.

19   Q    And you chose not to include the fact that you set her

20   up to be arrested the moment she walked out onto the street,

21   right?

22   A    The article doesn't include a lot of the story.  It

23   includes a very specific amount of the story as space permitted.

24   Q    Okay.  So, let's talk about how the article came into

25   existence.  You testified yesterday that a journalist reached

SPODEK-CROSS-WILLIAMS                           2107

1    out to you, right?

2        A    That is correct.

3        Q    Okay.  And they reached out to you prior to the

4    article?

5        A    That is correct.

6        Q    Okay.  And who was the journalist?

7        A    Jessica Pressler.

8        Q    And what was your understanding of what Ms. Pressler

9    wanted from you?

10       A    She just wanted to talk to me about Anna and I guess

11   get background and to talk about my experience with Anna.  At

12   this point the arraignment had taken place so, she, I guess,

13   knew about my interaction with Anna in Marrakech.

14       Q    And did you in fact have a conversation with Ms.

15   Pressler?

16       A    I do not believe at that time I had responded, no.

17       Q    Okay.  Now, at this point were you already having the

18   cathartic experience of writing it all down?

19       A    I believe I was contacted by Ms. Pressler in March of

20   2018, and I had been writing since August of 2017.

21       Q    Okay.  Now, so after that conversation did you have the

22   idea to sell your article?

23       A    No.  It was not an idea to sell my article.  It was an

24   idea to write and article for the publication where I worked.

25       Q    Okay.  So, were you planning to write that article for

SPODEK-CROSS-WILLIAMS                    2108

1    Vanity Fair for free, or were you looking to sell it to Vanity

2    Fair?

3         A    The reason I was paid for the article is if I had not

4    negotiated a freelancer's agreement, Conde Nast would have owned

5    the copyright to my story, which would have been a severe blow.

6    So, I negotiated to tell what was an extremely personal story

7    within the space I worked, the platform I just did, and in doing

8    so, I was compensated, but the $1,200, $1,300 I was paid was not

9    a motivating factor.

10        Q    Okay.  But the motivating factor is to get the story

11   out in publication?

12        A    The motivating factor was to tell this part of the

13   story in my own words.

14        Q    Okay.  Now, was this the first time you published any

15   written work?

16        A    I had written some behind the scenes pieces for V F dot

17   com in the past, Vanity Fair dot com.

18        Q    I am no sure exactly what you mean, behind the scene?

19   What does that mean?

20        A    Articles about a photographer working with a subject on

21   his shoot, just talking about maybe the music they are listening

22   to, or some sort of element relating to the photo shoot.

23        Q    Were they credited to you on Vanity Fair dot com?

24        A    They were.

25        Q    Okay.  This was your first piece in print?

1    A    That is correct.

2    Q    Okay.  Now, you testified that in college you studied,

3  I believe it was literature or English, right?

4    A    I did study English, yes.

5    Q    And you wanted to be a writer, right?

6    A    No.  That wasn't a career goal of mine.

7    Q    Okay.  Is that a career goal of yours now?

8    A    No, I will probably start applying for jobs in

9  advertising agencies, somewhere where I can use my visual

10 background in any way.

11   Q    Okay.  Now, you are represented by an agent from

12 Creative Artist Agency, right?

13   A    I am.

14   Q    Okay.  And that was Michelle Weiner?

15   A    That is, yes.

16   Q    Okay.  So, when did you engage Michelle Weiner?  Was it

17 when you were having the drafts that were for your own purpose,

18 or were you trying to maybe sell them?

19   A    It was after the article had been published.

20   Q    Okay.  So, you negotiated with Vanity Fair directly, or

21 someone else negotiated for you?

22   A    I did that directly.

23   Q    How did you come up with $1,200 or $1,300?

24   A    That was the number they offered.  I didn't negotiate

25 it.  It just was what it was.

SPODEK-CROSS-WILLIAMS                                    2110

1      Q     Okay.  And after they accepted your piece for

2  publication, did you reach out to Ms. Weiner?

3      A     She reached out to me.

4      Q     Okay.  And did you engage her as your agent?

5      A     I did.

6      Q     Okay.  And what was the purpose of that engagement?

7  What were you trying to achieve?

8      A     I had, as I mentioned, received a lot of attention.  I

9  have never done business in the film and television world.  I

10  felt very vulnerable going out of this experience.  I sought

11  advice and an advocate and an ally.  I found someone I trusted

12  who could help me to navigate a world I don't know.  I was in

13  over my head.

14      Q     In addition, you wanted to make money, right?

15      A     I wanted to find a home for this project.  Yes, money

16  is a factor.

17      Q     Okay.  In fact, you wanted to sell your project this

18  story to the highest bidder, right?

19      A     That is not accurate.

20      Q     Okay.  Do you remember calling me?

21           MS. MAYS-WILLIAMS:  Objection, your Honor.

22           THE COURT:  Sidebar.

23           (WHEREUPON, AN ON THE RECORD SIDEBAR CONFERENCE WAS

24      HELD)

25           THE COURT:  I thought you said you didn't want to

1    do this?

2              MR. SPODEK:  No, we agreed we were going to

3    actually say you called me, you put me in touch with your

4    agent, you wanted me to talk to your agent and not get into

5    the letter.

6              MS. McCAW:  I thought that we at the end decided

7    that we should just not go into this area.

8              MR. SPODEK:  No, I didn't agree to that.

9              THE COURT:  Okay.  There was a misunderstanding.  I

10   thought you agreed not to go into this?

11             MR. SPODEK:  No, I want to get out that she called

12   me and the purpose of the call was to speak to her agent and

13   that her agent, in fact, she put me in touch with her agent.

14   That's it.  I'm not going to get into --

15             MS. MAYS-WILLIAMS:  Why is this relevant if we are

16   not going to go any further?

17             MR. SPODEK:  Of course it's relevant.  She was

18   trying to get the highest bidder, 100 percent.

19             THE COURT:  But this creates a big problem, again,

20   Mr. Spodek, the same problem we were talking about this

21   morning, which is, if she says no --

22             MR. SPODEK:  But she could say no.

23             THE COURT:  Okay.  But if she a says no, then what

24   do we do with that information because again, am I, did I

25   miss this whole conversation this morning?  I thought we had

SPODEK-CROSS-WILLIAMS                    2112

1     decided that you had a problem because you are an officer of

2     the Court and, you know, that she is saying although she is

3     not your witness, but if you know she is saying something

4     that's inaccurate, don't you have some duty to correct the

5     record?

6               MR. SPODEK:  Judge, it wasn't my understanding.  My

7     understanding was, we went over the e-mail on the record and

8     I said, I am not going to address the e-mail.  I again tried

9     to see if the People would agree.  We came over to sidebar

10    and your Honor said, no, we are not going to address the

11    fact that she put me in touch with her agent.  She also

12    admits to, I am not going to ask her.

13              THE COURT:  She contacted you.  I guess the

14    question is, that shows what?

15              MR. SPODEK:  She is sitting there trying to make

16    herself out that she had a cathartic experience, that's why

17    she did this and I am going to get an agent to help

18    navigate.

19              MS. MAYS-WILLIAMS:  I remember judge saying you can

20    ask her, H B pay you $300.

21              MR. SPODEK:  I am going to get to that, but she

22    reached out to me.  It's relevant, judge.

23              MS. MAYS-WILLIAMS:  This particular line of

24    questioning is going to make you a witness.  It just did.

25              MR. SPODEK:  It's not.

1          THE COURT:  So, your agent called me, isn't it a

2    fact.

3          MR. SPODEK:  Your agent called me a number of

4    times.

5          THE COURT:  Maybe she doesn't know that.

6          MR. SPODEK:  The e-mail saying, I'm trying to get

7    in touch with Todd.

8          MS. McCAW:  She doesn't have any firsthand

9    knowledge and it's hearsay, what the agent told her is

10   hearsay.

11         MR. SPODEK:  She's on the e-mail.  She is on the

12   e-mail.  How is it not hearsay when it is a banking

13   statement?

14         MS. MAYS-WILLIAMS:  Because we are okay with that.

15         MR. SPODEK:  It doesn't matter.  She has firsthand

16   knowledge of the e-mail.

17         MS. MAYS-WILLIAMS:  I am going to object to it.

18   It's impermissible.

19         MR. SPODEK:  Judge, I strongly believe -- obviously

20   I'll respect your Honor's ruling, of course, but I believe

21   it's actually relevant, absolutely material to represent

22   that she called me, her agent was trying to get in touch

23   with me to talk about this.

24         MS. MAYS-WILLIAMS:  There is no explanation as to

25   why, but the same issue exists, even if she explains it and

SPODEK-CROSS-WILLIAMS                            2114

1    you disagree with the explanation.

2              MR. SPODEK:  I don't care what the explanation is.

3    She can say whatever she wants.  Did she call me just to

4    chat?

5              THE COURT:  Mr. Spodek, ask a question, are you

6    aware that your agent called me multiple times, whatever her

7    answer is.

8              MR. SPODEK:  Okay.  No problem.

9              THE COURT:  Listen, I'm trying too -- and are you

10   aware why your agent wanted to call me, I mean, how does

11   that get you closer to what her motivation is?

12             MR. SPODEK:  She's here crying the whole day on

13   this issue and I believe it's a ruse because she is trying

14   to make the story as exciting as possible.  Since I spoke to

15   her about it early on she wasn't crying.  She was ecstatic.

16             THE COURT:  Now you got a real problem because if

17   you are trying to show this crying is a big phony, then you

18   are really making yourself a witness.

19             MR. SPODEK:  What can I be a witness to?  All I'm

20   saying is, did you call me, did your agent call me.

21             THE COURT:  But the fact that you were called is

22   not the relevant issue here.  I told you, you can ask her 16

23   times, and I know you will 16 times, you know, isn't it a

24   fact that you stood to make six figures?

25             MR. SPODEK:  And I will, okay.  And ask her if she

1    was aware her agent called me.

2              THE COURT:  That he's calling you out because she

3    made a lot of money.

4              MR. SPODEK:  Because she specifically was calling

5    me to make more money.

6              THE COURT:  She made a heck of a lot money and you

7    can certainly show that this idea that she's having an

8    intellectual experience in her journal is bologna, what she

9    really wants to do was make money.  You can do that, but

10   calling you doesn't get there.  Take yourself out of this.

11             MR. SPODEK:  Okay.

12             THE COURT:  Okay.  Ask her whatever it is you want

13   about the money she made.  That's fine.

14             (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

15

16

17

18

19

20

21

22

23

24

25

Williams - People - Cross/Spodek

2116

1  CROSS-EXAMINATION

2  BY MR. SPODEK:

3      Q    Okay.  Ms. Williams, we were talking about your agent,

4  right?

5      A    Yes.

6      Q    So what is the agreement that you have with the agent,

7  the financial agreement?  I assume she gets paid for her work?

8      A    I believe she gets 10 percent of anything, any deals

9  that she participates in, I don't know.

10     Q    Did you sign a contract with her?

11     A    I did.

12     Q    Did you look into other agents?

13     A    I did not.

14     Q    She's the only agent you spoke to?

15     A    Yes.

16     Q    Okay.  How did you find her?

17     A    Through friends.  She approached me.

18     Q    So once she approached you, she was shopping your

19  story, right?

20     A    Yes, I believe so?

21     Q    You entered into a contract with her.  What did you

22  hire her to do?

23     A    To represent me in negotiations pertaining to this

24  story.

25     Q    Okay.  You hired her to try to find a deal for your

*C. Edwards*

Williams - People - Cross/Spodek

2117

1   story, right?

2       A    I hired her to broker a deal.

3       Q    To broker a deal.  And in that deal, you would retain

4   90 percent of the money, and she would retain 10 percent, right?

5       A    That is accurate.

6       Q    Did she come to, with a number of offers?

7       A    Two.

8       Q    So tell us what offers that came to you?

9       A    I believe, I mean, the first was through Conde Nast,

10  an employer, I believe, that was a part of my agreement with

11  them.  I can't remember the terminology.  I just know in good

12  faith, we had to pursue that, that avenue first and the second

13  was with HBO.

14      Q    Now, the Conde Nast offer, were you still a full-time

15  employee there at the time?

