IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RACHEL DELOACHE WILLIAMS,

               Plaintiff,

    v.

NETFLIX, INC.,

               Defendant.

C.A. No. 22-cv-1132-CFC

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Dated: December 9, 2022

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Phone: (310) 274-3803
aisaacs@rufuslaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
rodsmolla@gmail.com
(864) 373-3882

*Attorneys for Plaintiff Rachel DeLoache Williams*

## TABLE OF CONTENTS

OBJECTIONS....................................................................................................1

ARGUMENT ....................................................................................................2

   I.    THE LAW OF DEFAMATION RECOGNIZES NO TALISMANIC
IMMUNITY FROM LIABILITY FOR OTHERWISE ACTIONABLE
DEFAMATORY STATEMENTS EMBEDDED IN WORKS OF FICTION,
DRAMATIZATION, OR DOCUDRAMA............................................................2

   II.   THE AMBIGUOUS *INVENTING ANNA* DISCLAIMER DOES NOT
INSULATE NETFLIX FROM LIABILITY..........................................................7

   III.   THE STATEMENTS ARE FACT NOT OPINION ................................11

      A.   The Governing New York Standards....................................................11

      B.   Ties Go to the Plaintiff.........................................................................13

      C.   The Statements are Factual ..................................................................15

   IV.   THE STATEMENTS ARE MATERIALLY FALSE AND CARRY
DEFAMATORY MEANING ............................................................................19

      A.   The Substantial Truth and Defamatory Meaning Arguments are
Interlocking and Interwoven ...............................................................19

      B.   The New York Standards for Defamatory Meaning...............................21

      C.   The Average Reader Materiality Test.....................................................21

      D.   The Netflix Statements as Measured by the Average Viewer ................22

      E.   Actual Viewers Regarded the Depictions as Defamatory.......................25

CONCLUSION ...............................................................................................26

# TABLE OF AUTHORITIES

## Cases

*600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930 (N.Y. 1992) ...................11

*Armstrong v. Simon & Schuster*, 85 N.Y.2d 373 (1995) .........................................14

*Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979), *cert. denied*, 444 U.S. 984 (1979) ...................................................................................................................................3, 4

*Brian v. Richardson*, 87 N.Y.2d 46 (1995)...............................................................11

*Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256 (3d Cir. 2006) ..............................1

*Carney v. Memorial Hosp. & Nursing Home of Greene County*, 64 N.Y.2d 770 (1985) ...............................................................................................................13

*Colborn v. Netflix Inc.*, 541 F. Supp. 3d 888 (E.D. Wis. 2021) ......................... 5, 18

*Corrigan v. Bobbs-Merrill Co.*,  126 N.E. 260 (N.Y. 1920) ...................................3

*Davis v. Boeheim*, 24 N.Y.3d 262 (2014).................................................................13

*Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009)...........................................................................................10

*Edgington v. Fitzmaurice,* 29 Ch. Div. 459 (1885) .................................................17

*Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48 (S.D.N.Y. 2021) ..................... 5, 8, 18

*Fetler v. Houghton Mifflin Co.*, 364 F.2nd 650 (2nd Cir. 1966)...............................3

*Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537 (C.D. Cal. Jan. 27, 2022) .. passim

*Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161 (E.D.N.Y. 2018), *aff'd*, 813 F. App'x 728 (2d Cir. 2020) ...............................................................................9

*Grower v. State*, 23 A.D.2d 506 (3d Dept. 1965), *order aff'd*, 19 N.Y.2d 625 (1967) ...............................................................................................................13

*Heller v. NBC Universal, Inc.*, 2016 WL 6583048 (C.D. Cal. June 29, 2016) ........4

*Hill v. Doc Shop Productions, Inc.*, 2022 WL 1078173 (Cal. Ct. App. Apr. 11, 2022) ................................................................................................................5

*Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991) ............................12

*John E. Reid & Associates, Inc. v. Netflix, Inc.*, No. 19 CV 6781, 2020 WL 1330657 (N.D. Ill. Mar. 23, 2020).................................................................11

*Liberman v. Gelstein*, 605 N.E.2d 344 (N.Y. 1992).................................................25

*Lovingood v. Discovery Communications, Inc.*, 800 F. App'x 840 (11th Cir.), *cert. denied*, 140 S. Ct. 2808 (2020) ..................................................................10

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ................... 17, 18, 21

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ......................................................16

*Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918 (7th Cir. 2003).............4, 9

*Netflix, Inc. v. Barina*, 2022 WL 3908540 (Tex. App. Aug. 31, 2022)....................6

*November v. Time Inc.*, 13 N.Y.2d 175 (1963)........................................................14

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995)...................................... 3, 6, 8

*Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ...........................17

*Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir. 1985) ..........................................12

*Sarver v. Hurt Locker LLC*, No. 2:10-CV-09034-JHN (JCx), 2011 WL 11574477 (C.D. Cal. Oct. 13, 2011) ...........................................................................6

