# __EXHIBIT 1__

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RACHEL DELOACHE WILLIAMS,

                    Plaintiff,

        v.                                          C.A. No. 22-cv-1132-CFC

NETFLIX, INC.,

                    Defendant.

**PLAINTIFF'S RESPONSE AND OBJECTIONS TO DEFENDANT NETFLIX, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Court's Scheduling Order, Plaintiff Rachel DeLoache Williams ("Williams"), by and through her undersigned attorneys, hereby sets forth her objections and response to Defendant Netflix, Inc.'s ("Defendant") First Set of Interrogatories propounded to Williams ("Interrogatories"). Williams reserves the right to correct, amend, modify, or supplement her responses and objections to these Interrogatories at any time in the future, as warranted by the circumstances.

**GENERAL OBJECTIONS**

Williams objects generally to the Interrogatories as set forth below. Each of the responses that follow is made subject to these objections. To the extent that Williams responds to Interrogatories to which she objects, such objections are not waived. In addition, the inadvertent disclosure of privileged information shall not constitute a waiver of any applicable privilege.

1.  Williams objects to the Interrogatories to the extent they, or the Definitions or Instructions contained therein seek to impose obligations beyond the scope permitted by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Delaware. In particular, but without limitation, interrogatories are not the proper discovery device for obtaining production of documents, and Williams objects to Instruction no.

2 which requests Williams to furnish certain documents and "information," to Instruction no. 3 which refers to the withholding of documents, and to Instruction no. 4 which refers to documents that have been destroyed or discarded.

2.   Williams objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, work-product privilege, common-interest privilege, joint defense privilege, or any other applicable privilege.

3.   Williams objects to the Interrogatories to the extent they seek disclosure of information from persons or entities over whom Williams has no control.

4.   Williams objects to the Interrogatories to the extent that they seek information that is unduly burdensome to obtain.

5.   Williams objects to the Interrogatories to the extent that they are vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing.

6.   Williams objects to the Interrogatories to the extent that they seek information that is publicly available.

7.   Williams objects to the Interrogatories to the extent that they seek confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially.

8.   Williams objects to the Interrogatories as premature to the extent that they seek information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure.

9.   Williams objects to the Interrogatories to the extent that they seek material not relevant to any party's claims or defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative

access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Request compared with her likely benefit.

10. Williams' investigation is ongoing, and she specifically reserves the right to correct, amend, modify or supplement her responses to the Interrogatories at any time in the future, as warranted by the circumstances.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing objections, Williams responds as follows:

**INTERROGATORY NO. 1:**

For each of the alleged Defamatory Statements, please identify all facts that support, contradict, or refute your contention that the Statement is false and defamatory or omitted critical facts.

**RESPONSE TO INTERROGATORY NO. 1:**

Williams objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing.  Williams further objects to this Interrogatory because it seeks information that is publicly available. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

**Defamatory Statements Nos. 1-7**:

1) Williams was friends with Sorokin because she liked her, not because Sorokin paid for some of their meals.

2) Williams did not drop Sorokin as a friend because Sorokin was no longer able to pay for her social life and clothes. Sorokin never paid for Williams's clothes, nor did she finance Williams's social life. Instead, Williams dropped Sorokin as a friend because she discovered that Sorokin (a) had made the fraudulent statements and promises which induced her to incur liabilities of around $62,000 on Sorokin's behalf, (b) had made numerous promises to reimburse her approximately $62,000 (and sent her fabricated wire confirmations) but only reimbursed her $5,000, and (c) was a liar and a con artist.

3) Sorokin never bought clothes (such as a jacket or a sweater), shoes, earrings, or a bag as gifts for Williams and Williams never wore Sorokin's clothes, shoes or accessories. The only exceptions to this were that Sorokin gave Williams one pair of yoga pants because they did not fit her, and one pair of shoes with black bottoms because she did not like them, which Williams accepted out of politeness but never wore and did not keep.

4) Sorokin wore clothing belonging to Williams and received multiple garments that Williams purchased for her in Morocco. Williams also gifted Sorokin a portable speaker.

5) Williams never told Neff Davis that Sorokin had bought her clothes.

6) Williams never accused Davis of being Sorokin's "paid bitch," has never used such foul and insulting words to anyone, and has never run away from Davis because she was afraid of her. Williams was never involved in any direct or negative confrontation with Davis.

7) Williams never borrowed money or valuable possessions from Sorokin, and was never in a position where she was under an obligation to pay Sorokin back for anything.

8) Sorokin selected and made the booking arrangements with the La Mamounia Hotel herself.

9)  Williams did not make any suggestions to Sorokin about what type of accommodation to book at the La Mamounia Hotel.

10) Williams never got a massage while staying at the La Mamounia Hotel.

11) Sorokin took tennis lessons at the La Mamounia Hotel by herself - Williams did not participate in or attend such lessons.

12) The tour of the Majorelle Gardens was Sorokin's idea, not Williams'.

13) When Sorokin was living at the 11 Howard hotel, she often invited Williams to stop by on her way to or from work. Sorokin used the hotel's second floor "Library" like her living room and its ground-floor restaurant, Le Coucou, as her kitchen. Meals or drinks were often charged to Sorokin's room. Sorokin did not pay her bills and ended up owing 11 Howard a lot of money.

14) Sorokin used Williams for her contacts, access, and credibility as she worked to expand her network. For example, Sorokin asked Williams on numerous occasions to make reservations at places that Sorokin would otherwise have been unable to access—e.g., the cafe at Condé Nast, where Williams worked, or Ducked Up, a restaurant on the top floor of Ludlow House, part of the Soho House Members' Club to which Williams belonged. Sorokin also asked Williams to assist her in securing an invitation from *Vanity Fair* to purchase a ticket to the magazine's annual New Establishment Summit. Sorokin pressured Williams to invite colleagues and members of Williams' social circle to join for dinners and the trip to Morocco as a means for expanding her network, widening her pool of potential marks, and bolstering the illusion of Sorokin's credibility in a house-of-cards-style scheme.

8668.4.8B

5

15) Williams paid for some of their drinks and dinners, including some dinners at La Coucou and a dinner in New York after the Morocco trip. Williams also routinely purchased coffee and bottled water for Sorokin.

16) Williams and Sorokin sometimes split the cost of drinks and dinners.

17) On at least two occasions, Williams went to a bar with Sorokin and others and Sorokin offered to buy drinks for everyone, but when the bill came, she did not have a credit card and Williams ended up paying the bill.

18) Sorokin and Williams got pedicures together on February 22 and May 4.[1] Williams paid for her own pedicure both times.

19) Sorokin and Williams never had a manicure together and Sorkin never paid for a manicure for Williams.

20) Sorokin and Williams got massages or facials together on two occasions: (a) Sorokin had to check out of 11 Howard for one night to avoid being legally classified as a tenant rather than a guest. In order for Sorokin's belongings to stay in the room where she lived, Williams agreed to "check-in" (in name only) to that room for the night in question. Sorokin booked a room for herself at the Greenwich Hotel for that night and invited Williams to have a spa night with her there. On the night in question (April 11), after leaving work early, Williams arrived at 11 Howard to meet Sorokin, but Sorokin was over an hour late, so that by the time they arrived at the Greenwich Hotel, they were halfway through the time allotted for their spa appointments. In the time that remained, they split one massage and one facial between them. Because Sorokin had made them so

---

[1] All dates are in 2017 unless otherwise indicated.

late that the value of the service had been halved, Sorokin paid the bill; and (ii) on May 2, Sorokin, Williams and Duke had massages together at Eden Day Spa. Williams paid for herself.

21) Sorokin and Williams never had hair services together.

22) Williams never tried to get Sorokin to pay for a hair stylist for her, and Sorokin never paid for her hair.

23) On April 20 and May 4, Williams came to the salon where Sorokin was having a hair appointment but did not have any hair service herself. On April 20, Sorokin asked if Williams wanted a blowout, but Williams declined.

24) Williams and Sorokin attended about 10 sessions of infrared sauna together and shared the costs.

25) Sorokin spoke to Williams about various beauty treatments (such as microcurrent facials, cryotherapy, and IV drips) but they never had any of these treatments together.

26) The first workout sessions Williams did with Sorokin were booked through an app called TroupeFit. Sorokin made the first reservation on February 22 and invited Williams to join her. When Williams offered to pay for half of the session, Sorokin declined.

27) Sorokin and Williams attended a Pilates class together once on March 15 at SLT on Crosby Street in Manhattan. Williams booked and paid for her class.

28) Sorokin had booked one-person training session for herself on March 24 and invited Williams to join her. From March 1 to May 12, at Sorokin's invitation, Williams attended thirteen more sessions. Sorokin assured Williams that the cost to her would be the same regardless of whether Williams attended as well.

29) Soon after the Morocco trip, Sorokin asked Williams to contact trainer Key Son about workout sessions because she believed (correctly) that Williams would get a discount because she was a Condé Nast employee. Sorokin never purchased any workouts.

30) Sorokin never paid for a cab or an Uber solely for Williams. She and Williams each paid for cabs or Ubers that they took together during their friendship. Sorokin routinely used a car service to get from 11 Howard to Duke's gym near Hudson Yards. Her route passed the block where Williams lived, so on her way Sorokin would stop to collect Williams and the coffees Williams bought for each of them.

31) Williams never made the statements attributed to her in Defamatory Statements Nos. 1, 4, 5, 6 and 7.

**Defamatory Statement No. 8**:

1) Williams never made the statements, expressions or gestures attributed to her in this Defamatory Statement. In particular but without limitation, she never belittled Davis for working in a hotel, or derided her ambition to make a film.

**Defamatory Statements Nos. 9 and 10**:

1) Williams did not leave the La Mamounia Hotel because of the "bad situation" caused by Sorokin's financial issues. She had told Sorokin in New York before they even flew to Morocco that she would be leaving Morocco on a specific day (May 19) to travel to France for a work assignment.

2) Williams stayed at the La Mamounia Hotel on May 18 and had dinner with Sorokin. When she left the next morning as previously arranged, Sorokin was staying in a luxurious private villa at the Hotel accompanied by Jesse Hawk who stayed with Sorokin until she checked out of

the Hotel, and then accompanied her to another luxury hotel in Morocco where they both stayed for a few more days.

3)   When Williams left on May 19, she knew that Sorokin was having financial issues, but she understood based on what Sorokin told her that these issues were temporary, and that Sorokin would be receiving substantial funds soon.

4)   Williams did not "abandon" Sorokin in Marrakesh. When she left, Sorokin was not alone, and if Sorokin was depressed and/or in trouble, Williams was unaware of that.

**5)**   Williams did not stop being friends with Sorokin because Sorokin was having problems in Morocco, but rather because she discovered that Sorokin (a) had made the fraudulent statements and promises which induced her to incur liabilities of around $62,000 on Sorokin's behalf, (b) had made numerous promises to reimburse her $70,000 (and sent her fabricated wire confirmations) but only reimbursed her $5,000, and (c) was a liar and a con artist.

**Defamatory Statement No. 11**:

1)   From September 13, 2017 (weeks prior to Sorokin's arrest) to April 10, 2018 (when she gave Kacy Duke advance notice that Vanity Fair would be publishing her article), Williams did not communicate with Duke.

2)   Williams never had a conversation with Duke in which she intentionally concealed or lied about her role in Sorokin's arrest.

**Defamatory Statement No. 12**:

1)   Williams never had a conversation with Duke or Davis in which she intentionally concealed or lied about her role in Sorokin's arrest.

**Defamatory Statement No. 13**:

1)  Duke never confronted Williams in the aggressive manner portrayed in this scene. Duke and Williams maintained an amicable relationship before, during and after the trial.

2)  Williams never uttered the words attributed to her in this scene, nor did she ever run away from Duke.

3)  Williams cooperated with the police because she believed that Sorokin was a criminal who had defrauded her and others and that it was appropriate for the authorities to prosecute her for those crimes: not because it was "the only way to get reimbursed." Williams had no expectation that Sorokin's prosecution would benefit her financially or otherwise.

4)  Williams did not mislead Duje and/or Davis about her role in Sorokin's arrest by omission. She included the relevant details in her Book and testified about them at trial.

5)  Williams was not ashamed by what she had done, nor did she feel used by the police and prosecutors, and she never said such things to anyone.

6)  American Express had not "taken care" of Williams' liability for the Hotel charges on her Personal Amex – it did eventually waive the $36,010 charge for the Hotel but not until a few weeks after the criminal trial ended (i.e., after this scene), when it unexpectedly agreed to remove it; moreover, Williams had already paid Amex for the non-hotel charges.

**Defamatory Statement No. 14**:

1)  Williams told Duke that she wanted to think about contacting Sorokin's parents.

**Defamatory Statement No. 15**:

1)  Williams never lied to her employer about this Amex charge.

2)  Williams voluntarily told her employer that a large personal charge had been placed on her Business Amex and that she accepted responsibility for it.

8668.4.8B

3)  Williams never made the statements attributed to her in this scene.

**Defamatory Statement No. 16**:

1)  Vanity Fair was not defrauded, and Williams was not complicit in such a scheme.

2)  Williams never gave La Mamounia permission to charge anything on the Business
Amex.

3)  There was never a possibility of Vanity Fair would have to pay the charge because
Williams marked the charge as "personal" on her expense report and informed the finance manager
that she was reconciling the line item. This meant that she accepted responsibility for paying the
balance to Amex directly, and consequently, she was never confronted nor investigated by Vanity
Fair.

4)  Williams was supported by her Vanity Fair colleagues throughout the ordeal caused by
Sorokin's failure to reimburse her as promised for the credit cards charges for La Mamounia.

5)  Only $16,670 of the La Mamounia charges was charged to the Business Amex, not
$62,000.

6)  American Express's own investigation concluded that the La Mamounia charges were
charged without her consent and against her explicit instructions.

7)  Williams did not attempt to conceal the La Mamounia charges from her employer.


**<u>INTERROGATORY NO. 2</u>:**

With respect to each of the alleged Defamatory Statements, state your complete factual
basis for asserting that the Defendant acted knowingly, recklessly, intentionally, maliciously, or
in bad faith and identify in your answer all persons with knowledge of facts relating to your
contention.

8668.4.8B                                    11

**RESPONSE TO INTERROGATORY NO. 2:**

Williams objects to this Interrogatory to the extent that it seeks information that is unduly burdensome to obtain. Williams further objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit. Without waiving any general or specific objections, Williams responds as follows:

Netflix hired a researcher to investigate the Sorokin story whose research was given to the creator and writers. Shonda Rhimes, the executive producer and creator of the Series, explained in an interview, "We were telling a story that was based on fact, so needed a document to build an extensive timeline of events, to dig into little things that we weren't even sure were going to matter. For this particular show, having someone who has read every transcript of the trial, who was paying close attention to every detail in Anna's life, was really, really important, because we wanted to know what we were thinking. We wanted to know what we were making up; we didn't want to be making things up just for the sake of it." She added, "we wanted to intentionally be fictionalizing moments versus just accidentally be fictionalizing them." As a result of this research, Netflix knew the truth about the subject matter of the Series, and where it departs from the truth, it was because Netflix had intentionally decided to do so. Netflix had also read Willams book and article, and

had no reason to doubt their factual accuracy. Thus, Netflix knew that the Defamatory Statements were false or acted with a reckless disregard of Williams' rights.

