# **EXHIBIT 4**



21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Rachel Strom**
212.402.4069 tel
212.379.5244 fax

rachelstrom@dwt.com

June 25, 2024

<u>**VIA Email**</u>

Alexander Rufus-Isaacs
Rufus-Isaacs, Aclanhd, & Grantham LLP
9440 Santa Monica Blvd., Suite 301
Beverely Hills, CA 90210
aisaacs@rufuslaw.com

  Re: *Williams v. Netflix, Inc.*, No. 22-cv-1132-CFC (D. Del. 2022)

Dear Alexander:

  We write in response to your May 28, 2024 letter regarding Defendant Netflix, Inc.'s responses and objections to Plaintiff Rachel Deloache Williams's Request for Production of Documents and First Set of Interrogatories (the "May 28 Letter"). Having reviewed the letter, we are satisfied that our responses and objections comply with the law and do not warrant revision or additional productions. However, to avoid further dispute, we are willing to make a few limited supplemental productions as described below. This response letter addresses the issues raised in the May 28 Letter in the same numerical order:

### I. REQUEST FOR PRODUCTION OF DOCUMENTS

  A. We assume Netflix's May 29 production of its privilege log resolves your concern on this issue.

  B. Similarly, we produced logs for the following third parties on May 29, 2024 as well: Shondaland, Katie Lowes, Jessica Pressler, Abby Ajayi, Jess Brownell, Melissa Lo, Juan Carlos Fernandez, and Nzinga Stewart. We trust that this also resolves your concern on this issue.

  C. We understand Section C of your Letter to concede that Netflix has satisfied its obligation to answer "whether or not all responsive documents have been provided." However, you then assert that Netflix has not made clear "whether or not any responsive documents were found." But this can be best answered from the face of Netflix's substantial document production. While you appear to request

Alexander Rufus-Isaacs
June 25, 2024
Page 2

that Netflix go through your document requests and confirm individually whether it has found documents responsive to each request, we have two main issues with that request. ***First,*** such an exercise is not required by the federal or local rules, nor is it consistent with Plaintiff's own responses and objections to Netflix's document requests. *See, e.g.*, Plaintiff's August 21, 2023 Responses and Objections to Netflix's First Set of Requests for Production of Documents at 8 ("Subject to and without waiving the foregoing specific and general objections, and to the extent Plaintiff understands the Request, she responds that she will produce all non-privileged, responsive documents in her possession, custody or control, subject to the provisions of the stipulated protective order entered in this case.").

***Second***, because of how you worded the document requests, it would be entirely subjective to determine if certain documents were responsive to certain requests. Specifically, some of Plaintiff's requests for production call for documents "having a tendency to prove" a variety of contentions—*i.e.*, "that the primary reason why Plaintiff socialized with Sorokin was because Sorokin provided her with Gifts and Benefits" or "that Plaintiff pressured Sorokin to book a larger or more expensive suite at the La Mamounia Hotel in Marrakech." You may believe one document has a "tendency to prove" such things, while we would disagree.

Thus, if there are particular categories of documents that you do not believe have been produced, we are happy to evaluate those individually and identify any such responsive documents in our production.

D.  As set forth in Section C *supra*, it is apparent from the face of the third parties' substantial document productions whether responsive documents were found for each of Plaintiff's subpoena requests. Additionally, it would be unduly burdensome and inconsistent with the subpoena recipients' third-party status to require them to sift through their productions and itemize which documents were responsive to which subpoena requests. *See, e.g.*, Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."). Even the third parties that you represent did no such thing in their responses and objections. *See, e.g.*, January 9, 2024 Responses and Objections of Third Party Witness James Zumot to Defendant Netflix, Inc.'s Subpoena at 5 ("Subject to and without waiver of these objections, Witness will produce copies of non-privileged documents responsive to this Request to the extent they are located after a reasonable search proportionate to Witness's status as a third-party.").[1]

---

[1] Relatedly, we have now reviewed these third parties' productions and have some concerns regarding the format in which some of them were produced. For example, Mr. Zumot's production contains some illegible documents (*see, e.g.*, JZ0002), as well as screenshots of conversations with unknown recipients (*see, e.g.*, JZ0001). We may follow up with some separate requests for certain documents to be re-produced or certain information about these documents provided.

Alexander Rufus-Isaacs
June 25, 2024
Page 3

As noted *supra*, if there are particular categories of documents requested in the third-party subpoenas that you want to inquire further about, we are happy to evaluate those requests on a case-by-case basis, but we believe that these parties' responses are sufficient as produced and do not require supplementation across the board.

E. You claim once again that Netflix has improperly invoked the New York reporter's privilege. But your argument relies on several fundamental misunderstandings of the statute and the nature of the withheld information.

**_First_**, to be clear, we are not withholding any information under the reporter's privilege about your client. So, the withheld information is not relevant to your client's claims in this case.

