IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| RACHEL DELOACHE WILLIAMS, | |
| Plaintiff, | |
| v. | C.A. No. 22-cv-1132-CFC-EGT |
| NETFLIX, INC., | |
| Defendant. | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER PARTIAL MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Dated: August 29, 2025

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Telephone: (310) 274-3803
aisaacs@rufuslaw.com

Dion G. Rassias (Bar No. 2829)
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 592-1000
Facsimile: (215) 592-1523
dgr@beasleyfirm.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
Telephone: (864) 373-3882
rodsmolla@gmail.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

# Table of Contents

I.    INTRODUCTION ...................................................................1

II.   STATEMENT OF FACTS ....................................................1

III.  SUMMARY OF ARGUMENT.............................................1

IV.   ARGUMENT.........................................................................2

    A.    The Summary Judgment Standard ...............................2

    B.    The Elements of a New York Defamation Claim ...........3

    C.    The Statements are False and Tend to Expose Williams to Reputational Harm ...................................................4

        1.    The Morrocco Statements are False..........................4

        2.    The Morocco Abandonment Statements are Defamatory ...........................................................6

        3.    The Credit Card Discipline Statements are False .................7

        4.    The Credit Card Discipline Statements are Defamatory .........................................................9

        5.    The First Element of the Defamation Claims is Satisfied .........9

    D.    The Publication Element is Satisfied .........................9

    E.    The Statements were Published with Actual Malice.....................10

        1.    The Actual Malice Requirement ...........................10

        2.    Netflix Has Admitted Fabrication Of The Morrocco Scenes ..................................................10

3.    **Netflix Has Admitted Fabrication Of The Disciplinary Scenes** ........................................................................11

4.    **Deliberate Fabrication of Material Falsity is Actual Malice** ...................................................................13

5.    **The Motive to Villainize Explains the Deliberate Fabrication**................................................................15

6.    **That *Inventing Anna* Is A Dramatization Does Not Alter The Analysis**................................................19

7.    **The Actual Malice Has Been Brought Home** .......................21

F.    **The Statements Constitute Libel Per Se**...........................................24

V.    **CONCLUSION** .............................................................................25

# Table of Authorities

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................3

*Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407, 885 N.Y.S.2d 251 (2009) ...................24

*Burnett v. National Enquirer, Inc.*, 144 Cal. App. 3d 991 (1983) ...........................14

*Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir. 1976) ......................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................3

*Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. App. 548, 372 N.E.2d 1211 (1978) ...............................................................................................................17

*Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967) .................................. 16, 17, 19

*Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997) .............. 13, 21

*Fairstein v. Netflix, Inc.*, 2023 WL 6125631 (S.D.N.Y. Sept. 19, 2023), ........ 20, 21

*Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 21 N.Y.S.3d 6 (2015) ................6

*Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537 (C.D. Cal. Jan. 27, 2022) ..........20

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .............................................................14

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ...................................................10

*Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280 (S.D.N.Y. 2023) ........ 13, 24

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir.1969), *cert. denied*, 396 U.S. 1049 (1970) ............................................................................................. 17, 19

*Greenberg v. Spitzer*, 155 A.D.3d 27, 62 N.Y.S.3d 372 (2017) ........................ 4, 10

*Harris v. City of Seattle*, 152 Fed. App'x 565 (9th Cir. 2005) ...............................17

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ...........16

*Harvey v. Netflix, Inc.*, 2024 WL 4536639 (C.D. Cal. Sept. 27, 2024) ..................20

*Herbert v. Lando*, 441 U.S. 153 (1979) ..................................................................13

*Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348 (2009) .............................................16

*Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011) ...................................................3

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ...................................6

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).................................... 10, 21

*Palin v. New York Times Co.*, 113 F.4th 245 (2d Cir. 2024)........................... 17, 25

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) ........................................................................25

*Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, *cert. denied*, 423 U.S. 882 (1975)...........................................................................17

*St. Amant v. Thompson*, 390 U.S. 727 (1968)..........................................................13

*Tavoulareas v. Piro*, 759 F.2d 90 (D.C. Cir.), *vacated on other grounds,* 817 F.2d 762 (D.C. Cir. 1987) (en banc), *cert. denied*, 484 U.S. 870 (1987)........................................................................................................ 18, 19

*Thomas H. v. Paul B.*, 18 N.Y.3d 580 (2012).............................................................6

*Wehling v. Columbia Broadcasting System* 721 F.2d 506 (1983).............................6

