IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RACHEL DELOACHE WILLIAMS,

Plaintiff,

v.

NETFLIX, INC.,

Defendant.

C.A. No. 22-cv-1132-CFC-EGT

**FILED UNDER SEAL**

**PLAINTIFF'S CONCISE STATEMENT OF FACTS IN SUPPORT OF HER PARTIAL MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Dated: August 29, 2025

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Telephone: (310) 274-3803
aisaacs@rufuslaw.com

Dion G. Rassias (Bar No. 2829)
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 592-1000
Facsimile: (215) 592-1523
dgr@beasleyfirm.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
Telephone: (864) 373-3882
rodsmolla@gmail.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

**Departure From Morocco – The True Facts**

1.    ███████████████████████████████████████████████

███████████████████████████████████ Ex.3, p.8.

2.    Williams accepted but told Sorokin that she would have to leave on May 19 for a work assignment in France. Ex.4, 286:13-287:21.

3.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ Ex.3, pp.8-9.

4.    ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ Ex.3, p.9; Ex.6.

5.    ███████████████████████████████████████████████

████████████████████████████████████████████ Ex.3, p.9.

**The Series Falsely Portrays Williams' Departure From Morocco**

6.    In the 9th Set Of Defamatory Statements, Hawk's character (Noah) meets Williams and suggests that they leave the Resort immediately. She goes to pack and finds Sorokin in bed alone, drunk and depressed. She tells Sorokin that

they are leaving, making a bogus excuse. Sorokin begs her not to leave her, but Williams leaves anyway. She departs the Hotel with Noah, leaving Sorokin on her own with a guard outside her room. Ex.1 (on thumb drive) at time stamp 46:00-51:05; Ex.7, 118:25-119:18; Ex.61, pp.2-5.

7.      The 10th Set Of Defamatory Statements shows Sorokin's friend Neff Davis being interviewed by a journalist. Davis states, "Please, Rachel abandoned Anna. Kicked her when she was down, and left her alone in some foreign country. Rachel's happy to call herself Anna's friend when it meant free shit, trips to Morocco, but as soon as times got tough... Some friend." Ex.1 at 54:25-54:40; Ex.61, p.6.

**Williams' Departure From Morocco – Actual Malice**

8.      Jess Brownell was a writer and member of the Writers Guild of America ("<u>WGA</u>") who contracted with, and was paid by, Storybuilders LLC, a WGA signatory entity that is ultimately wholly owned by Netflix ("Storybuilders"). Ex.7, 17:7-18:2; Ex.56, ¶8 and Exh. F; Ex. 60. p.1.

9.      Brownell wrote Episode 6. Id., 106:4-7, 107:12-24.

10.     Brownell knew that everyone was aware that Williams was leaving the Resort before Sorokin for a prearranged work trip to France. Id., 115:14-116:5.

11.     Brownell knew that after Williams left, Hawk and Sorokin stayed on and went to another luxury resort in Morocco together for a week. Id., 116:6-24.

12.    Brownell had no reason to believe that Sorokin had asked Williams to stay before Williams left. Id., 116:25-117:3.

13.    Brownell agreed that the scenes and conversations in which the 9th and 10th Sets Of Defamatory Statements appear ("Defamatory Scenes") were fictional and invented. Id., 117:4-119:18; Ex.61, pp.2-5.

14.    Brownell read the research packages that had been written by Dr. Melissa Lo, a researcher working on the Series, one of which included the facts in ¶¶1-5 above. Ex.3, pp.8-9; Ex.7, 26:13-23.

15.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ [1] Ex.8, 17:19-19:10, 150:18-152:4.

16.    Shonda Rhimes did not know whether Williams had a conversation with Sorokin like the one shown in the 9th Set Of Defamatory Statements and agreed that she did not leave Morocco against Sorokin's wishes. Ex.17, 171:15-173:22, 175:24-176:12.

---

[1] Howe was designated as Netflix's representative to testify about the research upon which the Series is based and the differences between the events described in Williams' book and article and the events in the Series. Ex.8, 15:3-16:9.

**Disciplinary Issues Regarding The Corporate Card – The True Facts**

17.    Williams testified at Sorkin's criminal trial ("Trial") that the Resort charged $12,654.96 and $4,115,49 (total $16,770) to the Corporate Card. Ex.5, 1976:1-7; Ex.9, p.2.