16      A    I was.

17      Q    And do you remember the terms of that deal?

18      A    I don't.

19      Q    You turned down that deal, though, right?

20      A    I did.  I did.

21      Q    Safe to say, the HBO deal was more favorable for you?

22      A    Yes.  Safe to say.

23      Q    How much was Conde Nast offering you?

24      A    Again, I actually don't recall.

25      Q    How much did HBO offer you?

*C. Edwards*

Williams - People - Cross/Spodek

2118

1       A    35,000 for the option.

2       Q    Was Conde Nast offering you less that $35,000.

3       A    I believe so, yes.

4       Q    You took the highest bidder of those two, right?

5       A    Between the two, I went with HBO, that's correct.

6       Q    Now, that $35,000, approximate, is that the only

7   payment you received under that contract?

8       A    The option, yes, that is correct.

9       Q    Do you stand to make additional payments if they

10  exercise that option?

11      A    I do.

12      Q    Could you tell us what the total amount you could make

13  from HBO pursuant to that contract?

14      A    I am actually not sure.  It is still being negotiated.

15      Q    Did you sign a contract?

16      A    I did.

17      Q    Do you recall any other numbers that came up in that

18  contract?

19      A    I do believe -- not exactly.  I believe there was a

20  number around $300,000 but I again, don't remember the exact

21  figure.

22      Q    I understand.  We are just talking about approximate

23  numbers here.

24      A    And again, that is still in negotiations.  So just for

25  the sake of transparency, that is the number I remember.

*C. Edwards*

Williams - People - Cross/Spodek

2119

1    Q    And you state that that number is in negotiations,
2    right?
3    A    The project itself, yeah.
4    Q    Safe to say, that number could go up, right?
5    A    I don't think that's likely.
6    Q    But it's possible.
7    A    I guess so.
8    Q    So what is the mechanism that you would get for
9    $300,000?  Do they have to exercise the option?
10   A    I am sorry, your terms are a little cryptic.  I don't
11   quite know what you are asking.
12   Q    I am using the terms you told us on direct.
13   A    The terms you are using, that's why I have an agent.
14   Q    Okay.  Let's take you back to the basics.  What did
15   HBO buy from you?
16   A    They purchased the rights to make something based upon
17   the story I have told.
18   Q    What could they possibly make?
19        MS. MAYS-WILLIAMS:  Objection.
20        THE COURT:  Sustained.
21   Q    Okay.  Did they contract with you to make a television
22   show about your story?
23   A    I don't know if it was television shows explicitly.
24   It was a film project.
25   Q    Is it safe to say, if they choose to make a film or TV

C. Edwards

Williams - People - Cross/Spodek

2120

1    project, you would then get the $300,000?

2        A    I believe that is correct.

3        Q    Besides the $30,000 that you received already, and the

4    potential $300,000, is there any other potential to make money

5    in that contract?

6        A    The contract is still being negotiated.  I am not

7    sure.

8        Q    Okay.  Are you a party to those negotiations?

9        A    No.

10       Q    Do you have any idea of what they are negotiating?

11       A    I actually don't.

12       Q    Have you had conversations with your agent about some

13   of the things you would like to be in the contract?

14              MS. MAYS-WILLIAMS:  Objection, your Honor.

15              THE COURT:  Yes or no, have you had

16       conversations?

17              THE WITNESS:  No.

18              THE COURT:  All right.  Next question.

19       Q    In addition to the contract with HBO, that is vague.

20            Did you enter into a contract with Simon and Schuster?

21       A    I did.

22       Q    Did your agent with CAA negotiate that contract for

23   you?

24       A    An agent did, yes.

25       Q    Who was that agent?

*C. Edwards*

Williams - People - Cross/Spodek

2121

1    A    Molly Glick.

2    Q    So, you have one agent to deal with film and TV,

3    right?

4    A    That's correct.

5    Q    And you have a separate agent who works with Literary

6    agencies and companies.

7    A    That's correct.

8    Q    And how did you come to the second agent?

9    A    Somewhere like, to where I came to the first.  They

10   all work in tandem.  They are both within the same agency.

11   Q    And is it the same financial agreement where the

12   agency keeps 10 percent?

13   A    The Literary agent keeps 15 percent.

14   Q    Okay.  It pays to be in the literary world, I see.

15        MS. MAYS-WILLIAMS:  Objection.

16        THE COURT:  A little levy.  It's lunch time.

17        MR. SPODEK:  In moments we will be done.

18   Q    The arrangement with the publishers, Simon and

19   Schuster, you know the terms of that contract?

20   A    I believe I stand to make $300,000 as I disclosed

21   yesterday.  It is paid in for, in four amounts, four increments.

22   Q    Is there any additional monies you could make from the

23   book contract?

24   A    Again, I can't remember the exact terms.  I believe

25   there are some royalty privileges.  I don't really know.

*C. Edwards*

Williams - People - Cross/Spodek

2122

1      Q     Okay.  Did you ever talk to either agent about the

2   trial in this case?

3                   MS. MAYS-WILLIAMS:  Objection.

4                   THE COURT:  Overruled.

5                   THE WITNESS:  Only to say that I didn't want

6         things to be publicized, because I didn't want my testimony

7         to be misconstrued as a ploy for my own benefit, because it

8         is not.

9      Q     You didn't want it to be publicized, but you sold a

10   story, a television show, and a book?

11     A     Not based on my testimony.  I told a very personal

12   story.  I don't know.  I don't know what the question is?

13     Q     You don't know what the question is?

14     A     No, I don't.

15     Q     You just stated that you didn't want to monetize off

16   of this, right?

17     A     I didn't want the trial or my testimony to be

18   misconstrued as something to benefit myself.  I still feel that

19   way.  It is not about entertainment, about law and order and a

20   crime.

21     Q     For you it is about entertainment, though, right?

22     A     This is not about entertainment.  This is about a

23   trauma.  This is about something I went through.  This is

24   about -- the judicial system in America.  This is not

25   entertainment.

*C. Edwards*

Williams - People - Cross/Spodek

2123

1    Q    So you stand to make potentially $630,000, not to

2  mention the $1200 from the article, or 1300, approximate, that

3  doesn't interest you at all?

4    A    This is the most traumatic thing I ever been through.

5  I wish I had never met Anna.  If I could go back in time and not

6  be where I am today, you bet.  I wouldn't wish this on anybody.

7    Q    I understand that.  But this horrible experience that

8  you went through, you sold to three separate people, right?

9    A    I worked very hard to get where I am today.  That is

10  true.  I did sell to three separate people.  I worked very hard.

11    Q    And when you say, worked very hard, you worked very

12  hard on selling the story of your experience with Ms. Sorokin,

13  right?

14              MS. MAYS-WILLIAMS:  Objection, your Honor.

15              THE WITNESS:  That is not accurate.

16              THE COURT:  Overruled.

17    Q    When did you quit Vanity Fair?

18    A    I did not quit Vanity Fair?

19    Q    When were you terminated by Vanity Fair?

20    A    I was laid off on February 5th, was the day they told

21  me.  I don't know when the exact termination date, it would have

22  been.

23    Q    When did you sign the contract with HBO?

24    A    I believe it was in July or August of 2018.

25    Q    Okay.  When did you sign the contract with Simon and

*C. Edwards*

Williams - People - Redirect/Mays-Williams

2124

1  Schuster?

2      A    I can't remember which came first.  It would have been

3  around the same time.

4      Q    Had you been working since you were laid off from

5  Vanity Fair.

6              THE COURT:  Excuse me, is that laid off in 2018

7      or 2019?

8              THE WITNESS:  Nineteen.

9              THE COURT:  Nineteen.  Okay.

10             THE WITNESS:  Have I've been working, yes.

11     Q    What have you been doing?

12     A    I've been finishing the book.

13             MR. SPODEK:  Nothing further, Judge.

14             THE COURT:  All right.  Almost there.

15             Any redirect?

16             MS. MAYS-WILLIAMS:  Very brief.

17             THE COURT:  Can you do it in a few minutes?

18             MS. MAYS-WILLIAMS:  Yes.

19  REDIRECT EXAMINATION

20  BY MS. MAYS-WILLIAMS:

21     Q    During cross examination the defense asked you whether

22  the defendant paid for food and drink at 11 Howard.

23             Did you actually ever see the defendant pay for

24  anything at 11 Howard?

25     A    I did not.

C. Edwards

Williams - People - Redirect/Mays-Williams

2125

1      Q    And one last question.

2           Defense counsel ask you during cross examination about

3    other types of hotels that the defendant suggested.

4           Could you tell us a little bit about what those hotels

5    were, what were they like?

6      A    You mean, for New Yorker or for the trip?

7      Q    For the trip to Morocco or the trip in general, before

8    you guys decided on La Mamounia.

9      A    They were destinations luxury hotels.  I would have

10   probably been comfortable, although it's hard to imagine

11   something being quite as lavish like the La Mamounia.  They were

12   in the same realm of a hotel.

13              MS. MAYS-WILLIAMS:  No further questions.

14              MR. SPODEK:  Nothing, Judge.

15              THE COURT:  Thank you, ma'am.  You're free to go.

16              Ladies and gentlemen, I am sorry I kept you a

17        little late for your lunch.

18              I appreciate your patience.  So we will come back

19        closer to 2:30 today, okay.

20              However, don't discuss the case amongst

21        yourselves or with anyone.  You see any of us outside at

22        lunch time, ignore us.  We must ignore you.

23              Please don't have any conversations with the

24        media.

25              Do not use your lunch hour to do any independent

*C. Edwards*

Proceedings

2126

1    research.  Don't post anything on social media.

2              In the event you see anything or hear anything

3    about this, please ignore it.

4              Most of all, have a nice lunch and follow the

5    sergeant.

6              (Whereupon, the jurors exited the courtroom and

7    the following occurred.)

8              (Whereupon, a luncheon recess was taken at this

9    time.)

10             *          *          *

11       A F T E R N O O N     S E S S I O N

12             *          *          *

13             (The following then occurred in open court out of

14   the presence of the jury:)

15                    *              *              *

16

17

18

19

20

21

22

23

24

25

                                                    *C. Edwards*

Proceedings

2127

1          THE CLERK:  Case on trial continued.  All parties

2     are present.

3          THE COURT:  All right, good afternoon, everyone.

4     There was something you wanted to say or do?

5          MS. McCAW:  Yes, your Honor.  So as we discussed,

6     I believe I lost tracks of the days.  On a prior day, we

7     discussed the issue regarding the Chase records,

8     specifically, the fact that Ms. Williams received the card

9     from the defendant.  The defendant proffered this card as a

10    legitimate form of payment.

11         And the People, in terms of being able to prove

12    the defendant intended to deceive Ms. Williams, need to be

13    able to bring out the facts that there was no money in the

14    account at the time that, that transaction occurred.

15         As we discussed previously, the statement itself

16    also reveals that the defendant attempted to cut checks in

17    the exact same checks.

18         In fact, the People do believe it's relevant from

19    Ms. Williams' testimony.  We understand that your Honor did

20    not agree with that position.

21         Excuse me, the way we reference, I believe there

22    were two options.  Either the witness is able to put in the

23    Chase record or we come up with a stipulation.  The People

24    have proposed a stipulation to Mr. Spodek.  He does not

25    like the stipulation.

*C. Edwards*

Proceedings

2128

1          And so, I guess, we are, to the fact of the

2     situation, the People are renewing their position with

3     respect to the ability to move in the full Chase record.

4          MR. SPODEK:  Your Honor, it's not that I do not

5     like the stipulation.  All I ask is that there was

6     overdraft protection at the time this account transaction

7     was made.  I ask that we put that in the stipulation.  The

8     People said, no.

9          MS. McCAW:  The People's response for that, is

10    that we are having a live witness whose going to testify

11    with respect to the business records at issue.

12         And though, the witness will be putting in

13    documents that show that there is overdraft protection on

14    the account, he's welcome to ask questions of that witness

15    regarding the overdraft protection.

16         But to be able to put this in two different

17    places is frankly unnecessary.

18         MR. SPODEK:  For the same token, why couldn't the

19    witness just testify, redact everything and just say this

20    day here was the balance.

21         MS. McCAW:  The witness can testify to a document

22    that's not in evidence.  It's hearsay.  It's not

23    permissible.