*Silsdorf v. Levine*, 59 N.Y.2d 8 (1983), *cert. denied*, 464 U.S. 831 (1983) ............13

*Smith v. People of the State of California*, 361 U.S. 147 (1959)............................17

*Spahn v. Julian Messner, Inc.*, , 233 N.E. 2d 840 (N.Y. 1967) ................................3

*Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006)...............................................9

*Sweeney v. Prisoners' Legal Services of New York*, 146 A.D.2d 1 (3d Dept.1989) ......................................................................................................................13

*Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021), *cert. denied*, 2021 WL 5043599 (Nov. 1, 2021)...26

*Thomas H. v. Paul B*., 18 N.Y.3d 580 (2012)..........................................................21

*US Dominion, Inc. v. Fox News Network*, LLC,  2021 WL 5984265 (Del. Super. Ct. Dec. 16, 2021) ...............................................................................................12

*Wehling v. Columbia Broadcasting System* 721 F.2d 506 (5th Cir. 1983)..............21

**Other Authorities**

Robert Sack, *Libel, Slander, and Related Problems* 138 (1980);..........................21

Rodney Smolla, *Law of Defamation* § 5.08 (1991) .................................................21

*The Role of the Will in Law*, 68 Harv.L.Rev. 1 (1954)...........................................17

## **OBJECTIONS**

By Stipulation, the parties requested an increase of the word limit for their briefs by 1,250 words because Netflix needed to address its defenses to all 16 Defamatory Statements and Williams was entitled to parity. The Stipulation was approved by Order dated October 25, 2022 (D.I. 13). However, Netflix ultimately filed not only a Memorandum of Law just under the 6,250 word limit, but also a 29-page chart (D.I. 16-5) containing more than 8,500 words setting out its detailed defenses to the Defamatory Statements. This amounts to a massive unilateral extension by Netflix of the new limit. Williams strenuously objects and requests that the Court ignores the chart.[1]

Williams also objects to Netflix's references to her *Vanity Fair* article ("Article") and her book entitled *My Friend Anna* ("Book") (D.I. 16.1 and 16.2) to attack the Complaint because this is a 12(b)(6) motion and these items are extrinsic to the Complaint and do not constitute "matters incorporated by reference or integral to the claim, items subject to judicial notice (or) matters of public record." *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006). Netflix claims in

---

[1] Williams has created a counter-chart (Exhibit 1 to the Declaration of Alexander Rufus Isaacs) which is submitted for the court's consideration only if it overrules Williams' objection and considers the Netflix chart. This counter-chart reproduces the descriptive columns of Netflix's chart and substitutes Williams' factual claims from the Complaint in place of Netflix's factual claims, and substitutes summary versions of her legal arguments as to why the statements are actionable.

Footnote 1 that these items are "incorporated by reference in the complaint" but that is untrue. Neither item is incorporated by reference - the Complaint only mentions them, and whereas *Inventing Anna* (the "Series") is "integral to the claim" because it contains the Defamatory Statements, the same cannot be said of the Article and the Book which are only pled to help establish Netflix's constructive knowledge of their contents for purposes of showing actual malice.

## ARGUMENT

### I. THE LAW OF DEFAMATION RECOGNIZES NO TALISMANIC IMMUNITY FROM LIABILITY FOR OTHERWISE ACTIONABLE DEFAMATORY STATEMENTS EMBEDDED IN WORKS OF FICTION, DRAMATIZATION, OR DOCUDRAMA

The Series is a docudrama. Netflix opens its argument by touting the role the genre plays in bringing historical events to a larger audience. D.I. 15 at 11. Fair enough. But docudramas, dramatizations, and even works of fiction are not defamation free-fire zones. The law of defamation recognizes no talismanic immunity from liability for otherwise actionable defamatory statements embedded in such works.[2] The philosopher Marshall McLuhan famously declared that "the medium is the message" but the law of defamation stands for the opposite proposition. It is the message, not the medium, that controls.

---

[2] Williams accepts that New York substantive law governs her defamation claim, as augmented by First Amendment principles. It also accepts that New York does not recognize a false light claim and therefore does not oppose that part of the Motion,

In *Gaprindashvili v. Netflix, Inc*., 2022 WL 363537 (C.D. Cal. Jan. 27, 2022), a federal district court in California held that a factual statement concerning a real person depicted in the Netflix series *The Queen's Gambit* could give rise to defamation liability, even though the series was fictional, observing: "As an initial matter, Netflix does not cite, and the Court is not aware, of any cases precluding defamation claims for the portrayal of real persons in otherwise fictional works." *Id.* at *5.  On the contrary, the court held, "the fact that the Series was a fictional work does not insulate Netflix from liability for defamation if all the elements of defamation are otherwise present." *Id.* (citing *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979), *cert. denied*, 444 U.S. 984 (1979) (fictional character in the novel was identifiable as the real person) and *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (creators of docudramas that mix fact and fiction "must attempt to avoid creating the impression that they are asserting objective facts")).