Though Sorokin was convicted on eight charges, including grand larceny, Netflix portrayed her sympathetically, ignoring or downplaying the real nature of her actions which were dishonest, self-serving, injurious to others and doomed to fail. Rhimes stated in an interview that Sorokin is a "fascinating creature," saying, "She's a villain's villain, if you know what I mean. You kind of can't help but admire her."  In another interview, she said, "I root for Anna,.. but I don't necessarily expect everyone else to. People have their judgements." Despite being a con artist, the Series presents Sorokin's brazen willingness to lie, cheat and steal her way past supposedly unjust obstacles rooted in bureaucracy, ageism and sexism as admirable.

As a counterbalance to its overly sympathetic portrayal of Sorokin, Netflix made a conscious decision to portray Williams negatively. Netflix's own website presents a damning judgment, describing her as "Anna's opportunistic friend Rachel" who "enjoys the perks Anna's wealth provides, like luxury clothes and accessories.  Unlike Neff, Rachel turns her back on Anna once the full scope of her deception comes to light."

Netflix further described Williams in a press release dated October 31, 2019 ("2019 Press Release"), as "a natural-born follower whose blind worship of Anna almost destroys her job, her credit, and her life. But while her relationship with Anna is her greatest regret, the woman she becomes because of Anna may be Anna's greatest creation." It is grossly insulting (and totally false) to describe Williams as a "natural-born follower" who engaged in "blind worship" of Sorokin, or as Sorokin's "creation," and is further evidence of Netflix's bias against her.

Actress Katie Lowes made a telling admission in a media interview about her role: "You have no idea who's the antihero, who's the villain, or who's right and who's wrong. It's playing in

this grey area the whole time, especially with Rachel." One way to achieve this is to make the real life villain more appealing and to make the real life victim less appealing by making her unlikeable. Lowes confirms that this is what occurred when she told one interviewer, "I was playing it as that classic high school mean-girl vibe where you're jockeying for best-friend position to Anna." She told another: "[The Rachel character is] a people pleaser. She's young, naïve, and had a privileged life. I don't think this is necessarily true of Rachel Williams in real life; I think this is true of the character Shonda wrote and what Shonda needed the character to be for the show." This constitutes an admission that not only is the portrayal of Williams in the Series false, but that it was false because that is what Rhimes "needed" to invent for dramatic purposes, to make the Series "sing."

It was entirely Netflix's decision to falsely paint Williams to be a vile person. The 8,500 word Pressler Article upon which the Series is closely based mentions Williams only briefly and makes no negative judgments about her.

The Vanity Fair Article was published in April 2018, and the Book was published in early 2019. Both contain accurate narratives of what happened to Williams, the Book doing so in great detail. They were publicly available to Netflix which expressly acknowledged the existence and success of the Book in Episode 9 at 1:17:44-46.  Further, Rhimes stated in the interview quoted above that the researcher "read every transcript of the trial, who was paying close attention to every detail in Anna's life." Thus, when Netflix made the decision to research the underlying facts, it is charged with knowledge of the facts in the Vanity Fair Article and the Book, and the sworn testimony of Williams and others in the Transcripts, and its decision to depart from those facts was either intentional or reckless.

Williams twice put Netflix on written notice before the Series was broadcast about her concerns that she would be defamed and cast in a false light. By letter dated January 7, 2020, an

attorney representing Williams (a) informed Netflix that the statements about Williams in the 2019 Press Release were false and defamatory, (b) urged Netflix not to portray Williams in a defamatory manner or in a false light; and (c) warned Netflix that if it did, Williams would sue. Netflix responded by letter dated January 17, 2020, promising that Williams' portrayal "will be within the bounds of the law." That promise was broken on numerous occasions in the Series as set forth herein. And by letter dated February 9, 2022, Williams' current attorney informed Netflix that the Series defamed her in specific scenes, including the 14th Set of Defamatory Statements, explaining to Netflix why the portrayal of Williams in those scenes was false. Netflix responded by letter dated February 14, 2022, denying that the Series defamed Williams and declining to make any changes. Netflix failed to correct the falsities described in Williams' counsel's letters.

Netflix had a self-interested motive in intentionally and recklessly lying about Williams because its creatives thought that painting a false picture of Williams as a vile and contemptible person would make the Series "sing."

Netflix made a deliberately callous decision to enhance the dramatic impact of the Series by portraying Williams falsely and negatively, a decision made with knowledge of falsity or reckless disregard for truth or falsity. Discovery is expected to reveal that this decision was made within Netflix by the producers, executives, writers, and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix acted with knowledge of falsity or reckless disregard for truth or falsity in deliberately falsifying the true facts surrounding Williams' relationship with Sorokin, including the false portrayal of Williams as a freeloader and false friend. Netflix knew that Williams was friends with Sorokin because she liked her, not because Sorokin would pick up the tab, or Netflix broadcast these falsehoods with subjective doubt as to their truth. Discovery is expected to reveal

that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Williams did not drop Sorokin as a friend because Sorokin was no longer able to pay for her social life and clothes (she never bought Williams any clothes), but rather because she discovered that Sorokin (i) had made the fraudulent statements and promises detailed above which induced her to incur liabilities of around $62,000 on Sorokin's behalf, (ii) had made numerous promises to reimburse her approximately $62,000 (and sent her fabricated wire confirmations) but only reimbursed her $5,000, and (iii) was a liar and a con artist, or Netflix broadcast these falsehoods with subjective doubt as to their truth. Yet despite Netflix's knowledge of or subjective doubt concerning the true facts, it intentionally portrayed false facts of and concerning Williams regarding these matters to viewers. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Sorokin never bought clothes, shoes, earrings, or a bag as gifts for Williams, who never wore Sorokin's clothing (save for one pair of yoga pants (see footnote 10) during a friendship lasting around 16 months) or accessories and never told Neff that Sorokin had bought her clothes, or Netflix subjectively doubted the truth of these falsehoods. Yet despite that knowledge of or subjective doubt concerning the true facts, Netflix intentionally portrayed false facts of and concerning Williams regarding these matters to viewers. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Williams never accused Neff of being Sorokin's "paid bitch," or subjectively doubted that Williams had ever made this statement to Neff. Yet Netflix intentionally fabricated that quotation, which was never spoken by Williams. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that the statements portraying Williams as a disloyal and opportunistic friend who wore expensive designer shoes which were gifts from Sorokin were false, or Netflix subjectively doubted the truth of those statements. Netflix knew that it was not true that Williams did not wear any such shoes and that she did not drop Sorokin as a friend because Sorokin was in jail, but rather ultimately that Williams ultimately dropped Sorokin as a friend because Sorokin defrauded Williams. Netflix knew these statements and portrayals were false, yet acted with either knowledge of falsity or reckless disregard for truth or falsity as to all of them. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Williams never borrowed money or valuable possessions from Sorokin, or subjectively doubted that Williams ever borrowed money or possessions from Sorokin. Yet despite Netflix's knowledge of falsity or subjective doubt as to truth or falsity, Netflix broadcasted false these and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that the scene in which Williams was portrayed as angling to get Sorokin to pay for an expensive hair styling for herself, and succeeded in doing so, was false, or Netflix broadcast the portrayal with subjective doubt as to its truth or falsity. Netflix knew that Williams never tried to get Sorokin to pay for an expensive hair stylist for her, and Sorokin never paid for her hair stylist, or Netflix subjectively doubted the truth of these allegations. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that the scene that it twice broadcasted depicting Williams as trying to persuade Sorokin to book a larger suite at the Hotel, and when Sorokin demurred, she kept on the pressure by volunteering to book the upgrade herself, was false, or Netflix broadcast the scene with subjective doubt as to its truth. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

8668.4.8B

Netflix knew that the scenes in which it portrayed Williams as getting a massage and tennis lessons and pressuring Sorokin to book a tour of the Majorelle Gardens, were false, or Netflix broadcast the scenes with subjective doubt as to its truth. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that when Williams and Sorokin first started seeing each other, they split the cost of drinks, dinners and transport; that on two or more occasions, Williams went to a bar with Sorokin and some others where Sorokin offered to buy drinks for everyone, but when the bill came, Sorokin did not have a credit card and Williams ended up paying for the bill, one of which was more than $1,000; and that Williams paid for a dinner for both of them in New York after the Morocco trip. Yet Netflix deliberately and knowingly portrayed false facts concerning these matters, communicating to viewers that Sorokin paid for everything. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Williams and Sorokin had approximately 10 sessions together in an infrared sauna, and they paid for about 5 sessions each. Yet Netflix intentionally portrayed Sorokin

as paying for all of the sauna treatments. Netflix knew the falsity or subjectively doubted the accuracy of its portrayal regarding these events. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that Sorokin only paid for one spa treatment for Williams, which consisted of a facial and a massage, at the Greenwich hotel where she was staying, and that Sorokin never paid for a manicure for Williams, or Netflix broadcast false statements regarding these events with subjective doubt as to their truth. In portraying these events Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that a scene in which Williams is portrayed belittling Neff for working in a hotel, and deriding Neff's ambition to make a film, was manufactured and fabricated and never occurred, or Netflix broadcast its portrayal of this scene with subjective doubt as to its truth. Netflix knew that Williams never acted or spoke in such a way to Neff, or to anyone else, and did not make the other statements attributed to her in this scene. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth

8668.4.8B                                          20

to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that a scene in which Neff stated or implied that Williams abandoned Sorokin when Sorokin was alone and having a tough time in Morocco was a false portrayal, or Netflix broadcast with subjective doubt as to the truth of this scene. Netflix knew that the true facts are that Williams had told Sorokin back in New York that she would be leaving Morocco on a specific day (May 19) to travel to France for work. She did not "abandon" Sorokin. The problems with credit cards at the Hotel and the private museum tour occurred the day before on May 18. Williams stayed at the Hotel that night and had dinner with Sorokin. When she left the next morning as previously arranged, Sorokin was still in the luxurious private villa at the Hotel accompanied by Jesse who stayed with Sorokin until she checked out of the Hotel, and then accompanied her to another luxury hotel in Morocco where they both stayed for a few more days. When Williams left on May 19, she knew that Sorokin she was having financial difficulties, but Sorokin had said that she would be receiving substantial funds soon. It is therefore absolutely false to suggest that Williams left Marrakesh when Sorokin was "down," alone, and in a tough situation. Netflix knew these true facts, yet intentionally presented false facts to viewers, or broadcasted its portrayal with subjective doubt that the portrayal was true. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were

made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that its portrayal of a scene in which Neff states or implies that Williams terminated her friendship with Sorokin in Morocco because Sorokin was having problems was false, or Netflix broadcast with subjective doubt as to the truth of the portrayal. Netflix knew that Williams did not stop being friends with Sorokin because Sorokin was having problems in Morocco, but rather because she subsequently discovered on her return to New York that Sorokin was a liar and a con artist whose statements and promises had induced Williams to incur liabilities of around $62,000 on Sorokin's behalf were false, and who only reimbursed her $5,000 despite numerous promises to reimburse her $70,000 to account for the full debt and any late fees incurred, or Netflix broadcasted with subjective doubt as to the truth of its portrayal regarding these facts. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that its portrayal of a scene surrounding the interactions between Williams and Noah regarding the circumstances leading to their decision to leave Morocco was false, or Netflix broadcast the scene with subjective doubt as to its truth. Netflix deliberately portrayed Williams as abandoning Sorokin because Sorokin was alone, depressed and in serious trouble in Morocco. Netflix knew that this was false, and that Williams left Morocco on May 19 as previously arranged because of work assignment, and that when she left, Sorokin was accompanied by Jesse and had told Williams that funds to cover her expenses were in the process of being wired to her.

Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that a scene in which Williams is portrayed as pretending to be surprised by the news that Sorokin had been arrested (in Los Angeles) and was back in New York, and wondering how she had been caught, was false, or Netflix broadcasted, was manufactured, fabricated, and false, or Netflix broadcasted with subjective doubt as to the portrayal's truth. Netflix knew the true facts, which were that Williams had in fact been working with law enforcement and had invited Anna to meet her for lunch in Los Angeles so that the police could arrest her.  Despite Netflix's knowledge of the true facts, Netflix invented a scene that never occurred, portraying Williams as deceiving and lying by omission to Kacy when she feigned ignorance in their conversation on that subject. Netflix knew that the true facts are that from September 13, 2017 (weeks prior to Sorokin's arrest) to April 10, 2018 (when she gave Kacy advance notice that Vanity Fair would be publishing her article), Williams did not communicate with Kacy at all, or Netflix broadcast with subjective doubt as to the accuracy of this fabricated scene. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers,

showrunners and directors working for Netflix who were responsible for the defamatory content
of the Series.