**_Second_**, you claim that neither Jessica Pressler nor Netflix can invoke the privilege over Ms. Pressler's newsgathering materials because they were used in the production "of a TV drama," which you claim is "not 'news.'" But Ms. Pressler undoubtedly engaged in newsgathering in the course of drafting her article for *New York Magazine* regarding Anna Sorokin's criminal charges as well as her forthcoming book—and in the process, received information from a number of confidential sources. It does not matter that these newsgathering materials were later used to create a dramatized series—Ms. Pressler and Netflix have an unqualified right under New York law to maintain the protection of these confidential sources' identities—which were originally procured as part of Ms. Pressler's writing process. *See* N.Y. Civ. Rights Law § 79-h(b).

**_Third_**, even if Ms. Pressler had not engaged in newsgathering for purposes of writing an article and book (she did), the New York reporter's privilege can apply beyond traditional journalists to those entities/individuals who perform "[t]he informative function asserted by representatives of the organized press . . . [such as] novelists, academic researchers, and dramatists." *Von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144–45 (2d Cir. 1987) (emphasis added*); see also Matter of Application of Home Box Off., Inc.*, 64 Misc. 3d 566, 570-71 (N.Y. Sup. Ct. 2019) (holding that New York Shield law applied to HBO as "documentary filmmakers have been deemed journalists and are thus entitled to the privilege" and noting that "even were the project more entertainment-focused, the broad definition would still likely apply as long as one of the purposes of the project was disseminating news to the public . . . ."). Here, in dramatizing the real-life events involved in Anna Sorokin's high-profile criminal case, Netflix was performing an informative function for the public—thus, the New York Shield Law would apply even in the absence of Ms. Pressler's role.

**_Fourth_**, you claim that the privilege cannot apply to documents that "were not created by Ms. Pressler and/or do not mention her name." This is untrue, and you

have no law to support this proposition. Rather, the privilege, by its very terms protects all information "made or obtained" by the journalist. N.Y. Civ. Rights Law § 79-h(c). And, information Ms. Pressler obtained would not have been created by her and likely would not mention her name.

To the extent you claim that Netflix has no right to invoke the privilege over documents containing Ms. Pressler's newsgathering information, this is also incorrect. Where, as here, Ms. Pressler confidentially shared her newsgathering with Netflix while working for them as a consultant on the series, Netflix shall invoke the reporter's privilege on her behalf. *See* N.Y. Civ. Rights Law § 79-h(f) ("The privilege contained within this section shall apply to supervisory or employer third person or organization having authority over the person described in this section."). Accordingly, Ms. Pressler's newsgathering information (such as the names of her confidential sources) may be redacted from Netflix's documents as well—not just from Ms. Pressler's production. *See Home Box Office, Inc.*, 64 Misc. 3d at 567 (holding that HBO could invoke the New York reporter's privilege over outtakes of a documentary produced by its sub-division HBO Documentary Films and famed actor Dwayne "The Rock" Johnson).

*Fifth*, you claim that the "privilege only [provides] protection against being held in contempt. It does not prevent us from seeking other remedies, such as evidence or issue preclusion." This is plainly untrue. The statute prohibits journalists from being compelled to disclose both their confidential sources (without any exceptions) and their non-confidential newsgathering materials unless the latter is "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." N.Y. Civ. Rights Law § 79-h(b-c). The statute also provides that such confidential sources are "inadmissible in any action or proceeding," as are non-confidential newsgathering materials unless the three elements above are satisfied. N.Y. Civ. Rights Law § 79-h(d); *see also Giuffre v. Maxwell*, 221 F. Supp. 3d 472 (S.D.N.Y. 2016) (quashing subpoena served on journalist in a defamation case, finding the New York Shield Law precluded any inquiry into the identities of journalist's confidential sources and also protected her non-confidential newsgathering materials); *Greenberg v. CBS Inc.*, 69 A.D.2d 693, 709 (2nd Dep't 1979) (refusing to require media defendants in defamation case to waive the New York Shield Law and disclose their confidential sources, noting it "would be unnecessarily damaging to the purposes of the statute"); *Sprewell v. NYP Holdings, Inc.*, 43 A.D.3d 16, 22 (1st Dep't, 2007) (granting summary judgment to media defendants on defamation claim and allowing them to rely on information provided by confidential sources without revealing their identities).

For these reasons, we will not withdraw our reporter's privilege in this case over newsgathering information that, in any event, is not related to your client.