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458 (3d Cir. 1989) ................3

**Rules**

Fed. R. Civ. P. 56 .....................................................................................................14

Fed. R. Civ. P. 56(a)...................................................................................................2

Fed. R. Civ. P. 56(g) ..................................................................................................3

**Treatises**

Robert Sack, *Libel, Slander, and Related Problems* (1980)............................... 6, 24

Rodney Smolla, *Law of Defamation* (1991) ...................................................... 6, 17

Rodney Smolla, *Smolla and Nimmer On Freedom of Speech* (2008) .....................16

# I. INTRODUCTION

This is an action for defamation *per se* arising from knowingly false statements and attributions concerning plaintiff Rachel DeLoache Williams made by defendant Netflix, Inc., in its series entitled *Inventing Anna* about a fraudster named Anna Sorokin. The parties have stipulated that New York substantive law shall govern this case.[1]

## II. STATEMENT OF FACTS

The facts germane to this Motion are set forth in the accompanying Concise Statement of Facts. When appropriate they are referenced as "SF" and incorporated in the argument below.

## III. SUMMARY OF ARGUMENT

The Complaint identifies 16 sets of defamatory statements divided into 5 categories: (1) statements in which she is portrayed as a freeloader and/or a false friend, (2) statements in which she is portrayed as a snob, (3) **statements in which she is portrayed as abandoning Sorokin in Morocco**; (4) statements in which she is portrayed as deceiving friends about her role in Sorokin's arrest, and (5) **statements in which she is portrayed as being disciplined by her employer for misusing her corporate American Express card to pay for Sorokin-related**

---

[1] On November 4, 2022, Netflix filed a motion to dismiss the Complaint for failure to state a claim, which Williams opposed. By Order dated March 26, 2024, the Court dismissed the false light cause of action but otherwise denied the motion.

**expenses**.

The present Motion for Summary Judgment on Liability argues that summary judgment on liability should be granted in Williams' favor on the third and fifth categories (above in bold)—the "Morocco abandonment" defamation, and the "credit card discipline" defamation. No disputed issues of fact exist as to any elements of Williams's defamation claims under those two categories. The statements are defamatory, false, were published with actual malice, and constitute "libel per se."

Most critically, the falsity of the statements is not contested, and the persons within Netflix responsible for the statements have openly admitted that the scenes were invented. Williams did not do what the scenes depicted her as doing, and did not say what the scenes depicted her as saying. As this is a rare case in which defendants have conceded that the offending defamatory material is false and fabricated, and all other elements of her defamation claim being satisfied, Williams is entitled to summary judgment as to liability for those defamatory statements.[2]

## IV.    ARGUMENT

### A.    The Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides:  "A party may move for summary judgment, identifying each claim or defense—or the part of each

---

[2] Williams does not move for summary judgment on damages.

claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Rule 56(g) further provides: "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."

"Facts that could affect the outcome are 'material facts,' and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011), *citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Williams v. Borough of West Chester, Pa*., 891 F.2d 458, 460-61 (3d Cir. 1989).

### B.    The Elements of a New York Defamation Claim

"The elements of a cause of action for defamation are (a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c)

amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting defamation per se." *Greenberg v. Spitzer*, 155 A.D.3d 27, 41, 62 N.Y.S.3d 372, 383 (2017).  In addition, where, as here, the plaintiff is a public figure, she is required to prove, by clear and convincing evidence, that the defamatory statements were published with actual malice.  *Id.*  As to the two categories on which Williams seeks summary judgment, all four elements are satisfied.  No genuine issues of material fact exist as to any of them, and Williams is thus entitled to judgment as a matter of law.

### C.  The Statements are False and Tend to Expose Williams to Reputational Harm

### 1.  The Morrocco Statements are False

The falsity of the Morrocco Statements is not disputed. Here are the undisputed true facts:

Sorokin invited Williams and Jesse Hawk on a vacation to the luxury La Mamounia Resort in Morocco in May 2017.  (SF#1) Williams accepted but told Sorokin that she would have to leave on May 19 for a work assignment in France. (SF#2)

When they arrived on May 13, the Resort asked Sorokin for a credit card but she did not have one that worked.  She said that funds would be wired to her shortly. On May 18, under pressure from the Resort, Sorokin asked Williams to give them a credit card to hold until her funds arrived. Williams agreed and gave the Resort her

personal American Express card to hold as security. She later exchanged it for Corporate American Express card provided by her employer, Condé Nast. (SF#3)