18.    The Corporate Card was a personal charge card; employees were responsible for paying American Express, not Conde Nast. Ex.11, 9:14-17, 20:5-21; Ex.62, pp.5-7.

19.    Williams testified at the Trial that if she used the Corporate Card for business expenses, she would submit an expense report to Conde Nast, and would be reimbursed for the business expenses. Ex.10, 2030:23-2031:10.

20.    Williams testified at the Trial that she sometimes used the Corporate Card to pay for personal expenses; and if she did, she would not seek reimbursement from Conde Nast but would pay American Express herself. Id., 2031:11-17.

21.     Conde Nast employees sometimes charged personal expenses to their corporate credit cards; so long as they paid those charges themselves, they were never disciplined. Ex.11, 38:5-18, 71:14-72:5.

22.    After she got back from Morocco, Williams told Conde Nast that there was a personal charge on the Corporate Card for which she was responsible. Ex.11, 18:14-19:13, 78:13-79:4; Ex.12, 246:12-247:21; Ex.63.

23.    Conde Nast took no disciplinary action against Williams as a result of the charges to the Resort on the Corporate Card. It never started an investigation, or suspended her, or threatened to call the police, or asked her to return the Corporate Card or her ID, or accused her of fraud. Ex.11, 70:19-71:6, 72:16-73:5, 80:20-81:22, 82:14-17.

24.    Williams filed a dispute with American Express over the charges to the Resort on her on the Corporate Card. In September 2017, American Express temporarily removed them from her account and later waived them. Ex.64, p.2.

**Disciplinary Issues Regarding The Corporate Card - What The Series Showed**

25.    The 15th Set Of Defamatory Statements shows Williams being asked by a colleague named Linda about an unpaid balance on the Corporate Card. Feigning ignorance, she replies, "Oh. Mine?" Linda says she should pay it before it is discovered. She agrees, adding, "I must have forgotten." Ex.2 (on thumb drive), 16:10-16:45.

26.    The 16th Set Of Defamatory Statements consists of 3 scenes in Episode 7. The first shows Williams talking to Linda who is shocked that Williams "let (Sorokin) spend $62,000 on your company AmEx." Id., 18:38-18:51.

27.    The second scene shows Williams in a meeting with her employer, denying allegations that she was "trying to defraud the company." She asks, "Are you firing me?" The Executive says, "If an investigation finds that you were in on

it, we'll be calling in the police." The Executive added, "You helped your friend defraud this company. You're neck deep in this Rachel." Id., 38:05-38:45.

28.    The third scene shows Williams in another meeting with her employer. The Executive tells her, "Rachel, until this investigation is complete, I'll need you to return all your company IDs and credit cards," and adds that she has been "suspended pending a thorough enquiry." Id., 45:33-50.

**Disciplinary Issues Regarding The Corporate Card – Actual Malice**

29.    Lo did not investigate or know if Conde Nast had a policy prohibiting employees from charging personal expenses to corporate credit cards. Ex.13, 96:12-22.

30.    Lo was able to check facts about Conde Nast policies and procedures with a friend who worked as an editor at Vanity Fair, and did so at least once. Ex.14, 49:4-50:23; Ex.15, p.2.

31.    Lo had no reasonable basis for believing that Williams had disciplinary problems at work because of the charges to the Corporate Card. Ex.13, 129:6-12, 130:6-10.

32.    ███████████████████████████████████████

███████████████████  Ex.16, p.2; Ex.13, 90:10-22.

33.    Abby Ajayi was the primary writer of Episode 7 and a WGA member. Ex.14, 14:23-15:16, 19:25-20:5.

34.    Ajayi entered into a work-for-hire contract with Storybuilders. Id., 17:3-11; Ex.56, ¶8 and F.

35.    Rhimes, Ajayi and Brownell read the transcripts of Williams' testimony in the Trial ("Transcripts"). Ex.14, 57:2-4; Ex.7, 26:3-8; Ex.17, 67:6-8.

36.    Shonda Rhimes was the showrunner who oversaw the Series and contributed to writing Episodes 1-8. Ex.17, 132:4-19.

37.    Ajayi created the fictional scene that is the subject of the 15th Defamatory Statement. Ex.14, 137:10-138:4; Ex.18, pp.2-3 (blue highlights).