24         MR. SPODEK:  The document could be in evidence

25    and everything could be redacted except the information.

*C. Edwards*

Proceedings

2129

1          THE COURT:  I have to admit, I really don't know

2      what it is you're asking me.  I am a little bit confused

3      here.

4          I said I wasn't going to allow evidence of the

5      uncharged crime of writing all these bad checks.

6          However, you just had a witness testify who said

7      that every time the hotel officials in Marrakech were

8      trying to get money out of Ms. Sorokin, there was no money

9      there to be obtained.

10          So, now you're trying to put somebody on from

11      that account who is going to say there was zero money in

12      the account, right.

13          Why do we need to put in any testimony about the

14      fact that she was writing all these bad checks?  All we

15      need to know is, for you to be able to meet your burden of

16      proof.  There is no money in the account.

17          MS. McCAW:  So, your Honor, the issue is as we

18      discussed previously, that the business records themselves,

19      it is impossible to redact the business record in such a

20      way to show, number one, that there is no money in the

21      account.

22          And number two, without revealing the fact that

23      she had cut a check.

24          THE COURT:  Why can't you have an account number

25      one, two, three, four, to reflect out balance zero?

*C. Edwards*

Proceedings

2130

1      MS. McCAW:  Well, because, when we looked at the

2   actual records, the records themselves would show that

3   there was -- close to zero balance in the account on the

4   beginning of the month.  It would show that at the end of

5   month, but it would not show anything in the middle when

6   the actual transaction took place.

7      So, therefore, in order to actually be able to

8   say that on the date when, when the defendant proffered the

9   card to Ms. Williams, there was no money in the account.

10      THE COURT:  Let's say she proffered the card on

11   the 15th of March.  Why can't you show on the 15th of March

12   zero?

13      MS. McCAW:  Because the records themselves would

14   not show that.

15      The records themselves, in order to understand

16   what the balance is, you would have to be able to look at

17   the entire transaction.

18      These are the records that I provided to your

19   Honor a couple of days ago.  I gave a proposed redaction.

20   I think your Honor saw with the proposed redaction, it

21   simply says, beginning balance, end balance and then really

22   nothing else.

23      In order to appreciate what the balance was at

24   any given point in time, you have to examine the money that

25   goes in.  You have to examine the money that goes out.

*C. Edwards*

Proceedings

2131

1           And only by looking at the entirety of the

2      statement, and understanding the entirety of the statement,

3      can you understand what the balance was on any given day,

4      because of the peculiarity of the way that Chase presented

5      its records.

6           MR. SPODEK:  Judge, I don't agree.  I think that

7      Chase reference could say it was zero balance, based on the

8      records redacted.

9           MS. McCAW:  But that's hearsay.

10          THE COURT:  He is your witness.  You're going to

11     object to the hearsay coming out of the mouth of your own

12     witnesses.  He's apparently not objecting.

13          MS. McCAW:  Well, I think the other issue with

14     that, is that, we have the rights to present evidence that

15     is also reliable in nature.  And there is certainly a large

16     difference between a person who was actually showing the

17     business record and saying, this is what the business

18     records shows to some person who works at Chase, just

19     saying, there was a zero balance on the account.

20          THE COURT:  I don't understand that argument

21     either.  I don't want -- I think it is too prejudicial to

22     have evidence being put in front of this jury of an

23     uncharged crime of this nature.

24          That she, on multiple occasions, intentionally

25     wrote checks for which there was no balance.

*C. Edwards*

Proceedings

2132

1          You didn't charge her with that crime, and in the

2     interest of my job balancing between, balancing the

3     Molineaux evidence, that's how I balanced it.

4          May I see the -- please.  You read my mind, the

5     stipulation.

6          All right.  What is your problem with that?

7          MR. SPODEK:  All I want to prove is that this

8     account, they are talking about the overdraft.  I want to

9     have the stipulation state that this account had overdraft

10    protection.  It was a past account.  They want me to stip

11    to that, I think that should be included.

12         THE COURT:  But doesn't overdraft protection

13    signal to the jury that there would have been no problem

14    accepting this card on that date?

15         MR. SPODEK:  Whatever the case may be, that is

16    the fact.  It was overdraft protection on this account.

17    It's not a charged crime.  It was overdraft protection.

18         MS. McCAW:  As I said, your Honor, the records

19    themselves will -- the account opening documents do have a

20    page that says something to the effect, there is overdraft

21    protection on the account.  He's welcome to ask the

22    witness, who will be testifying regarding that page of the

23    records.

24         MR. SPODEK:  The People have asked me to sign ten

25    stipulations of records, audio calls, technological stuff

*C. Edwards*

Proceedings

2133

1    to keep the trial moving.  I've been more than gracious

2    enough to do it.  I've spoken to my client and we have

3    agreed.

4           I ask for one line to be added to a stipulation

5    and the People have an objection to it.  That just seems

6    unfair.

7           THE COURT:  Maybe it's a line that they think is

8    very prejudicial to their case.

9           All right.  So then how do you propose?

10          MR. SPODEK:  They are stuck with the issue, your

11   Honor.  You issued a ruling.  They can't circumvent your

12   Honor's ruling and say, well, the records are confusing.

13   These are the records they have.  They have to deal with

14   it.

15          MS. McCAW:  Your Honor, I think the problem is

16   that, if we are not allowed to put the information in, it

17   creates an impression before the jury.

18          I think you heard Ms. Williams' testimony as

19   well, that when the card was initially declined, she

20   believed that the reason for that was because the card

21   needed some sort of pre-authorization from the user, which

22   is a potentially reasonable inference to make, given the

23   circumstances.

24          And, again, the People really need to be able to

25   prove that, that is not something that actually happened.

*C. Edwards*

Proceedings

2134

1        And so, you know, the records are what they are.

2   But it's also highly -- it is probative that days before

3   she went on this trip, that she attempted to steal money

4   from somebody else, potentially to pay for that.

5        THE COURT:  Why didn't you indict her for that.

6   You had the chance.  You didn't do it.  So now you made a

7   decision.

8        I don't understand why you can't ask your witness

9   on May the 9th, did the account have any money it in?  And

10  the answer is, no.  An overdraft, it means no money.

11       MS. McCAW:  Okay.  Can we have -- I mean, we

12  would also want to elicit the further information that's

13  contained in that stipulation.  That not only was there no

14  money in the account, but there was a significant

15  overdraft.  I mean, the problem is --

16       MR. SPODEK:  And then I need to be able to ask

17  about the overdraft balance as well.

18       THE COURT:  Wait, wait.  You want to ask him

19  about the overdraft without asking him how it got to be

20  overdrafted.  You don't want to say, oh, it was overdraft

21  because she wrote x number of checks she had no money for,

22  is that what you're saying?

23       MS. McCAW:  The other problem is too, that Chase

24  witnesses, I don't know that he's going to be willing to

25  testify, other than to what the documents are.  I mean, he

*C. Edwards*

Proceedings

2135

1    is a records custodian.  To say to him something along the

2    lines of, from memory, can you please say what these

3    records say, it's just not an appropriate question in the

4    records, which is kind of why we find ourselves in the

5    situation.

6                    MR. SPODEK:  Judge, the People are stuck with the

7    case.  This is what we have.  It is what it is.

8                    THE COURT:  These are business records, right?

9                    MS. McCAW:  Yes.

10                   THE COURT:  So, I am sorry, I still don't

11   understand why he cannot testify from the records that on

12   such and such a date, there was no money in the account.

13                   I think he can testify, now that I understand

14   what the People are asking, on May 9 the account had an

15   overdraft of x amount of dollars.  But then I agree, if

16   you're going to raise the question of overdraft, I do think

17   defense counsel is allowed to raise the issue of overdraft

18   protection, and you can both argue what that may or may not

19   have meant for Rachel Williams when she put her credit card

20   out there, right?

21                   MS. McCAW:  I mean, we will have to confer with

22   the witness to see whether he would be able to say that.

23                   THE COURT:  Why can't he say that?  Aren't their

24   business records that he could, that he could -- he's the

25   custodian of these records, right?

*C. Edwards*

Proceedings

2136

1       MS. McCAW:  Yes.

2       THE COURT:  So why can't he testify from these

3   records?  And when you put them into evidence, they get

4   redacted, and I tell the jury what I always tell the jury,

5   which is, you're not to speculate on what's redacted.

6       MS. McCAW:  Okay.

7       THE COURT:  Now, I can understand if you're

8   worried you're going to put him on the stand and he is not

9   going to know what he is looking at.  You need a few

10  minutes to work with him, that's fine.  Is that what you

11  need?

12      MS. McCAW:  Yes, we will need that.

13      THE COURT:  All right.  That's fine.  So, you are

14  going to introduce redacted records.

15      MS. McCAW:  I don't know that.

16      THE COURT:  I don't know, it's your case.  You

17  tell me.  You're going to introduce redacted records if he

18  is the custodian of the business record.

19      MS. McCAW:  I mean, I think if we were to go that

20  route, and again, I am not sure -- I am sure it was proper,

21  but I think that the appropriate route would be for him to

22  testify from the unredacted business record.  I mean, we

23  just wouldn't put it into evidence.

24      MR. SPODEK:  Judge, I had initially proffered

25  that as a suggestion, that you could refresh his

*C. Edwards*

Proceedings

2137

1    recollection --

2            MS. McCAW:  I don't think he needs refreshing his

3    recollection.  He has no independent recollection.  They

4    are not his occurrences.  He would basically have to

5    testify from the record which are not in evidence.

6            THE COURT:  Look, this is like medical records,

7    okay, that someone testifies from.  They are placed in

8    evidence, and before they are shown to the jury, you redact

9    portions that are not relevant, right.

10           Why can't you let him testify to these records,

11   introduce these records.  Don't publish them to the jury.

12   Ask certain questions of him.

13           And before they go to the jury, the two of you

14   agree on redactions.  How is that?

15           Then they are in evidence.  Then there is no

16   legal question.  You can't ask him questions.  But you now

17   know based on my ruling there are certain questions you

18   can't ask him.  Like, did she write x number of bad checks.

19   You could ask him, you could ask him all the questions that

20   you got here.

21           MS. McCAW:  Okay.

22           THE COURT:  And you won't object when she moves

23   in the records, subject to redaction you both agree on

24   before the jury sees them.  How is that?

25           MS. McCAW:  Okay.

                                                    C. Edwards

Proceedings

2138

1   THE COURT:  Do you need to talk to him for a few

2   minutes?

3   MS. McCAW:  He is not going to be our first

4   witness.

5   THE COURT:  So you want to call somebody else

6   instead, and you will get a break before you see them.

7   MS. McCAW:  That's fine.

8   THE COURT:  Who is next?

9   MS. MAYS-WILLIAMS:  We are going to hear from

10  Thomas Sternnjacob, two witnesses from Deutsche Bank.

11  THE COURT:  Deutsche Bank.  There was an

12  interpreter here, yes.

13  MS. MAYS-WILLIAMS:  Yes.  He is here.  The

14  witness is going to try to start without him, and should it

15  become difficult, he could speak English.

16  MR. SPODEK:  I think we should have one way or

17  the other.

18  THE COURT:  The interpreter is here.  Why don't

19  we just let the witness speak through the German language.

20  He speaks German, German language interpreter.  Yes.

21  Because what are we going to do start struggling

22  around in front of the jury.  I don't think that is good.

23  What do you think, you're concerned he is going to start

24  speaking in half English.

25  MS. MAYS-WILLIAMS:  Yes, I am worried that it

*C. Edwards*

Proceedings

2139

1    will start to become confusing, because he does speak

2    English already.  He is a little nervous.  I don't think --

3              MR. SPODEK:  Humbly, your Honor, I am just

4    suggesting your Honor, you use an interpreter and that's

5    the way?

6              THE COURT:  Does he speak English?

7              MS. MAYS-WILLIAMS:  He speaks English very well.

8              THE COURT:  So why is the interpreter here?

9              MS. MAYS-WILLIAMS:  He is just nervous, that's my

10   point.  He just wanted somebody here, just in case.

11             THE COURT:  Look, I have never spoken to this

12   witness in my life.  If you think he could speak without a

13   German language interpreter, call him and let him speak

14   English.

15             If you think that the jury is not going to be

16   able to understand him, then let's use the interpreter.