In a seminal New York case, *Fetler v. Houghton Mifflin Co*., 364 F.2nd 650 (2nd Cir. 1966), the court held that a viable libel-in-fiction claim existed, given the many similarities between the circumstances of a fictional character and the real-life person.  "Reputations may not be traduced with impunity, whether under the literary forms of a work or fiction." *Corrigan v. Bobbs-Merrill Co*.,  126 N.E. 260, 262 (N.Y. 1920).  *See also Spahn v. Julian Messner, Inc*., , 233 N.E. 2d 840, 842 (N.Y. 1967) ("Exactly how it may be argued that the 'all-pervasive' use of imaginary incidents—

3

incidents which the author knew did not take place—invented dialogue—dialogue which the author knew had never occurred—and attributed thoughts and feelings—thoughts and feelings which were likewise the figment of the author's imagination—can be said not to constitute knowing falsity is not made clear by the defendants. Indeed, the arguments made here are, in essence, not a denial of knowing falsity but a justification for it."); *Bindrim*, 92 Cal. App. 3d at 71, n. 2 ("The fact that '*Touching*' was a novel does not necessarily insulate Mitchell from liability for libel, if all the elements of libel are otherwise present."); *Muzikowski v. Paramount Pictures Corp*., 322 F.3d 918, 925 (7th Cir. 2003) (holding actionable a defamation claim arising from the movie *Hardball* arising from a negative portrayal of a real person not named by name in the film but identifiable as the actionable person on whom a character was based.)

Many of the soundbites quoted by Netflix from cases it cites in support of its docudrama defense come from cases that actually cut against it.  In *Heller v. NBC Universal, Inc*., 2016 WL 6583048 (C.D. Cal. June 29, 2016), arising from the film *Straight Outta Compton*, the court struck some statements as not actionable but held other statements and implications actionable.  *Id*. at *9 ("Accordingly, the Court deems Plaintiff's defamation claim legally sufficient insofar as it is based on the Film's statements or implications that Plaintiff discouraged Ice Cube from hiring an attorney, which is an objective fact that either occurred or did not.").

Netflix itself is well-familiar with many of these cases, and its own exposure to defamation liability when its programming defames real people, as evidenced by *Gaprindashvili*. Indeed, in the first case cited by Netflix in advancing its "docudrama defense," *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48 (S.D.N.Y. 2021), the court, applying New York law, held that a defamation claim arising from the Netflix docudrama *When They See Us* was viable. The court held that the plaintiff had plausibly alleged a claim of defamation as to five scenes within the docudrama. Rejecting the assertion that the docudrama was merely "opinion," the court held that "[t]he average viewer could conclude that these scenes have a basis in fact and do not merely reflect the creators' opinions about controversial historical events." *Id.* at 58.

Other recent Netflix productions have also been found actionable. *See Hill v. Doc Shop Productions, Inc.*, 2022 WL 1078173, at *1 (Cal. Ct. App. Apr. 11, 2022) (In an action arising from the Netflix series *Afflicted,* various plaintiffs sued Netflix and others for defamation. The court found the statements actionable, rejecting Netflix's motion to dismiss, holding that the actual facts, "when contrasted with the show script excerpts and aired version of Afflicted, were sufficient to constitute a threshold showing that defendants could be reasonably understood as falsely implying" the alleged defamation); *Colborn v. Netflix Inc.*, 541 F. Supp. 3d 888, 901 (E.D. Wis. 2021) ("Netflix is also not entitled to dismissal based on its argument that

5

the series' implication that Colborn criminally framed Avery for the Halbach murder 'constitute[s] a nonactionable opinion based on fully disclosed true or privileged facts'"); *Netflix, Inc. v. Barina*, 2022 WL 3908540, at \*2 (Tex. App. Aug. 31, 2022) ("Keeping in mind the undesirable chilling effect of holding media participants liable for defamation, we nonetheless conclude that the documentary was capable of defamatory meaning.") (internal citation omitted)

In short, contrary to the impression conveyed by Netflix, docudramas, dramatizations, and fictional works based on real events often do give rise to actionable defamation claims, including claims against Netflix itself. Ultimately, "[t]he test is whether a reasonable viewer would understand the character to be the person identified and to have the characteristics as described." *Gaprindashvili*, 2022 WL 363537, at \*5, citing *Sarver v. Hurt Locker LLC*, No. 2:10-CV-09034-JHN (JCx), 2011 WL 11574477, at \*8 (C.D. Cal. Oct. 13, 2011), aff'd sub nom. *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016))). "Courts 'must look to the specific context in which the statements were made and to the content of the statements themselves' to determine whether the speaker 'creat[ed] the impression that they [were] asserting objective facts.'" Id., quoting *Partington*, 56 F.3d at 1155.