Netflix knew that it fabricated and manufactured a false scene in which Williams is
depicted as saying to a colleague that "I'm not going to turn over a foreign woman to the police,
not in Trump's America," yet Williams is later shown to go to the police to offer to help them
arrest Sorokin.  In manufacturing the invented scene with words that Williams never spoke Netflix
deliberately set out to portray Williams as a hypocrite and liar. Netflix also intentionally
manufactured the words spoken by Williams in connection with these events, putting words into
Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those
words or subjectively doubting that Williams spoke those words. Netflix broadcasted false and
defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for
truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless
falsehoods were made by the producers, executives, writers, showrunners and directors working
for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it intentionally manufactured and fabricated a scene occurring in the
courthouse immediately after Williams has finished her testimony which revealed her role in
Sorokin's arrest. Kacy, who had heard the testimony, depicted as waiting on the stairs and
confronting Williams, accusing her of betraying Sorokin to the police but concealing that fact from
her friends, of benefitting financially from this conduct, and of falsely playing the victim. Netflix
intentionally created this fabricated scene to convey great dramatic power because of the strength
with which Kacy delivers the statements and because Kacy is the moral compass in the Series, one
of the few to emerge with her integrity intact. By contrast, Williams is shown to be a weak,
cowardly and dishonest person who does not stand up to Kacy but rather runs away with a few

lame excuses, just as she had run away when Neff confronted her about her disloyalty to Sorokin. Netflix knew that the entire scene was fabricated and manufactured, or Netflix broadcasted with subjective doubt as to the truth of the portrayal. Netflix knew that Kacy never confronted Williams in this manner, and Williams never uttered the words attributed to her in this scene, nor did she ever run away from Kacy, or Netflix broadcasted with subjective doubt as to the truth of this portrayal. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcast these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it was falsely conveying to viewers that Williams cooperated with the police for her own financial gain, rather than because she believed that Sorokin was a criminal who had defrauded her and others and that it was appropriate for the authorities to prosecute her for those crimes, or Netflix broadcasted with subjective doubt as to the truth of the portrayal. Netflix knew that Williams had no expectation at all that Sorokin's prosecution would benefit her financially or otherwise, or broadcasted with subjective doubt as to its portrayal. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers,

showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it was falsely portraying Williams as having misled her friends about her role in Sorokin's arrest, or broadcast that portrayal with subjective doubt as to its accuracy. Netflix knew that Williams had included all the relevant details in the Book authored by Williams as well as in her testimony at trial. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it falsely portrayed Williams as being ashamed by what she had done, or as regarding herself as having been used by the police and prosecutors, or Netflix broadcasted these statements with subjective doubt as to their truth. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcast these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it was falsely conveying to viewers that American Express had "taken care" of Williams' liability for the Hotel charges on her Personal Amex before or during the trial. Netflix knew that American Express did eventually waive the $36,010 charge for the Hotel but not

until a few weeks after the criminal trial ended, when it unexpectedly agreed to remove it and that Williams had already paid American Express for the non-hotel charges. Netflix broadcast these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it broadcast a false and fabricated scene depicting Kacy as stating or implying that Williams was lying when she told Kacy that she wanted to think about contacting Sorokin's parents, because at the time, she was writing, or had written, the Vanity Fair Article which explained how Sorokin had conned her and lied to her. Netflix knew that the true facts are that Williams never had such a conversation with Kacy, or Netflix created this scene with subjective doubt as to its accuracy. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcast these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it broadcast a false and fabricated scene stating or implying that Williams lied to her employer about being aware that there is a large unpaid balance on her Business Amex, and falsely claiming when confronted that she must have forgotten about it, or Netflix broadcasted with subjective doubt as to the accuracy of this portrayal. Netflix knew that Williams voluntarily

and proactively told her employer that a large personal charge had been placed on her Business Amex and that she accepted responsibility for it, or Netflix broadcasted with subjective doubt as to the accuracy of its contrary portrayal. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcast these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

Netflix knew that it broadcast false and fabricated portrayals of the circumstances surrounding the charges placed on Williams' American Express cards. In one scene, Williams admits that she let Sorokin charge $62,000 to the Business Amex. In another, an executive accuses Williams of poor judgment and of helping her friend defraud her employer. And in a third scene, she is ordered to return her company ID's and credit cards. The cumulative effect of these scenes is to portray Williams as an irresponsible employee whose employer believed that she was complicit in a $62,000 fraud against the employer, and that her misconduct was sufficiently serious to warrant an investigation and the return of her ID's and credit cards. Netflix knew that these portrayals were false. Netflix knew that her employer was not defrauded, and Williams was not complicit in such a scheme. Netflix knew that at no point in time was there any possibility of her employer having to pay the charge because Williams marked the charge as "personal" on her expense report and informed the finance manager that she was reconciling the line item. This meant that she accepted responsibility for paying the balance to Amex directly, and consequently, she

was never confronted nor investigated by her employer. Williams was supported by her colleagues throughout the ordeal. Further, only $16,670 of the Hotel charges was charged to the Business Amex, not $62,000, and American Express's own investigation concluded that it was charged without consent and against her explicit instructions. Furthermore, the ensuing conversation falsely portrays Williams as attempting to conceal the fraudulent charge from her employer. Netflix deliberately conveyed to viewers false statements regarding all of the above circumstances, or Netflix broadcasted the statements with subjective doubt as to their truth. Netflix also intentionally manufactured the words spoken by Williams in connection with these events, putting words into Williams' mouth to convey and communicate the false portrayal, knowing she did not speak those words or subjectively doubting that Williams spoke those words. Netflix broadcasted these false and defamatory facts of and concerning Williams with knowledge of falsity or reckless disregard for truth or falsity as to these matters. Discovery is expected to reveal that these knowing and reckless falsehoods were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series.

**INTERROGATORY NO. 3:**

Describe all facts that support your contention in the Complaint that you suffered "damages to [your] earnings and/or potential earnings" as a result of the Series' portrayal of you, and identify the amount of these alleged damages.

RESPONSE TO INTERROGATORY NO. 3:

Williams objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion

testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

Personal social media accounts, most importantly Instagram, routinely serve as key marketing tools for those working in media and the visual arts. Accordingly, Williams, like many creatives, relies on Instagram to exhibit a portfolio of personal and professional content. This approach yielded professionally beneficial, almost exclusively positive engagement until February 2022, when the Series first aired, at which point, as a direct result of her villainous portrayal, Williams undeservedly became the target of sustained online abuse and harassment.

Two years later, comments posted to Williams' online accounts continue to be predominantly derisive and professionally disparaging, citing and spreading misinformation introduced by Netflix in their false and damning portrayal.

Many employers conduct cyber-screening as part of their hiring process—evaluating job candidates based on their digital footprint. Anyone who searches Williams on the internet, or makes a cursory scan of her social media, would easily connect her with the Series and be confronted by a barrage of comments attacking her character based on Netflix's malicious portrayal.

Such widespread negative commentary would be reason enough for previously consistent clients to avoid hiring Williams for freelance assignments—as has been the case, evidenced by the sharp decline in Williams' earnings. Beyond that, were potential employers to watch the series, they would be presented with a prejudicial, fabricated depiction of Williams making disparaging

remarks about her boss and, later, being investigated, suspended, and fired by her employer—when in reality none of these comments or events took place. Williams had and maintains a positive relationship with her former colleagues and employer, who remained supportive throughout the ordeal with Sorokin.

INTERROGATORY NO. 4:

Describe all facts that support your contention in the Complaint that you suffered "damage to [your] reputation" as a result of the Series' portrayal of you.

RESPONSE TO INTERROGATORY NO. 4:

Williams objects to this Interrogatory to the extent that it seeks information that is unduly burdensome to obtain. Williams further objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit. Williams further objects to this Interrogatory because it seeks information that is publicly available. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

In lieu of listing every instance where someone has attacked Plaintiff's reputation, she has produced multiple documents evidencing such attacks in response to Request To Produce No. 47.

INTERROGATORY NO. 5:

Describe all facts that support your contention in the Complaint that, as a result of the Series, you experienced "personal humiliation, distress, and anguish."

RESPONSE TO INTERROGATORY NO. 5:

Williams objects to this Interrogatory to the extent that it seeks information that is unduly burdensome to obtain. Williams further objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

Plaintiff's portrayal in the Series has been severely distressing and emotionally damaging for her. Many areas of her life have been profoundly impacted: her physical and mental health (including prolonged periods of sleep disturbance and the onset of biochemical depression), her

emotional stability, her confidence in taking on new challenges and opportunities, her ability to approach new and positive interpersonal relationships with openness and an appropriate willingness to trust. The repercussions caused by the Series have also profoundly affected her sense of security and safety in public forums.

The Series intentionally provides millions of viewers with a false and highly damaging depiction of Williams' personal character, even going so far as to include her photograph in the Series' credits, drawing an irrefutable line from the character portrayed to Williams as a real person.

The depiction of Williams was so convincingly damning that many believed it to be true. As a result, Williams—or rather, the fictious version of Williams presented to millions of viewers by the Series, one of Netflix's all-time most watched shows—has been the subject of scorn and ridicule in tens of thousands of messages, echoing the Series' vicious, defamatory themes:

- Williams deserves prolonged, public shaming for daring to trust someone who made her living by deceiving others.

- Williams is a contemptible, racist "Karen" figure, who is rude to and dishonest with Duke and Davis, a fictious despicability made clear through the Series' depiction of interactions that never occurred.

- Williams spent years "mooching off" Sorokin, a convicted criminal with a track record of parasitic and predatory behavior, who lavished Williams with meals and gifts that far exceeded the value of the bill from Marrakech. (Sorokin and Williams were friends for only one year, and it was Sorokin who leeched onto Williams.)

- Williams is a horrible person for having worked with the police—for not remaining loyal to someone who had lied to her about everything, subjecting Williams to a pattern of emotional and financial abuse.

- Williams turned on a "friend" out of vindictiveness and spite and then sold her story out of opportunistic greed, because (according to the series) Williams profited from book and movie deals after American Express had already forgiven her debt. In truth, Williams decided to share her story as a cautionary tale, and as a means to recover both emotionally and financially from the harm caused by Sorokin. Williams' entertainment deals preceded American Express's decision to protect her from a portion of the charges, and the bulk of the debt incurred at La Mamounia was forgiven only after Sorokin's conviction—two years after the trip to Morocco.

INTERROGATORY NO. 6:

Identify, as that term is defined above, every health care provider, including hospitals, clinics, insurance carriers, treatment centers, physicians, nurses, clinicians, psychologists, psychiatrists, social workers, therapists of any sort, including marriage or relationship counselors, and any other personal or institutional provider of medical or mental health care, that you have seen or consulted as a result of the Series.

RESPONSE TO INTERROGATORY NO. 6:

Williams objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing.  Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal

Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

Dr. Julia Wood https://knoxvillepsych.com/meet-the-doctors/dr-julia-wood/

INTERROGATORY NO. 7:

Identify the date on which you notified Vanity Fair that you had incurred personal charges on your Business Amex card in Morocco.

RESPONSE TO INTERROGATORY NO. 7:

Williams notified Geoffrey Collins, Vanity Fair's Editorial Business Director, in person upon her return from Morocco. She also emailed Condé Nast Accounting (Teresa Dulwin) on or about October 17, 2017.

INTERROGATORY NO. 8:

Describe the manner in which you notified Vanity Fair that you had incurred personal charges on your Business Amex card in Morocco, including the identity of any individuals at the company whom you informed and how you informed those individuals (*i.e.*, by e-mail, in-person conversation, telephone, etc.).

RESPONSE TO INTERROGATORY NO. 8:

See Response To Interrogatory No. 7.

INTERROGATORY NO. 9:

Describe the circumstances of Vanity Fair's "investigation into [your] unauthorized business charge" as noted in Exhibit 1 to your Response to Netflix's Motion to Dismiss— including the names of the employees involved, the process of the investigation, the findings of the investigation, the potential consequences of the investigation, and the actual consequences of the investigation.

RESPONSE TO INTERROGATORY NO. 9:

Williams objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

Williams cannot respond to this Interrogatory because she was never investigated by Vanity Fair because of the credit card charges to La Mamounia.


INTERROGATORY NO. 10:

Identify and describe every time that you used your Business Amex for personal use.

RESPONSE TO INTERROGATORY NO. 10:

Williams objects to this Interrogatory to the extent that it seeks information that is unduly burdensome to obtain. Williams further objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory as premature to the extent that it seeks information related to opinion testimony or expert discovery, or information subject to pre-trial disclosures under the Federal Rules of Civil Procedure. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit.  Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially.

Without waiving any general or specific objections, Williams responds to this interrogatory by referring to the charges marked "personal" on the expense reports she submitted to Condé Nast and which have been produced during discovery herein.


INTERROGATORY NO. 11:

Describe the reasons for your termination from Vanity Fair.

RESPONSE TO INTERROGATORY NO. 11:

Williams objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing.  Williams further

objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit.  Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

Williams was not "terminated" by her employer; rather, she was laid off amicably and with severance due to a company-wide restructuring that eliminated her position, along with those of many others.

INTERROGATORY NO. 12:

Describe your education, training, employment background, and employment history, including but not limited to every employment position you have held and why you left each of your previous positions.

RESPONSE TO INTERROGATORY NO. 12:

Williams objects to this Interrogatory to the extent that it seeks information that is unduly burdensome to obtain. Williams further objects to this Interrogatory because it is vague, ambiguous, overbroad, unreasonably duplicative, unduly burdensome, oppressive, or harassing. Williams further objects to this Interrogatory because it seeks material not relevant to her claims or any defenses or proportional to the needs of the case, given the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of this Interrogatory compared with its likely benefit. Williams further objects to this Interrogatory because it seeks information that is publicly available. Williams further objects to this Interrogatory because it seeks confidential or proprietary information that Williams maintains in confidence and/or is obligated to treat confidentially. Without waiving any general or specific objections, Williams responds as follows:

<u>Employment History</u>

Williams has never been terminated or fired from a job position. Her employment for *Vanity Fair* ended as a result of company-wide layoffs. Her other employment positions have been on a freelance basis.

<u>Employment Background</u>

DESIGNER: SETS, PROPS, & INTERIORS (FREELANCE)

- Whitlow Park (creative studio) – Owner, 2023-present

- Mary Howard Studio – Prop Buyer/Coordinator/Set Design Assistant, 2023-present

- ELLE Magazine – Set Designer, 2023-present

- *And Just Like That*

PHOTO & EVENT PRODUCTION (FREELANCE)

- Viewfinders – Photo Producer, 2022-present

- Tom Ford – Production Manager (Celebrity & VIP Fittings), 2021

- InStyle – Photo Producer, 2021

- Netflix Queue – Executive Photo Producer, 2020-2021

DIGITAL EDITING & DESIGN (FREELANCE)

- Coastal Arbor Care (Water Mill, NY) – Web & Brand Identity Manager, 2021-present

- Beach Lane Building Services (Bridgehampton, NY) – Web Designer, 2021-present

MEDIA

- *Air Mail* – Freelance Contributing Writer, 2022

- HBO – Writer, mini room,

- *My Friend Anna* (Gallery Books, nonfiction) – Author, 2019

- *Vanity Fair* (Condé Nast)    – Photo Editor, 2016-2019

  – Associate Photo Editor, 2015-2016

  – Associate Photo Producer, 2014-2015

  – Associate to the Senior Photo Producer, 2012-2014

  – Assistant to the Senior Photo Producer, 2010-2012

VOLUNTEER ACTIVITIES

- Breadtree Farms – Photographer, 2019-2021

- Runway Heroes – Photographer, 2019-2021

INTERNSHIPS

- Mercedes-Benz Fashion Week (IMG) – Sponsor Relations Volunteer, 2009-2011

- Siren Public Relations – Intern, June 2010

- *Harper's Bazaar* (Hearst) – Photo Department Intern, Summer 2009

- Art + Commerce / PRODn (IMG) – Intern, Summer 2008

- Planned Parenthood Federation of America – Development Intern, Summer 2007

Education

Kenyon College (Gambier, OH) – B.A., cum laude, English and Studio Art, 2006-2010

Public schools (Knoxville, TN) – Grades K-12, 1993-2006

INTERROGATORY NO. 13:

Identify all gifts and experiences that Anna Sorokin ever purchased for you, including but not limited to all meals, drinks, items of clothing, spa services, personal training sessions, hotel stays, excursions, and airfare.

RESPONSE TO INTERROGATORY NO. 13:

See Responses to Interrogatory No. 1 with respect to Defamatory Statements Nos. 1-7.