Alexander Rufus-Isaacs
June 25, 2024
Page 5

    **F.** In this section, you speculate that Netflix did not produce documents you believe should exist by drawing parallels from an unrelated case about another series. But your questions are mainly premised on a fundamental misunderstanding as to how the Series was produced. We will address each sub-category of documents in turn:

        a. You complain that Netflix has only produced two sets of Writers' Room Notes, even though third-party Shondaland produced many of these documents. The reason for this is obvious—Shondaland wrote and produced *Inventing Anna*, not Netflix. As you can see from the Writers' Room Notes that were produced, the individuals typically in the room during these meetings included Shonda Rhimes and the other third-party writers on the show. Thus, it is entirely understandable why these documents were produced by Shondaland instead of Netflix—they were only in the possession of Shondaland.

        b. This same response applies to section (b), in which you allege that Netflix only produced three sets of documents containing comments on the development of the Series. The Series was written and developed by Shondaland, which is not a party to this case. As you can tell from the privilege logs that we produced, however, Netflix lawyers reviewed the Series, but those communications are clearly work product and attorney-client privileged.

        c. You incorrectly claim that we did not produce Ms. Pressler's notes from Plaintiff's testimony at Anna Sorokin's trial. Those documents were produced at SHONDALAND012718-20 (titled "Courtroom happenings from Jessica for 4/17/19) and SHONDALAND011948-49 (titled "Jessica's report from court: Thursday April 18: Rachel Day 2").

        d. You falsely claim that we have failed to produce documents "pertaining to the drafting of and/or discussion about the press release dated October 31, 2019, in which Netflix insultingly described Rachel as 'a natural-born follower . . . . .'" But we produced 146 documents containing the "natural-born follower" language, so we trust this resolves your concerns.

    You also request "a list of custodians, search terms, and the time period searched by Netflix, Shondaland and the witnesses." As we have said since February, if you provide these items for the documents searched by your client, then we will do the same for Netflix.

    **G.** ==In this section, you seek the contracts between Netflix and Shondaland. While we still maintain that these documents are irrelevant to Plaintiff's defamation claims, should you agree that this will resolve your concerns, we will produce six agreements that pertain to the creation of the Series, but we will not agree to produce any other documents or agreements that are referred to in these agreements,==

>as they are not relevant to the specific creation of the Series. Specifically, if it will resolve your concerns, we will agree to produce the following contracts: (1) the Separation of Rights Agreement; (2) the Certificate of Authorship; (3) the Script Agreement; and (4) the agreements with Anna Sorokin, Kacy Duke, and Neffatari Davis. Please let us know if that will address your concerns, and we will produce those agreements.

## II. INTERROGATORIES

**A. Interrogatories Nos. 2, 3 and 4**: You ask that Netflix "confirm that the chart in support of the Motion to Dismiss states all facts which support or refute the subject contentions." However, all three of these interrogatories constitute "contention interrogatories" as they request Netflix to state "all the facts upon which it bases a contention"—and courts in the Third Circuit have found that such interrogatories should be deferred "until the end of discovery." *Novanta Corp., v. Iradion Laser, Inc.*, No. CV 15-1033-SLR-SRF, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2016) ("If the court forces a party to respond to early contention interrogatories, the party may have to set forth theories of its case that have not yet been developed"); *see also Fischer & Porter Co. v. Tolson*, 143 F.R.D. 93, 96 (E.D. Pa. 1992) (contention interrogatories were premature when filed before substantial documentary or testimonial discovery had been completed). In this case, discovery does not close until December 2024, and thus, it would be premature to fully respond to these interrogatories. Additionally, as noted in Netflix's Responses and Objections, these interrogatories are also inappropriate because they call for legal conclusions—for example, asking for evidence regarding lack of defamatory meaning, which is a question of legal interpretation for the court.

Notwithstanding this response, Netflix intends to serve a revised interrogatory response to identify Jinny Howe as a Netflix witness on the topic of actual malice.

**B. Interrogatories Nos. 5 and 6**: You object to Netflix's response to Interrogatory 5, which requested that Netflix identify "all gifts that Sorokin gave to Plaintiff at any time." But, as noted in the Interrogatory response, this is information that Plaintiff herself clearly already possesses—and will be fully known to Defendant throughout the course of discovery, specifically after Defendant deposes Plaintiff and Sorokin. It is inappropriate to request further clarification at this time. Likewise, regarding Netflix's response to Interrogatory No. 6 (which requested that Netflix identify "all Benefits for which Plaintiff paid, and which were consumed by, provided to or otherwise benefitted both Plaintiff and Sorokin (or Sorokin's friends)"), you state only that "it makes no difference if plaintiff provided a Benefit based on an assumption, or if American Express later issued a credit for a payment that plaintiff had previously made." Netflix does not understand this criticism to be calling for additional information, and so declines to respond further.

Alexander Rufus-Isaacs
June 25, 2024
Page 7

      **C. Interrogatory No. 8**: Regarding Interrogatory No. 8, you clarify that this interrogatory seeks information about any "interviews" Netflix conducted of persons "for purposes connected to the lawsuit." Any such interviews, if they occurred, would clearly be attorney-client privileged and work product. Accordingly, Netflix declines to respond further.

We are available to discuss if you have any questions.

      Respectfully Submitted,

      Rachel Strom

cc:    Brian Farnan
       Michael Farnan
       Rodney Smolla
       Thomas Hanson Jr.