On May 19, Williams had breakfast with Sorokin and Hawk at the Resort and then left for her work assignment in France, believing that Sorokin's funds would arrive soon and she would pay the Resort. (SF#4) After Williams left, Sorokin and Hawk moved to another 5-star hotel in Morocco where they spent another week before going home. (SF#5)

Here is how *Inventing Anna* falsely portrayed these events:

Hawk's character, Noah, meets Williams as night falls and suggests that they leave the Resort immediately. Williams goes to the bedroom and finds Sorokin in bed alone, drunk and depressed. She tells Sorokin that they are leaving, making a bogus excuse. Sorokin begs her not to leave her, but Williams says she is leaving anyway. She packs and departs the Hotel with Noah, leaving Sorokin on her own with a hotel guard outside her room. (SF#6)   *Inventing Anna* later shows Sorokin's friend Neff Davis being interviewed by Vivian the journalist. Davis states, "Please, Rachel abandoned Anna. Kicked her when she was down, and left her alone in some foreign country. Rachel's happy to call herself Anna's friend when it meant free shit, trips to Morocco, but as soon as times got tough. . . Some friend." (SF#¶ 7)

The dissonance between what really happened and what was portrayed as having happened in *Inventing Anna* is actionable falsehood. The "substantial truth"

5

principle, in New York and across the United States, distinguishes between the trivial and the material.  Trivial falsehoods are not actionable; material falsehoods are.   As the Supreme Court held in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), the test is whether the statement would "'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* at 517, *quoting* Robert Sack, *Libel, Slander, and Related Problems* 138 (1980); and *citing Wehling v. Columbia Broadcasting System* 721 F.2d 506, 509 (1983) *and* Rodney Smolla, *Law of Defamation* § 5.08 (1991).  *See also Franklin v. Daily Holdings, Inc*., 135 A.D.3d 87, 94, 21 N.Y.S.3d 6, 12 (2015) (same).

The falsehoods here are far from trivial.  The truth is that Williams left Morocco on her long-established exit date of May 19.  There was no dramatic confrontation in Sorokin's bedroom, in which Williams left a drunken Sorokin with a lame excuse.  There was no abandonment of Sorokin by Williams of any sort, whatsoever.  These are undisputed material falsehoods.

## 2.    The Morocco Abandonment Statements are Defamatory

The Morocco abandonment statements portray Williams as a fickle and hypocritical fair-weather friend who abandoned Sorokin when she was alone, greatly depressed and vulnerable in a remote foreign country. The statements on their face would and did expose Williams to "public contempt, hatred, ridicule, aversion or disgrace." *Thomas H. v. Paul B*., 18 N.Y.3d 580, 584 (2012).  Indeed, as the

6

Complaint alleged, and as now remains absolutely uncontroverted on the record before this Court, Williams was subjected to a torrent of public contempt, hatred, aversion, and disgrace for allegedly having abandoned her friend Sorokin in Morocco. These real-world expressions of contempt numbered in the thousands. This existence of this avalanche of reputational contempt caused by the falsity has been and could not be contested by Netflix.

### 3. The Credit Card Discipline Statements are False

The falsity of the credit card discipline statements is not disputed. Here are the undisputed true facts:

Williams testified at Sorkin's criminal trial that the Resort charged $16,770 to the Corporate American Express Card that Williams had through her employer Condé Nast, publisher of *Vanity* Fair. (SF#17) The Corporate Card was a personal charge card and therefore Williams was liable for any charges she made to it, not Condé Nast. (SF#18) When Williams used the Corporate Card for business expenses, she would submit an expense report to Condé Nast, and Condé Nast would reimburse her for the expenses. (SF#19) Williams sometimes used the Corporate Card to pay for personal expenses; and if she did, she would not seek reimbursement from Condé Nast but would pay American Express herself. (SF#20) Condé Nast employees sometimes charged personal expenses to their corporate credit cards; if they paid those charges themselves, they were never disciplined. (SF#21) Soon

7

after she got back from Morocco, Williams told Condé Nast executives that there was a large charge on the Corporate Card for which she was responsible. (SF#22) Condé Nast took no disciplinary action against Williams as a result of the charges to the Resort on the Corporate Card. (SF#23)  It never started an investigation, or suspended her, or threatened to call the police, or asked her to return the Corporate Card or ID, or accused her of fraud. (SF#23)  Williams filed a dispute with American Express over the charges to the Resort on her on the Corporate Card and in September 2017, American Express temporarily removed them from her account, later waived them completely. (SF#24)