38.    Ajayi created the fictional scenes that are the subject of the 16th set of Defamatory Statements. Id., 150:11-152:2; 153:19-154:3; Ex.18, pp.6-12 (yellow highlights).

39.    Ajayi did not know what rules Conde Nast had about employees' use of corporate Amex cards. Id., 140:25-141:6.

40.    Ajayi did not know if Conde Nast ever investigated Williams about the charges to the Corporate Card. Id., 150:25-151:7.

41.    Ajayi knew that Williams was never ordered to return her company ID and credit cards until the investigation was complete. Id., 150:11-24.

42.    Ajayi did not know if Williams was ever suspended from her job because of the charges to the Corporate Card. Id., 151:22-152:2.

43.     Ajayi believed it was fair to portray Williams' fears about being disciplined as events in the Series even though the events in question did not occur in real life. Id., 153:5-18.

44.     Ajayi invented the disciplinary measures that were shown to have been taken against Williams in these scenes. Id., 153:19-154:3.

45.     Rhimes did not know if Conde Nast took any disciplinary measures against Williams because of the credit card charges. Ex.17, 201:3-6.

**Actual Malice- General**

46.     In 2017, Netflix entered into a 5-year agreement with Shondaland (renewed for another 5 years in 2022) whereby it paid Shondaland's overhead and other expenses in return for the exclusive services of Shondaland and Rhimes. Ex.17, 16:10-12, 17:19-21, 19:25-20:5; Ex.19; Ex.66, 23:14-21.

47.     Netflix had financial and creative control over the projects it worked on with Shondaland, including the Series, subject to Shondaland's approval rights over certain issues. Ex.17, 21:21-22:4, 24:12-25:4 and 138:6-23; Ex.19, ¶3.

48.     Netflix executives described the relationship with Shondaland as a partnership. Ex.20, 25:6-12; Ex.65, 16:24-17:7; 30:3-20; Ex.66, 15:20-16:3, 16:19-18:8, 30:10-25.

49.    Through Storybuilders, Netflix hired Rhimes as the showrunner and main writer for the Series. Ex. 17, 16:10-12, 17:19-21; Ex.56, ¶¶3, 4; Exs. 58, 59 and 60.

50.    Netflix needed to approve the acquisition of the article on which the Series was based and paid for them. Ex.17, 21:21-22:4.

51.    ████████████████████████████████████████████████████

████████████████████████ Ex.8, 38:3-39:6.

52.    ████████████████████████████████████████████████████

Ex.8, 8:5-9:13; Ex.57.

53.    Netflix relied on Rhimes, Lo and its inhouse counsel to compare the real life events with the events portrayed in the Series. Ex.21, ¶¶3-4 and 9; Ex.8, 51:25-56:10.

54.    Rhimes said: "The big addition to our room this time was we hired a really incredible, amazing researcher. … We wanted to know what we were making up. … We wanted to intentionally be fictionalizing moments versus just accidentally be fictionalizing moments." Ex.22; Ex.17, 29:20-30:9

55.    Rhimes said, "[t]here were so many elements of that show that were facts... But there was also stuff that we invented because it needed to be invented to make the story really sing and be what it should be." Ex.23; Ex.17, 33:16-34:5

56.    Lo prepared research packages for each major character setting out the underlying facts which she had to send to Netflix's inhouse counsel for approval before sending them to the cast and program makers. Ex.13, 19:1-8, 37:1-38:21

57.    Lo also prepared annotated notes on the scripts which she had to send to Netflix's inhouse counsel for approval before sending them to the cast and program makers. Ex.13, 36:8-13.

58.    The Transcripts were sent to Netflix ███████████████████ ████████████████████████████████ Exs. 5 and 10 (bate stamps); Ex.8, 49:19-50:15; 56:11-57:11.

59.    Lo read the Transcripts and relied on them for her research because they provide Williams' version of what happened, and she was confident that Williams' sworn testimony was accurate and more reliable than other people's unsworn testimony. Ex.13, 30:16-24; 80:3-14; 83:22-84:1; Ex.24, p.3.

60.    ██████████████████████████████████ ████████████████████████████ Ex.8 40:8-41:2; 49:19-50:23.

61.    Netflix consulted Williams' book entitled "My Friend Anna" ("Book") to research the facts. Ex.8, 43:8-16; 45:21-46:20; Ex.20, 50:6-14; Ex.25, p.1.