17   But I think we have to go with what we go with.

18             Do you speak with him with an interpreter when

19   you speak to him?

20             MS. MAYS-WILLIAMS:  I don't.  I don't.  I mean,

21   he lives in Germany.  I have only spoken with him a few

22   times.  But I can understand.  This is just about his

23   comfort level.  He asked me to make one available for him,

24   so I did.

25             THE COURT:  Then why don't we start out in

*C. Edwards*

Sternjacob - People - Direct/Mays-Williams

2140

1    English.  He won't be nervous here.  All right.  Let's go.

2                COURT OFFICER:  Jury entering.

3                (Whereupon, the jurors enter the courtroom and

4    the following occurred:)

5                THE CLERK:  Case on trial continued.  All parties

6    are present.  All jurors are present.

7                THE COURT:  Welcome back.

8                MS. MAYS-WILLIAMS:  The People call Thomas

9    Sternjacob to the stand.

10               COURT OFFICER:  Raise your right hand.  And face

11   the checks.

12         THOMAS STERNJACOB, after having first been duly sworn

13   was examined and testified as follows:

14               COURT OFFICER:  Have a seat, please.

15               THE COURT:  Good afternoon.

16               In a loud voice, please say your full name and

17   spell your last name.

18               THE WITNESS:  Thomas Sternjacob,

19   S-T-E-R-N-J-A-C-O-B.

20               COURT OFFICER:  And your town of residence?

21               THE WITNESS:  Germany.  And I live in Maenz,

22   Germany.

23   DIRECT EXAMINATION

24   BY MS. MAYS-WILLIAMS:

25        Q    Mr. Sternjacob, are you employed?

*C. Edwards*

Sternjacob - People - Direct/Mays-Williams

2141

1    A    Pardon?

2    Q    Are you employed?

3    A    Yes.

4    Q    What do you do for a living?

5    A    I work in Deutsche Bank in Frankfurt.

6    Q    What do you do for Deutsche Bank in Frankfurt?

7    A    I am the head of investigation in Germany for, in the

8  Department of Financial Anti-financial Crime.

9    Q    What are some of your duties and responsibilities as

10  the head of investigation?

11   A    I am responsible to kind of mis-cotact and internal

12  and external fraud.

13   Q    And how long have you worked as the head of

14  investigation as Deutsche Bank in Germany?

15   A    Since two years, from since two years that I am the

16  head of investigation.

17   Q    And how long have you worked at Deutsche Bank?

18   A    I started in Deutsche Bank in 2002.

19   Q    Now, is there any difference between Deutsche Bank and

20  Germany, and the Deutsche Bank in the United States?

21   A    Germany, we have retail banking.  That means with

22  branches.

23   Q    And as a Deutsche Bank Germany employee, are you able

24  to access the records of Deutsche Bank clients in the United

25  States?

*C. Edwards*

Sternjacob - People - Direct/Mays-Williams

2142

1    A    No.

2    Q    Now, if you needed to find out information about a

3  Deutsche Bank client in the United States, how would you find

4  that information?

5    A    I can get in touch with my colleagues here in the US

6  or sometimes if I get intentional inquiry or inquiry from

7  authorities, we could start an international inquiry.

8        It just means that I get in touch with my colleagues

9  and I ask what, and all helps.

10   Q    Now, is there a database with Deutsche Bank Germany

11 that allows you to search the client's records of German

12 clients?

13   A    Yes.

14   Q    Now, could you please explain to the members of the

15 jury what type of information you could find in that database?

16   A    We could find all necessary information.  That means

17 we have a law in Germany where it says that we have to record

18 all information from a card.  It means all transactions have to

19 be recorded, as well as all accounts, opened information, like,

20 like the I.D. card from the customers.

21   Q    Now, in addition to bank records, do you also have any

22 record of wire transfer confirmation as well?

23   A    Sorry, I didn't catch it.

24   Q    Do you also have wire confirmation records as well?

25   A    Yes.

*C. Edwards*

Sternjacob - People - Direct/Mays-Williams

2143

1    Q    Now, could you just explain to the, to the members of

2  the jury, first, how you're able to search a database?

3    A    I am sorry, you talk to -- it was too fast for me.

4    Q    I am sorry, could you please explain how you're able

5  to search the database in Germany, for records or anything that

6  you just described.

7    A    I have access to all necessary system in my function

8  and I could search off, off account numbers and names.

9              (Whereupon, the following was recorded by

10   Official Court Reporter Denise Taylor:)

*C. Edwards*

1       Q      Now, directing your attention to August 2017, did you

2   have an occasion to search for the time period of November 2016

3   through August 2017 for a Deutsche Bank account for an

4   individual by the name of Anna Delvey?

5       A      Yeah.

6       Q      And what were your results upon your search?

7       A      There was no results.

8       Q      Now, directing your attention to the same time period,

9   did you also search for the name Anna Sorokin?

10      A      Yeah.

11      Q      What were your results?

12      A      We found no results.

13      Q      Did you also search for the name Anna Sorokina during

14  the same time, for the same time period?

15      A      Yes.

16      Q      And what were your results?

17      A      No results.

18      Q      Did you also search for the name Anna Sorokin Delvey

19  from 2000 -- November 2016 through August 2017?

20      A      Yes.

21      Q      And what were your results?

22      A      No results.

23      Q      Did you also search for the date of birth January 23rd

24  1991, in connection with the name variations?

25      A      No.

1    Q    Why not?

2    A    It was not necessary.  We start, in a search, we switch

3  the name and make an example.  If we start with my, as an

4  example, we get a lot of results and then we take the first name

5  and then we reduce the results and then we take the date of

6  birth and then we reduce the results and in this case, we start

7  with the mentioned name and as we get no result, it wasn't

8  necessary to do, make this with the date of birth.

9    Q    Now, directing your attention to an exhibit that's

10  already in evidence, People's 1, I am going to direct your

11  attention, once you have it, to P X 239 through P X 241.  Have

12  you had an opportunity to --

13    A    Sorry, sorry, 239.

14    Q    At 239, yes?

15    A    Okay.

16    Q    Have you had an opportunity to review this exhibit

17  before testifying today?

18    A    Yes.

19    Q    Okay.  Now, could you tell the members of the jury, is

20  this a genuine Deutsche Bank statement?

21    A    No.

22    Q    Now, could you start with P X 239 and tell the members

23  of the jury how you know that's true?

24    A    I begin in the right corner, on the top under

25  Deutsche's bank name, you see the Figure 24 H and this word

1    behind in German, it means in English client service.  It's a

2    telephone number for clients and this number in this paper is

3    not correct.  We switched this number in a 0-800 number in 2013.

4         Q    Okay.  So, this document is dated 2017.  So, just for

5    clarification are you saying that that number is outdated?

6         A    That number is.  Sorry.

7         Q    Just for clarification, are you saying that number was

8    no longer used in 2017?

9         A    Yeah.

10        Q    All right.  Excuse me, 2016?

11        A    Yeah.

12        Q    Okay.  You stopped using it in 2013?

13        A    Yes.

14        Q    And what is the next way that you know that this is not

15   a genuine document?

16        A    You see in the middle of the document, statement from

17   the 1st of July 2016 to the last date in September 2016, and in

18   the right side you see the 15th of September, that means this is

19   not possible, like, could print this out in the 15th of October

20   and get a complete overview to September.

21        Q    All right.  Are there any other indications on this

22   piece of paper that this is not a genuine Deutsche Bank

23   statement?

24        A    Yeah, that's correct.  It's not genuine.

25        Q    Okay.  Is there, are there any other examples on 239

1    that let you know that this is not a genuine bank statement?

2      A    Yeah.  In this field we started with statement page and

3    branch, the account number doesn't match with the name in the

4    left corner on the top with Anna Sorokin.

5      Q    Okay.  Are there any other indications that this is not

6    a genuine document?

7      A    No.

8      Q    Okay.  So, directing your attention to P X 240, could

9    you take a look at this page and tell the members of the jury

10   how you know that this is not a genuine document?

11     A    Yeah. As you can see it says statement page.  This is

12   Page 2 from Page 3, and this seems like, for me, as a mix

13   between account statement and securities account statement.

14   Now, in an account statement you have all transactions in, what

15   you have done, you know, each transactions and security,

16   security account, I forgot the name in English, sorry, security

17   account information, there is some info about if you have shares

18   in your account, but not this one.  You have some, how many

19   shares you have when you have, by the shares, what are the price

20   of the shares, if the other side is what is the current value of

21   the shares at this stage, this is, have you make monies, the

22   shares of this date or you lost money, some information and not

23   on this.  On the security account information we use, I forgot

24   the name, just if I could show you it could help me.

25                THE COURT:  Would it assist you to be able to

1    describe this in your own language?

2              THE WITNESS:  No.  It's fine for me.  I forgot this

3    one word we use this, you see this is so, and we use it

4    this.

5    Q    Okay.

6    A    What is the name?

7    Q    So, to clarify, a genuine Deutsche Bank statement would

8    be horizontal rather than vertical in its presentation?

9    A    In horizontal security account statement, the normal

10   for debit card account is the other one.

11   Q    Is vertical.  All right.

12   So, just to clarify, your testimony was that this piece of

13   paper appears to be a mixture of a debit card statement as well

14   as a security statement?

15   A    Yes.

16   Q    Is that it?

17   A    From one point of view, yes.

18   Q    Okay.  Directing your attention to P X 241, could you

19   tell the members of the jury how you know this particular page

20   is not genuine?

21   A    241.

22   Q    Yes, please.  The next page.

23   A    Yeah.  That's the same as the page before.  It's, if

24   it's should be on security information, a security account

25   information, missed info about how many shares or something like

1   that and if it's an account information and the statement

2   information from each transaction, yeah.  And at the bottom of

3   this page, this Deutsche Bank.

4        Q     Directing your attention to the bottom of the page, you

5   said?

6        A     Yeah.

7        Q     Okay.

8        A     And it's normally, we don't have this in our account

9   information.

10        Q     Okay.  So, to clarify, on a genuine Deutsche Bank

11   statement that portion at the bottom is not there?

12        A     Correct.

13        Q     Okay.  All right.  Now, I'd like to direct your

14   attention to P X 279.  Now, could you tell the members of the

15   jury is this a copy of a genuinely executed Deutsche Bank wire

16   confirmation?

17        A     No.

18        Q     Now, could you tell the jury what information does this

19   paper purport to give?

20        A     Yeah.  I missed some info.  This don't, okay, should

21   say at first, if it's an international transaction, yeah.  If

22   it's settled, you see the field I B A N or continental in the

23   middle we put the figures in blocks, with four figures, then

24   it's spelled and then the next four figures and this is one

25   number, this is wrong.

1     Q     So, to clarify, the jurors are looking at a number with

2  possibly eight or so numbers and they are all in one line and

3  you say a genuine document would have four numbers a space and

4  then another four numbers; is that your testimony?

5     A     Yes.  Correct.

6     Q     Okay.

7     A     For, I have checked our systems on the 12th of January

8  and we have no transaction, or we don't find this.  I don't find

9  this transaction.

10    Q     So, okay, so to clarify, in addition to the formatting

11  issues, you've actually done a search for this particular

12  transaction and you did not find this transaction?

13    A     Correct.

14    Q     Now, could you tell the members jury, again, what date

15  did this transaction take place, or purport to take place?

16    A     The name of the receiver is 281 PAS L C, which is a

17  number of 150,000.

18    Q     And what is the date?

19    A     On the 12th of January, in 2017.

20    Q     All right.  Thank you.

21    Now, directing your attention to People's 10, which is also

22  already in evidence, specifically P X 1132?

23    A     Yeah.

24    Q     Could you please tell the members of the jury whether

25  this is a genuine Deutsche Bank wire confirmation?

 1    A    No, it is not.

 2    Q    How can you tell?

 3    A    At first the same field, I B A N field, it's not split

 4 in the blocks, in four figure blocks.

 5    Q    Okay.  Is there anything else?

 6    A    Yes, and, I checked this in our systems and I can't

 7 find.

 8    Q    Okay.  Now, if an individual was to actually submit a

 9 wire request, how would it look any differently from the page

10 that we're looking at right now?