In this case, Netflix not only decided to give Williams' real name to one of the characters in the Series but it identified that character as having the same employer, living in the same neighborhood and having the same alma mater as

Williams; it portrayed the character in situations based on real life events which involved Williams, such as her friendship with Sorokin, the trip to Morocco, and Sorokin's trial; and it even used a photograph of the real Williams (Exh. 1 to Complaint). Thus, a reasonable viewer would easily understand that Williams behaved in real life in the same way as the character bearing her name in the Series. The hateful online abuse levelled at Williams, some of which is quoted in the Complaint at ¶4, demonstrates that many viewers did indeed form a highly negative opinion of her as a result of watching the Series. But the damage to Williams' reputation (and this entire lawsuit) could easily have been avoided if Netflix had used its creativity to give her character a fictitious name, as it did with many characters in the Series, and different biographical facts. Complaint, ¶5.

## II. THE AMBIGUOUS *INVENTING ANNA* DISCLAIMER DOES NOT INSULATE NETFLIX FROM LIABILITY

Netflix exaggerates not only the significance of docudramas as a genre, but also the significance of the "disclaimers" that appear in each episode of the Series. These so-called disclaimers are not vocal—there is no voice-over reading them. Rather, they appear on the fly, often cleverly embedded in visuals in opening scenes and easily missable by viewers, and they are, as disclaimers go, bizarrely phrased, stating in various formulations: "This (whole) story is completely true, except for all the parts that are total bullshit/ is totally made up." Even Netflix appears to lack much courage of conviction in making its disclaimer argument, sheepishly

describing its own purported disclaimer as "cheeky language." D.I. 15 at 12. A more appropriate adjective would be "confusing." Viewers have no way of knowing which parts of the Series are true and which are not. They could easily conclude that the portrayal of characters with real names (like Williams) is true, and that the portrayal of characters with fictitious names is fictional.

The law of defamation, however, recognizes no immunity for dramatic or fictional works prefaced by disclaimers, let alone any special deference to cheeky ones. Rather, a disclaimer is simply one factor to be considered in the mix in determining whether the events depicted would be regarded by an average viewer or reader as factual or fanciful. As the court held in *Gaprindashvili*, rejecting the same disclaimer defense interposed by Netflix here, "[t]he Court also considers the presence of the disclaimer that the Series is a work of fiction as a factor in this analysis, albeit not a dispositive one." *Gaprindashvili*, 2022 WL 363537, at * 6. The court properly concluded that the reality of the Netflix broadcast trumped any significance attached to the disclaimer, holding that "[i]n context, therefore, Netflix "creat[ed] the impression that [it] was asserting objective facts." *Id.* (quoting *Partington*, 56 F.3d at 1155).

*Gaprindashvili* hardly stands alone. In *Fairstein*, the court also held that statements in the Netflix docudrama were actionable notwithstanding a disclaimer that appeared in each episode. *Fairstein*, 553 F. Supp. 3d at 59. In *Muzikowski* the

8

Seventh Circuit was unfazed by a disclaimer appearing in the credits of the film. *Muzikowski*, 322 F.3d at 922. Similarly, in *Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1st Cir. 2006), the First Circuit reversed a district court for finding a disclaimer dispositive. ("[T]he district court relied heavily on the disclaimer appearing at the bottom of the first column of the article, i.e., '[t]he individuals pictured are unrelated to the people or events described in this story.'"). It noted the placement of the disclaimer, observing that it was "easy enough to overlook," and held that "we cannot say as a matter of law that too few readers would overlook the disclaimer to constitute a considerable and respectable segment of the community" and that notwithstanding the disclaimer the publication was "reasonably susceptible to a defamatory meaning." *Id.* at 126, 128. What was true in *Stanton* is doubly true here—the fleeting and random appearance on the screen in episodes of the Series containing the contradictory message that the depictions are at once "completely true" yet also at times "total bullshit" or "totally made up" certainly cannot as a matter of law inoculate Netflix from liability.

The cases cited by Netflix in support of its disclaimer defense are anemic counters at best. In *Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161, 171 (E.D.N.Y. 2018), *aff'd*, 813 F. App'x 728 (2d Cir. 2020), the court dismissed the case at the summary judgment stage, not on a motion to dismiss, on the ground that the plaintiff had failed to demonstrate a triable issue of fact on actual malice. Among

the weaknesses in the plaintiff's case, which arose from the movie *The Wolf of Wall Street*, was the problem that the movie did not name the plaintiff.  The plaintiff claimed to be represented, however, by a "composite character."  In holding there was insufficient evidence of actual malice, the court considered multiple factors, including the presence of a disclaimer. *Greene* at most establishes that a disclaimer may be a non-dispositive element in the mix. Even on that point, it is weak precedent for the purposes here, since it turned on the absence of actual malice, not on defamatory meaning, and involved a composite character in a fictionalized movie— not a character, as here, bearing plaintiff's real name.