Dated: January 31, 2023                    FARNAN LLP

                                          s/Brian E. Farnan/s
                                          Brian E. Farnan (Bar No. 4089)
                                          Michael J. Farnan (Bar No. 5165)
                                          919 North Market St., 12th Floor
                                          Wilmington, DE 19801
                                          Telephone: 302-777-0300
                                          Facsimile: 302-777-0301
                                          bfarnan@farnanlaw.com
                                          mfarnan@farnanlaw.com

                                          Rodney Smolla (Bar No. 6327)
                                          164 Chelsea Street
                                          South Royalton, VT 05068
                                          rodsmolla@gmail.com
                                          (864) 373-3882

                                          Alexander Rufus-Isaacs (admitted *pro hac vice*)
                                          RUFUS-ISAACS ACLAND &
                                          GRANTHAM LLP
                                          9440 Santa Monica Blvd., Suite 301
                                          Beverly Hills, CA 90210
                                          Phone: (310) 274-3803
                                          aisaacs@rufuslaw.com

                                          *Attorneys for Plaintiff Rachel DeLoache Williams*

8668.4.8B                                        41

## <u>VERIFICATION</u>

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

I have read the foregoing PLAINTIFF'S RESPONSE AND OBJECTIONS TO DEFENDANT NETFLIX, INC.'S FIRST SET OF INTERROGATORIES and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on January 31, 2024, at <u>Water Mill</u>, <u>New York.</u>

I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

Rachel D. Williams
Print Name of Signatory

Signature

## CERTIFICATE OF SERVICE

I hereby affirm that a copy of this document was served on Netflix's counsel

via email on January 31, 2024, at the following addresses:

Thomas E. Hanson, Jr.
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
thanson@btlaw.com

Rachel F. Strom
Chelsea T. Kelly
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
rachelstrom@dwt.com
chelseakelly@dwt.com
lindseycherner@dwt.com

/s/ Alexander Rufus-Isaacs
Alexander Rufus-Isaacs

# **<u>EXHIBIT 2</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RACHEL DELOACHE WILLIAMS,

Plaintiff,

v.

NETFLIX, INC.,

Defendant.

C.A. No. 22-cv-1132-CFC

**PLAINTIFF'S DISCLOSURES PURSUANT TO FRCP RULE 26(a)**

Pursuant to Fed. Rules of Civil Procedure 26(a)(1), plaintiff Rachel DeLoache Williams ("Williams") provides the following information:

(i)     the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses;

Kathryn MacLeod, ███████████████████████████████

███

Subjects: (a) Williams' personal and professional history and character; (b) the effects of the Series *Inventing Anna* ("Series") on Williams; (c) the accuracy of the portrayal of Williams in the Series

Laurie Williams, ███████████████████████████████

███████

1

Subjects: (a) Williams' personal history and character; (b) the effects of the Series on Williams; (c) the accuracy of the portrayal of Williams in the Series

Joshua Williams, ████████████████████████████

████████

Subjects: (a) Williams' personal history and character; (b) the effects of the Series on Williams; (c) the accuracy of the portrayal of Williams in the Series

Susan White, ████████████████████████████

████████

Subjects: (a) Williams' personal and professional history and character; (b) the effects of the Series on Williams; (c) the accuracy of the portrayal of Williams in the Series

James Zumot, ██████████████████████████████

████

Subjects: (a) the effects of the Series on Williams

Carrie Waible, ███████████████████████████████

████████████████████████████

Subjects: (a) the effects of the Series on Williams

(ii)  a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses;

a) Texts, emails, and other correspondence between Williams and Anna Sorokin, Kacy Duke, Neff Davis, Jesse Hawk, Cate Sturgess, Kathryn MacLeod, Ashley Simpson, "Bettina Wagner," Michael McCaffrey, Nick Rogers, Jessica Pressler, Matthew Giles, representatives of CAA, representatives of Conde Naste, representatives of La Mamounia, representatives of the New York District Attorney's office,

b) Articles in the print and online media and on websites about Williams, Neff Davis, Katie Lowes, Shona Rhimes, and the Series

c) Social media posts/online comments by or about Williams

d) Social media posts/online comments about the Series

e) Audio recordings of conversation between Williams and others

f) Financial records including Amex statements (personal and corporate), Chase statements, email from PayPal, invoice from

La Mamounia, evidence of flight purchases and bookings, list of charges incurred on behalf of Ms. Sorokin

g) Williams' Vanity Fair article

h) Williams' book entitled My Friend Anna

i) Transcripts for 4/17/19 and 4/18/19 and other documents relating to Ms. Sorokin's trial

(iii)    a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered…"

Plaintiff seeks only general damages in this lawsuit.  Plaintiff incorporates the damages and relief set forth in her Complaint.

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Plaintiff is not aware of any insurance policy covering this action.

Dated: June 27, 2023

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
rodsmolla@gmail.com
(864) 373-3882

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Phone: (310) 274-3803
aisaacs@rufuslaw.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

CERTIFICATE OF SERVICE

I, Brian E. Farnan, hereby certify that on June 27, 2023, a copy of Plaintiff's

Disclosures Pursuant to FRCP Rule 26(a) was served on the following as

indicated:

Via E-Mail
Thomas E. Hanson, Jr.
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
thanson@btlaw.com

*Attorneys for Defendant Netflix, Inc.*

Via E-Mail
Rachel F. Strom
Chelsea T. Kelly
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
rachelstrom@dwt.com
chelseakelly@dwt.com
lindseycherner@dwt.com

*Attorneys for Defendant Netflix, Inc.*

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RACHEL DELOACHE WILLIAMS,

Plaintiff,

v.                                                    C.A. No. 22-cv-1132-CFC

NETFLIX, INC.,

Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT NETFLIX, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 34, and 45 of the Federal Rules of Civil Procedure and the Court's Scheduling Order, Plaintiff Rachel DeLoache Williams ("Plaintiff"), by and through its undersigned attorneys, hereby sets forth her objections and responses to Defendant Netflix, Inc.'s ("Defendant") First Set of Requests for Production propounded to Plaintiff ("Requests").

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

Plaintiff incorporates the following Preliminary Statement and General Objections into each of her responses herein:

1.      Each of the responses and objections set forth below is based on Plaintiff's reasonable understanding of the Requests. To the extent that Plaintiff asserts an interpretation of any Request that is inconsistent with Defendant's

understanding, Plaintiff reserves the right to supplement her objections or responses.

2.      Plaintiff objects to these Requests to the extent they fail to comply with the Federal Rules or the Scheduling Order.

3.      Plaintiff objects to these Requests to the extent they are beyond the scope of permissible discovery or seek to impose duties and obligations beyond those imposed on Plaintiff by the Federal Rules or the Scheduling Order.

4.      Plaintiff objects to these Requests to the extent they seek information created, compiled, transmitted and/or received at times so remote from the allegations as to be irrelevant, not reasonably calculated to lead to the discovery of admissible evidence relating to the issues in this lawsuit, and not relevant to any party's claim or defense or proportional to the needs of the case.

5.      Plaintiff objects to these Requests to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine or immunity. The inadvertent production of any privileged or protected information or document shall not constitute, or be deemed, a waiver of any applicable statutory, regulatory, common law or other privilege.

6.      Plaintiff objects to these Requests to the extent they seek disclosure of information or documents that would violate individual privacy interests,

8668.4.1

confidentiality agreements or other arrangements between Plaintiff and any other individual or entity.

7.     Plaintiff objects to these Requests to the extent they are unlimited as to time and, thus, call for information that is overly broad, unduly burdensome, not reasonably likely to lead to discovery of admissible evidence, and not relevant to any party's claim or defense or proportional to the needs of the case.

8.     Plaintiff objects to these Requests to the extent they seek confidential and proprietary information, including trade secrets and competitively sensitive business information, where any purported marginal benefits of disclosure of the requested information are outweighed by the burden associated with disclosure of such highly sensitive materials. Confidential information will not be disclosed until an appropriate protective order is entered by the Court.

9.     Plaintiff objects to these Requests to the extent that they seek the production of information or documents not within Plaintiff's possession, custody or control.

10.     Plaintiff objects to these Requests to the extent they seek  information or documents already known to, or in the possession, custody or control of Defendant or any third parties, or that are in the public domain or are otherwise equally available to Defendant.

11.     Plaintiff objects to these Requests to the extent that they seek to impose an obligation to identify or search for information or documents at any location, or from any source other than where they would reasonably be expected to be stored in the ordinary course of business. Plaintiff's responses are based upon a reasonable search and investigation of facilities and files that could reasonably be expected to contain responsive information.

12.     Plaintiff objects to these Requests to the extent they (i) assume facts that do not exist, are incorrect, and/or are disputed, and/or (ii) mischaracterize or misstate facts and/or defenses appearing in the pleadings and/or prior discovery in this action in defining the information requested. Plaintiff submits these objections and responses without admitting the factual or legal premise of any of these Requests.

13.     Plaintiff objects to these Requests to the extent they are vague, ambiguous, unintelligible, uncertain and fail to specify with reasonable particularity the information sought and/or would unreasonably require Plaintiff to speculate as to the nature or scope of the information sought.

14.     Plaintiff objects to these Requests as overly broad, harassing and unduly burdensome to the extent they seek to have Plaintiff investigate, collect, review, and disclose information or documents that are not relevant to any claim or defense asserted in this action.

15.     Plaintiff objects to these Requests to the extent they seek information that is not relevant to the subject matter of this lawsuit, is neither admissible nor reasonably calculated to lead to the discovery of admissible evidence, and is not relevant to any party's claim or defense nor proportional to the needs of the case.

16.     Plaintiff objects to these Requests to the extent they prematurely seek expert discovery and/or opinions.

17.     Plaintiff objects to these Requests to the extent that they are duplicative and cumulative.

18.     The fact that any of the Requests have been answered neither should be taken as an admission nor an acceptance of the existence of documents or categories of documents or of any of the facts assumed by such Requests, nor should be construed as an admission that such information is relevant to the subject matter of this litigation or constitutes admissible evidence.

19.     A response to any of the Requests that states that responsive documents will be produced does not constitute a representation or acknowledgment by Plaintiff that there are any documents responsive to such Request, or that, if responsive documents exist, they are in Plaintiff's possession, custody, or control. Rather, a statement that responsive documents will be produced is simply a statement that, if such documents exist and can be located

through a diligent search and reasonable inquiry of documents in Plaintiff's present possession, custody, or control, Plaintiff will produce them.

20.    Plaintiff reserves the right to object to the admission into evidence of any or all information or documents produced in response to these Requests in any pending or future proceeding on any grounds provided by law. Plaintiff further reserves the right to interpose additional objections and object to any additional Requests directed to it.

21.    Plaintiff submits these responses without waiving any claim of privilege or confidentiality and without conceding the relevancy or materiality of the subject matter of any request and without prejudice to her rights to object to further discovery or to object to the admissibility of any additional proof on the subject matter of any answer at the time of trial.

22.    Plaintiff reserves her rights (i) to object to the admissibility of these responses or any documents produced; (ii) to object to the further discovery; or (iii) to revise, amend, or clarify its responses when appropriate to do so.

23.    Plaintiff's research, discovery, and preparation for trial in this matter are presently ongoing and are not yet complete. Plaintiff's responses to the Requests are based upon the current state of her pretrial preparation and the information which is presently known to it based upon the investigation it has conducted to date. Plaintiff anticipates that her continuing discovery and

investigation will reveal information or documents not presently known to her, or information or documents the significance of which is not presently known, upon which Plaintiff may rely at trial. Accordingly, although Plaintiff assumes no obligation to voluntarily supplement or amend these responses to reflect information, evidence, documents, or things discovered following service of these responses, such responses are made without prejudice to Plaintiff's right to produce additional information or documents at a later date, and to introduce such information or documents at the time of trial. Furthermore, these responses are prepared based on Plaintiff's good faith interpretation and understanding of each request, and are subject to correction for inadvertent errors, if any.

Plaintiff hereby specifically incorporates each of the foregoing General Objections into each and every response to the Requests. Each of the following specific responses is subject to and without waiver of these General Objections.

## **RESPONSE TO REQUESTS FOR PRODUCTION**

REQUEST FOR PRODUCTION NO. 1:

All Documents and Communications regarding any item or experience that Anna Sorokin ever purchased for you, including but not limited to meals, drinks, spa treatments, personal training sessions, clothes, and travel—such as cab or Uber fare, airplane tickets, hotel expenses, and similar costs.

RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that the terms "purchased" and "experience" are vague, ambiguous and unintelligible. Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 2:

To the extent not covered by Request No. 1, all Documents and Communications regarding any item or experience that Anna Sorokin ever promised to purchase for you or intimated she would purchase for you or "treat" you to, including but not limited to meals, drinks, spa treatments, personal training sessions, clothes, and travel—such as cab or Uber fare, airplane tickets, hotel expenses, and similar costs.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that the terms "purchased" and "experience" are vague,

8668.4.1                                    8

ambiguous and unintelligible. Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 3:

All Documents and Communications supporting your claim on page 35 of your book *My Friend Anna: The True Story of a Fake Heiress*, that you and Anna Sorokin went out with "publicists, models, musicians, and designers," accessing "exclusiv[e]" circles in New York.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is vague, ambiguous and/or unintelligible; (ii) is overly broad and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

REQUEST FOR PRODUCTION NO. 4:

All Communications with or about Anna Sorokin and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term "Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 5:

All Communications with or about Neffatari Davis and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this

Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term "Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 6:

All Communications with or about Kacy Duke and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term

"Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 7:

All Communications with or about Todd Spodek and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term "Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

8668.4.1

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 8:

All Communications with or about Jessica Pressler and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term "Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession,

custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 9:

All Communications with or about Shonda Rhimes or any employees at Netflix or Shondaland regarding the Series.

RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks documents and information that are protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine; (ii) is vague, ambiguous and/or overbroad as to the term "Communications … about" and unduly burdensome; (iii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iv) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 10:

All Communications with any producer or consultant regarding the Series.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the terms "producer," "consultant" and "regarding the Series."

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 11:

All Documents and Communications related to Jessica Pressler's article "How Anna Delvey Tricked New York's Party People," referenced in paragraph 19 of the Complaint.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control,

subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 12:

All Communications with Creative Artists Agency or any other talent agency regarding any projects or potential projects with you.

RESPONSE TO REQUEST FOR PRODUCTION NO. 12:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is vague, ambiguous and/or overbroad as to the terms "projects or potential projects"; (ii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iii) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 13:

All Communications regarding attempts to pitch or sell a project with Anna Sorokin.

RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is vague, ambiguous and/or overbroad as to the term "a project with Anna Sorokin"; (ii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iii) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 14:

All Communications regarding attempts to pitch or sell a project with Jessica Pressler.

RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "attempts to pitch or sell a project with Jessica Pressler.