Here is how *Inventing Anna* portrayed those credit card discipline events:

Williams is shown being asked by a colleague named Linda about an unpaid balance on the Condé Nast Corporate Card. Feigning ignorance, Williams replies, "Oh. Mine?" Linda says she should pay it before it is discovered. Williams agrees, adding, "I must have forgotten." (SF#25) Williams is again shown talking to a character called Linda, who is shocked that Williams let Sorokin "spend $62,000 on your company AmEx."  (SF#26) Williams is later shown in a meeting with her employer.  At first Williams is shown denying allegations that she was "trying to defraud the company."  Williams asks, "Are you firing me?" The Executive says, "If an investigation finds that you were in on it, we'll be calling in the police." Williams denies taking anything. The Executive says, "You stayed at the hotel, didn't

you?" He added, "You helped your friend defraud this company. You're neck deep in this Rachel." (SF#27)  Williams is again shown meeting with her employer. The Executive tells her, "Rachel, until this investigation is complete, I'll need you to return all your company IDs and credit cards," and adds that she has been "suspended pending a thorough enquiry." (SF#28)

### 4. The Credit Card Discipline Statements are Defamatory

Again, these falsehoods are defamatory and material.  The truth is that Williams did nothing wrong at all in relation to her Corporate Card.  She was entirely forthcoming with Condé Nast, was never investigated, threatened with criminal prosecution, or suspended. Yet the Series portrays Williams as dishonestly attempting to deceive her employer, for which she was threatened with police investigation, and suspended from employment.  The difference between the truth and the portrayal would plainly have an effect on the average reader sufficient to subject Williams to "contempt, hatred, ridicule, aversion, or disgrace."

### 5. The First Element of the Defamation Claims is Satisfied

The bottom line is manifest.  There are no genuine undisputed facts as to the material falsity or defamatory impact of the Morocco abandonment and credit card discipline statements.

### D. The Publication Element is Satisfied

The second element of a New York defamation claim is "publication," requiring communication of the defamatory material to a third party.  *Greenberg*,

155 A.D.3d at 41. *Inventing Anna* was presented to millions of viewers - the seven episodes in which Williams' character appeared had been streamed for a total of ███████ hours worldwide as of January 2025. (SF#98) The publication element is satisfied.

### E.    The Statements were Published with Actual Malice

### 1.    The Actual Malice Requirement

The third element of a defamation claim in New York is fault. Williams concedes that she is a public figure for purposes of her suit and thus must prove actual malice through clear and convincing evidence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Actual malice means publishing the defamation "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Because Netflix is an organizational defendant, "the state of mind required for actual malice" must "be brought home to the persons in the . . . organization having responsibility for the publication." *Id.* at 284.

### 2.    Netflix Has Admitted Fabrication Of The Morrocco Scenes

Jess Brownell was a writer and Writers Guild of America ("WGA") member who contracted with, and was paid by, Storybuilders LLC, a WGA signatory entity[3]

---

[3] WGA members are required by the WGA to contract with an entity which is a signatory to the WGA collective bargaining agreements when working in the USA. Ex.14, 14:25-15:16.

that is ultimately wholly owned by Netflix ("Storybuilders"). (SF#8)  She was the primary writer of Episode 6, in which the scenes about leaving Morocco appear. (SF#8, 9) Brownell testified in her deposition that the scenes were fictional and invented. (SF#10, 11, 12, 13, 14)

Jinny Howe was designated as the Netflix representative to testify about Netflix's decision to develop and/or produce a series; research about the facts upon which the Series is based; the differences between Rachel Williams and the character in the Series named Rachel Williams; the differences between the events described in Rachel Williams' book and article and the events in the Series; and the use of Rachel Williams' real name for a character in the Series.  ██████████████ ██████████████████████████████████████████████████ . (SF#15) Similarly, Shonda Rhimes did not know whether Williams had a conversation with Sorokin like the one described in SF#6 and agreed that she did not leave Morocco against Sorokin's wishes. (SF#16)