62.    Lo sent portions of the Book to the writers. Ex.26; Ex.7, 25:6-13.

63.    Rhimes said that because they could not interview her, the writers had to invent some things about Williams and they also relied on what Sorokin and others told them. Ex.23, pp.2 and 4; Ex. 17:33:16-34:5.

64.    ███████████████████████████████████████████
███████████████████████████████████████ Ex.8, 62:9-63:24.

65.    ███████████████████████████████████████████
███████████████████████████ Ex.8, 68:8-22.

66.    Netflix were provided with draft scripts and edits of the Series which it reviewed and then sent comments back to Shondaland. Ex.8, 48:21-25; 185:15-186:24; Ex.20, 23:4-25:5; Ex.27.

**Actual Malice – Expressions Of Malice Against Williams**

67.    The writers met in a room (the "Writers Room") to discuss the Series. An assistant summarized their discussions in Writers Room Notes ("Notes") which are generally accurate. Rhimes' comments are in bold. Ex.7, 54:20-55:7; Ex.17, 101:17-102:19.

68.    Some of the Notes were sent to Netflix. Exs. 54, 55 (see bate stamps).

69.    Rhimes was the dominant personality in the Writers Room and had influence over the other writers whom she had hired. Ex.14, 68:15-21, 69:4-7; Ex.7, 60:5-15.

70.



Ex.29, p.3.

71.                                                      Ex.30, p.8.

72.                                                      Ex.31, p.12.

73.                                                      Ex.32, p.6.

74.

Id.; Ex.33, pp.3-4; Ex.34, p.1.

75.    Rhimes "love(d)" Davis' negative posts about Williams. Ex.35, p.2.

76.    Rhimes would not want herself to be portrayed in the way that Neff depicted Williams in the Instagram post. Ex.36; Ex.17, 49:21-50:4.

77.    Rhimes agreed that Davis was biased against Williams and "made sure that we portrayed her bias very clearly in the show." Ex.17, 51:10-23.

78.



Ex.37, p.2.

79.                                              Ex.34, p.7; Ex.17, 107:14-19.



80.

"  Ex.38, p.1; Ex.7, 78:21-80:23.

81.  Ex.38, p.2.

82.  Ex.39, p.2.

83.  Ex.40, p.2; Ex.17, 133:6-12.

84.  Ex.41, p.12.

85.  Ex.42, p.20; Ex.17, 110:15-25.

86.  Ex.43, p.3.

87.



elp

Ex.44, p.2.

88.

Ex.45, p.2.

89. Ex.46, p.2.

90. Ex.47, p.3.

91.

Ex.48; Ex.17, 67:21-68:12.

92. Ex.49, p.5.

93.    Rhimes said of Sorokin in an interview, "she's a "fascinating" creature, saying, "She's a villain's villain, if you know what I mean. You kind of can't help but admire her." Ex.50, p.3; Ex.17, 45:4-12.

94.    In another interview, Rhimes said, "I root for Anna." Ex.51, p.2; Ex.17, 46:13-16.

95.    Netflix suggested to Shondaland that Davis "was genuine and real, unlike (Williams)." Ex.52, p.3.

96.

(Ex.1 at 54:25-54:40) ███████████████████████████████████ Ex.53,

p.3; Ex.17, 54:5-19.

97.    Howe believed that Williams was "milking the cow," i.e., exploiting

her problems with Sorokin to benefit financially. Ex.28, p.1.

98.    The relevant episodes of the Series were streamed for ██████

hours. Ex. 67.

Dated: August 29, 2025

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rodney Smolla (Bar No. 6327)
164 Chelsea Street
South Royalton, VT 05068
Telephone (864) 373-3882
rodsmolla@gmail.com

Dion G. Rassias (Bar No. 2829)
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 592-1000
dgr@beasleyfirm.com

Alexander Rufus-Isaacs (admitted *pro hac vice*)
RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Telephone: (310) 274-3803
aisaacs@rufuslaw.com

*Attorneys for Plaintiff Rachel DeLoache Williams*

## CERTIFICATION OF COMPLIANCE

The foregoing document complies with the type-volume limitation of this Court's Order re Extension of Word Limit for Motions for Summary Judgment and Oppositions Thereto.  The text of this Statement, including footnotes, was prepared in Times New Roman, 14 point.  According to the word processing system used to prepare it, the brief contains 2,920 words, excluding the case caption and signature block.

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

Dated: August 29, 2025