11    A    Sorry.  Could you clarify?

12    Q    So, could you just tell the members of the jury what is

13 necessary in order to initiate a wire transfer?  Let's start

14 there.  What must an individual do?

15    A    Okay.  First of all, you need an account and what you

16 can do is, this sounds like it's an online banking, you have a

17 format and you could put all the necessary data in and then, but

18 this does not mean that the transaction have been done, that

19 first you need to, in Europe it's in T H N.  It's called, it's

20 like an encode where you have to put in the system that the

21 banks knows that you are the right customer and you are

22 authorized to start this transaction and -- but this could also

23 be that you put this in the, in a format and this does not mean

24 that this transaction have been done.  Yeah, you could put this

25 in and you make up a screen shot.  This is the first one and the

1   second one --

2       Q     Well, let me clarify what you've just said so I make

3   sure everybody understands.

4       Is it your testimony that you can actually input the

5   information of the value, the date, the recipient, but you don't

6   to press send in order to get a page like that?  Is that fair to

7   say?

8       A     Yeah.  Correct.

9       Q     Okay.  And what was the next point you were making?

10      A     The next is, we have, if you start transaction and

11  before this transaction is out, the I T systems checks your

12  account and checks if you have enough money in your account,

13  yeah, that it's possible to send this out.  For example, if I

14  had only $1 in my account, but I want to send a transfer for

15  100,000 Euro and then the system stop this transaction as it's

16  not possible to have not enough amount in my, in my account.

17      Q     So, to clarify your second point, you could also have

18  this screen up here if you input the information, press send,

19  but this doesn't show that the transaction has actually

20  occurred.  Is that an accurate recount of what you just said?

21      A     Correct.

22      Q     Okay.  Now, directing your attention to People's 17.

23  Specifically P X 1660, okay, could you tell the members of the

24  jury, if they are looking at a genuine screen shot of a Deutsche

25  Bank wire confirmation?

1     A    Yeah, it's not.

2     Q    It's not.  How do we know that, or how do you know

3  that, rather?

4     A    As I mentioned, account numbers, customer account

5  numbers, it's a valid, a real number, yeah, but it doesn't match

6  with the mentioned name.  One field is higher for the customer

7  and I have check our systems and I can't find this transaction

8  and here on this account number from the receiver.

9     Q    So, to clarify, you've checked for this particular

10  transaction and you didn't find it.  Number two, the recipient

11  account number isn't present so you couldn't send the wire

12  without knowing where the money should go to and number three,

13  the account number does not go back to the person that it

14  purports to go back to?

15     A    And I missed the field country.  The country, as well.

16     Q    And the destination country is missing, as well?

17     A    Uh hum.

18     Q    Directing your attention to People's 21, okay,

19  specifically 2026 through 2028, could you tell the members of

20  the jury if they are genuine Deutsche Bank confirmations?

21     A    No, it is not genuine.

22     Q    How is that clear?

23     A    They are the same as the others.  The I B A N number

24  it's, the field, it's not split in blocks, and I have checked

25  our system and I cannot find this transaction.

```
 1      Q      Now, could you tell us the date of this particular
 2  document?
 3      A      Yes.  It's the 26th of June, of 2017.  It's from
 4  35,400.
 5      Q      And who is the intended recipient?
 6      A      It's called Fly Blade, Inc.
 7      Q      Now, directing your attention to what's already in
 8  evidence as People's 34, specifically P X 2032, could you tell
 9  the members of the jury --
10      A      P X.  Could you repeat the number?
11      Q      2032, could you tell the members of the jury whether
12  this is a genuine Deutsche Bank wire confirmation?
13      A      No, it's not.
14      Q      And how can you tell?
15      A      Same events, I B and account number and missed blocks.
16      Q      Now, could you tell us who the intended recipient is?
17      A      It's Gibson, Dunn & Crutch, L L P, amount is $70,000
18  U S dollars.
19      Q      And finally, directing your attention to People's 38,
20  which is also already in evidence to P X 2562 through P X 2565,
21  can you tell the members of the jury whether they are looking at
22  a genuine copy of a Deutsche Bank wire confirmation?
23      A      No.  It's not genuine.
24      Q      Okay.  How do you know that?
25      A      The IBAN and account number is not split in the blocks.
```

1    Q    And who is the intended recipient?

2    A    It's Rachel D. Williams, with an amount of 80,000 U S

3    dollars.

4    Q    Now, did you also search for this transaction?

5    A    I don't know.

6         MS. MAYS-WILLIAMS:  All right, your Honor.  I have

7    no further questions.

8         THE COURT:  Thank you.  Any cross-examination?

9         MR. SPODEK:  Just briefly, judge.

10   CROSS-EXAMINATION

11   BY:  MR. SPODEK:

12   Q    Good afternoon, Mr. Sternjacob.

13   A    Yes.

14   Q    Right?

15   A    Yup.  Correct.

16   Q    You testified that there are two types of statements at

17   Deutsche Bank, right, two types of statements, an account

18   statement and then a security statement.  Is that what you

19   testified to?

20   A    No.  I testified this document.

21   Q    Okay.  When you first looked at that document --

22   A    Yeah.

23   Q    -- do you remember saying that there were two different

24   types of statements at Deutsche Bank?

25   A    Yup.

SPODEK-CROSS-STERNJACOB                    2156

1    Q    One of them is an account summary, right?

2    A    Correct.

3    Q    And it has a lot of details, right?

4    A    Yes.

5    Q    And then, a different statement is a security

6    statement, right?

7    A    Yeah.

8    Q    The security statement is horizontal, right, it's like

9    this, not like this?

10   A    Yeah.

11   Q    The account statement, how many pages is it usually?

12   A    It depends on how many transactions you have.

13   Q    Okay.  What's the minimum amount of pages it would be?

14   A    One.

15   Q    It could be one page?

16   A    Sure.

17   Q    And if there is a lot of transactions it could be

18   20 pages?

19   A    More, yeah.

20   Q    Okay.  Does it list all the details of all the

21   transactions on the account summary?

22   A    Uh hum, yes.

23   Q    Anything purchased, right?

24   A    Sorry.

25   Q    Anything purchased, if a customer at Deutsche Bank

1    purchased something, it would say?

2        A    Paid or received.

3        Q    Either paid or receive?

4        A    Yeah.

5        Q    Are the statements the same in Germany Deutsche Bank as

6    they are in U S Deutsche Bank?

7        A    I don't know.

8                MR. SPODEK:  Okay.  I have nothing further, judge.

9                THE COURT:  Anything else?

10               MS. MAYS-WILLIAMS:  No, your Honor.

11               THE COURT:  Thank you, sir.  You are free to leave.

12               THE WITNESS:  Thank you.  I apologize for my

13   English.

14               Can I go?

15               THE COURT:  You can go.

16               Ladies and gentlemen, the only place you can go

17   right now is the restroom.

18               Don't discuss the case.  Please follow the court

19   officer.

20               (FURTHER PROCEEDINGS TAKEN BY CELENA EDWARDS)

21

22

23

24

25

Proceedings

2158

1    THE CLERK:  Case on trial continued.  All parties

2    are present.  Okay.  We are ready to go.

3    (Whereupon, the jurors enter the courtroom and

4    the following occurred:)

5    THE CLERK:  Case on trial continued.  All parties

6    are present.  All jurors are present.

7    MS. McCAW:  Your Honor, before the People call

8    their next witness, I would like permission to publish

9    records that came in through stipulation.

10    THE COURT:  Yes.

11    MS. McCAW:  Thank you, your Honor.

12    And I am going to read a portion of the

13    stipulation while I publish them.

14    THE COURT:  This is the stipulation previously,

15    was previously read into the record?

16    MS. McCAW:  It was.

17    THE COURT:  Okay.

18    MS. McCAW:  So this is Court Exhibit 30.  This

19    is, if an AmEx representative were called to testify, the

20    person would say, I have reviewed People's Exhibit

21    appertinent to here, 26 and 27, which contained records

22    pertaining to AmEx credit card held in the account, Anna

23    Delvey.

24    People's Exhibit 26 contains 12 pages, including

25    a fax cover sheet of documents faxed to American Express by

*C. Edwards*

Proceedings

2159

1    the account-holder, Anna Delvey, on May 30, 2017 as proof

2    of assets in support of her application for the credit

3    card.

4           These are exact copies of the documents received

5    by AmEx, which were maintained by AmEx in the regular

6    course of business.

7           I am now publishing PX1970 to the members of the

8    jury, 1971, 1972, 1973, 1974, 1975, 1976, 1977, 1978, 1979.

9    1980, and 1981.

10          Also, People's Exhibit 27 consist of two pages,

11   including a fax cover sheet of document faxed to AmEx by

12   the account-holder, Anna Delvey, on June 12, 2017.

13          And four pages including a fax cover sheet faxed

14   to AmEx by the account-holder, Anna Delvey on June 15,

15   2017, which were submitted to American Express in support

16   of the account-holder's request to remove a block that had

17   been placed on the credit card.

18          These are exact copies of the documents received

19   by AmEx, which were maintained by AmEx in the regular

20   course of its business.

21          I am now publishing PX1982, PX1983, PX1984.

22   PX1985, PX1986 and PX1987.

23          At this point in time, your Honor, the People

24   call as their next witness, Gregg Sternjacob.

25          COURT OFFICER:  Witness entering.

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2160

1          GREGORY SHTYRKALO, after having first been duly sworn

2     was examined and testified as follows:

3                    COURT OFFICER:  Please have a seat.

4                    In a loud voice, please state your full name, and

5          spell your last name.

6                    THE WITNESS:  Gregory Shtyrkalo

7          S-H-T-Y-R-K-A-L-O.

8                    COURT OFFICER:  County of residence?

9                    THE WITNESS:  Kings County.

10                   COURT OFFICER:  Thank you.

11                   THE COURT:  Good afternoon sir, welcome.

12    DIRECT EXAMINATION

13    BY MS. McCAW:

14         Q    Good afternoon.

15              Are you employed?

16         A    I am.

17         Q    Where are you employed?

18         A    JP Morgan Chase bank.

19         Q    What is your position at JP Morgan Chase Bank?

20         A    I am assistant branch manager.

21         Q    What are your duties and responsibilities as an

22    assistant branch manager?

23         A    I train and supervise branch employees who assist

24    customers with their banking and financial needs.

25         Q    How long have you been working for Chase?

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2161

1        A     Twelve years.

2        Q     Now, as of assistant branch manager, are you familiar

3   with the kind of records that JP Chase keeps in the regular and

4   ordinary course of its business?

5        A     I am.

6        Q     I am now going to ask you to take a look at what's

7   previously been marked for identification as People's Exhibit 41

8   and, I am sorry, 40 and 41.

9              THE COURT:  40 and 41.

10             MS. McCAW:  Yes, 40 and 41.

11       Q     Before we actually look at that particular exhibit,

12  what kind of records does Chase keep with respect to its

13  customers, generally speaking?

14       A     Signature card and bank statements.

15       Q     Now, with respect to those records, is it the business

16  of Chase to keep those kinds of records?

17       A     Yes, it is.

18       Q     Are those records maintained in the regular ordinary

19  course of business?

20       A     Yes.

21       Q     Are the entries included in those records made at the

22  time of the acts recorded or at a reasonable time thereafter?

23       A     Yes.

24       Q     Is the person recording the information in those

25  records, under a business duty to do so truthfully and

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2162

1    accurately?

2        A    Yes.

3        Q    I am now going to ask you to take a look at what has

4    been marked for identification, as People's Exhibit 40 and 41.

5            What, generally speaking, are those records?

6        A    People's Exhibit 40 is a personal signature card -- I

7    am sorry, I don't have 41 in front of me.

8            MS. McCAW:  Forty-one is the rest of the binder.

9            THE WITNESS:  The signature cards and bank

10   statements, and proof of transactions.

11       Q    Now, were those particular records kept in the regular

12   and ordinary course of business?

13       A    Yes, they were.

14           MS. McCAW:  At this point in time, I offer

15   People's Exhibit 40 and 41 into evidence.

16           MR. SPODEK:  With the understanding, Judge, it's

17   not to be published at this time.