*Lovingood v. Discovery Communications, Inc*., 800 F. App'x 840, 848 (11th Cir.), *cert. denied*, 140 S. Ct. 2808 (2020) is similar.  Again, the case turned on actual malice, not on defamatory meaning.  And again, the court treated the disclaimer as a factor, but certainly not as dispositive, or as even highly influential.  Moreover, the court found one of the allegedly defamatory statements to convey defamatory meaning and be actionable.  *Id.* at 849. Thus, the disclaimer did *not* operate as a bar to liability.  Even so, the plaintiff still lost, but not for lack of defamatory meaning, but for lack of actual malice.  *Id.*

Netflix cites two other cases in a "see also" footnote.  D.I. 15 at 12, n.6.  Neither case turned on the presence of a disclaimer. *Diaz v. NBC Universal, Inc*., 536 F. Supp. 2d 337, 339 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009)

was a "group libel" case in which the court held that a depiction of New York police officers' narcotics squad involving some 400 members was not "of and concerning" any specific plaintiff. *John E. Reid & Associates, Inc. v. Netflix, Inc*., No. 19 CV 6781, 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020), where the court found the statements non-actionable, but did not purport to rely on the disclaimer.

## III.   THE STATEMENTS ARE FACT NOT OPINION

### A. The Governing New York Standards

New York has adopted a three-part test for separating fact from opinion.  "The factors to be considered are: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to 'signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995) (internal citations omitted).

 "Under either Federal or State law, the dispositive question [for determining whether a claimed "opinion" is actionable] is whether a reasonable listener could have concluded that [the speaker] was conveying facts about the plaintiff." *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 934 (N.Y. 1992).  Realism, not literalism, is the touchstone.  "In making this inquiry, courts cannot stop at literalism.

The literal words of challenged statements do not entitle a media defendant to 'opinion' immunity or a libel plaintiff to go forward with its action." *US Dominion, Inc. v. Fox News Network*, LLC,  2021 WL 5984265, at *27 (Del. Super. Ct. Dec. 16, 2021) (applying New York law and rejecting an opinion defense in Dominion Voting's defamation suits against Fox News).  It follows that "[i]n determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person."  *Id.*

New York, like many states, treats as actionable statements couched as opinion that, "however labeled by defendant, would reasonably appear to state or imply assertions of objective fact." *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991). *See also Redco Corp. v. CBS, Inc*., 758 F.2d 970, 972 (3d Cir. 1985) ("However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion. In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion.")

Moreover, an opinion that is not honestly maintained but rather cynically expressed solely to inflict damages is not protected under New York law.  To be protected, a statement couched as "opinion" must be the honest expression of the speaker's real opinion.  See, e.g., *Grower v. State*, 23 A.D.2d 506, 507 (3d Dept.

1965), *order aff'd*, 19 N.Y.2d 625 (1967) ("A comment is fair if based on a true

statement of the facts, it is free from actual malice and ill will and is an honest

expression of the writer's real opinion or belief.").

### B. Ties Go to the Plaintiff

In baseball, "ties go to the runner." In defamation law, ties go to the plaintiff.

The New York Court of Appeals recognized this fundamental axiom in a case

involving basketball, not baseball, arising from a defamation action against famed

Syracuse basketball coach Jim Boeheim:

> Essentially, defendants argue that because a reader could interpret the
> statement as pure opinion, the statement is as a consequence,
> nonactionable and was properly dismissed under CPLR 3211(a)(7).
> However, *on a motion to dismiss we consider whether any reading of
> the complaint supports the defamation claim*. Thus, although "[i]t may
> well be that [the challenged statements] are subject to defendants'
> interpretation . . . the motion to dismiss must be denied if the
> communication at issue, taking the words in their ordinary meaning and
> in context, is also susceptible to a defamatory connotation."

*Davis v. Boeheim*, 24 N.Y.3d 262, 272 (2014) (emphasis added)*, quoting Sweeney

v. Prisoners' Legal Services of New York*, 146 A.D.2d 1, 4 (3d Dept.1989), *citing

Carney v. Memorial Hosp. & Nursing Home of Greene County*, 64 N.Y.2d 770,

772 (1985); and *Silsdorf v. Levine*, 59 N.Y.2d 8, 12-13 (1983), *cert. denied*, 464

U.S. 831 (1983). "If the words are reasonably susceptible of multiple meanings,

some of which are not defamatory, it is then for the trier of fact, not for the court

13

acting on the issue solely as a matter of law, to determine in what sense the words were used and understood."

Procedurally, motions to dismiss are frowned upon. Plaintiffs should generally have a chance to make their case to a jury. But more profound values are at stake. The New York rule reflects the underlying balance that the law of defamation seeks to achieve between protection of freedom of speech and protection of human dignity and reputation. In the words of the New York Court of Appeals:

> We begin our analysis by underscoring the procedural posture of this case. All that is before us is plaintiff's verified amended complaint and defendants' motion to dismiss on the law. We recognize that summary judgment has particular value, where appropriate, in libel cases, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms. *But we recognize as well a plaintiff's right to seek redress, and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint.*

*Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 379 (1995) (internal citations omitted; emphasis added).