Subject to and without waiving the foregoing general and specific objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 15:

Any Communications in which you have used the term "bitch" and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is vague, ambiguous and/or overbroad as to the term "used the term "bitch"; (ii) seeks documents and information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iii) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

8668.4.1

18

REQUEST FOR PRODUCTION NO. 16:

All Documents and Communications regarding your and Anna Sorokin's decision to reserve a suite or riad at La Mamounia resort in Morocco.

RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it falsely assumes that Plaintiff played any part in Sorokin's decision about the type of accommodation reserved at La Mamounia.

Subject to and without waiving the foregoing general and specific objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 17:

All Communications with "Jesse," as identified in paragraph 10 of the Complaint, regarding Anna Sorokin or the trip to Morocco.

RESPONSE TO REQUEST FOR PRODUCTION NO. 17:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 18:

All Documents and Communications regarding your and Anna Sorokin's decision to visit the Jardin Majorelle and related museum in Morocco.

RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 19:

All Documents and Communications regarding your trip to, and experience in, Morocco in 2017.

RESPONSE TO REQUEST FOR PRODUCTION NO. 19:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is vague, ambiguous and/or overbroad as to the term "regarding your trip to, and experience in"; (ii) seeks documents and

information which are neither relevant to any party's claims or defense, nor proportional to the needs of the case; and (iii) is not limited in time and scope.

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 20:

All Documents and Communications supporting your allegation in paragraph 11 of the Complaint that you provided your Personal Amex to La Mamounia, relying on Anna Sorokin's promise to pay the hotel bill.

RESPONSE TO REQUEST FOR PRODUCTION NO. 20:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) is overbroad in time; and (ii) seeks disclosure of information or documents that would violate the privacy interests of Plaintiff or any third party.

Subject to and without waiving the foregoing general and specific objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or

control that she believes may be responsive to this Request, subject to the

provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 21:

All monthly statements or bills from your Personal Amex and Business

Amex from February 2016 to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 21:

In addition to her General Objections, which are incorporated into this

response as though fully set forth herein, Plaintiff specifically objects to this

Request on the grounds that it (i) is overbroad in time; and (ii) seeks disclosure of

information or documents that would violate the privacy interests of Plaintiff.

Subject to and without waiving the foregoing general and specific

objections, and to the extent Plaintiff understands the Request, she responds that

she will produce the following confidential documents subject to the provisions of

the stipulated protective order entered in this case [ECF No. 41]: Personal Amex

statements showing purchases relating to Sorokin; Business Amex statements for

February–December 2017.

REQUEST FOR PRODUCTION NO. 22:

All Documents and Communications supporting your allegation in

paragraph 12 of the Complaint that you gave La Mamounia your Business Amex to

"physically hold with [your] explicit instruction that it was not to be charged," to

persuade the hotel to return your Personal Amex to use at the museum at the Jardin Majorelle.

RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 23:

All Documents and Communications supporting your allegation in paragraph 13 of the Complaint that you incurred "around $62,000" of charges on your credit cards from the Morocco trip, including the hotel, airfare, museum tour, air shipment charges for video equipment, clothes for Sorokin in Marrakesh, transportation, and restaurant charges.

RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 24:

All Documents and Communications supporting your allegation in paragraph 14 of the Complaint that $16,670 was charged to your Business Amex and $36,010 to your Personal Amex.

RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 25:

All Documents and Communications supporting your allegation in paragraph 14 of the Complaint that you "made multiple pleas to Sorokin to reimburse [you], and Sorokin made multiple promises to do so."

RESPONSE TO REQUEST FOR PRODUCTION NO. 25:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 26:

All Documents and Communications supporting your allegation in paragraph 14 of the Complaint that Sorokin ultimately only sent you $5,000.

RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 27:

All Documents and Communications supporting your allegation in paragraph 14 of the Complaint that this situation "caused a financial crisis for [you]" and you were "forced to borrow money to pay [your] rent and living expenses, and suffered great stress as a result of these debts . . . ."

RESPONSE TO REQUEST FOR PRODUCTION NO. 27:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 28:

All Documents and Communications supporting your allegation in paragraph 16 of the Complaint that you borrowed money from a friend "to pay American Express for the non-hotel charges [you] incurred on Sorokin's behalf . . . ."

RESPONSE TO REQUEST FOR PRODUCTION NO. 28:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 29:

All Documents and Communications supporting your statement on pages 18-20 in your book *My Friend Anna: The True Story of a Fake Heiress*, that your experience of resolving the payment issues in Morocco caused you to "f[igh]t back tears . . . swallowing hard to contain [your] emotions"; your "hands [to] bec[o]me sweaty and start[] to shake"; and "barely hold[] it together, ready to collapse into a heap of self-pity and despair."

RESPONSE TO REQUEST FOR PRODUCTION NO. 29:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 30:

All Communications with any Vanity Fair employees, contractors, or agents regarding the charges incurred on your Business Amex as a result of the Morocco trip described in paragraphs 9-15 of the Complaint, and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 30:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 31:

All Documents and Communications supporting or refuting your allegation in paragraph 16 of the Complaint that you "disclosed the situation to [your] employer [Vanity Fair]," regarding the Business Amex charges.

RESPONSE TO REQUEST FOR PRODUCTION NO. 31:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 32:

All Documents and Communications supporting or refuting your allegation in footnote 7 of the Complaint on page 8 that you "marked the Hotel charge 'personal' on an expense report [you] submitted to [your] employer [Vanity Fair]".

RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 33:

All Documents and Communications regarding Vanity Fair's investigation of these Business Amex charges, described on page 20 of Exhibit 1 to Plaintiff's Opposition to Defendant's Motion to Dismiss (ECF No. 24-1).

RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "investigation."

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 34:

All Documents and Communications supporting your assertion to Anna Sorokin as stated on pages 139 and 206 of your book *My Friend Anna: The True Story of a Fake Heiress*, that your "job [wa]s on the line" as a result of the charges on your Business Amex from Morocco.

RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "on the line."

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 35:

All Communications with American Express regarding the charges incurred on your Business Amex as a result of the Morocco trip described in paragraphs 9-15 of the Complaint, and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 36:

All Documents and Communications regarding your loss of employment at

Vanity Fair and the reasons for same, as alleged in paragraph 18 of the Complaint.

RESPONSE TO REQUEST FOR PRODUCTION NO. 36:

Subject to and without waiving the foregoing general objections, and to the

extent Plaintiff understands the Request, she responds that she will produce those

non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated

protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 37:

All Documents and Communications memorializing the conversation

described in paragraph 85 of the Complaint in which you "told Kacy [Duke] that

[you] wanted to think about contacting Sorokin's parents."

RESPONSE TO REQUEST FOR PRODUCTION NO. 37:

Subject to and without waiving the foregoing general objections, and to the

extent Plaintiff understands the Request, she responds that she will produce those

non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated

protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 38:

All Documents and Communications regarding your role in working with
the police and District Attorney's Office to investigate, arrest, and prosecute Anna
Sorokin, including but not limited to the information that you provided the police
and District Attorney's Office regarding Sorokin.

RESPONSE TO REQUEST FOR PRODUCTION NO. 38:

Subject to and without waiving the foregoing general objections, and to the
extent Plaintiff understands the Request, she responds that she will produce those
non-privileged documents in her possession, custody or control that she believes
may be responsive to this Request, subject to the provisions of the stipulated
protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 39:

All Documents and Communications regarding your allegation in paragraph
17 of the Complaint that a prosecutor and police detective contacted you on
September 5, 2017 to request your assistance in locating Anna Sorokin.

RESPONSE TO REQUEST FOR PRODUCTION NO. 39:

Subject to and without waiving the foregoing general objections, and to the
extent Plaintiff understands the Request, she responds that she will produce those
non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 40:

All Documents and Communications regarding your allegation in paragraph 17 of the Complaint that the authorities asked you "to keep matters pertaining to the ongoing investigation confidential."

RESPONSE TO REQUEST FOR PRODUCTION NO. 40:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 41:

All Documents and Communications regarding your allegation in paragraph 17 of the Complaint that you "used text messages and social media posts to help law enforcement determine Sorokin's whereabouts, in Malibu, CA."

RESPONSE TO REQUEST FOR PRODUCTION NO. 41:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 42:

All Documents and Communications regarding your allegation in paragraph 17 of the Complaint that in early October 2017, you contacted Sorokin and, "at the police detective's urging, arranged to meet her for lunch," where she was arrested.

RESPONSE TO REQUEST FOR PRODUCTION NO. 42:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 43:

Any Documents and Communications in which you informed Kacy Duke or Neffatari Davis of your role in working with the police or District Attorney's Office to investigate, arrest, and prosecute Anna Sorokin.

RESPONSE TO REQUEST FOR PRODUCTION NO. 43:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 44:

All Documents and Communications that you allege demonstrate that Defendant acted with actual malice in releasing the Series.

RESPONSE TO REQUEST FOR PRODUCTION NO. 44:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 45:

All Documents and Communications supporting or refuting your allegation that you have suffered "damages" resulting from the Series, as claimed in paragraphs 141 and 147 of the Complaint.

RESPONSE TO REQUEST FOR PRODUCTION NO. 45:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 46:

All Documents and Communications supporting or refuting your allegation in paragraph 146 of the Complaint that you have suffered "personal humiliation, distress, and anguish, as well as damages to [your] earnings and/or potential earnings" because of the Series.

RESPONSE TO REQUEST FOR PRODUCTION NO. 46:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 47:

All Communications that you received from anyone regarding your portrayal in the Series (whether negative or positive) and Documents memorializing same.

RESPONSE TO REQUEST FOR PRODUCTION NO. 47:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 48:

All public statements you have made concerning Anna Sorokin, Neffatari Davis, Kacy Duke, Defendant, Shonda Rhimes, Shondaland, or the Series since April 1, 2019.

RESPONSE TO REQUEST FOR PRODUCTION NO. 48:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "public statements."

Subject to and without waiving the foregoing general and specific objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 49:

All Documents relating to your earned income, including wages and investments, for the years 2018 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks information that is not reasonably likely to lead to discovery of admissible evidence, and not relevant to any party's claim or defense or proportional to the needs of the case; and (ii) seeks disclosure of information and documents that would violate the Plaintiff privacy interests.

**REQUEST FOR PRODUCTION NO. 50:**

A copy of each of your federal tax returns from the years 2018 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it (i) seeks information that is not reasonably likely to lead to discovery of admissible evidence, and not relevant to any party's claim or defense or proportional to the needs of the case; and (ii) seeks disclosure of information and documents that would violate the Plaintiff privacy interests.

**REQUEST FOR PRODUCTION NO. 51:**

All pitch and publicity materials related to your book (*My Friend Anna: The True Story of the Fake Heiress*) and Vanity Fair article ("'As an Added Bonus, She

Paid for Everything': My Bright-Lights Misadventure with a Magician of Manhattan")—including but not limited to copies of any transcribed or recorded interviews you gave regarding this book and/or article.

RESPONSE TO REQUEST FOR PRODUCTION NO. 51:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 52:

All contracts with Simon & Schuster regarding the publication of your book, *My Friend Anna: The True Story of the Fake Heiress*, including but not limited to documents regarding any advances or royalties.

RESPONSE TO REQUEST FOR PRODUCTION NO. 52:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 53:

An itemized list of all profits that you derived from the publication of your book, *My Friend Anna: The True Story of the Fake Heiress*, from the date of publication to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 53:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 54:

An itemized list of all profits that you derived from the publication of your Vanity Fair article, "'As an Added Bonus, She Paid for Everything': My Bright-Lights Misadventure with a Magician of Manhattan", from the date of publication to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 54:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes

may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 55:

All Documents, Communications, and contracts with HBO regarding selling your life rights, including the income you generated as a result.

RESPONSE TO REQUEST FOR PRODUCTION NO. 55:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce those non-privileged documents in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 56:

All Documents relating to any expense or loss of business you allegedly incurred as a result of Defendant's release of the Series on February 11, 2022.

RESPONSE TO REQUEST FOR PRODUCTION NO. 56:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 57:

All Documents relating to any remedial measures undertaken by you after the release of the Series on February 11, 2022.

RESPONSE TO REQUEST FOR PRODUCTION NO. 57:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "remedial measures."

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 58:

All cease and desist letters that you have sent in which you allege that your reputation has been harmed.

RESPONSE TO REQUEST FOR PRODUCTION NO. 58:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad as to the term "cease and desist letters."

Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no responsive documents are in her possession, custody or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 59:

All Documents and Communications relating to sources of funding for this Action, including any litigation finance companies.

RESPONSE TO REQUEST FOR PRODUCTION NO. 59:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that a diligent search has been conducted and no such documents are in her possession, custody, or control because no such documents exist.

REQUEST FOR PRODUCTION NO. 60:

All Documents and Communications about or referring to the Series.

RESPONSE TO REQUEST FOR PRODUCTION NO. 60:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad.

REQUEST FOR PRODUCTION NO. 61:

All Documents that you receive in response to any subpoena you serve in this Action.

RESPONSE TO REQUEST FOR PRODUCTION NO. 61:

Subject to and without waiving the foregoing general objections, and to the extent Plaintiff understands the Request, she responds that she will produce in the future any non-privileged documents that come in her possession, custody or control that she believes may be responsive to this Request, subject to the provisions of the stipulated protective order entered in this case [ECF No. 41].

REQUEST FOR PRODUCTION NO. 62:

To the extent not covered by prior requests above, all Documents that you intend to rely on in a trial of this matter.

RESPONSE TO REQUEST FOR PRODUCTION NO. 62:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad.

REQUEST FOR PRODUCTION NO. 63:

To the extent not covered by prior requests above, all Documents and Communications supporting or refuting all allegations in the Complaint.

RESPONSE TO REQUEST FOR PRODUCTION NO. 63:

In addition to her General Objections, which are incorporated into this response as though fully set forth herein, Plaintiff specifically objects to this Request on the grounds that it is vague, ambiguous and/or overbroad.

Dated: August 21, 2023

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
rodsmolla@gmail.com
(864) 373-3882

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Phone: (310) 274-3803
aisaacs@rufuslaw.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

# EXHIBIT 4

**Davis Wright**
**Tremaine LLP**

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Rachel Strom**
212.402.4069 tel
212.379.5244 fax

rachelstrom@dwt.com

July 9, 2024

**VIA EMAIL**

Alexander Rufus-Isaacs
Rufus-Isaacs, Acland, & Grantham LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
aisaacs@rufuslaw.com

  Re: *Williams v. Netflix, Inc.* — **Ms. Williams' Document Production Deficiencies, Second Letter**

Dear Alexander:

  We have reviewed Ms. Williams' document production and are in the process of reviewing your third-party productions. During the course of our review, however, we have noticed several issues that we wanted to bring to your attention. We hope we can work through these before going to the Court.