### 3. Netflix Has Admitted Fabrication Of The Disciplinary Scenes

Abby Ajayi was the primary writer of Episode 7 in which the scenes about Williams being disciplined appear. (SF#33). She entered into a work-for-hire contract with Storybuilders. (SF#34) She created the fictional scenes that are the subject of the 15th and 16th Defamatory Statement and are described in SF#25-28. (SF#37 and 38) But she did not know what rules Conde Nast had about employees'

use of corporate Amex cards. (SF#39) Nor did she know if Conde Nast ever investigated Williams about the charges to the Corporate Card or if Williams was ever suspended from her job because of the charges to the Corporate Card. (SF#40 and 42) She knew that Williams was never ordered to return her company ID and credit cards. (SF#41) In short, she invented the disciplinary measures that were shown to have been taken against Williams in these scenes. (SF#44) Generally, she believed it was fair to portray Williams' fears about being disciplined as events in the Series even though the events in question did not occur in real life. (SF#43)

Dr. Melissa Lo was a researcher working on the Series. (SF#14) She was able to check facts about Conde Nast policies and procedures with a friend who worked as an editor at Vanity Fair, and did so at least once. (SF30) But she did not bother to investigate whether Conde Nast had a policy prohibiting employees from charging personal expenses to corporate credit cards. (SF#29) She admitted that she had no basis for believing that Williams had disciplinary problems at work because of the charges to the Corporate Card (except for texts she sent to Sorokin seeking reimbursement). (SF#31) █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████"(SF#32)

Shonda Rhimes was the showrunner who oversaw the Series and contributed to the writing of Episodes 1-8. (SF#44) She did not know if Conde Nast took any

disciplinary measures against Williams because of the credit card charges. (SF45)

### 4.    Deliberate Fabrication of Material Falsity is Actual Malice

In a typical actual malice case, a plaintiff must establish actual malice through indirect or circumstantial evidence. That is because "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." *Herbert v. Lando*, 441 U.S. 153, 170 (1979). There are rare cases, however, in which the evidence of actual malice is direct, coming from the concessions of the defendants themselves. *See Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 308 (S.D.N.Y. 2023) (finding direct evidence of actual malice from the testimony of a television show's host).

Actual malice is usually contested, often by a defendant's self-serving denials, and when contested, is typically a jury question. Claims by defendants of good faith belief in the truth are routine and reflexive in defamation cases, but such claims alone will not insulate the defendant from liability. "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant," or "is the product of his imagination." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Courts commonly view such protestations with incredulity. *See Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial

evidence. By examining the editors' actions we try to understand their motives.")

The admissions here, however, take this case beyond the usual creation of jury issue.  In conceding that the offending scenes at issue here were entirely invented, Netflix has taken the jury question off the table. Rule 56 swings both ways.  On this record, in which Netflix concedes that the scenes were completely fabricated, no jury would even be permitted to find anything other than "knowledge of falsity."

Deliberate fabrication of a material falsehood is actual malice on steroids.  The principle that a deliberate fabrication is unprotected by the First Amendment dates to 1964, and is as old as the establishment of the actual malice standard itself.  As the Supreme Court explained when analyzing the tension between First Amendment freedoms and defamation, "[t]he use of calculated falsehood, however, would put a different cast on the constitutional question.  Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964). *See also Carson v. Allied News Co.*, 529 F.2d 206, 212 (7th Cir. 1976) (statements that are "a sheer fabrication by the defendant" are "an express example of actual malice"); *Burnett v. National Enquirer, Inc.*, 144 Cal. App. 3d 991, 1011(1983) (finding actual malice when the defendant knew that the publication was in part false and that the remainder of its substance "might very well be").

14

### 5.    The Motive to Villainize Explains the Deliberate Fabrication

The record here also clearly establishes *the reason* Netflix intentionally
fictionalized scenes defaming Williams.  Shonda Rhimes and the others responsible
for creating and writing *Inventing Anna* believed that the Series needed a villain.
(SF#¶ 68) Out of animus toward Williams, they cynically decided to portray
Williams as that villain.  (SF#¶¶ 68, 69)  The writers hired by Netflix to write the
Series met regularly in person in a room from March 2019 through February 2020
to create the Series. (SF#¶ 46)  It is no wonder that those writers produced a portrayal
of Williams that would expose her to "contempt, hatred, aversion, and disgrace."



(SF#¶¶ 46-70)

(SF#¶¶ 46-70)

" _____ " (SF#71); " _____ " (SF#¶¶78, 80); " _____

_____ " (SF#80); "a

_____ " (SF#79); Rachel is _____ (SF#82); " _____

_____ (SF#84); _____ (SF#85); _____

_____ (SF#86); _____

████████████████████████████ (SF#87; ████████████

(SF#90); and Rachel is ████████████████ (SF#92).