18           THE COURT:  Yes.

19           MR. SPODEK:  No objection.

20           THE COURT:  With that understanding.

21           MR. SPODEK:  Yes.

22           THE COURT:  People's 40, 41 in evidence.

23           MS. McCAW:  Thank you.

24       Q    At this point in time, I am going to ask you to take a

25   look at what has been marked in your binder as PX2628.

                                                    *C. Edwards*

Shtyrkalo - People - Direct/McCaw

2163

1        Can you please explain briefly what this document is?

2     A    This is a business signature card.  It describes when

3  a new business account is opened and who signed for it.

4     Q    I am sorry.

5     A    This is the business signature card and it indicates

6  and describes a new account opening and who opened it.

7              THE COURT:  You're publishing that to the jury?

8              MS. McCAW:  This is a different record, your

9  Honor.

10     Q    Now, directing your attention to the account title on

11  this document.

12        Can you please indicate what the account title is?

13     A    ADF Group, LLC.

14     Q    And directing your attention to the field printed

15  name.  Can you please read the printed name?

16     A    Anna Sorokin.

17     Q    Now, directing your attention to the following pages.

18        Can you please explain, generally speaking, what is

19  the account opening process for a Chase account?

20     A    We typically need to prove an identification of the

21  business, and of the individual opening the account.

22     Q    What kind of identification do you seek from the

23  person opening an account, if the person is a foreign national?

24     A    We typically need their passport and proof of address.

25     Q    What does Chase do with the passport that is presented

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2164

1   to it?

2       A    We make copies of it and retain it for a record.

3       Q    I am now going to ask you to direct your attention to

4   PX2633.

5            Can you please indicate what this record is, generally

6   speaking?

7       A    This is a copy of a foreign passport?

8       Q    What is the name indicated on the foreign passport?

9       A    Anna Sorokin.

10      Q    What is the country that issued this passport?

11      A    Russian Federation.

12      Q    I am now going to ask you to direct your attention to

13  PX2635.

14           Can you please indicate, generally speaking, what this

15  document is?

16      A    This is a bank statement.

17      Q    And what is the time period of this account statement?

18      A    April 1, 2016 through April 4, 2016.

19      Q    Now, directing your attention to PX2636.

20           Can you please explain what we are seeing here?

21           MR. SPODEK:  Judge, can we have a sidebar for a

22      point?

23           THE COURT:  Yes.

24           MR. SPODEK:  I am just trying to get a clear

25      understanding of your Honor's ruling and the records they

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2165

1    are not to publish.  Because I thought the understanding,

2    we weren't going to publish any records.  That he was going

3    to review them.

4            MS. McCAW:  This relates to a different account

5    and there is no evidence of check hiding.

6            MR. SPODEK:  The first page you put on the screen

7    seems to have a returnable check or something along those

8    lines on it.

9            MS. McCAW:  It has a negative balance.  There is

10   no return check.

11           THE COURT:  Okay.  Can I see that.  Let's take a

12   look.

13           MS. McCAW:  Yes, of course.

14           THE COURT:  Let me see.  What are you showing me?

15           MR. SPODEK:  From the first thing here, the

16   charge-off from Deutsche Bank.

17           MS. McCAW:  Your Honor, it doesn't mean that

18   there's any sort of criminal activity.  It means there was

19   a negative balance on the account, and that that amount was

20   charged off.  That's not criminal activity.

21           THE COURT:  Okay.  But if you were to ask him

22   right now, what those mean, is he going to say that means

23   there was a returned check?

24           MS. McCAW:  No.  He doesn't know that.  I have

25   not shown him those records.  What he would say, this is

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2166

1    the last that transaction on this account and that the

2    account was closed.

3            MR. SPODEK:  Closed with a negative balance.

4            THE COURT:  I thought you were showing him this

5    exhibit just to show him that she opened up an account and

6    she was an account-holder.

7            MS. McCAW:  So this particular record, I think

8    your Honor will recall, that there was a ruling that we

9    were allowed to introduce, that the screen shot she showed

10   is, Tom Lavin, it was not a genuine reflection of his

11   balance in her account.

12           THE COURT:  Right.

13           MS. McCAW:  That is the account that, that

14   relates to.

15           MR. SPODEK:  Showing that is a bounced check or

16   returned check or whatever that is.

17           MS. McCAW:  This is the last statement of the

18   account?

19           MR. SPODEK:  Let's redact that.

20           MS. McCAW:  It had a negative balance on that

21   date.  And, therefore, when she sent him the screen shoot

22   in July, indicating that this was after $20 million balance

23   in that account, that that was not true.

24           THE COURT:  That was a slight discrepancy, that's

25   what you're trying to show.

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2167

1      MS. McCAW:  Yes, your Honor.

2      MR. SPODEK:  Then I will object to this

3  particular document being published, which is why I said

4  subject to the recording being unredacted.  It gave leeway,

5  like the pedigree documents.

6      THE COURT:  So why can't you just ask him when

7  this account was closed, was there any balance in the

8  account?

9      MS. McCAW:  I don't think that there's any

10  difference, though, between that.  And actually, showing

11  the record, your Honor.

12      I mean, if the idea is this one doesn't show any

13  sort of criminal activity and so what is the difference

14  between saying there was a negative balance.

15      MR. SPODEK:  It says charged off, please

16  reimburse back.  There is potentially criminality.  There

17  is no reason for it to be -- it's not relative to anything.

18  They are right to prove -- they are trying to say there's a

19  revolving balance.

20      THE COURT:  I don't understand.  I recognize what

21  you're trying to do.  You need to show there wasn't

22  $20 million.  Why can't you simply ask him what was the

23  ending balance, zero.  And then when you agree on the

24  redactions, you redact this, and they get documents that,

25  the real document that says, zero.  And they get the phone

                                                    *C. Edwards*

Shtyrkalo - People - Direct/McCaw

2168

1    document, in your view, that says 20 million.  You are able

2    to show that she told them 20 million, but there was really

3    nothing in there.

4            MS. McCAW:  Okay.  We could redact that portion

5    just to go through the other records, because these all

6    pertain to the ruling your Honor previously made.

7            MR. SPODEK:  Although, as there is no returns

8    checks.

9            MS. McCAW:  No, sir.  There is not a return check

10   in this.

11           THE COURT:  Okay.  But I thought what we were

12   going to do, to avoid having to have this kind of debate

13   every 30 seconds is, you were going to ask him questions

14   about the account and then before it went to them, we were

15   going to go through and agree.

16           MS. McCAW:  That was pertaining to one particular

17   account, your Honor.

18           MR. SPODEK:  I believe this was still all the

19   Chase records.  That is why I specifically said.

20           THE COURT:  I don't see how it harms your case at

21   this point to ask him what the ending balance.

22           MS. McCAW:  Your Honor, the other situation, we

23   had also asked for permission to be able to say that she

24   had given documents to American Express that were altered

25   Chase statements.

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2169

1          THE COURT:  Say it again slowly.

2          MS. McCAW:  Altered Chase statements and as your

3     Honor will recall, those applications were granted.

4          THE COURT:  Yes.

5          MS. McCAW:  And so the genuine account statements

6     are included in this binder, and I want to be able to

7     publish it so these will come out, I think.

8          THE COURT:  Explain to me what it is you want to

9     do.  I thought, I thought we were only doing one thing with

10    this guy, which is to show that one account.  And we were

11    going to excise the returned check.  I didn't realize this

12    guy holds the key to a number of accounts.  So just what

13    else is it you want.

14         MS. McCAW:  May I go get the other exhibits?

15    It's sitting on the table.

16         MS. MAYS-WILLIAMS:  In the interim, I will try to

17    explain in the AmEx, that we have shown it shows that she

18    offered proof of funds to AmEx.  And there are a number of

19    transactions.  And it shows about the balance, similar to

20    the time of the exhibits.

21         So she wants to be able to show the genuine

22    statements, to show that it's not -- it doesn't at all look

23    like the statement she's admitted to AmEx.

24         MR. SPODEK:  I am going to object to those

25    records going in.

*C. Edwards*

Shtyrkalo - People - Direct/McCaw

2170

1          MS. McCAW:  These aren't in evidence.

2          MR. SPODEK:  I stiped to those already, so.

3          THE COURT:  Can we go to the table, so we could

4     put it down so everybody could take a look.  Is that okay

5     for you?

6          MS. McCAW:  So, your Honor, I think this is the

7     copy.  I put together the one, the witness has the actual

8     records, I am sorry.

9          Okay.  So this 13422.  I wanted to publish this

10    record to the members of the jury.  So this one is the

11    altered version.  This is the fake version.

12         MR. SPODEK:  Okay.  And I understand this, I

13    don't have no problem with that, I guess, because I

14    consented to these going to AmEx.  And I think it's easier.

15    As far as this one, I don't have a problem, because it

16    doesn't say anything about the particular tracks.

17         THE COURT:  Your concern is that that number

18    looks like a returned check, it isn't?

19         MR. SPODEK:  Some sort of alter.

20         MS. McCAW:  Although to be fair, your Honor, he

21    is trying to say overdraft is not necessarily indicative of

22    activity.  And then at the same time, saying that 2000

23    overdraft is.

24         THE COURT:  I thought we agreed on this already.

25         MS. McCAW:  I thought we had too.

                                              *C. Edwards*

Shtyrkalo - People - Direct/McCaw

2171

1          MR. SPODEK:  We agreed not to publish anything.

2     I said it on the record.

3          MS. MAYS-WILLIAMS:  It's two different accounts.

4          MS. McCAW:  So then this is the record.

5          So as you could see, this is the genuine record.

6     There's a negative balance of $924.  She says there is a

7     positive balance of $689,000.

8          Now there is an amount that does reflect the

9     check item, but we redacted that out.  So this was a

10    deposited check and it was returned.  We took that out.

11         MR. SPODEK:  What is this here?

12         THE COURT:  It just says withdrawals.  It doesn't

13    say, that's fine.

14         MS. McCAW:  Okay.

15         MR. SPODEK:  The main page that I saw.

16         THE COURT:  Okay.  Just before you, you show the

17    jury that one, that should be redacted, that one line.

18         MS. McCAW:  Okay.

19         THE COURT:  All right.

20         MS. McCAW:  I will ask him about it.

21         THE COURT:  All right.

22         MR. SPODEK:  Thank you.

23         (Whereupon, the following was recorded by

24    Official Court Reporter Denise Taylor:)

25                    *          *          *

                                             C. Edwards

1    Q    Now, directing your attention to P X 2636, what is the

2  time period for this statement?

3    A    Four days.

4    Q    And what are those four days?

5    A    April 1st, April 2nd 2016, April 3rd and April 4th

6  2016.

7    Q    Now, typically does Chase produce statements that have

8  only four dates for them?

9    A    No.  Statements are typically a month long.

10   Q    Why might there be a four day long statement?

11   A    I looks like the account was closed and charged off on

12  April 4th.

13         MR. SPODEK:  Objection, your Honor.  I would ask to

14     strike the last answer.

15         THE COURT:  It looks like the account was closed,

16     period?

17         MR. SPODEK:  Yes.

18         THE COURT:  All right.  Everything after the word

19     closed will be disregarded by the jury.

20   Q    Now, directing your attention to the ending balance of

21  this account, can you please indicate what the ending balance

22  is?

23   A    Zero.

24   Q    I'm now going to ask you to take a look at and I'm just

25  going to ask you to turn around and look at the screen at this

McCAW-DIRECT-SHTYRKALO                    2173

1    point.  I'm actually going to ask you to take a look at what has

2    previously been entered into evidence as People's 17, and direct

3    your attention to P X 1676.

4        Now, can you please indicate what the last four digits of

5    the account listed on the top of this page are?

6        A    6597.

7        Q    Now, directing your attention back to P X 2636, what

8    are the last four digits on the account that we just saw?

9        A    6597.

10       Q    And what is the purported balance at the top of the

11   page?

12       A    $20,661.85.

13       Q    All right.  I'm now going to ask you to direct your

14   attention to P X 2668, and I'm going to ask you, it's going to

15   be on the screen, but I am going to ask you to compare that to

16   what's already in evidence as People's Exhibit 27.

17       Now, directing your attention to P X 1985, can you please

18   indicate on P X 1985 what is indicated as the beginning balance?

19   Can you read it on the screen.  We are going to get you another

20   copy.