This division of labor is central to preserving the province of the jury in a defamation action—especially at the motion to dismiss stage. *November v. Time Inc.*, 13 N.Y.2d 175, 179 (1963) ("The gloss or interpretation which plaintiff would have the jury apply is derived not from external facts but is one which a reader might not irrationally attach to the article as written. The jury will be asked not to alter or expand the meaning of the actual words but to adopt a possible construction of them

14

and it will be for the jurors to determine in which of two possible senses the words were used.").

### C. The Statements are Factual

Applying the New York test, and with the overlay that ties must go to Williams, this Court should hold that an average viewer *could* reasonably understand each of the Defamatory Statements against Williams in the Series to be factual. The Complaint makes this clear by following the same format for each Set of Defamatory Statements: the first paragraph under each Set quotes the dialogue or identifies the action upon which that Set is based (¶31 for the 1st Set); the second paragraph identifies the factual statement(s) and/or implication(s) (¶32(a)-(c)); the third paragraph explains how each statement is false by referring to the true facts (¶33(a)-(c)); and the fourth paragraph explains why the statements and attributions are defamatory (¶34). Thus, the Court can see the factual statements for each Set by reading the second paragraph under that Set.

As a cautionary note, Williams alerts the Court to deflect the tendency of Netflix to erroneously conflate two entirely distinct concepts in defamation law, the notion of "defamatory meaning," and the entirely separate question of whether a statement that conveys defamatory meaning is a materially false statement of fact, and thereby actionable. Williams uses various phrases throughout her Complaint to plead, as she must, the defamatory *meaning* of the statements on which she bases

her claim.   But those phrases, explaining how various statements depict Williams as hypocritical, a freeloader, a false friend, a snob, deceitful, or lying are not the load-bearing phrases that determine actionability.   Those are the phrases, along with others, that Williams uses to explain why average viewers would think less of her in evaluating the statements *she is actually suing on*.   For purposes of the first line of defense interposed by Netflix, which is whether the statements at issue are sufficiently factual to support a defamation claim, the issues are not close.   Consider, as two prominent exemplars, the following:

- Whether Sorokin did or did not always buy clothes and accessories for Williams as the Series claims is objectively verifiable.  The purchases either did or did not happen.

- Whether Williams became Sorokin's friend just to receive financial benefits from Sorokin and severed the friendship because Sorokin had landed in jail and ceased providing any financial benefits, rather than the truth as Williams asserts it, which is that she severed the friendship because she came to understand that she had been manipulated and defrauded by Sorokin, can be objectively determined, discerning intent and motivation in the manner judges and juries routinely decide such matters.  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("And the 'state of a man's mind is as much a fact as the state of his digestion.'"), *quoting Postal Service Bd. of Governors v. Aikens*,

16

460 U.S. 711, 716 (1983)*, quoting Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885); *Smith v. People of the State of California*, 361 U.S. 147, 154 (1959) ("We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind), *citing* Roscoe Pound, *The Role of the Will in Law*, 68 Harv.L.Rev. 1 (1954).

Objective evidence, such as evidence that Williams was defrauded by Sorokin, and evidence that Williams believed Sorokin to be engaged in criminal activity, and went to authorities to complain about Williams' behavior, provides additional objective evidence of the alleged falsity.

Netflix has the hubris to claim that statements consisting of invented dialogue attributed to Williams which she never made are "opinion." This is wrong on two essential levels, as the Supreme Court established in its leading opinion on fabricated quotations, *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991). "A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation." *Id.* at 511. "First, the quotation might injure because it attributes an untrue factual assertion to the speaker. An example would be a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not." *Id*. "Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the

17

statement was made indicates a negative personal trait or an attitude the speaker does not hold." *Id.*

Netflix fabricated quotations which it used to communicate to viewers facts that are false regarding the underling events, and negative personal traits or attitudes that Williams does not hold.

Whether or not Williams made the statements attributed to her is a fact, not an opinion. It is a red herring to suggest that Netflix was simply expressing "its opinion" about Williams. Netflix falsely portrayed the statements *as coming from Williams herself.* Those statements carry defamatory meaning. Netflix cannot put words in William's mouth and then claim that its false attribution and fabricated quotes are "opinion."

Tellingly, many decisions have rejected the opinion defense that Netflix pushes here in the context of docudramas, including rejections in which Netflix was the defendant. *See Colborn*, 541 F. Supp. 3d at 901 ("Netflix is also not entitled to dismissal based on its argument that the series' implication that Colborn criminally framed Avery for the Halbach murder 'constitute[s] a nonactionable opinion'"); *Fairstein*, 553 F. Supp. 3d at 74 ("These statements and actions attributable to Fairstein have a precise meaning, are capable of being proved or disproved, and even allowing for the artistic context of 'When They See Us,' the average viewer could

reasonably believe that these depictions were based on undisclosed facts known to the filmmakers.").

Finally, Williams' Complaint gives rise to a plausible inference that a factfinder could conclude that Netflix subjectively *knew* that what it was couching as its "opinion" about Williams was simply not believed even by Netflix, and that it disingenuously advanced a narrative it knew it was spinning in order to heighten the drama for its story, a narrative that the creative persons responsible for the Series did not in fact subjectively believe.  Complaint ¶¶ 96-136.