  *First*, several of the records produced are bad file types and potentially corrupted at the point of original data collection. These are RDWX_0004201, RDWX_0000610, and RDWX_0000611. In Relativity, these files appear as "Could Not Be Imaged," indicating that whoever processed this information on your end was unable to correct issues at the time of production. In addition, RDWX_0004729 appears to have been .zip file, a file type not reviewable on Relativity and therefore typically not produced. The production of these documents does not comply with your obligations under the Federal Rules to provide "electronically stored information in a form that is 'reasonably usable.'" Fed. R. Civ. P. 34(b)(2)(E)(ii). Please confirm that you will produce these files in a viewable and processable format by July 24.

  *Second*, many of the text messages produced by Ms. Williams in response to the Requests were produced incompletely. These include critical text messages between Ms. Williams, Anna Sorokin, Neff Davis, and Kacy Duke. In particular, these text messages do not include many of the images or screenshots sent between the parties to the text conversations. In place of the images, the text messages commonly show a notation reading "*Attachment not found:* [filename]" or "[MEDIA UNAVAILABLE]." The documents that we have identified containing this defect are: RDWX_0015188, RDW02198_U; RDWX_0015531, RDWX_0016547, RDWX_0015545,

Alexander Rufus-Isaacs
Page 2
July 9, 2024

RDWX_0015557,    RDWX_0015589,    RDWX_0016067,    RDWX_0015665,
RDWX_0016047,    RDWX_0016129,    RDWX_0016129,    RDWX_0016507,
RDWX_0016507,    RDWX_0016523,    RDWX_0016556,    RDWX_0016565,
RDWX_0016690,  RDWX_0016703,  RDWX_0017082,  and  RDWX_0017095.  Please
confirm that these communications will produced in their complete form inclusive of the
missing images by July 24.

*Third,* Ms. Williams did not produce her federal tax returns for the years 2018 to the present
in response to Response No. 50.  Please confirm that those documents will be produced by July
24.

*Fourth,* please confirm that Ms. Williams' production of records relating to her
confrontation of Anna Sorokin with Kacy Duke and Laurel Smith at the Frying Pan on
August 1, 2017, which is responsive to, *inter alia*, Request Nos. 4, 6, 25 is complete and
that the 1 hour 52 minute recording at RDWX_0001080 and the transcripts at
RDWX_0000084  and RDWX_0000262 respectively represent the complete and unedited
recordings and transcriptions of the Frying Pan confrontation in your client's possession.
Please make this confirmation by July 24 as well.

*Fifth*, the third-party production of James Zumot is also defective and incomplete.
Many of the documents produced appear to be haphazard screenshots of text messages or
social media messages that cut off the name or names of the participants and the dates of
the conversations and cherry-pick conversation snippets, rendering the information they
contain incomplete. This flaw is present throughout the production, but some examples
include: JZ0001, JZ0002, JZ0003, JZ0007, JZ0008, JZT0009, JZT0011. Additionally, there are
missing images in what appears to be a transcript of certain of Mr. Zumot and Ms. Williams' text
messages at JZ0033, JZ0037, JZ0041, JZ0048, JZ0054, JZ0055, JZ0057, and JZ0060. Please
confirm that these documents will be properly produced in their complete form by July 24.
Furthermore, Mr. Zumot has not produced records responsive to Request Nos. 3, 4, 5, 6, 7, 8, 9,
10, 11, 12, and 13.  Please confirm that Mr. Zumot's documents responsive to these Requests will
be produced by July 24. Finally, as it relates to Mr. Zumot's production, can you please explain
the basis for withholding notes Mr. Zumot sent to the Plaintiff on the complaint?  You have claimed
attorney-client privilege/work product, but he is not an attorney.  Please provide that explanation
as well by July 24.

*Sixth,* the third-party production of Joshua Williams is woefully deficient. First, no
text messages responsive to the requests have been produced. Please confirm that you
searched for responsive text messages from your client and that none exist. Second, the

Alexander Rufus-Isaacs
Page 3
July 9, 2024

earliest document from Mr. Williams' production is from April 2018. In other words, Mr. Williams has failed to produce any documents or communications from 2017 until April 2018 that would be contemporaneous to his daughter's experiences with Sorokin and the investigation thereof as would be responsive to Request Nos. 2, 3, 4, 5, 6, 7, 8, 9, and 10. Please confirm that Mr. Williams' documents responsive to these Requests will be produced by July 24.

We appreciate your prompt attention to this matter.

Respectfully Submitted,

Rachel Strom

cc:    Brian Farnan
       Michael Farnan
       Rodney Smolla
       Thomas Hanson Jr.

# EXHIBIT 5

**Rufus-Isaacs, Acland & Grantham LLP**

9440 Santa Monica Blvd
Suite 301
Beverly Hills, CA 90210
t:310.274.3803
www.rufuslaw.com

July 24, 2024

**VIA ELECTRONIC MAIL ONLY**

Rachel F. Strom
Davis Wright Tremaine LLP
1251 Sixth Avenue, 21st Floor
New York, NY 10020
E-Mail: rachelstrom@dwt.com

Chelsea T. Kelly
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington D.C., 20005
E-Mail: chelseakelly@dwt.com

Lindsey B. Cherner
Davis Wright Tremaine LLP
1251 Sixth Avenue, 21st Floor
New York, NY 10020
E-Mail: lindseycherner@dwt.com

Thomas E. Hanson, Jr.
Barnes & Thornburg LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801-1050
E-Mail: Thanson@btlaw.com

Re:    *Rachel Williams v Netflix, Inc.,* C.A. No. 22-cv-1132-CFC

Dear Rachel, Chelsea, Lindsey and Thomas:

This is our reply to your letter dated July 9, 2024. The documents referenced below
have been collected and are being formatted for production. We have also prepared a
privilege log for the CAA documents that have been withheld or redacted. We expect to
produce the log and the documents to you later today or tomorrow.

**Issue No. 1.**

Many of the files you identified by bate stamp number were attached to old texts that
are no longer available.

Ms. Williams has searched diligently for the file referenced in RDWX0004201 and has
found it. It is an image of a cover design for her book.

Ms. Williams has searched diligently for the files referenced in RDWX610-611 but was
unable to find them because these images have expired due to her phone's storage
capacity.

8667.1.8

Rachel Strom, et al.
July 24, 2024
Page 2

Ms. Williams believes that the zip file referenced in RDWX0004729 was created by the Manhattan D.A.'s office during their prosecution. She has searched diligently for the zip file but could not find it. She believes that it may have contained image files of the same receipts pertaining to La Mamounia that she produced in the same sequence.

## Issue No. 2

The notations "attachment unavailable" and "media unavailable" refer to images/attachments that have expired. Ms. Williams has searched diligently for the original texts/files you specified but could not find them. She did, however, find PDF files of some text messages which we are producing.

## Issue No. 3

We have already objected to the production of Ms. Williams' tax returns and will not be producing them. They are privileged and irrelevant.

## Issue No. 4

These are two recordings from the Frying Pan intervention, one with a length of 1:52:52 and another with a length of 12:08. Those two recordings are complete and unedited and the transcript was generated by a transcript recording service called Rev. We are producing them. Ms. Williams has no other recordings or transcripts of the intervention.

## Issue No. 5

Pages JZ0031 through JZ0080 of Mr. Zumot's original production contain the text of all the relevant text messages between him and Ms. Williams that he was able to find, while pages JZ0001 through JZ009 contain images of the messages that he was able to find. These images appear to have become blurred when they were converted to pdf, so we are producing PNG files of the same pages which are much sharper.

Mr. Zumot has diligently searched through his files again and located images of an additional 14 pages which are being produced herewith marked JZ0088-JZ00101.

JZ0001: This image ties out to the complete text message dated 2022-02-06 21:58:28 which appears on JZ0062.

JZ0002: This image ties out to the complete text message dated 2022-02-22 17:39:13 which appears on JZ0053.

JZ0003: This image ties out to the complete text message dated 2022-03-12 19:33:13 which appears on JZ0048.

8667.1.8

Rachel Strom, et al.
July 24, 2024
Page 3

JZ0007: Mr. Zumot is producing the relevant part of the text conversation with a friend (because it mentions Ms. Williams) and objects to producing any other texts in that thread based on his right to privacy and on relevance grounds because they do not concern Ms. Williams.

JZ0008: Mr. Zumot has produced the entire text conversation between himself and a gentleman named Tim Dondanville who has no connection to the case.

JZT0009: Assuming you mean JZ0009, this is a page from a text conversation between Dan Ferris, Tanya Mehdizadeh, Ms. Williams and Mr. Zumot that took place on 2/7/22. Mr. Zumot found another 3 pages. The complete 4 page thread can be found at JZ0098-101.

JZT0011: Assuming you mean JZ0011, this is the first page of a chapter (JZ0011-JZ0021) which Ms. Williams sent by email to Mr. Zumot. The email cover page is JZ0022.

JZ0033: Ms. Williams sent two images to Mr. Zumot via text as examples of the online harassment that she was subjected to. These images are on JZ0088 and JZ0089.

JZ0037: Same as for JZ0033. The image in question is on JZ0090.

JZ0041: The images in question are on JZ0091 and JZ0092.

JZ0048: The image in question is on JZ0093.

JZ0054: The image in question is on JZ0002.

JZ0055: The images in question are on JZ0094 and JZ0095.

JZ0057: The images in question are on JZ0096 and JZ0097.

JZ0060: Please explain what you are looking for.

The reason why Mr. Zumot has not produced documents that are responsive to categories 3-13 in the subpoena is because he has diligently searched for such documents but did not find any.

As to your last question, the documents in question were withheld because they refer to privileged attorney client communications between Ms. Williams and her attorneys and their attorney work product, as is evident from the information provided in the privilege log, and Mr. Zumot was assisting Ms. Williams with communicating with her counsel in connection with the lawsuit.

Rachel Strom, et al.
July 24, 2024
Page 4

**Issue No. 6**

Joshua Williams has diligently searched his records to find any additional text messages that might be responsive to any of the 14 categories on pages 9-10 of the subpoena, and for any possibly responsive documents dated before April 2018, and was unable to find any.

I trust this resolves all of your concerns. If not, please let me know.

Very truly yours,

RUFUS-ISAACS ACLAND &
GRANTHAM LLP

Alexander Rufus-Isaacs

ARI

cc:    Brian E. Farnan
       Michael J. Farnan
       Rodney A. Smolla

8667.1.8

# **<u>EXHIBIT 6</u>**

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PRIVILEGE LOG OF RACHEL WILLIAMS - Williams v. Netflix, Inc., No. 122-cv-01132-CFC | | | | | | | | | |
| 2 | Batesnumber | | Description | Date | Time | From | To | C.C./Shared With | Subject | Privilege |
| 3 | 10069 | | RW email to ARI | 6/2/2022 | 15:38 | Rachel Williams | Alexander Rufus-Isaacs | | Inventing Anna Cast - Netflix Tudum | Attorney-Client Privilege/Work Product |
| 4 | 41663 | 41668 | Libel report under UK law | 6/5/2019 | | Nicola Thatcher (solicitor) | Quercus Publishing PLC | | | Attorney-Client Privilege/Work Product |
| 5 | 50098 | 50102 | Email from NY atty Elisa Rivlin to RW with notes on RW's book entitled "privileged and confidential" and "atty work oroduct" | 5/16/2019 | 7:48 | Elisa M. Rivlin | Rachel Williams | | Privileged and Confidential: Our Call | Attorney-Client Privilege/Work Product |
| 6 | 50104 | 50105 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/28/2019 | 9:52 | Rachel Williams | Aimee Bell, Max Meltzer, Mollie Glick, Anna Carmichael | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 7 | 50106 | 50107 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/28/2019 | 11:47 | Katy Follain | Rachel Williams | Aimee Bell, Max Meltzer | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 8 | 50108 | 50109 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/28/2019 | 17:28 | Rachel Williams | Aimee Bell, Max Meltzer, Katy Follain | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 9 | 50110 | 50111 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/29/2019 | 12:27 | Rachel Williams | Rachel Williams | Aimee Bell, Max Meltzer | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 10 | 50112 | 50115 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/29/2019 | 3:26 | Katy Follain | Rachel Williams | Aimee Bell, Max Meltzer | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 11 | 50122 | 50124 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/30/2019 | 6:54 | Katy Follain | Rachel Williams | Aimee Bell, Max Meltzer | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 12 | 50125 | 50126 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/30/2019 | 10:34 | Elisa M. Rivlin | Rachel Williams | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 13 | 50127 | 50128 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/30/2019 | 10:48 | Rachel Williams | Elisa M. Rivlin | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 14 | 50129 | 50130 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/30/2019 | 0:48 | Elisa M. Rivlin | Rachel Williams | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 15 | 50131 | 50132 | Emails headed "My Friend Anna - legal report" about the UK libel report | 5/30/2019 | 0:56 | Rachel Williams | Elisa M. Rivlin | | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 16 | 50133 | 50137 | Emails headed "My Friend Anna - legal report" about the UK libel report | 6/3/2019 | 9:27 | Rachel Williams | Katy Follain | Aimee Bell, Max Meltzer | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 17 | 50138 | 50140 | Emails headed "My Friend Anna - legal report" about the UK libel report | 6/7/2019 | 8:27 | Katy Follain | Rachel Williams | Aimee Bell, Max Meltzer, Alison MacDonald | MY FRIEND ANNA - legal report | Attorney-Client Privilege/Work Product |
| 18 | 50141 | 50146 | Libel report under UK law | 6/5/2019 | | Nicola Thatcher | Quercus Publishing PLC | | | Attorney-Client Privilege/Work Product |
| 19 | 50208 | | RW-ARI emails | 2/21/2022 | 13:39 | Rachel Williams | Alexander Rufus-Isaacs | | Anna Sorokin Instagram Posts | Attorney-Client Privilege/Work Product |
| 20 | 60167 | 60169 | Draft email RW to ARI | 2/23/2022 | 11:59 | Rachel Williams | | | | Attorney-Client Privilege/Work Product |
| 21 | 60170 | 60177 | Email RW to ARI | 2/23/2022 | 13:17 | Rachel Williams | | Kathryn Schafer (KS) and Lauri Williams (LW) | INVENTING ANNA - OBJECTIONS (Part 1) | Attorney-Client Privilege/Work Product |
| 22 | 60178 | 60222 | RW-ARI emails and draft complaint | 8/28/2022 | 13:12 | Rachel Williams | Alexander Rufus-Isaacs | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 23 | 60225 | 60229 | RW-ARI emails | 8/29/2022 | | Rachel Williams | Alexander Rufus-Isaacs | Jimmy Zumot (JZ) | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 24 | 70246 | 70255 | Draft email RW to Glen Kulik (GK - attorney) | 4/24/2021 | 12:36 | Rachel Williams | | KS, LW | draft for my defamation lawyer | Attorney-Client Privilege/Work Product |
| 25 | 70256 | | Email RW to GK | 4/24/2021 | 13:46 | Rachel Williams | Glen Kulik | KS, LW, Erick Heck (EH) | Defamation Inquiry from Rachel Williams (Regarding Todd Spodek/Anna Sorokin) | Attorney-Client Privilege/Work Product |
| 26 | 70263 | | Draft email to GK | 4/24/2021 | 15:32 | Rachel Williams | Glen Kulik | LW | Defamation Inquiry from Rachel Williams (Regarding Todd Spodek/Anna Sorokin) | Attorney-Client Privilege/Work Product |
| 27 | 70265 | 70266 | RW-GK emails | 4/24/2021 | 19:23 | Glen Kulik | Rachel Williams | | Defamation Inquiry from Rachel Williams (Regarding Todd Spodek/Anna Sorokin) | Attorney-Client Privilege/Work Product |
| 28 | 70267 | 70270 | RW-GK emails | 4/25/2021 | 9:59 | Rachel Williams | Glen Kulik | KS, LW | Defamation Inquiry from Rachel Williams (Regarding Todd Spodek/Anna Sorokin) | Attorney-Client Privilege/Work Product |
| 29 | 70271 | 70272 | Email RW to GK | 4/25/2021 | 12:02 | Rachel Williams | Glen Kulik | Taylor Vederame, Liz Hancock, Alicia LaPalombara, Kate Kellman | Defamation Inquiry from Rachel Williams (Regarding Todd Spodek/Anna Sorokin) | Attorney-Client Privilege/Work Product |
| 30 | 70421 | 70423 | RW email to ARI | 2/9/2021 | 15:47 | Rachel Williams | Alexander Rufus-Isaacs | | Thank you and additional materials | Attorney-Client Privilege/Work Product |
| 31 | 70457 | 70458 | RW email to ARI | 2/16/2016 | 12:58 | Rachel Williams | Alexander Rufus-Isaacs | | INDEPENDENT UK - Inventing Anna has a brutal vendetta against Rachel DeLoache | Attorney-Client Privilege/Work Product |
| 32 | 90358 | 90359 | Michelle Weiner of CAA (MW) emails with Tara Kole | 11/1/2019 | 19:59 | Michelle Weiner | Tara Kole | CAA people and RW | Potential Question | Attorney-Client Privilege/Work Product |
| 33 | 90364 | 90365 | MW emails with Christine Cuddy (CC - attorney) and GK | 11/5/2019 | 14:29 | Christine Cuddy | Michelle Weiner | CAA people and RW | defamation question | Attorney-Client Privilege/Work Product |
| 34 | 90366 | 90367 | RW emails GK | 11/13/2019 | 15:04 | Rachel Williams | Glen Kulik | | defamation question | Attorney-Client Privilege/Work Product |
| 35 | 90370 | 90371 | MW emails with CC and GK | 11/5/2019 | 14:29 | Christine Cuddy | Michelle Weiner | CAA people and RW | defamation question | Attorney-Client Privilege/Work Product |
| 36 | 90372 | 90373 | RW-GK emails | 11/13/2019 | 15:18 | Glen Kulik | Rachel Williams | | defamation question | Attorney-Client Privilege/Work Product |
| 37 | 90374 | 90393 | RW replies to MW emails with CC and GK | 11/13/2019 | 16:00 | Rachel Williams | Michelle Weiner | CAA people and RW | defamation question | Attorney-Client Privilege/Work Product |
| 38 | 90400 | 90406 | RW-GK emails | 12/18/2019 | 12:41 | Rachel Williams | Glen Kulik | | defamation question | Attorney-Client Privilege/Work Product |
| 39 | 90407 | 90408 | RW replies to MW emails with CC and GK | 12/18/2019 | 14:41 | Rachel Williams | Michelle Weiner | CAA people and RW | defamation question | Attorney-Client Privilege/Work Product |
| 40 | 90409 | | RW-GK emails | 12/18/2019 | 14:30 | Glen Kulik | Rachel Williams | KS | Recap re Rachel DeLoache Williams | Attorney-Client Privilege/Work Product |
| 41 | 90410 | 90417 | RW-GK emails | 12/18/2019 | 11:16 | Rachel Williams | Glen Kulik | | Recap re Rachel DeLoache Williams | Attorney-Client Privilege/Work Product |
| 42 | 90422 | 90433 | RW-GK emails plus draft letter | 1/7/2020 | 16:06 | Rachel Williams | Glen Kulik | | Draft Letter | Attorney-Client Privilege/Work Product |
| 43 | 90532 | 90546 | RW-ARI emails | 2/8/2022 | 15:32 | Rachel Williams | Alexander Rufus-Isaacs | KS, LW | (Time Sensitive) - Defamation - NETFLIX - | Attorney-Client Privilege/Work Product |