The writers were thus dripping with common-law "ill-will" malice toward Williams. As media defendants will always correctly point out, it is error to conflate common-law ill-will malice with constitutional "actual malice." Yet it is also well established that the existence of such animus is probative of actual malice, in that it supplies evidence of the motive from which knowing or reckless falsity may be inferred. *See Kipper v. NYP Holdings Co*., 12 N.Y.3d 348, 353-55, n. 4, (2009) (Observing that the "sort of actual malice required under *New York Times* 'should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will,'" but also noting that "such motivations are not irrelevant to the actual malice inquiry "), *citing* Rodney Smolla, *Smolla and Nimmer On Freedom of Speech* § 23:3, at 23–17 (2008). *See also Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 169 (1967) (Warren, C.J., concurring) (finding that actual malice was shown by a magazine's motivation to drive circulation through sensationalized reporting). So too, the Second Circuit, in a defamation case tried under New York law, held that political "bias" was probative of the existence of actual malice. *Palin v. New York Times Co*., 113 F.4th 245, 267

16

(2d Cir. 2024).

In a similar vein, "'evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.'" *Harris v. City of Seattle*, 152 Fed. App'x 565, 567-68 (9th Cir. 2005), *quoting* Smolla, *Law of Defamation* at § 3:71.  As applicable here, the evidence that the writers of *Inventing Anna* decided in advance that the Series needed a villain and Williams should be that villain, is a variation of the "preconceived story line" motif.  *See also Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir.1969) ("evidence of ... motive and intent" may help establish actual malice), *cert. denied*, 396 U.S. 1049 (1970); *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. App. 548, 560, 372 N.E.2d 1211, 1220 (1978) (desire to "get" plaintiff is "relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity"); *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, 688, *cert. denied*, 423 U.S. 882 (1975) ("[W]hen [*Associated Press v. Walker*, 388 U.S. 130 (1967)] and *Curtis* are read together, they still stand for the proposition that personal motives on the part of a newspaper, or participation by a newspaper in a plan or scheme to injure, is evidence of recklessness and willful disregard for truth which may be considered along with other evidence on the question of actual malice.").

Among the most cogent articulation of these principles was decision of the United States Court of Appeals for the District of Columbia Circuit, in a panel decision written by Judge McKinnon and joined by then-Judge and later-Justice Antonin Scalia:

> The mere existence of a preconceived plan to "get" the subject of a defamatory story does not prove that the publisher acted knowingly or recklessly in publishing false information. But it is beyond question that one who is seeking to harm the subject of a story—whether motivated by simple ill will (*Cochran*), or partisan political considerations (*Sprouse*), or otherwise laudable concern for the safety of the nation (*Ginzburg*), or a mere desire to attract attention and boost circulation (*Butts*)—is more likely to publish recklessly than one without such motive. We turn, then, to the evidence of the defendants' motive to "get" the plaintiffs.

*Tavoulareas v. Piro*, 759 F.2d 90, 118 (D.C. Cir.), *vacated on other grounds,* 817 F.2d 762, 766 (D.C. Cir. 1987) (en banc), *cert. denied*, 484 U.S. 870 (1987). Elaborating, the court explained that that "distinction, however, is akin to that between motive to kill (e.g., greed or hatred) and intent to kill in a murder prosecution. They are not the same thing. The second is an element of the crime of murder; the first is evidence admissible to prove that element." *Id.* at 118, n. 34.[4]

---

[4] The panel opinion was vacated by the Circuit *en banc* based on a holding that considering all factors, actual malice was not established.  But the *en banc* Court did not quarrel with the panel's observations that bad motives may in appropriate cases be probative of actual malice, stating: "Nevertheless, reason and the weight of precedent suggest that, under some circumstances, the probative value of ill-will evidence in establishing 'intent to inflict harm through falsehood' outweighs

(Continued…)

In short, "[t]here is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." *Goldwater*, 414 F.2d at 342, *citing Curtis*, 388 U.S. at 159-61.

While evidence of ill-will, bias, and preconceived story lines can thus support an inference of actual malice, this case is one giant step beyond all that. For here, no *inference* of actual malice is necessary. Netflix's witnesses have *conceded* that they manufactured the offending scenes defaming Williams. Here, the evidence of hatred for Rachel and the biased preconceived decision to cast her as the Series victim merely provides the context explaining *why* Netflix intentionally falsified its portrayal. The animus supplies the context that rounds out the actual malice picture.