21       A    Okay. $689,907.93.

22       Q    Is that the beginning balance?

23       A    No.  Beginning balance is zero.

24       Q    What is the ending balance, according to this document,

25   P X 1985?

McCAW-DIRECT-SHTYRKALO                                    2174

1        A     Ending balance $689,907.93.

2        Q     Now, again directing your attention to P X 2668, this

3    is a genuine Chase document; is that correct?

4        A     Yes.

5        Q     And directing your attention to the account number for

6    these two documents, what if anything do you notice about the

7    account number of these two documents?

8        A     They appear the same.

9        Q     What is the date range for these two documents, what if

10   anything do you notice about the date ranges?

11       A     They are the same.

12       Q     And according to P X 2668, the Chase document, can you

13   please indicate what is the ending balance according to the

14   Chase document?

15       A     Negative $924.46 cents.

16       Q     Now, I am now going to ask you to direct your attention

17   to P X 20 -- 2707.  Now again, is this a document that was

18   supplied by J P Morgan Chase.

19       A     Yes.

20       Q     What is the beginning balance in this account,

21   according to this document?

22       A     Zero.

23       Q     What is the ending balance?

24       A     Zero.

25       Q     Now, directing your attention to P X 1983, directing

1   your attention to the account number at the top of these two

2   documents, P X 2707 and P X 1983, can you please compare these

3   two account numbers and let me know what if anything you notice?

4       A    They are the same.

5       Q    And what is the date range indicated at the top of the

6   document?

7       A    April 29th 2017 to May 31st 2017.

8       Q    And are they the same for both documents?

9       A    Yes.

10      Q    Directing your attention to P X 1983, can you please

11  indicate and P X 1983, what is the beginning balance for this

12  account?

13      A    5 million.

14      Q    And what is the ending balance?

15      A    5 million.

16      Q    Now, at this point in time, I am now going to ask you

17  what has previously been entered into evidence as People's

18  Exhibit 38 A, can you please indicate the number that is

19  indicated on this card?

20      A    4900708029167766.

21      Q    I'm now going to ask you to take a look at P X 2627.

22  Now, do you see that A T M card number reflected on this page?

23      A    I do.

24      Q    What is the account that it's linked to, according to

25  this page?

McCAW-DIRECT-SHTYRKALO                    2176

1      A    700956597.

2      Q    I'm now going to ask you to take a look at P X, P X

3  2639.  Now, what is the date range that it is indicated for this

4  account?

5      A    I'm sorry.

6      Q    I'm sorry.  The date range indicated for this

7  statement?

8      A    P X?

9      Q    I'm sorry. 2639.

10              MS. McCAW:  Your Honor may I provide --

11              THE COURT:   You want to approach the witness?

12              MS. McCAW:  Yes.

13              THE COURT:  That's fine.

14     Q    All right.  Now, what is the account number that's

15  indicated at the top of this document?

16     A    700956597.

17     Q    Now, directing your attention back to 2627, just hold

18  your place, is this account the same that is associated with the

19  debit card number that's contained on the screen?

20     A    Yes.

21     Q    All right.  Now, what is the time period that is

22  indicated for this statement?

23     A    April 29th 2017 to May 31st 2017.

24     Q    What is the beginning balance for this statement?

25     A    $4.79 cents.

```
 1        Q    Now, directing your attention to May 9th of 2017, as of

 2   May 9th 2017, what was the balance in this account?

 3        A    It was negative $600.

 4             MR. SPODEK:  Judge.  Judge.  Your Honor.

 5             MS. McCAW:  Your Honor, may I just point for the

 6        witness?  May I approach the witness?

 7             THE COURT:  You can approach the witness.  The jury

 8        should disregard that last statement.

 9        A    Oh.  Okay.

10        Q    Now, again, as of May 9th what was the balance in this

11   account?

12        A    669.

13        Q    I'm sorry.  As of May 9th?

14             MR. SPODEK:  Your Honor, I think we should have a

15        sidebar.

16             (WHEREUPON, AN ON THE RECORD SIDEBAR CONFERENCE WAS

17        HELD)

18             MR. SPODEK:  Your Honor, this is the third instance

19        where this material has been referenced in open court and it

20        should not have been.

21             THE COURT:  Well, it's clearly not a well prepped

22        witness.

23             Why don't you stand next to him?

24             MS. McCAW:  Okay.

25             THE COURT:  And point.  Ask your question and
```

1    point.

2              MS. McCAW:  Okay.

3              THE COURT:  All right?

4              MS. McCAW:   Okay.

5              MR. SPODEK:  Okay.

6              THE COURT:  And I've already told them to

7    disregard.

8              MR. SPODEK:  I would ask your Honor to give another

9    curative instruction to them.  There's been some --

10             THE COURT:  All right.  Well, the last one he just

11   said, he started to say.

12             MS. McCAW:  A positive amount, I believe.

13             MR. SPODEK:  Prior to that, he said.

14             THE COURT:  Read it back.

15             (WHEREUPON, THE REQUESTED TESTIMONY WAS READ AT

16   SIDEBAR)

17             THE COURT:  That one I issued an instruction and

18   told them to disregard it.  So, if you stand next to him and

19   point, do you think he will be able to get that straight?

20             MS. McCAW:  I hope so.  I mean, I prepped him in

21   the hallway.  I did what I could.

22             THE COURT:  All right.

23             (AFTER WHICH, THE FOLLOWING PROCEEDINGS WERE HELD

24   IN OPEN COURT)

25             MS. McCAW:  Your Honor, may I?

McCAW-DIRECT-SHTYRKALO                    2179

1              THE COURT:  Yes.

2     Q     Now, what was the balance at the end of this period,

3  directing your attention to the prior page?

4     A     It was zero.

5     Q     Now, directing your attention to May 30th of 2017, were

6  there any additions to the account?

7     A     There was a reversal principal overdraft.

8              MR. SPODEK:  Objection.

9              THE COURT: Sustained.

10             MS. McCAW:  Your Honor, may we have a sidebar?

11             THE COURT: Yes.

12             (WHEREUPON, AN ON THE RECORD SIDEBAR CONFERENCE WAS

13  HELD)

14             MS. McCAW:  I believe that when we discussed this

15  previously, this was information that we were allowed to get

16  out, but there was an overdraft on the account and that it

17  was charged off at the end of the statement that was

18  explicit and contemplated by your Honor's ruling.

19             MR. SPODEK:  No.

20             MS. McCAW:  An overdraft simply means a negative

21  balance in the account.

22             THE COURT:  The problem is, at this point I don't

23  remember what I said you could do, to be honest with you.  I

24  thought we were left with the impression, didn't one of

25  these accounts end up having a negative balance?

McCAW-DIRECT-SHTYRKALO                    2180

1          MS. McCAW:  Yes.

2          MR. SPODEK:  Yes.

3          THE COURT:  And didn't I say they could get asked

4    if a negative balance was provided, they didn't talk about

5    how it became a negative balance?

6          MR. SPODEK:  Judge, I don't recall that.

7          THE COURT:  I thought that's what I said.

8          MS. McCAW:  That was your Honor's ruling.

9          THE COURT:  That's what I thought it was.

10         MS. McCAW:  So, what I am trying to do, but he

11   clearly --

12         THE COURT:  He doesn't know what he is doing.  He

13   has been prepped.  He's just reading what he wants to read.

14   Go ahead.

15         MS. McCAW:  What I want to do is, the ending

16   balance was zero, directing your attention to May 30th with

17   an amount added to the account, he reads the amount that was

18   added to the account.  Prior to that time, what was the

19   balance in the account.  Hopefully that will be enough for

20   him to understand that was a negative balance before you

21   added that amount in and then I will say, what was the

22   previous, date of the previous transaction date, and that's

23   it.

24         MR. SPODEK:  If that's your Honor's rulings?

25         THE COURT:  No, that was my ruling.  It was my

1    ruling as long as it didn't focus on how you got to that

2    negative amount.

3              MS. MAYS-WILLIAMS:  Your Honor, can I just state,

4    there is a witness that is about five minutes.  Could we put

5    that witness on afterwards?

6              THE COURT:  If we can get through this one.

7              MS. MAYS-WILLIAMS:  Okay.

8              (AFTER WHICH, THE FOLLOWING PROCEEDINGS WERE HELD

9    IN OPEN COURT)

10             MS. McCAW:  Thank you, your Honor.

11   Q    All right.  Now, again directing your attention to P X

12   2640, is there a deposit into the account on May 30th?

13   A    Yes.

14   Q    Now, what is the deposit into the account?

15   A    It's described as reversal principal overdraft.

16   Q    What is the amount?

17   A    $9,856 and 63 cents.

18   Q    Now, generally speaking, would a Chase account have a

19   reversal principal overdraft at the end of the account activity?

20   Would that be the last transaction in the account before it was

21   closed?

22   A    Yes.

23   Q    Now, directing your attention to the prior page, P X

24   2639, what was the ending balance of this account?

25   A    Zero.

1      Q    Now, putting those two together, what does that tell

2  you about what the balance was in the account prior to the

3  addition of that amount on May 30th 2017?

4      A    It was negative $9,866 and 63 cents.

5      Q    Now, I am going to ask you to just take a look at the

6  remaining transactions on this page, and what is the date,

7  simply the date of the last, prior transaction?

8      A    May 4th.  May 8th.

9           MS. McCAW:  Thank you.  No further questions.

10          MR. SPODEK:  Very brief, judge.  Very brief.

11          I could just stand here, your Honor because I've

12     seen the material.

13 CROSS-EXAMINATION

14 BY:  MR. SPODEK:

15     Q    I'm going to make it very easy.  Ms. Sorokin had a

16 debit card with Chase, right?

17     A    Right.

18     Q    That debit credit card was connected to that, that

19 Chase debit card was connected to a Chase Bank account?

20     A    Yes.

21     Q    Okay.  Does that Chase Bank account have overdraft

22 protection, correct?

23     A    Yes.

24     Q    Okay.  Drawing your attention to P X 02636, do you have

25 that in front of you?  I know you got a lot going on.  I can

1   give you my copy.

2       Okay.  I am showing you what's already in evidence as P X

3   02636 and, judge, may I approach the witness?

4            THE COURT:  Yes, you may.

5   Q    Would you be so kind to just read this top part of the

6   statement starting with the word, starting and ending with the

7   word "work" to the jurors?  That's it.

8   A    "Starting August 17th, unless you have instructed us

9   not to approve debit card purchases that overdraw your business

10  account, you may have to pay a $34 insufficient funds fee each

11  time we approve an everyday debit card transaction.  If your

12  checking account can't cover your purchase. Through August 19th,

13  we will continue to transfer funds for transactions that would

14  overdraw your account.

15      Keep in mind our standard overdraft practice will apply if

16  your checking account does not have enough money available to

17  cover a transaction.  In that case, we may charge you a $34

18  insufficient funds fee or $34 returned item fee for each check,

19  recurring payment, or other transfer that is for more than the

20  amount available in your account. Refer to your deposit account

21  agreement at Chase dot com for details on how your transactions

22  work."

23  Q    Okay.  That's enough.  Thank you.

24      Just so we are clear, if you have zero in the account you

25  would be charged a $34 fee for Chase to cover the amount over

1    zero, right.

2        A    Yes.

3        Q    Okay.  And Chase would cover that amount, right?

4        A    At the bank's discretion.

5        Q    Okay.  That's what the overdraft means, right?

6        A    Yes.

7                 MR. SPODEK:  Okay, nothing further, judge.

8    REDIRECT EXAMINATION

9    BY:  MS. McCAW:

10       Q    In your experience as an employee of Chase, if a person

11   has an overdrawn account by nearly $10,000, would Chase approve

12   further transactions on the account?

13       A    Typically, no.

14       Q    Would Chase typically approve a transaction of

15   approximately 30,000 on that account?

16       A    To go into the negative?

17       Q    To go further into the negative?

18       A    Typically, no.

19                 MS. McCAW:  No further questions, judge.

20                 MR. SPODEK:  Nothing, judge.

21                 THE COURT:  Thank you, sir.  You're free to go.

22                 Now, I understand the People have one very fast

23        witness?

24                 MS. MAYS-WILLIAMS:  One very, very fast witness.

25                 The People call Mr. Joseph Dougherty to the stand.

1          THE CLERK:  Do you solemnly swear or affirm that

2    the testimony you will give the Court will be the truth,

3    whole truth and nothing but the truth?