## IV.   THE STATEMENTS ARE MATERIALLY FALSE AND CARRY DEFAMATORY MEANING

### A. The Substantial Truth and Defamatory Meaning Arguments are Interlocking and Interwoven

Netflix argues that the Defamatory Statements are not materially false and are not defamatory.  The two assertions are in fact interwoven and interlocking.  Netflix bases its substantial truth defenses almost exclusively on isolated phrases and quotations from the Article and the Book, neither of which should be considered by this court for the reasons set forth above. These phrases and quotations paint the same defamatory picture of Williams as the Series does, seeking to portray her as a spoiled snob who more or less deserved to have been ripped off by Sorokin and that far from being a victim, she derived "great personal financial gain" from the saga, as if her escape from financial ruin by writing about her experiences somehow

justified Netflix making the Defamatory Statements. For example, the Motion twists phrases from the Book that Williams' father had once stood as a candidate for congress when she was 28, that she had known "cotillon-trained debutantes" in her youth, and that she had spent a semester in Paris studying photography, the history of haute couture, drawing and French, into a description of her as someone who "grew up in a politically-connected family surrounded by 'cotillon-trained debutantes,' (and) studied haute couture in Paris…'" (D.I, 15, pp. 3-4.) If the Court were to read the Book, it would learn that she was in fact raised in a middle class family in Tennessee by parents who were both clinical psychologists; that after graduating college, she moved to New York and achieved her dream of working in the photography department of Vanity Fair; and that hers has never been a spoiled life of family wealth and privilege. It reflects poorly on Netflix that it continues to insult her and call her "a snob who is unaware of her own privilege." (D.I. 15, p. 2).

In any event, these isolated quotations do *not* negate the material falsity of the Defamatory Statements – they simply quibble and nibble on the edges, but fail to get to the core.  The allegations in the Complaint are what ultimately matter and they *do not contradict* what Netflix has proffered, or what she herself had previously written. Rather, the entire purpose of her lawsuit is to seek vindication for the false statements that *contradict* her true accounts. The Court's attention is respectfully directed to the third and fourth paragraphs under each set of Defamatory Statements which explain

how each statement is false by stating the true provable facts and why the statements
and attributions are defamatory.

What Netflix is *actually arguing* is that the false statements of fact for which
it is being sued *would not matter* to an average viewer, when compared to the true
facts revealed in the Article and Book.

### B. The New York Standards for Defamatory Meaning

"Making a false statement that tends to expose a person to public contempt,
hatred, ridicule, aversion or disgrace constitutes defamation." *Thomas H. v. Paul B.*,
18 N.Y.3d 580, 584 (2012).

### C. The Average Reader Materiality Test

The touchstone for defamatory meaning and the touchstone for material
falsity both involve the common-sense common-law question of whether the
statements would lower the estimation of the reputation of the plaintiff in the mind
of the average listener.  As the Supreme Court held in *Masson*, the test is whether
the statement would "'have a different effect on the mind of the reader from that
which the pleaded truth would have produced.'" *Masson* 501 U.S. at 517, *quoting*
Robert Sack, *Libel, Slander, and Related Problems* 138 (1980); and *citing Wehling
v. Columbia Broadcasting System* 721 F.2d 506, 509 (5th Cir. 1983) *and* Rodney
Smolla, *Law of Defamation* § 5.08 (1991).

21

### D. The Netflix Statements as Measured by the Average Viewer

Considered against this backdrop, the lame assertions by Netflix that the Defamatory Statements would not damage Williams' reputation are tantamount to frivolous.

- An average viewer could regard Williams less favorably for befriending Sorokin for the cynical purpose of extracting financial benefits from her than for the non-sinister purpose of being authentically attracted to her as a friend.

- An average viewer could regard Williams less favorably if she severed her relationship with Sorokin because she was no longer receiving financial support from Sorokin, rather than because she realized that she had been the victim of fraud by Sorokin.

- An average viewer could regard Williams less favorably for calling Neff a "paid bitch" when compared to the allegedly true fact that Williams never made any such statement so accusing Neff.

- An average reader could regard Williams less favorably for the false statements about Williams wearing Anna's shoes, because it reinforces the gist and sting of the defamatory meaning of other statements repeating the defamatory implications that Williams only feigned friendship with Sorokin to gain financial benefits from their relationship. The false statement is not defamatory because of the color or expense of the shoes but because the

statement specifically reinforces the overall false narrative that Sorokin bought virtually all of the clothes, shoes, and accessories that Williams wore, thereby undergirding the false, disloyal, freeloading friend narrative.   An average viewer could think less of Williams for wearing luxury shoes given her by Sorokin as compared to the true facts, as alleged in the Complaint, denying any such lavish gifts from Sorokin to Williams.   And so here the "defamation is in the detail."