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Batesnumber | | Description | Date | Time | From | To | C.C./Shared With | Subject | Privilege |
| 44 | 90547 | 90548 | RW-ARI emails | 2/8/2022 | 16:49 | Alexander Rufus-Isaacs | Rachel Williams | | (Time Sensitive) - Defamation - NETFLIX - | Attorney-Client Privilege/Work Product |
| 45 | 90549 | 90551 | RW-ARI emails | 2/8/2022 | 17:54 | Alexander Rufus-Isaacs | Alexander Rufus-Isaacs | LW, KS | (Time Sensitive) - Defamation - NETFLIX - | Attorney-Client Privilege/Work Product |
| 46 | 90552 | 90556 | RW-ARI emails | 2/8/2022 | 19:49 | Alexander Rufus-Isaacs | Rachel Williams | | (Time Sensitive) - Defamation - NETFLIX - | Attorney-Client Privilege/Work Product |
| 47 | 90566 | 90569 | RW-ARI emails | 2/13/2022 | 0:05 | Alexander Rufus-Isaacs | Rachel Williams | | Google Alert - Rachel DeLoache Williams | Attorney-Client Privilege/Work Product |
| 48 | 90587 | | RW email to ARI | 2/16/2022 | 1:41 | Rachel Williams | Alexander Rufus-Isaacs | KS | Inventing Anna': Shonda Rhimes | Attorney-Client Privilege/Work Product |
| 49 | 90629 | | RW email to ARI | 2/18/2022 | 21:05 | Rachel Williams | Alexander Rufus-Isaacs | | New York Post: Insane 'Inventing Anna' treasts criminal Anna Delvey like a | Attorney-Client Privilege/Work Product |
| 50 | 90633 | | RW email to ARI | 2/20/2022 | 20:00 | Rachel Williams | Alexander Rufus-Isaacs | KS | Katie Lowes on "Rachel Williams in real | Attorney-Client Privilege/Work Product |
| 51 | 90703 | | RW email to ARI | 4/29/2022 | 14:29 | Rachel Williams | Alexander Rufus-Isaacs | | Inventing Anna' Creator Says Parts of | Attorney-Client Privilege/Work Product |
| 52 | 90704 | | RW email to ARI | 4/29/2022 | 14:29 | Rachel Williams | Alexander Rufus-Isaacs | KS | Inventing Anna' Creator Says Parts of | Attorney-Client Privilege/Work Product |
| 53 | 90705 | 90707 | RW-ARI emails | 4/30/2022 | 12:08 | Alexander Rufus-Isaacs | Rachel Williams | | Inventing Anna' Creator Says Parts of | Attorney-Client Privilege/Work Product |
| 54 | 90709 | | RW email to ARI | 2/8/2022 | 15:32 | Rachel Williams | Alexander Rufus-Isaacs | Alan Dimind (atty) | (Time Sensitive) - Defamation - NETFLIX - | Attorney-Client Privilege/Work Product |
| 55 | 90720 | 90721 | RW-ARI emails and draft complaint | 7/29/2022 | 19:11 | Rachel Williams | Alexander Rufus-Isaacs | | The transcript | Attorney-Client Privilege/Work Product |
| 56 | 90722 | 90764 | RW-ARI emails and draft complaint | 8/15/2022 | 18:51 | Rachel Williams | Alexander Rufus-Isaacs | | Inventing Anna: Shonda Rhimes on why she never wanted to meet the real Anna | Attorney-Client Privilege/Work Product |
| 57 | 90765 | 90928 | RW-ARI emails and draft complaint | 8/19/2022 | 21:39 | Alexander Rufus-Isaacs | Rachel Williams | LW, Joshua Williams (JW), JZ, KS | Netflix draft | Attorney-Client Privilege/Work Product |
| 58 | 90930 | 90931 | RW-ARI emails | 8/21/2022 | 22:16 | Rachel Williams | Alexander Rufus-Isaacs | | Inventing Anna: Shonda Rhimes on why she never wanted to meet the real Anna | Attorney-Client Privilege/Work Product |
| 59 | 90932 | 90937 | RW-ARI emails | 8/21/2022 | 23:14 | Alexander Rufus-Isaacs | Rachel Williams | JZ | Inventing Anna: Shonda Rhimes on why she never wanted to meet the real Anna | Attorney-Client Privilege/Work Product |
| 60 | 90938 | 91017 | RW-ARI emails and draft complaint | 8/24/2022 | 11:51 | Alexander Rufus-Isaacs | Rachel Williams | | Inventing Anna: Shonda Rhimes on why she never wanted to meet the real Anna | Attorney-Client Privilege/Work Product |
| 61 | 91018 | 91061 | RW-ARI emails and draft complaint | 8/28/2022 | 10:52 | Rachel Williams | Alexander Rufus-Isaacs | KS, JZ | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 62 | 91064 | 91108 | RW-ARI emails and draft complaint | 8/28/2022 | 19:12 | Rachel Williams | Alexander Rufus-Isaacs | JZ | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 63 | 91111 | 91155 | RW-ARI emails and draft complaint | 8/28/2022 | 19:12 | Rachel Williams | Alexander Rufus-Isaacs | KS | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 64 | 91158 | 91202 | RW-ARI emails and draft complaint | 8/28/2022 | 13:33 | Rachel Williams | Alexander Rufus-Isaacs | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 65 | 91205 | 91328 | RW-ARI emails and draft complaint | 8/28/2022 | 17:47 | Alexander Rufus-Isaacs | Rachel Williams | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 66 | 91329 | 91439 | RW-ARI emails and draft complaint | 8/29/2022 | 6:05 | Alexander Rufus-Isaacs | Rachel Williams | LW, JW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 67 | 91442 | 91552 | RW-ARI emails and draft complaint | 8/29/2022 | 6:05 | Alexander Rufus-Isaacs | Rachel Williams | JZ | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 68 | 91555 | 91666 | RW-ARI emails and draft complaint | 8/29/2022 | 8:04 | Rachel Williams | Alexander Rufus-Isaacs | LW, JW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 69 | 91668 | 91786 | RW-ARI emails and draft complaint | 8/29/2022 | 8:04 | Rachel Williams | Alexander Rufus-Isaacs | LW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 70 | 91789 | 91905 | RW-ARI emails and draft complaint | 8/29/2022 | 12:58 | Alexander Rufus-Isaacs | Rachel Williams | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 71 | 91906 | 92023 | RW-ARI emails and draft complaint | 8/29/2022 | 18:58 | Alexander Rufus-Isaacs | Rachel Williams | LW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 72 | 92024 | 92142 | RW-ARI emails and draft complaint | 8/29/2022 | 18:58 | Alexander Rufus-Isaacs | Rachel Williams | LW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 73 | 92145 | 92151 | RW-ARI emails and draft complaint | 8/29/2022 | 18:58 | Alexander Rufus-Isaacs | Rachel Williams | LW | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 74 | 92152 | 92155 | RW-ARI emails | 8/29/2022 | 14:03 | Alexander Rufus-Isaacs | Rachel Williams | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 75 | 92156 | 92161 | RW-ARI emails | 8/29/2023 | 14:12 | Rachel Williams | Alexander Rufus-Isaacs | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 76 | 92162 | 92166 | RW-ARI emails | 8/29/2022 | 14:12 | Alexander Rufus-Isaacs | Rachel Williams | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 77 | 92167 | 92172 | RW-ARI emails | 8/29/2022 | 14:13 | Rachel Williams | Alexander Rufus-Isaacs | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 78 | 92173 | 92178 | RW-ARI emails | 8/29/2022 | 14:15 | Alexander Rufus-Isaacs | Rachel Williams | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 79 | 92179 | 92184 | RW-ARI emails | 8/29/2022 | 14:17 | Rachel Williams | Alexander Rufus-Isaacs | | Complaint Notes and Question Responses | Attorney-Client Privilege/Work Product |
| 80 | 92185 | | RW-ARI emails | 8/30/2022 | 11:45 | Rachel Williams | Alexander Rufus-Isaacs | | Netflix sued by real Rachel Williams | Attorney-Client Privilege/Work Product |
| 81 | 92185 | | RW-ARI emails | 8/30/2022 | 12:01 | Alexander Rufus-Isaacs | Rachel Williams | | Netflix sued by real Rachel Williams | Attorney-Client Privilege/Work Product |
| 82 | 92187 | | RW-ARI emails | 8/30/2022 | 12:23 | Rachel Williams | Alexander Rufus-Isaacs | | Netflix sued by real Rachel Williams | Attorney-Client Privilege/Work Product |
| 83 | 92196 | 92260 | RW-ARI POST COMPLAINT COMMUNICATIONS | 11/10/2022 | | | | | | Attorney-Client Privilege/Work Product |
| 84 | 92261 | 92265 | RW-ARI emails with MTD | 11/10/2022 | 13:51 | Rachel Williams | Alexander Rufus-Isaacs | JZ | Activity in Case 1:22-cv-01132-CFC | Attorney-Client Privilege/Work Product |
| 85 | 92330 | 92374 | RW-ARI POST COMPLAINT COMMUNICATIONS | | | | | | | Attorney-Client Privilege/Work Product |
| 86 | 92375 | 92376 | RW-ARI POST COMPLAINT COMMUNICATIONS | | | | | | | Attorney-Client Privilege/Work Product |
| 87 | 120767 | 120771 | Vanity Fair Agreement with confidentiality term - unsigned | 4/11/2018 | | Vanity Fair | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |
| 88 | 120777 | 120781 | Vanity Fair Agreement with confidentiality term - unsigned | 4/11/2018 | | Vanity Fair | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |
| 89 | 120830 | 120834 | Vanity Fair Agreement with confidentiality term - signed | 4/11/2018 | | Vanity Fair | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |
| 90 | 200001 | 200004 | Amex Agreement with confidentiality term - signed | 5/29/2019 | | AMEX | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |
| 91 | 360056 | 360060 | Conde Naste Agreement with confidentiality term - signed | 4/30/2019 | | Conde Nast | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |
| 92 | 520002 | 520030 | Simon and Shuster Agreement with confidentiality term - unsigned | 8/7/2018 | | Simon and Shuster | Rachel Williams | | | Confidentiality/Privacy - per non disclosure term |
| 93 | 540001 | 540006 | Conde Naste Agreement with confidentiality term - signed | 4/11/2018 | | Conde Nast | Rachel Williams | | | Confidentiality/Privacy - per non disclosure |