### 6. That *Inventing Anna* Is A Dramatization Does Not Alter The Analysis

Netflix is entitled to no shelter from the fact that *Inventing Anna* was a dramatization. Netflix may pretend to think so, as evidenced by the flip statements that appear at the beginning of the various series episodes, which say in one breadth that "This (whole) story is completely true," and then, with brazen hubris, adding "except for all the parts that are total bullshit" or "totally made up." (Exs. 1 and 2)

---

the risk that admitting such evidence will chill honestly believed speech." *Tavoulareas* 817 F.2d at 795. The quoted panel analysis on motive thus remains persuasive authority.

But Netflix knows well better, from the many decisions in which Netflix programs that defame real people have been found defamatory. Indeed, even in works that purport to be *fictional*, Netflix portrayals have been found actionable as defamation when a false statement is deemed "of and concerning" a real person. In *Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537, at *8-9 (C.D. Cal. Jan. 27, 2022), for example, the fictional Netflix series *The Queen's Gambit* included a statement defaming a real person, the renowned Georgian chess champion Nona Gaprindashvili. The court found the statement actionable. *Id.* at * 9. So too, in *Harvey v. Netflix, Inc.*, 2024 WL 4536639, at *10 (C.D. Cal. Sept. 27, 2024), arising from the Netflix series *Baby Reindeer*, the court found allegations of actual malice arising from scenes in the series alleged to have falsely portrayed a central character in a drama presented as a true story.

The most significant germane precedent is *Fairstein v. Netflix, Inc.*, 2023 WL 6125631 (S.D.N.Y. Sept. 19, 2023), arising from the Netflix series, *When They See Us*, another Netflix dramatization of real events. In finding the portrayals of events actionable, the court there noted that, as here, "[t]here is evidence that, by opting to portray Fairstein as the series villain who was intended to embody the perceived injustices of a broader system, defendants reverse-engineered plot points to attribute actions, responsibilities and viewpoints to Fairstein that were not hers and are unsupported in defendants' substantial body of research materials." *Id.* at *1.

20

Similarly, as here, the court found that "the record also contains creative notes in which the series writers and Netflix employees suggest heightening the most negative aspects of the Fairstein character to build dramatic tension and advance storytelling goals." *Id.* at *2. The court in *Fairstein* concluded that "actual malice may be present when a dramatization or fictional work includes a description of a real-life person that is contradicted by the source material." *Id.* at *11.

The deviation from the "source material" is far starker here than in *Fairstein*, given the admission by Netflix that the offending Morocco abandonment and credit card discipline scenes were entirely invented. In deliberately fabricating these scenes, Netflix acted at its peril, and must accept the consequences of its hubris and temerity. *See Eastwood.* 123 F.3d at 1256 ("[W]e find, from the totality of their choices, that the editors intended to convey the impression—known by them to be false—that Eastwood willfully submitted to an interview by the Enquirer. This intentional conduct satisfies the 'actual malice' standard, permitting a verdict for Eastwood.").

### 7.    The Actual Malice Has Been Brought Home

Finally, the actual malice encompassed in the decisions to invent scenes that would subject Williams to obloquy and derision has been brought home to those responsible for the content of the offending scenes. *See Sullivan*, 376 U.S. at 287. The production of *Inventing Anna* was a collaborative effort between Netflix and

21

Shondaland (sometimes described as a "partnership") based on their 2017 agreement, with Netflix having financial and creative control over the Series subject to certain approval rights held by Shondaland. (SF#46, 47, 48) For example, Netflix needed to approve the acquisition of the rights to the Pressler article on which the Series was based and paid for them. (SF#50) ████████████████████████████ ████████████████████████████████ (SF#52)

Through Storybuilders, Netflix hired Rhimes as the showrunner and main writer for the Series. (SF#49) It relied on Rhimes, Lo and its inhouse counsel to compare the real life events and the events portrayed in the Series. (SF#53) Lo prepared research packages for each major character setting out the underlying facts and annotated notes on the scripts which she sent to Netflix's inhouse counsel for approval before sending them to the cast and program makers. (SF#56, 57)

Knowledge of the true facts was available to all of them through the transcripts of Williams' sworn testimony in the Criminal Trial ("Transcripts"). Copies were sent to Netflix ███████████████████████████████ ████████████████████ (SF#58) Netflix ██████████████████████████ ███████████████████████████████████ consulted Williams' book to research the facts. (SF#60, 61) Netflix was not only aware of the true facts but also how the Series falsely portrayed the underlying events because it

was provided with draft scripts and edits of the Series which it reviewed and then sent comments back to Shondaland. (SF#66)