4          THE WITNESS:  I do.

5          COURT OFFICER:  For the record, please state your

6    full name, spell your last name.

7          THE WITNESS:  My name is Joseph Dougherty.  Last

8    name is D O U G H E R T Y.

9          COURT OFFICER:  County of residence, sir?

10         THE WITNESS:  Hudson, New Jersey.

11         THE COURT:  Good afternoon, sir. Welcome.

12         THE WITNESS:  Thank you.

13   DIRECT EXAMINATION

14   BY:  MS. MAYS-WILLIAMS:

15       Q    Mr. Dougherty, are you employed.

16       A    Yes.

17       Q    What do you do for a living?

18       A    A principal investigator with Deutsche Bank's

19   anti-financial crime investigations team based in New York.

20       Q    What are some of your responsibilities in your role?

21       A    I conduct external and internal fraud investigations

22   relating to a wide range of financial crimes.

23       Q    How long have you worked at Deutsche Bank?

24       A    I will be with the bank five years this October.  So, I

25   joined October 2014.

MAYS-WILLIAMS-DIRECT-DOUGHERTY                    2186

1       Q      Now, is there a database within Deutsche Bank U S A

2   that allows you to search for client records?

3       A      Yes.

4       Q      Does that database also allow you to search for wire,

5   wire transfers?

6       A      Yes.

7       Q      Now, which division typically completes these types of

8   searches?

9       A      It can vary.  Payment operations obviously would have

10  it in their day-to-day, but also in my team, you know,

11  anti-financial crime, in investigations compliance, they would

12  also have the ability to query the database.

13      Q      Now, have you received training in conducting these

14  searches?

15      A      Yes.

16      Q      Okay.  And can you please explain what type of

17  information is contained within the database?

18      A      Basically it contains all U S dollar wire transactions.

19  So, you would have information like the sender, the remitter,

20  the beneficiary, the corresponding bank, the date of the

21  transaction, it's called the value date, the amount, the address

22  of the beneficiary bank, the address of the remitting bank, the

23  address for the sender, the address for the beneficiary, so all,

24  you know, various different information would be contained.

25      Q      Okay.  Now, does Deutsche Bank U S A employee be able

1   to search the databank of Deutsche Bank in another country?

2       A    No.

3       Q    Now, directing your attention to March 9th 2019, did

4   you have an occasion to search from the time period,

5   November 2016 through August 2017, for a wire transfer from your

6   bank in the name of the person, Anna Delvey?

7       A    Yes.

8       Q    What were your results?

9       A    No results.  No matches.

10      Q    Okay.  Now, directing your attention to the same

11  timeframe, did you conduct a similar search for the name Anna

12  Sorokin?

13      A    Yes.

14      Q    What were your results?

15      A    No matches.  Nil.  No matches.

16      Q    Now, directing your attention to April 2019, did you

17  have the opportunity to search for the same, to conduct the same

18  search for a person by the name of Anna Sorokina?

19      A    Yes.

20      Q    And what were your results?

21      A    Again, no, nil, no matches.

22      Q    Okay.  And finally, did you conduct a search for a

23  person by the name of Anna Sorokin Delvey from November 2016

24  through August 2017, any wire transfers in that name?

25      A    No.

MAYS-WILLIAMS-DIRECT-DOUGHERTY                    2188

1      Q     Finally, I am going to direct your attention to what is

2   already in evidence as People's 1.  I am going to direct your

3   attention specifically to P X 288 and toward the bottom of this

4   e-mail, do you see -- well, first, let me ask, can you explain

5   to the members of the jury what is the chips confirmation

6   number?

7      A     The chips confirmation number actually is called,

8   typically called a reference number, or U I D number, and it is

9   usually a six digit code and it's strictly, always, it's always

10  numerical characters.

11     Q     What's the purpose of this confirmation number?

12     A     It's used for, you know, tracking transactions.

13     Q     Okay.  If you can take a look at P X 288, can you tell

14  the members of the jury what the confirmation number there

15  reads?  Could you just read that out loud.  You can take a look

16  at the binder in front of you that might be easier?

17     A     0961 D D E U F D F 003214.

18     Q     Could you tell members of the jury whether that's a

19  genuine chips confirmation number?

20     A     No, it's not.  Again, chips, reference number, or U I D

21  number would be a six digit code and it would not have any

22  alphabetical characters, strictly numerical.

23          MS. MAYS-WILLIAMS:  All right. No further questions

24      for this witness.

25          THE COURT:  Any questions?

SPODEK-CROSS-DOUGHERTY                    2189

1              MR. SPODEK:  Yes.  Just one question.

2   CROSS-EXAMINATION

3   BY:  MR. SPODEK:

4       Q    You stated you work at Deutsche Bank, right?

5       A    Yes, sir.

6       Q    Okay.  On Deutsche Bank statements, do they list name

7   of the private banker, if you have one?

8       A    On the statement it is.

9       Q    On the statement it is?

10      A    I'm not aware of that.

11      Q    Okay.  Are there two different type of statements at

12  Deutsche Bank?

13      A    I'm not aware of that, sir.

14      Q    Okay.  Are you aware if Deutsche Bank issue statements

15  to their clients?

16      A    Yes.

17      Q    What kind of statements do they issue?

18      A    It depends what subsidiary, entity, you know, is

19  issuing.  Deutsche Bank has many affiliates and entities.

20              MR. SPODEK:  Okay.  I have nothing further, judge.

21              THE COURT:  Anything else?

22              MS. MAYS-WILLIAMS:  No, your Honor.

23              THE COURT:  Thank you, sir.  You're free to go.

24              THE WITNESS:  Thank you.

25              Does that conclude the evidence for today?

SPODEK-CROSS-DOUGHERTY                           2190

1          MS. McCAW:  Yes, your Honor.

2          THE COURT:  All right, counsel.  Just step up a

3    moment please.

4          (WHEREUPON, AN OFF THE RECORD BENCH CONFERENCE WAS

5    HELD)

6          THE COURT:  Right now it looks like our case is

7    going to be concluded in its entirety either Monday, the

8    case will end either Monday in time to be able to sum and

9    charge, or if that's a little ambitious, Tuesday at the

10   latest, so you'll get this case most likely Tuesday, okay.

11         Remember I told you that we're going to be working

12   next Tuesday.  So, you should simply prepare accordingly.  I

13   know there are some people left under some time pressures.

14   We are all mindful of that.  We haven't forgotten, okay.

15         So, you're about to embark now on a three-day

16   weekend.  You might be at Easter table, you might be at the

17   Passover table and everybody is going to ask you how the

18   trial is going and you are not going to tell them a thing,

19   okay, other than it's going and will be over next week.

20         Don't discuss this case amongst yourselves, don't

21   discuss it with anybody else.  Please if you see, if you see

22   in the papers or news media about this case on the internet,

23   ignore it.  If you see any of us outside over the weekend,

24   ignore us.  Ignore the press.  Don't speak with the press.

25   Don't do any independent research in this case.  Don't post

1    anything on social media about this case.  Make sure if you

2    can, that you have a lovely time off, if you are lucky

3    enough to be able to spend time with family and friends,

4    enjoy it.  Take good care of yourselves.

5         9:30 Monday morning please.  And I know sometimes I

6    feel like a fool because I tell you to come here early and I

7    know you are here and sitting here.  We are always working,

8    so don't think that we're just wasting your time.  Please

9    understand that.  Please try to be as prompt as you can.

10        See you Monday.

11        Why are we having somebody from the D A's Office

12   testify?  You can't stipulate, whatever the D A is going to

13   tell us, the following record are true copies of the record

14   in the possession of the District Attorney, they were taken

15   from the cellphone of Ms. Delvey, or whatever, we can't do

16   that?

17        MR. SPODEK:  I'm okay with that, judge.  I could

18   stip to probably the majority of the witnesses, to some

19   extent.

20        MS. McCAW:  Your Honor, I can consult and see, we

21   don't typically stipulate to witnesses who are major, are a

22   witness from the High Tech Analysis Unit that performed the

23   analysis on her phone.  We don't typically have that as a

24   stipulation because it is a technical matter that requires

25   some understanding of what fields and calls are in the

 1    report that is generated.

 2            THE COURT:  Understand what?

 3            MS. McCAW:  Basically when you conduct an

 4    extraction on the phone, they use some software and I am

 5    going to be vague because I don't fully understand it

 6    myself.

 7            THE COURT:  Why does the jury need to understand

 8    that?  Doesn't the jury simply need to understand that a

 9    phone -- did these calls come off the defendant's phone?

10            MS. McCAW:  The calls are a separate matter.  The

11    calls relate to calls that were made to Amex.  The other

12    witnesses relate to the material that was recovered from her

13    phone.  These are the ways that we have.  We have draft

14    documents on her phone and in her e-mail account that shows

15    that she forged the documents, so it's pretty crucial

16    evidence.  The witness will simply be explaining where the

17    documents came from and walking the members of the jury

18    through the documents.  I don't think it a particularly

19    lengthy testimony, but I think you can understand why it's

20    critical testimony.

21            THE COURT:  Okay.  So, what about the testimony

22    about, do you have a live witness on the phone calls between

23    the defendant and the bank?

24            MS. McCAW:  No, those are already in evidence.

25    Your Honor, it's simply a matter of playing the phone calls.

1    So, the evidence that I anticipate that we would have upon

2    playing the phone calls that are already in evidence, having

3    somebody from the High Technology Analysis Unit explain how

4    they performed the extraction of the phone.

5         THE COURT:  Please have them explain it, if they

6    can in 25 layperson's words, or less.

7         MS. McCAW:  I don't know if that's going to be

8    able -- your Honor, I'll do my best.

9         THE COURT:  Just because it's hard for you to

10   explain.  It's going to be hard for them to understand.  I

11   recognize now that you've told me what this is that you

12   obviously need for them to have a walkthrough.

13        MS. McCAW:  I think the particular issue, I mean, I

14   can explain it further to you, if you want.  I think that,

15   you know, if you want to just take my word for it that it

16   would be difficult for the jurors to understand a report

17   that is generated, unless this witness explains it.

18        THE COURT:  All right, but keep it simple.

19        MS. McCAW:  Yes, your Honor.

20        THE COURT:  Do we have to play every phone call?

21   Is there an hours worth of phone calls?  We can't play a

22   half hours worth of phone calls?

23        MS. McCAW:  Your Honor, I believe --

24        MS. MAYS-WILLIAMS:  We can take another look, your

25   Honor.

SPODEK-CROSS-DOUGHERTY                    2194

1              THE COURT:  All right.  If it won't impede your

2      ability to do what you have to do, try and cut it down and

3      then you are resting?

4              MS. McCAW:  Yes, your Honor.

5              THE COURT:  And you are not putting on a case?

6              MR. SPODEK:  I am not putting on a case, judge.  I

7      have very limited cross, if any, for any of those witnesses.

8              THE COURT:  I really think you should be prepared

9      with a summation on Monday, just in case.

10             MS. McCAW:  Your Honor, I think we also could have

11     stipulations that have to go into evidence.  I don't believe

12     defense counsel has signed them yet.

13             MR. SPODEK:  Remember, we talked about, I'll sign

14     your copies.

15             MS. McCAW:  Oh, okay.  Okay.

16             MR. SPODEK:  I'm ready to sign it.

17             THE COURT:  Make sure you have redacted everything

18     you need to redact and let's really try and wrap this up on

19     Monday because if we are summing and charging on Tuesday,

20     it's, you know, we've got to get another judge to do my

21     calendar.

22             Who knows where they are going to go.  So, to the

23     extent we can get this done on Monday, that would be great.

24     If we can't, I understand.  That's life.

25             What if anything do you want us to tell the jury?

1       You think about what if anything you want to tell the jury

2       facts, you won't be here and good luck to you.

3                MS. MAYS-WILLIAMS:  Thank you.

4                THE COURT:  All right.  Anything else?

5                MR. SPODEK:  What time 9:30 on Monday.

6                THE COURT:  Yeah.  Let's come back at 9:30.  Enjoy

7       whatever you are doing for the next three days.

8                There being no further business, Part 31 is

9       adjourned.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25