- The average reader could think less of Williams for the many statements falsely asserting that Williams was the beneficiary of gifts bestowed by Sorokin that were never in fact bestowed.   Netflix attempts to avoid the gist and sting of the statements by asserting it is not defamatory to accept gifts. That is not the point.  It is defamatory to be accused of befriending a person for the purpose of receiving gifts when in fact that was not the reason and moreover there were not gifts.  As an analogy, it is not defamatory to receive a bequest in a will.  It is defamatory to be falsely accused of carrying on a disingenuous relationship with a person resulting in receiving a bequest in a will, when the person falsely accused did not engage in such a disingenuous relationship and never received any bequest.  Similarly, it is not defamatory to falsely say that somebody paid for another person's haircut.   It is defamatory to falsely claim that a person paid for a haircut as part of the

recipient's angling for financial favors, and then to falsely invent statements attributed to the recipient that appear to show the recipient gloating over it.

- The average reader could think less of Williams for statements throughout the Series implying or stating or outright depicting Williams as manipulating Sorokin for special benefits. While in isolation it may not be defamatory to be falsely portrayed as helping to pick out a hotel, it certainly can be defamatory to be falsely portrayed as opportunistically seeking a benefactor to book the most expensive hotel, when no such effort was ever made.

- An average reader could think less of Williams for the false depiction by Netflix of the events surrounding Williams' departure from Morocco. Netflix is wrong in saying that the depiction is substantially true because Williams did in fact leave Morocco—of course she did—and left Morocco frightened and anxious—of course she was. The point is that Williams did not leave Morocco under the circumstances and for the reasons depicted by Netflix, conveying the defamatory meaning of that depiction.

- An average viewer could think less of Williams for the depiction by Netflix as a liar in relation to her cooperation with police in arresting Sorokin in Los Angeles. The average viewer could think less of Williams because she is falsely depicted as a liar who misled mutual friends about her role in Sorokin's arrest, as a disloyal and opportunistic friend who assisted law enforcement to

24

arrest a friend for her financial benefit, as someone who falsely claimed to be a victim of the Sorokin saga when in fact she benefitted financially, and as someone who was ashamed of her actions.

- An average viewer could think less of Williams for the portrayal by Netflix of Williams as a manipulative and deceitful person who misled Kacy about wanting to help Sorokin in order to dissuade her from calling Sorokin's parents.

- An average viewer could think less of Williams for Netflix's false portrayal of Williams as being evasive and lying to her employer in the investigation surrounding the American Express charges. Imputations of unethical business or professional conduct are universally treated as defamation *per se*. A statement is defamatory per se when it tends to "injure another in his or her trade, business or profession." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992).

### E.  Actual Viewers Regarded the Depictions as Defamatory

The Series triggered an avalanche of attacks on Williams in social media, as viewers accepted as true the negative portrayal of Williams by Netflix. Complaint ¶ 24. "Such evidence, while not dispositive, supports how a 'reasonable' viewer might have understood the [statement]." *Gaprindashvili*, 2022 WL 363537, at *7. *See also Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1, 11–12 (D.D.C.

25

2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021), *cert. denied*, 2021 WL 5043599 (Nov. 1, 2021) (treating evidence of how a statement was in fact understood by recipients as germane to the question of whether the statement was capable of sustaining a defamatory meaning).

## **<u>CONCLUSION</u>**

For the reasons above, the Court should deny the Motion.

Dated: December 9, 2022                    Respectfully submitted,

                                          FARNAN LLP

                                          /s/ Brian E. Farnan
                                          Brian E. Farnan (Bar No. 4089)
                                          Michael J. Farnan (Bar No. 5165)
                                          919 North Market St., 12th Floor
                                          Wilmington, DE 19801
                                          Telephone: 302-777-0300
                                          Facsimile: 302-777-0301
                                          bfarnan@farnanlaw.com
                                          mfarnan@farnanlaw.com

                                          Rodney Smolla (Bar No. 6327)
                                          164 Chelsea Street
                                          South Royalton, VT 05068
                                          rodsmolla@gmail.com
                                          (864) 373-3882

                                          Alexander Rufus-Isaacs (admitted *pro hac vice*)
                                          RUFUS-ISAACS ACLAND & GRANTHAM LLP
                                          9440 Santa Monica Blvd., Suite 301
                                          Beverly Hills, CA 90210

Phone: (310) 274-3803
aisaacs@rufuslaw.com

*Attorneys for Plaintiff Rachel
DeLoache Williams*

## CERTIFICATION OF COMPLIANCE

The foregoing document complies with the type-volume limitation of this Court's November 9, 2022 form Scheduling Order for All Cases.  The text of this brief, including footnotes, was prepared in Times New Roman, 14 point.  According to the word processing system used to prepare it, the brief contains 6,243 words, excluding the case caption, signature block, table of contents and table of authorities.


                                          /s/ Brian E. Farnan

                                          Brian E. Farnan (Bar No. 4089)

Dated: December 9, 2022

28