| | Batesnumber | | Description | Date | Time | From | To | C.C./Shared With | Privilege |
|---|---|---|---|---|---|---|---|---|---|
| 1 | PRIVILEGE LOG OF KATHRYN SCHAFER - Williams v. Netflix, Inc., No. 122-cv-01132-CFC | | | | | | | | |
| 2 | Batesnumber | | Description | Date | Time | From | To | C.C./Shared With | Privilege |
| 3 | | | Email from RW to GK | 4/24/2021 | 13:47 | Rachel Williams (RW) | Glen Kulik (GK) | Kathryn Schafer (KS) | Attorney-Client Privilege/Work Product |
| 4 | | | Email from GK to RW | 12/18/2019 | 14:30 | GK | RW | KS | Attorney-Client Privilege/Work Product |
| 5 | | | Email from RW to GK | 12/18/2019 | 11:16 | RW | GK | KS | Attorney-Client Privilege/Work Product |
| 6 | | | Email from RW 'Draft for my lawyer' | 2/3/2022 | 13:22 | RW | | KS, Laurie Williams (LW) | Attorney-Client Privilege/Work Product |
| 7 | KS0033 | | Email from RW 'Draft for the lawyer' | 2/8/2022 | 15:09 | RW | | KS, Carrie Waible (CW) | Attorney-Client Privilege/Work Product |
| 8 | KS0233 | | Email from ARI to RW | 2/21/2022 | 11:12 | ARI (Alexander Rufus-Isaacs) | RW | KS, CW | Attorney-Client Privilege/Work Product |
| 9 | KS0330 | | Text from RW 'regarding my lawsuit' | 6/7/2023 | 9:32 | RW | KS, CW | | Attorney-Client Privilege/Work Product |
| 10 | KS0336 | | Text from RW re comments from my lawyer | 8/29/2022 | 11:19 | RW | KS | | Attorney-Client Privilege/Work Product |
| 11 | KS0336 | | Text from RW re comments from my lawyer | 8/29/2022 | 11:20 | RW | KS | | Attorney-Client Privilege/Work Product |
| 12 | KS0337 | | Text from RW re comments from my lawyer | 8/29/2022 | 11:20 | RW | KS | | Attorney-Client Privilege/Work Product |
| 13 | KS0337 | | KS Response to text from RW re comments from my law | 8/29/2022 | 11:21 | KS | RW | | Attorney-Client Privilege/Work Product |
| 14 | KS0339 | | Email from RW to ARI | 8/30/2022 | 9:02 | RW | ARI | | Attorney-Client Privilege/Work Product |
| 15 | KS0339 | | Text from RW re comments from my lawyer | 8/30/2022 | 9:03 | RW | KS | | Attorney-Client Privilege/Work Product |
| 16 | KS0340 | | Email to ARI from RW | 8/31/2022 | 13:36 | RW | ARI | | Attorney-Client Privilege/Work Product |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 64 | | | | | | | | | |
| 65 | | | | | | | | | |
| 66 | | | | | | | | | |
| 67 | | | | | | | | | |
| 68 | | | | | | | | | |
| 69 | | | | | | | | | |
| 70 | | | | | | | | | |
| 71 | | | | | | | | | |
| 72 | | | | | | | | | |
| 73 | | | | | | | | | |
| 74 | | | | | | | | | |
| 75 | | | | | | | | | |
| 76 | | | | | | | | | |
| 77 | | | | | | | | | |
| 78 | | | | | | | | | |
| 79 | | | | | | | | | |
| 80 | | | | | | | | LW | |
| 81 | | | | | | | | | |
| 82 | | | | | | | | | |
| 83 | | | | | | | | | |
| 84 | | | | | | | | | |
| 85 | | | | | | | | | |
| 86 | | | | | | | | | |
| 87 | | | | | | | | | |
| 88 | | | | | | | | | |
| 89 | | | | | | | | | |
| 90 | | | | | | | | | |
| 91 | | | | | | | | JZ | |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | PRIVILEGE LOG OF JAMES ZUMOT - Williams v. Netflix, Inc., No. 122-cv-01132-CFC | | | | | | | | |
| 2 | Batesnumber | | Description | Date | Time | From | To | C.C./Shared With | Privilege |
| 3 | | | Email from JZ to RW re Complaint Notes | 8/21/2022 | 17:57 | James Zumot (JZ) | Rachel Williams (RW) | | Attorney-Client Privilege/Work Product |
| 4 | | | Email from RW to ARI | 8/26/2022 | 7:06 | RW | Alexander Rufus-Isaacs (ARI) | JZ | Attorney-Client Privilege/Work Product |
| 5 | | | Email from ARI to RW | 8/26/2022 | 7:50 | ARI | RW | JZ | Attorney-Client Privilege/Work Product |
| 6 | | | Email from ARI to RW | 8/26/2022 | 16:57 | ARI | RW | JZ | Attorney-Client Privilege/Work Product |
| 7 | | | Email from RW to ARI | 8/26/2022 | 8:18 | RW | ARI | JZ | Attorney-Client Privilege/Work Product |
| 8 | | | Email from ARI to RW | 8/27/2022 | 3:10 | ARI | RW | JZ | Attorney-Client Privilege/Work Product |
| 9 | | | Email from RW to ARI | 8/28/2022 | 7:52 | RW | ARI | JZ | Attorney-Client Privilege/Work Product |
| 10 | | | Email from ARI to RW | 8/29/2022 | 6:05 | ARI | RW | JZ | Attorney-Client Privilege/Work Product |
| 11 | | | Email from RW to ARI | 8/29/2022 | 5:04 | RW | ARI | JZ | Attorney-Client Privilege/Work Product |
| 12 | | | Email from JZ to RW re Complaint Notes | 8/29/2022 | 5:08 | JZ | RW | | Attorney-Client Privilege/Work Product |
| 13 | | | Email from ARI to RW | 6/10/2022 | 0:01 | ARI | RW | JZ, Rod Smolla (RS) | Attorney-Client Privilege/Work Product |
| 14 | | | Email from AD to RW | 6/26/2022 | 18:57 | Atty Alan Dimond (AD) | RW | JZ | Attorney-Client Privilege/Work Product |
| 15 | | | Email from AD to RW | 6/26/2022 | 18:33 | AD | RW | JZ | Attorney-Client Privilege/Work Product |
| 16 | | | Email from RW to AD | 6/26/2022 | 18:52 | RW | AD | JZ | Attorney-Client Privilege/Work Product |
| 17 | | | Email from ARI to RW | 8/19/2022 | 21:39 | ARI | RW | JZ, Laurie Williams (LW), Joshu | Attorney-Client Privilege/Work Product |
| 18 | | | Email from ARI to RW | 8/15/2022 | 15:52 | ARI | RW | JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 19 | | | Email from ARI to RW | 8/16/2022 | 10:45 | ARI | RW | JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 20 | | | Email from RW to ARI | 8/21/2022 | 19:16 | RW | ARI | JZ | Attorney-Client Privilege/Work Product |
| 21 | | | Email from ARI to RW | 8/21/2022 | 23:11 | ARI | RW | JZ | Attorney-Client Privilege/Work Product |
| 22 | | | Email from RW to ARI | 8/21/2022 | 20:14 | RW | ARI | JZ | Attorney-Client Privilege/Work Product |
| 23 | | | Email from BF to ARI | 1/5/2023 | 7:36 | Brian Farnan (BF) | ARI | RW, JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 24 | | | Email from ARI to RW | 1/5/2023 | 10:54 | ARI | RW | JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 25 | | | Email from RW to ARI | 1/5/2023 | 9:46 | RW | ARI | JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 26 | | | Email from ARI to RW | 1/5/2023 | 13:32 | ARI | RW | JZ, LW, JW | Attorney-Client Privilege/Work Product |
| 27 | | | | | | | | | |
| 28 | | | | | | | | | |
| 29 | | | | | | | | | |
| 30 | | | | | | | | | |
| 31 | | | | | | | | | |
| 32 | | | | | | | | | |
| 33 | | | | | | | | | |
| 34 | | | | | | | | | |
| 35 | | | | | | | | | |
| 36 | | | | | | | | | |
| 37 | | | | | | | | | |
| 38 | | | | | | | | | |
| 39 | | | | | | | | | |
| 40 | | | | | | | | | |
| 41 | | | | | | | | | |
| 42 | | | | | | | | | |
| 43 | | | | | | | | | |
| 44 | | | | | | | | | |
| 45 | | | | | | | | | |
| 46 | | | | | | | | | |
| 47 | | | | | | | | | |
| 48 | | | | | | | | | |
| 49 | | | | | | | | | |
| 50 | | | | | | | | | |
| 51 | | | | | | | | | |
| 52 | | | | | | | | | |
| 53 | | | | | | | | | |
| 54 | | | | | | | | | |
| 55 | | | | | | | | | |
| 56 | | | | | | | | | |
| 57 | | | | | | | | | |
| 58 | | | | | | | | | |
| 59 | | | | | | | | | |
| 60 | | | | | | | | | |
| 61 | | | | | | | | | |
| 62 | | | | | | | | | |
| 63 | | | | | | | | | |
| 64 | | | | | | | | | |
| 65 | | | | | | | | | |
| 66 | | | | | | | | | |
| 67 | | | | | | | | | |
| 68 | | | | | | | | | |
| 69 | | | | | | | | | |
| 70 | | | | | | | | | |
| 71 | | | | | | | | | |
| 72 | | | | | | | | | |
| 73 | | | | | | | | | |
| 74 | | | | | | | | | |
| 75 | | | | | | | | | |
| 76 | | | | | | | | | |
| 77 | | | | | | | | | |
| 78 | | | | | | | | | |
| 79 | | | | | | | | | |
| 80 | | | | | | | | LW | |
| 81 | | | | | | | | | |
| 82 | | | | | | | | | |
| 83 | | | | | | | | | |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 84 | | | | | | | | | |
| 85 | | | | | | | | | |
| 86 | | | | | | | | | |
| 87 | | | | | | | | | |
| 88 | | | | | | | | | |
| 89 | | | | | | | | | |
| 90 | | | | | | | | | |
| 91 | | | | | | | | IZ | |

| Batesnumber | | Description | File Name | Date | Time | From | To | C.C./Shared With | Privilege |
|---|---|---|---|---|---|---|---|---|---|
| | | PRIVILEGE LOG OF LAURIE AND JOSHUA WILLIAMS - Williams v. Netflix, Inc., No. 122-cv-01132-CFC | | | | | | | |
| | | Draft email from RW to GK | Gmail - Re_ draft for my defamation lawyer | 4/24/2021 | 12:37 | Rachel Williams (RW) | Glen Kulik (GK) | LW | Attorney-Client Privilege/Work Product |
| | | Email from LW to RW re defamation lawyer | Gmail - Re_ draft for my defamation lawyer | 4/24/2021 | 13:08 | Laurie Williams (LW) | RW | | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | AttnyCorrespondence | 8/26/2022 | 7:06 | RW | Alexander Rufus-Isaacs (ARI) | Joshua Williams (JW), LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | AttnyCorrespondence | 8/26/2022 | 7:50 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | AttnyCorrespondence | 8/26/2022 | 16:57 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | AttnyCorrespondence | 8/26/2022 | 20:18 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | AttnyCorrespondence | 8/27/2022 | 3:10 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | AttnyCorrespondence | 8/28/2022 | 7:52 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | AttnyCorrespondence | 8/29/2022 | 6:05 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from LW to RW re Complaint | AttnyCorrespondence | 8/29/2022 | 5:10 | LW | RW | JW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | IncludesHolidayLetter | 8/26/2022 | 7:06 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from JW to RW and LW re Summary Memo | IncludesHolidayLetter | 7/7/2022 | | JW | RW, LW | | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RS | IncludesHolidayLetter | 7/7/2022 | 14:15 | ARI | RS | RW, JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | IncludesHolidayLetter | 6/15/2022 | 16:09 | RW | ARI | RS, JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | IncludesHolidayLetter | 6/10/2022 | 0:01 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | IncludesHolidayLetter | 8/21/2022 | 23:11 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | IncludesHolidayLetter | 8/21/2022 | 19:16 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | IncludesHolidayLetter | 8/19/2022 | 21:39 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | IncludesHolidayLetter | 8/16/2022 | 10:45 | ARI | RW | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | IncludesHolidayLetter | 8/15/2022 | 15:52 | RW | ARI | JW, LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | ReLegalCorrespondence | 6/10/2022 | 0:01 | ARI | RW, RS | | Attorney-Client Privilege/Work Product |
| | | Email from RW to LW and JW re Summary Memo | ReLegalCorrespondence | 6/13/2022 | 11:21 | RW | JW, LW | | Attorney-Client Privilege/Work Product |
| | | Email from JW to RW and LW re Summary Memo | ReLegalCorrespondence | 6/14/2022 | 11:35 | JW | RW, LW | | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | Gmail - (Time Sensitive) Defamation - NETFLIX - | 2/8/2022 | 15:32 | RW | ARI | LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | 2 Gmail - Re_ (Time Sensitive) Defamation - NET | 2/8/2022 | 16:49 | ARI | RW | LW | Attorney-Client Privilege/Work Product |
| | | Email from RW to ARI | 2 Gmail - Re_ (Time Sensitive) Defamation - NET | 2/8/2022 | 17:54 | RW | ARI | LW | Attorney-Client Privilege/Work Product |
| | | Email from ARI to RW | 2 Gmail - Re_ Complaint Notes and Question Re | 8/29/2022 | 18:58 | ARI | RW | LW | Attorney-Client Privilege/Work Product |

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 84 | | | | | | | | | | |
| 85 | | | | | | | | | | |
| 86 | | | | | | | | | | |
| 87 | | | | | | | | | | |
| 88 | | | | | | | | | | |
| 89 | | | | | | | | | | |
| 90 | | | | | | | | | | |
| 91 | | | | | | | | | | IZ | |

# <u>EXHIBIT 7</u>

 Gmail

**Rachel Williams <williams.rachel.d@gmail.com>**

---

## 8668.3.1 Rachel Williams Complaint 081922.docx
1 message

**Zumot, James** <JZumot@sigulerguff.com>                                Sun, Aug 21, 2022 at 8:57 PM
To: "williams.rachel.d@gmail.com" <williams.rachel.d@gmail.com>

You'll find some notes attached (I tracked changes and added a few notes).


I thought this was really great – very structured, logical, and focused on <u>factual</u> misrepresentations.


Where I thought that you might take another look was when it came down to highlighting the impact that this ordeal has had on you.  At no point does he quantify the magnitude of the "tidal wave" or "torrent" of hatred that you received as a direct result of this show.   Furthermore, while he references the needlessness of them using your real name, it also might be a good idea to revisit that at the end of the complaint when he explicitly discusses malice.

---

Important legal disclaimers and other information concerning this email can be found here.

**Privacy Notice:** Privacy Notice: For important information about how Siguler Guff uses or collects your personal data, and about your privacy rights, including GDPR and CCPA, please visit here.

---

 **8668.3.1 Rachel Williams Complaint 081922.docx**
101K