Lo read the Transcripts and relied on them for her research because she was confident that Williams' testimony was accurate and more reliable than other people's unsworn testimony. (SF#59) Rhimes, Ajayi and Brownell also read them. (SF#35) ███████████████████████████ (SF#62)

Rhimes felt that it was necessary to invent scenes in order to make them "sing" but she wanted to know the true facts so that her fictionalizing would be intentional. (SF#54, 55) This was especially true of Williams because ███████████████ ██████████ she was not under contract to Netflix. (SF#51, 63)

The fact that the writers did not have access to Williams and that they invented scenes about her did not raise accuracy concerns for Netflix. (SF#64) ██████████ ██████████████████████████████████████████████████ ████████████████████████████████████ (SF#65, 77)

The actual malice targeting Williams was ubiquitous, permeating all levels of the collaboration, from top to bottom. The comments quoted above in Section E(5) show that those with actual malice responsible for the defamation include, most importantly, Shonda Rhimes, a dominant character (SF#69). Her sympathies clearly lay with Sorokin, a "fascinating creature" whom she rooted for, in contrast with

Willaims whom she ██████████ describes as the "villain of our story." (SF#90, 92, 93, 94) Netflix and the writers clearly followed her lead in this respect. (SF96, 97)

### F.     The Statements Constitute Libel Per Se

The statements at issue constitute libel per se under New York law.  To begin, in New York a broadcast such as *Inventing Anna* is treated as libel, not slander.  "[B]ecause of the permanence and reach that television and radio broadcasts attain, broadcast speech bears closer similarities to writing than to fleeting, ordinary spoken language, and therefore if spoken defamation is broadcast rather than merely uttered, most American jurisdictions treat it as libel rather than slander." *Goldfarb*,  663 F. Supp. 3d at 295, *citing Sack on Defamation* at § 2:3.  "New York follows the majority rule."  *Goldfarb*,  663 F. Supp. 3d at 295.

Jurisdictions across the United States vary somewhat in their use of the term of art "per se" in defamation law, often with different definitions for libel and slander.  New York follows the mainstream and traditional position as to libel.  "Libel is broken down into two discrete forms—libel per se, where the defamatory statement appears on the face of the communication, and libel per quod, where no defamatory statement is present on the face of the communication but a defamatory import arises through reference to facts extrinsic to the communication." *Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407, 412, 885 N.Y.S.2d 247, 251 (2009).  The defamatory meaning of the Morocco and credit card statements is plain on the face of the

24

statements.   Williams was thus not "obliged to prove special damages because the challenged statements were defamatory per se, meaning that they tended 'to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society.'" *Palin*, 113 F.4th at 268, *quoting Rinaldi v. Holt, Rinehart & Winston, Inc*., 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) ("Any written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.").

## V.   CONCLUSION

For the reasons recited above, Plaintiff Rachel Williams moves for summary judgment as to liability on the Morrocco and credit card discipline statements.


Dated: August 29, 2025                    Respectfully submitted,

                                          FARNAN LLP

                                          /s/ Brian E. Farnan
                                          Brian E. Farnan (Bar No. 4089)
                                          Michael J. Farnan (Bar No. 5165)
                                          919 North Market St., 12th Floor
                                          Wilmington, DE 19801
                                          Telephone: 302-777-0300
                                          Facsimile: 302-777-0301
                                          bfarnan@farnanlaw.com

mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
Telephone (864) 373-3882
rodsmolla@gmail.com

Dion G. Rassias (Bar No. 2829)
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 592-1000
Facsimile: (215) 592-1523
dgr@beasleyfirm.com

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Telephone: (310) 274-3803
aisaacs@rufuslaw.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

26

## CERTIFICATION OF COMPLIANCE

The foregoing document complies with the type-volume limitation of this Court's Order re Extension of Word Limit for Motions for Summary Judgment and Oppositions Thereto.  The text of this Plaintiff's Opening Brief in Support of Her Partial Motion for Summary Judgment on Liability, including footnotes, was prepared in Times New Roman, 14 point.  According to the word processing system used to prepare it, the brief contains 6,084 words, excluding the case caption, list of contents, table of authorities, and signature block.

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

Dated: August 29, 2025