# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RACHEL DELOACHE WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | C.A. No.:  22-1132-CFC-EGT |
| | : | |
| v. | : | **PUBLIC VERSION** |
| | : | |
| NETFLIX, INC., | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT NETFLIX, INC.'S OPENING BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (LIABILITY)

OF COUNSEL:
Rachel F. Strom
Chelsea T. Kelly
Nimra H. Azmi
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rachelstrom@dwt.com
chelseakelly@dwt.com
nimraazmi@dwt.com
lindseycherner@dwt.com

Kelly M. Klaus
Blanca F. Young
Rose Leda Ehler
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
kelly.klaus@mto.com
blanca.young@mto.com
rose.ehler@mto.com
Dated:  August 29, 2025

Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant Netflix, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................1

NATURE AND STAGE OF PROCEEDINGS ........................................2

SUMMARY OF ARGUMENT ...............................................................3

STATEMENT OF FACTS .....................................................................3

I.    BACKGROUND ..........................................................................3

II.   WILLIAMS'S DEFAMATION CLAIM ........................................6

ARGUMENT .........................................................................................6

I.    WILLIAMS CANNOT MEET HER BURDEN ON ACTUAL MALICE ........................................................................................8

    A.   As to Each Statement, Williams Must Have Clear and Convincing Evidence That a Netflix Executive Responsible for Publishing the Series Had Subjective Awareness of the Statement's Probable Falsity ................................................8

    B.   Williams Has No Evidence That Any Netflix Executive Had Subjective Awareness of Any Statement's Probable Falsity .............11

    C.   Williams Has No Evidence That Netflix Intended or Was Reckless to Any Alleged Defamatory Implication .............................14

II.   WILLIAMS CANNOT MEET HER BURDEN ON FALSITY ....................16

    A.   "Misusing her Business Amex" (Nos. 15–16) .....................................18

    B.   "Abandoning Sorokin in Morocco" (Nos. 9–10) ................................20

    C.   "Freeloader/False Friend" (Nos. 1–7, 10) ..........................................22

    D.   "Snob" (No. 8) .......................................................................................25

    E.   "Deceiving friends about her role in the arrest or benefitting from it" (Nos. 11–14) ..................................................................................25

CONCLUSION ......................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................................7

*Basulto v. Netflix*,
    No. 1:22-cv-21796, 2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) .............13, 14

*Blair v. Inside Edition Prods.*,
    7 F. Supp. 3d 348 (S.D.N.Y. 2014) .........................................................7, 17, 24

*Buckley v. Littell*,
    539 F.2d 882 (2d Cir. 1976) ....................................................................23

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001) ....................................................................19

*Church of Scientology Int'l v. Time Warner, Inc.*,
    903 F. Supp. 637 (S.D.N.Y. 1995) .........................................................8

*Colborn v. Netflix, Inc.*,
    661 F. Supp. 3d 838 (E.D. Wisc. 2023)....................................................2, 9, 10

*Copeland v. Netflix, Inc.*,
    No. 1:24-cv-00163-SB, 2025 WL 775500 (D. Del. Mar. 11, 2025) ...................8

*Davis v. Costa-Gavras*,
    654 F. Supp. 653 (S.D.N.Y 1987) ............................................................11, 20

*Dongguk Univ. v. Yale Univ.*,
    734 F.3d 113 (2d Cir. 2013) ....................................................................10

*Dunn v. Gannett N.Y. Newspapers, Inc.*,
    833 F.2d 446 (3d Cir. 1987) ....................................................................8, 11

*Electra v. 59 Murray Enters., Inc.*,
    987 F.3d 233 (2d Cir. 2021) ....................................................................7, 13

*Fairstein v. Netflix, Inc.*,
   No. 20-cv-8042 (PKC), 2023 WL 6125631 (S.D.N.Y. Sept. 19,
   2023) ...................................................................................................11

*Fodor v. Berglas*,
   No. 95 Civ. 1153 (SAS), 1995 WL 505522 (S.D.N.Y. Aug. 24,
   1995) ...............................................................................................11, 12

*Guccione v. Hustler Mag., Inc.*,
   800 F.2d 298 (2d Cir. 1986) ...............................................................17

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989).............................................................................8

*Heller v. NBCUniversal, Inc.*,
   No. 15-cv-09631-MWF-KS, 2016 WL 6583048 (C.D. Cal. June
   29, 2016) .........................................................................................17, 18

*Kendall v. Daily News Publ'g Co.*,
   716 F.3d 82 (3d Cir. 2013) ..........................................................*passim*

*Lovingood v. Discovery Commc'ns, Inc.*,
   800 F. App'x 840 (11th Cir. 2020) ......................................................14

*Mallory v. S & S Publishers*,
   260 F. Supp. 3d 453 (E.D. Pa. 2017).............................................12, 13

*Mallory v. Simon & Schuster, Inc.*,
   728 F. App'x 132 (3d Cir. 2018) .........................................................13

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991)........................................................................11, 17

*McCafferty v. Newsweek Media Grp., Ltd.*,
   955 F.3d 352 (3d Cir. 2020) ............................................................7, 13

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990)................................................................................17

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................................8, 10

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) ...............................................................17

*Prince v. Intercept*,
   No. 21-CV-10075, 2023 WL 4492413 (S.D.N.Y. July 12, 2023).....................10

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
   774 F. Supp. 3d 688 (S.D.N.Y. 2025) ...............................................14

*Schiavone Constr. Co. v. Time, Inc.*,
   847 F.2d 1069 (3d Cir. 1988) ...............................................................9

*SodexoMAGIC, LLC v. Drexel Univ.*,
   24 F.4th 183 (3d Cir. 2022) ...............................................................6

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)...............................................................9

**STATE CASES**

*Cousins v. Goodier*,
   No. S20C-11-036 CAK, 2021 WL 3355471 (Del. Super. Ct. July 30, 2021) ...............................................................23, 25

*DRT Constr. Co. v. Lenkei*,
   176 A.D.2d 1229 (N.Y. App. Div. 1991) ...............................................23

*Fulani v. N.Y. Times Co.*,
   260 A.D.2d 215 (N.Y. App. Div. 1999) ...............................................17

*Kipper v. NYP Holdings Co.*,
   12 N.Y.3d 348 (N.Y. 2009) ...............................................................10, 11

*Rinaldi v. Holt, Rinehart & Winston*,
   42 N.Y.2d 369 (N.Y. 1977) ...............................................................17

# INTRODUCTION

Plaintiff Rachel DeLoache Williams's sole remaining claim alleges that Defendant Netflix, Inc. published 16 defamatory "Statements" about her in a docudrama called *Inventing Anna* (the "Series").  Williams cannot get to a jury on any Statement without clear and convincing evidence that (1) Netflix published the Statement with "actual malice" and (2) the Statement was a false statement of verifiable fact.  Williams has had ample opportunity over nearly two years to take discovery in support of her claim: she has received thousands of documents and deposed almost two dozen witnesses.  It is now clear Williams cannot meet her burden as to any Statement.  Netflix therefore moves for summary judgment on Williams's claim.[1]

**First**, Williams has no evidence that anyone at Netflix had either a subjective belief that any Statement was false or any serious doubt about the truth of any Statement.  The evidence instead is undisputed that the Netflix creative executives responsible for the Series (the individuals whose mental state is relevant to actual malice) subjectively believed that the Series portrayed Williams as a "sympathetic

---

[1] Netflix's concurrently filed motion for partial summary judgment on Williams's request for punitive damages argues that even if Williams's liability claim survives as to one or more Statements, Williams has no evidence to support her punitive-damages request.  If the Court grants this motion on all 16 Statements, that second motion will be moot.

and relatable character."  None of these individuals thought the Series conveyed anything false or defamatory about Williams.

**Second**, if the Court looks beyond actual malice, Williams's claim still fails because she has no evidence that any Statement was false.  Minor discrepancies (*e.g.*, whether Anna Sorokin gave Williams red-bottom shoes, a jacket, and a purse; or instead gave her black high-heels and yoga pants) do not count as falsehoods for a defamation claim.  Nor may Williams base her claim on Statements that constitute opinions that other participants in the Sorokin saga had about Williams (*e.g.*, Neff Davis, another friend of Sorokin, opining that Williams was a "user" or "dropped" Sorokin as a friend).

Williams had the right to tell her version of the Anna Sorokin story in her *Vanity Fair* article, in her book *My Friend Anna*, and in numerous media appearances.  But without clear and convincing evidence of actual malice or falsity, Williams cannot use defamation liability to punish Netflix for telling the same story from perspectives with which she disagrees.  Williams's portrayal in the Series "may not have been to [her] liking, but that does not make it defamatory."  *Colborn v. Netflix, Inc.*, 661 F. Supp. 3d 838, 865 (E.D. Wisc. 2023).

## NATURE AND STAGE OF PROCEEDINGS

Williams sued Netflix for false light and defamation.  D.I. 1.  The Court dismissed the false light claim.  D.I. 65 at 8.

## SUMMARY OF ARGUMENT

1.    Williams cannot show that Netflix acted with actual malice when it published the scenes in the Series containing the 16 Statements.

2.    Williams cannot show that any Statement is a false statement of verifiable fact.

## STATEMENT OF FACTS

### I.    BACKGROUND

Williams met Anna Sorokin in 2016, when Williams was a *Vanity Fair* photo editor and Sorokin was pretending to be a wealthy German heiress.  Ex. 22 at 4.[2]  Williams says the two met at a nightclub, where Sorokin ordered "bottle service" and "picked up the tab."  CSF 26, *see* CSF 27.  In Williams's words, she and Sorokin saw each other frequently for "adventure-filled nights out, for drinks and sometimes dinner"— and Sorokin "paid for everything."  Ex. 22 at 6; CSF 30.  The two remained friends until a 2017 trip to a luxury Moroccan resort ended with Williams footing a $62,000 bill that Sorokin promised (but failed) to repay.  Ex. 22 at 21; CSF 50, 69.  Eventually, Williams reported Sorokin to the police, helped them effectuate Sorokin's arrest, and testified for the prosecution at Sorokin's criminal trial.  CSF 54, 55.

---

[2] "CSF" cites are to the Concise Statement of Facts, and "Ex." cites are to the Declaration of Rachel F. Strom, both filed in support of this motion.

In April 2018, Williams published a *Vanity Fair* article, *"As an Added Bonus, She Paid for Everything": My Bright-Lights Misadventure with a Magician of Manhattan*, which recounted some of Williams's experiences with Sorokin. CSF 1. Williams also wrote a book, *My Friend Anna: The True Story of a Fake Heiress*, and gave press interviews telling her story. CSF 2. Williams sold to HBO the exclusive television rights to adapt and fictionalize her stories. CSF 3.

Jessica Pressler, a journalist, also published an article about Sorokin, in May 2018 in *New York Magazine* ("Pressler Article"). CSF 6. Shonda Rhimes, founder of Shondaland and creator of popular series like *Grey's Anatomy* and *Scandal*, wanted to adapt the Pressler Article into a series. Shondaland and Netflix have a deal pursuant to which they partner to bring new movies and episodic series to the public. CSF 8. In connection with *Inventing Anna*, Netflix provided resources, and Shondaland and Rhimes researched and wrote what would become the Series. CSF 10–11.

Shondaland and Rhimes created a docudrama that was faithful to the truth and respectful of the real-life participants in the Sorokin story. But the relevant question for ***this*** motion is not what Shondaland and Rhimes knew and believed, because they are not defendants. Instead, this motion focuses on the subjective knowledge and beliefs of the responsible creative executives at Netflix, which is the only defendant.

4

The Netflix executives testified that they believe it is important to portray real people responsibly when releasing a docudrama.  CSF 16; *see also* CSF 18 ("[O]f course, if [a show]'s based on true people, you want to be respectful to the true people.").  Netflix therefore ensured that Shondaland had ample resources for development, including by funding a dedicated researcher (a Ph.D. from Harvard); securing the rights to Pressler's article; paying for footage of the Morocco trip captured by Williams's friend, Jesse Hawk; and obtaining agreements with (and thereby securing access to) several prominent participants in the Sorokin story. CSF 11.

Netflix understood it could not obtain Williams's rights or consult her because she had previously entered into an exclusive deal with HBO for its own potential Sorokin project.  CSF 12, 13.  It is relatively common for two companies like HBO and Netflix to develop projects on the same high-profile topic.  CSF 13.  It also is consistent with industry custom and practice for the company in Netflix's position not to contact sources who are under exclusive arrangements with a competitor. CSF 14.

Members of Netflix's creative team occasionally suggested feedback on draft scripts and preliminary cuts of individual episodes.  Ex. 14 (Wolarsky Dep.) at 25:2–5; Ex. 8 (Levitan Dep.) at 22:14–16.  But none of them had access to the writers' room; saw any of Shondaland's notes of writers' room meetings; reviewed or had

access to the research packages prepared by the Series' researcher; or participated in the writers' interviews with sources.  CSF 22–24; Ex. 6 (Howe Dep.) at 40:3–7. There is no evidence that Netflix wrote or edited any of the 16 Statements.  Netflix's team trusted Shondaland's work, did not harbor any ill-will toward Williams, and did not believe any scenes from the Series were false and defamatory.  CSF 21, 19, 25.

## II.    WILLIAMS'S DEFAMATION CLAIM

Williams alleges the Series conveys 16 false and defamatory statements about her.  D.I. 1 ¶¶ 31–95.  Specifically, Williams alleges that certain scenes or dialogue falsely represent as fact or imply that she (1) was a "freeloader and/or a false friend" to Sorokin (Statement Nos. 1–7, 10); (2) a "snob" (No. 8); (3) "abandon[ed] Sorokin in Morocco" (Nos. 9–10); (4) "deceiv[ed] friends about her role in [Sorokin's] arrest or benefitt[ed] from" the arrest (Nos. 11–14); and (5) "misus[ed] her Business Amex" card, hid that fact from her employer, and was investigated for misusing the card (Nos. 15–16).

## ARGUMENT

Summary judgment must be granted if Williams "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial."  *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (citation omitted).

Williams has the burden of proving that (1) Netflix published a (2) false and (3) defamatory statement of verifiable fact about her; (4) Netflix did so with "actual malice"; and (5) the statement was per se defamatory or caused special damages. *See Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 259 (2d Cir. 2021).[3]

Williams must prove both actual malice and falsity by "clear and convincing evidence."  N.Y. Pattern Jury Instr.–Civil 3:34.  This is "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."  *Blair v. Inside Edition Prods.*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014) (quotation omitted) ("New York … require[s] public figures to demonstrate falsity by clear and convincing evidence.").

When evaluating a motion for summary judgment on a defamation claim, the court "must bear in mind the actual quantum and quality of proof necessary to support liability."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  The court must find "no genuine issue [of fact]" and grant summary judgment to the defendant "if the evidence presented [by the plaintiff] is of insufficient caliber or

---

[3] New York substantive law applies to Williams's claim.  *See* D.I. 65 at 1–2. Williams is a public figure with respect to the Sorokin saga, and the actual malice standard therefore applies.  *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).  CSF 1–2, 5.

quantity to allow a rational finder of fact to find [a required element] by clear and convincing evidence." *Id.*

Finally, Williams must meet her burden with respect to "***each allegedly libelous statement individually***." *Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995) (emphasis added), *aff'd*, 238 F.3d 168 (2d Cir. 2001). Summary judgment must be granted as to any Statement for which Williams does not have evidence sufficient to meet her burden on either falsity or actual malice. *Dunn v. Gannett N.Y. Newspapers, Inc.*, 833 F.2d 446, 453–55 (3d Cir. 1987) (analyzing each statement on review of summary judgment order).

The Court should grant summary judgment because Williams has no evidence, much less clear and convincing evidence: (1) that any Netflix executive responsible for publishing the Series acted with actual malice; or, alternatively, (2) that any Statement is a false statement of verifiable fact.

## I.    WILLIAMS CANNOT MEET HER BURDEN ON ACTUAL MALICE

### A.    As to Each Statement, Williams Must Have Clear and Convincing Evidence That a Netflix Executive Responsible for Publishing the Series Had Subjective Awareness of the Statement's Probable Falsity

"Actual malice has 'nothing to do with bad motive or ill will.'" *Copeland v. Netflix, Inc.*, No. 1:24-cv-00163-SB, 2025 WL 775500, at *4–5 (D. Del. Mar. 11, 2025) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 n.7 (1989)). Rather, the plaintiff must prove that the defendant made the statement "with

**knowledge that it was false** or with **reckless disregard** of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (emphasis added). "The standard is a subjective one, based on the defendant's actual state of mind, and the Supreme Court has cautioned that 'reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.'" *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Recklessness instead must be shown with evidence "demonstrating that **the defendant in fact entertained serious doubts** as to the truth of the statement or that **the defendant had a subjective awareness of probable falsity**." *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (emphasis added) (internal quotations and citation omitted).

Four important rules on the actual malice standard are particularly relevant to this motion:

<u>**First**</u>, where "the alleged defamatory statement has two possible meanings, one that is defamatory and one that is not," the plaintiff must "show something beyond knowledge of, or recklessness in regard to, the falsity of the statement's defamatory meaning." *Id*. at 89–90. The plaintiff **also** must show that the defendant *"*intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it." *Id*. at 90. The defendant is "entitled to

judgment as a matter of law unless" the admissible evidence shows the defendant's required mental state as to "the defamatory implication the plaintiff identifies." *Colborn*, 661 F. Supp. 3d at 861. Most of the Statements in this case are subject to the defamation-by-implication standard, as discussed in Sections I.C and II, *infra*.

**Second**, because Netflix is a corporation, "the state of mind required for actual malice [must] be brought home to the persons in [Netflix] having responsibility for the publication of the [Statements]." *N.Y. Times*, 376 U.S. at 287. Where, as here, "there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify ***the individual responsible for publication of a statement***, and it is ***that individual*** the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (emphasis added); *Prince v. Intercept*, No. 21-CV-10075, 2023 WL 4492413, at *6 (S.D.N.Y. July 12, 2023) (same). Williams must prove that specific person's mental state with evidence; "[s]uspicion, surmise and accusation" do not suffice. *See Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354, 357 (N.Y. 2009) (alteration in original) (citation omitted).

**Third**, Williams has the burden to identify clear and convincing evidence of actual malice. "[A] libel defendant's burden in support of summary judgment is not, as [the] Supreme Court reasoned, to prove as a matter of law that it did not publish with actual malice, but to point to deficiencies in the record that will prevent plaintiff

10

from proving that fact by clear and convincing evidence." *Id*. at 354; *see Dunn*, 833 F.2d at 450.

**Fourth**, because a docudrama is a "creative interpretation of reality," "if alterations of fact in scenes portrayed are not made with serious doubts of truth of the *essence* of the telescoped composite, such scenes do not ground a charge of actual malice." *Davis v. Costa-Gavras*, 654 F. Supp. 653, 658 (S.D.N.Y 1987) (emphasis added); *see Fairstein v. Netflix, Inc.*, No. 20-cv-8042 (PKC), 2023 WL 6125631, at *9–11 (S.D.N.Y. Sept. 19, 2023) (in applying actual malice standard to docudramas, courts "often recogniz[e] that the use of invented dialogue or a condensed timeline may be necessary storytelling devices and are not themselves evidence of actual malice"); *cf. Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 513 (1991) ("an acknowledgment that the work is so-called docudrama or historical fiction … might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed").

## B.    Williams Has No Evidence That Any Netflix Executive Had Subjective Awareness of Any Statement's Probable Falsity

At the start of discovery, when asked to identify all facts supporting her claim, Williams predicted that "[d]iscovery" would show decisions "made within Netflix" demonstrating actual malice. Ex. 18 at 15–16. Discovery showed no such thing.

Discovery instead showed that Netflix secured the rights to a well-reported article about the Sorokin story from a "reputable source." CSF 6, 9, 11. *See, e.g.*,

11

*Fodor v. Berglas*, No. 95 Civ. 1153 (SAS), 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995) ("Because *New York* Magazine is considered a reputable source, [defendant] would have had no reason to believe that the article he relied on was inaccurate."). Netflix partnered with an accomplished television creator and provided her with substantial resources to support the factual investigation and writing of the Series, including by funding a dedicated independent researcher with a Ph.D. from Harvard, engaging multiple sources for interviews, and obtaining unpublished footage of the Morocco trip. CSF 11.

Any effort by Williams to oppose this motion with evidence about what Shondaland purportedly knew or believed would be misguided for two reasons. First, Shondaland did nothing wrong. Second, that evidence is immaterial because the only defendant here is Netflix. There is no evidence that anyone from the Netflix creative team set foot in the writers' room for the Series, saw any notes created in the writers' room, reviewed any of the research packets prepared by the Series' researcher, or sat in on any interviews the writers conducted with sources. *See* CSF 22–24; Ex. 6 (Howe Dep.) at 40:3–7. Discovery also showed no evidence that Netflix wrote or edited any of the 16 Statements. Netflix's representatives testified that they did not believe the Series contained any false statements about Williams or portrayed Williams in a derogatory manner. CSF 25. There is no contrary evidence.

12

Williams cannot prove actual malice on the ground that Netflix's creative executives did not personally investigate the facts underlying the Series. "Courts have routinely held that failure to investigate, without more, does not demonstrate actual malice." *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 463 (E.D. Pa. 2017) (collecting cases), *aff'd*, 728 F. App'x 132 (3d Cir. 2018); *see Electra*, 987 F.3d at 259 (affirming summary judgment on that basis); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020) (affirming dismissal on that basis).

Nor was Netflix required to engage Williams as a consultant or obtain her pre-publication approval. *See Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132, 136 (3d Cir. 2018) (not interviewing plaintiff and instead relying on interviews with others who knew her did not suffice for actual malice at summary judgment).

This case is like *Basulto v. Netflix*, which also involved a "docudrama" distributed by Netflix. *See* No. 1:22-cv-21796, 2023 WL 7129970, at *45 (S.D. Fla. Sept. 20, 2023). The *Basulto* court assumed that each challenged statement in the movie was false and defamatory. The court nevertheless granted Netflix summary judgment because "***[p]laintiffs did not produce any evidence that anyone at Netflix entertained serious doubts*** about the Film's accuracy." *Id*. (emphasis added). The evidence showed Netflix considered the film's creators to be "reliable"; the mere

13

fact that Netflix executives did not personally "investigate" the facts could not support a finding that Netflix acted with actual malice. *Id.*

The same result follows here. Williams has no evidence that any Netflix creative executive knew any Statement was false or had any serious doubt on that score. Rather, the undisputed evidence shows that Netflix relied on Shondaland to utilize the substantial resources that Netflix provided, and there is no evidence of actual malice. Summary judgment should be granted for Netflix. *See id.*; *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 850 (11th Cir. 2020) (affirming summary judgment where plaintiff "identified no such evidence showing that anyone at Discovery had actual doubts about the scene or real awareness that the scene might be problematic"); *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 774 F. Supp. 3d 688, 702 (S.D.N.Y. 2025) (granting summary judgment where no sufficient evidence of actual malice on part of individuals responsible for publication), *appeal docketed*, No. 25-868 (2d Cir. Apr. 11, 2025).

### C.    Williams Has No Evidence That Netflix Intended or Was Reckless to Any Alleged Defamatory Implication

For most of the Statements, the alleged defamatory meaning arises, if at all, only by implication and not as an express statement of fact. *See* Section II, *infra* (alleged defamatory meaning of "freeloader/false friend," "snob," "abandoning Sorokin in Morocco," and "misuse of business AmEx" Statements are, at most, implied). For all such Statements, Williams has an ***additional*** burden. She must

14

prove by clear and convincing evidence that a responsible Netflix executive intended the scene "to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it." *Kendall*, 716 F.3d at 89–90. Here, "[r]ecklessness" requires showing that the responsible executive "knew that the defamatory meaning was not just possible, but ***likely***, and still made the statement despite their knowledge of that likelihood." *Id*. at 91 (emphasis added).

Netflix does not agree that the scenes in question are susceptible to a defamatory implication. *See* Section II, *infra*. But even if they are, Williams has no evidence that any Netflix executive intended (or was reckless to the possibility) that viewers of the Series would take from the scene the defamatory implication that Williams alleges.

For example, Williams alleges in her Complaint that the Series implies she was complicit in a scheme to defraud her employer by improperly using her corporate credit card. *See* D.I. 1 ¶ 93. Williams made the same claim in a letter to Netflix two days before the Series premiered. Ex. 37. But the Series does ***not*** show Williams being complicit in Sorokin's fraud. The Series shows Williams being pressured to put down her credit card to pay for the hotel in Morocco, Ex. BB (Series Episodes), Ep. 6 at 28:11–29:39; confirming with the hotel that her corporate card would not be charged, CSF 75; and repeatedly pressing Sorokin to pay her back so Williams could settle the debt, CSF 76.

But even if a reasonable jury could find that the Series implies Williams's complicity with Sorokin's fraud, there is no evidence that anyone at Netflix intended for the audience to take that meaning from the Series or thought it "likely" the audience would do so. Williams relies heavily on a scene in which a Vanity Fair superior tells the Williams character she is "neck deep in this." D.I. 1 ¶ 91. But Jinny Howe testified that this superior and others portrayed in the scene "are very limited in what they know and what they believe to have occurred. ***I have a larger perspective just having been on—the previous episodes told a larger story for me***." Ex. 6 (Howe Dep.) at 182:19–183:7 (emphasis added). Similarly, the evidence is undisputed that the Netflix executives believed the Series portrayed Williams as a victim of, rather than a participant in, Sorokin's fraud. *E.g.*, CSF 17 (Howe: Williams is "a sympathetic and relatable character, and I think it's very clear that she was victimized by Anna Delvey"); *see infra* Section II.A.

*       *       *

Because Williams cannot show that Netflix acted with actual malice, the Court should grant summary judgment as to all 16 Statements.

## II.    WILLIAMS CANNOT MEET HER BURDEN ON FALSITY

The absence of evidence of actual malice means the Court need not reach the question whether Williams could establish with clear and convincing evidence that any Statement asserts or implies a statement of verifiable fact that is false. However,

if the Court does reach that question, summary judgment should be granted for Netflix because Williams cannot meet her burden.

"The standard for assessing falsity is informed by the 'common law of libel ... [which] overlooks minor inaccuracies and concentrates upon substantial truth.'" *Blair*, 7 F. Supp. 3d at 357 (quoting *Masson*, 501 U.S. at 516) (alterations in original). "New York law recognizes that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth[.]" *Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 302 (2d Cir. 1986); *Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216 (N.Y. App. Div. 1999) (complaint properly dismissed where "statement's 'gist' or 'sting'" did not materially differ from the alleged truth).

Further, a defamation claim must be based on statements of fact, not opinions. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). "Opinions, ... libelous or not, are constitutionally protected ... , provided that the facts supporting the opinions are set forth." *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 380 (N.Y. 1977).

When a docudrama is at issue, statements "about a controversial occurrence [that] fairly describes the general events involved and offers [a creator's] personal perspective about some of its ambiguities and disputed facts ... should generally be protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995); *see Heller v. NBCUniversal, Inc.*, No. 15-cv-09631-MWF-KS, 2016 WL

6583048, at *6–7 (C.D. Cal. June 29, 2016) (creators should be protected when they depict a "public controversy … , dramatizing some details, excluding others … , and implicitly expressing their opinion in favor of [one side]"; otherwise, "virtually any docudrama on a controversial topic could be defamatory").[4]

Discovery has confirmed that all Statements alleged to be false either do not clearly convey the meaning Williams ascribes to them, convey a protected opinion, and/or are substantially and in essence true.

## A.    "Misusing her Business Amex" (Nos. 15–16)[5]

Williams lumps together several scenes from Episode 7 (following the Williams character's return from Morocco) and alleges their "cumulative effect" "is to portray Williams as an irresponsible employee whose employer [Vanity Fair] believed that she was complicit in a $62,000 fraud against the employer, and that her misconduct was sufficiently serious to warrant an investigation and the return of her

---

[4] Thus, a depiction of "a classic difference of opinion over whether [music group] N.W.A.'s contracts [with the plaintiff] were 'favorable' or 'unfavorable,' whether N.W.A. was being paid its 'fair share' or not, and whether [plaintiff] was a 'sleazy' manager or a good businessman," constituted non-actionable opinions. *Heller*, 2016 WL 6583048, at *6–7. "While it is true that the producers of the Film took the side of N.W.A. in this controversy, any reasonable viewer watching the scenes would understand that the implications constitute opinion, not provable facts." *Id.* at *6.

[5] The shorthand descriptions of the Statements are from the Complaint. In a pre-motion meet-and-confer, Williams said she will move for summary judgment on the "Business AmEx" and "Abandoning Sorokin in Morocco" Statements. This brief therefore addresses those Statements first.

ID's and credit cards."  D.I. 1 ¶ 93; *see* Ex. BB (Series Clips), at Episode_7.1.1, Episode_7.1.2, Episode_7.1.4, Episode_7.1.5.

As discussed, no reasonable jury could conclude that the scene implies that Williams ***in fact*** was complicit with Sorokin in defrauding Vanity Fair, or that anyone at Netflix intended (or was reckless to the possibility) the audience would come away with that implication.  *See* Section I.C, *supra*; *cf. Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) ("the Article does not present Fishman's claim as undisputed fact, but rather makes clear that Scientology denies the truth of Fishman and Dr. Geertz's charges").

Additionally, Williams cannot prove that the Statements falsely represent the fact of the potential ramifications of Williams's use of her corporate credit card for the Morocco charges and Williams's stated concern that these events put her job at risk.  It is undisputed that the written policies of Conde Nast (which owns Vanity Fair) state that they prohibit personal use of corporate cards and require all personal charges to be timely resolved.  CSF 64 ("Corporate cards are not allowed to be used for PERSONAL EXPENSES."); CSF 65 (failure to timely pay charges could "result in employee disciplinary action" and "termination").  It also is undisputed that Williams did not immediately report the charges to the accounting department, and may have taken up to three months to do so.  CSF 70–74.  Further, Williams ***repeatedly*** texted Sorokin she feared losing her job and wanted to avoid explaining

the charges to her employer.  *See, e.g.*, CSF 73 (texting Sorokin that she would "have to explain to corporate accountants why [she had] such a huge overdue personal charge on [her] corporate AmEx" and "I'm in huge trouble. My job is on the line."); CSF 72 ("My employer is able to see my corporate statement, which is extremely high and past due.").

Williams cannot show that it is false for the Series to dramatize Williams's ***own admission*** that she was "in huge trouble" with her "job … on the line" by depicting the Williams character as being in huge trouble with her job on the line. *See Davis*, 654 F. Supp. at 659.

### B.    "Abandoning Sorokin in Morocco" (Nos. 9–10)

The scenes in question show the Williams character, at the urging of a companion photographer on the trip, leaving a scary situation in which Williams may be arrested based on Sorokin's inability to pay.  *See* Ex. BB (Series Episodes), Ep. 6 at 28:23–29:52, 35:00; CSF 51.  Williams alleges that her character's portrayal in these scenes falsely implies that she "abandoned" her friend, Sorokin.   D.I. 1 ¶¶ 62–65.

The implication that Williams urges contradicts what the Series indisputably shows.  The scenes show Sorokin pressuring Williams to pay for enormous expenses on a trip that Williams could not afford, and Williams doing so in order to defuse dangerous situations.  Ex. BB (Series Episodes), Ep. 6 at 28:23–29:52, 35:00 ("If

20

you don't have a form of payment, I must call the police."). The scenes further show Williams being reluctant to leave Sorokin ("We can't just leave her," she says), and agreeing to leave only after the photographer friend persuades Williams she should leave for her own safety. CSF 51. Moreover, Sorokin is shown bragging to Williams that her father is going to fund her foundation and attempting to arrange a private helicopter to take Williams to the airport. Ex. BB (Series Episodes), Ep. 6 at 4:22. No reasonable jury could find that the scenes imply that Williams abandoned her friend.[6]

But even if a reasonable jury could credit Williams's alleged implication, Williams has no evidence (let alone clear and convincing evidence) that the alleged implication is false. It is undisputed that Williams left both Sorokin and Hawk in Morocco to fly to France for a work trip, and that Williams knew Sorokin had no working credit cards to pay the hotel bill. Ex. AA at 111; CSF 49. It also is undisputed that, at the time, Williams believed the situation at the hotel was a "pressure cooker" and she was afraid of ending up in a foreign jail. CSF 46. Williams herself said that she had been "hoping to leave [Morocco] before Anna got up," and pretended to be sad but in reality was "relieved" to go. CSF 48. Williams also said she then decided "to slow down [her] friendship with Anna." CSF 50.

---

[6] Williams also has no evidence that anyone at Netflix intended the audience to take that implication from the scenes. *Kendall*, 716 F.3d at 89–91.

21

To the extent the Series can be interpreted to imply that Williams "abandoned" Sorokin, that implication has ample factual support.

### C.    "Freeloader/False Friend" (Nos. 1–7, 10)

The "freeloader" Statements are purportedly implied in scenes that portray the Williams character accepting gifts from Sorokin (a haircut, fitness training with Duke, and the Morocco trip) and admitting to the Davis character that Sorokin "may have bought some of my clothes." *See* D.I. 1 ¶¶ 13–21 (Nos. 1–7, 10); Ex. BB (Series Clips), at Episode_5.1.1, Episode_5.1.2, Episode_2.1.1. The "false friend" Statements depict the Davis character conveying her opinion that Williams stopped being Sorokin's friend after the Morocco trip because Sorokin was no longer paying for these experiences or gifts. *See* D.I. 1 ¶¶ 13–21 (Nos. 1, 2, 3, 10); Ex. BB (Series Clips), at Episode_2.1.1, Episode_2.1.2. Williams cannot meet her burdens as to these Statements for multiple reasons.

**<u>First</u>**, the Series does not state that Williams was a freeloader or a false friend. What Williams calls "Statements" on this issue are actually implications. And the scenes at issue are equally consistent with the implications that Williams accepted gifts from someone who could afford them and ceased being Sorokin's friend because Sorokin had defrauded her. Williams has no evidence that any Netflix executive intended for the scenes to convey the defamatory implications that

22

Williams alleges, or that those executives knew the audience was likely to take those implications from the scenes.  *Kendall*, 716 F.3d at 89–91.

**Second**, the freeloader/false friend implications are not statements of verifiable fact:  they are not capable of being proved true or false.  For a defamation claim to proceed to a jury, the jury must be able to "determine the truth or falsity of Defendant's statements in some objectively verifiable manner."  *Cousins v. Goodier*, No. S20C-11-036 CAK, 2021 WL 3355471, at *5 (Del. Super. Ct. July 30, 2021) (statement that plaintiff was "racist" was not capable of being proven true or false), *aff'd*, 283 A.3d 1140 (Del. 2022).  Williams may not proceed on a claim as to "concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity."  *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976); *DRT Constr. Co. v. Lenkei*, 176 A.D.2d 1229, 1229 (N.Y. App. Div. 1991) (phrase "profit hungry land abusers" was not provably false).

**Third**, even if any scene did imply as a matter of verifiable fact that Williams was a "freeloader," Williams cannot prove by clear and convincing evidence that that implication is false.  Williams published an article under her own name that stated of her friendship with Sorokin: "as an added bonus, ***she paid for everything***."  CSF 30 (emphasis added).  Discovery confirmed that Williams accepted expensive meals, drinks, workout sessions, and items of clothing from Sorokin, and that Williams expected Sorokin to pay all of her expenses on a lavish trip to Morrocco.

23

*See* CSF 28, 29.  Williams picks at the margins, such as the type of high heels she was gifted, but such "minor inaccuracies" do not amount to falsity because they do not change the meaning for the audience.  *Blair*, 7 F. Supp. 3d at 357–59 (citation omitted).

**Fourth**, the "false friend" Statements (scenes) depict the Davis character conveying her opinion that Williams was not a real friend to Sorokin because she did not support her when Sorokin was going through financial and legal trouble. Discovery proved that Davis believed this.  CSF 38.  The Series was accurate in portraying Davis's opinion and does not assert it to be fact.[7]  Indeed, the Series shows why Williams would not support Sorokin, whose false promises put Williams in danger and financial crisis.  *See* CSF 51; *see supra* pp. 20–21.  The Series also depicts Duke and Davis deciding, like Williams, not to visit Sorokin in jail.  Ex. BB (Series Episodes), Ep. 2 at 1:20 (Duke); *id.* Ep. 2 at 0:58:00–1:05:00 (Davis).  In any event, it undisputed that Williams stopped being friends with Sorokin after the financial issues in Morocco and then helped orchestrate her arrest while still pretending to be Sorokin's friend.  *See* CSF 52–55.

---

[7] In Statement No. 1, the Williams character defends herself against the Davis character's opinion that Sorokin "fund[ed] your social life and clothes," denying that Sorokin ever "paid [her] way" and countering that while Sorokin "***may*** have bought ***some*** of my clothes," she bought Davis's time.  Ex. BB (Series Episodes), Ep. 2 at 15:15–15:40 (emphasis added).  Both perspectives are thus conveyed.

### D.    "Snob" (No. 8)

The "snob" Statement is a scene in Episode 5 in which, according to Williams's allegations, Davis is shown to perceive that Williams has white privilege and looks down on Davis because she works at a hotel.  D.I. 1 ¶ 58; Ex. BB (Series Clips), at Episode_5.1.3; *see also* D.I. 1 ¶ 61 (alleging Williams is portrayed as a "Becky").  This episode is subtitled "Neff," CSF 39, and the challenged scene conveys the Davis character's perception of Williams.  Netflix accurately portrayed the real Davis's opinion, which is that Williams is "judgmental" and a "Becky." CSF 42–43.

Whether someone is a "snob" or a "Becky" also is not a verifiable fact that can be litigated in a defamation action.  *See Cousins*, 2021 WL 3355471, at *4 ("Courts have consistently held that imputations of racism and all sorts of other negative qualities are inherently subjective and not actionable.") (collecting cases).

Finally, even assuming this Statement describes an actionable assertion of fact by implication, that implication is amply supported by text messages in which Williams referred to Davis as "tactless," "annoying," "thirsty," and "that concierge girl," CSF 40, and by Williams's acknowledgement she has white privilege, CSF 44.

### E.    "Deceiving friends about her role in the arrest or benefitting from it" (Nos. 11–14)

The "deceiving friends" scenes show Williams feigning ignorance when Duke and Davis find out about Sorokin's arrest when, in fact, Williams worked with the

police to facilitate Sorokin's arrest. CSF 52; *see also* Ex. BB (Series Clips), at Episode_8.1.1, Episode_9.1.2. The gist of these Statements is true.

It is undisputed that, at the request of the police, Williams lured Sorokin to step outside a California rehab facility on the pretense Williams would meet her for lunch, and that Williams did this so the police could arrest Sorokin. *See* CSF 53–54. And it is undisputed that Williams withheld this information from Duke (and Davis), notwithstanding that Williams was in regular touch with Duke. CSF 55. Williams protests she did not expressly lie to Davis or Duke face-to-face (*see* D.I. 1 ¶¶ 73, 77), but Williams cannot meet her burden of demonstrating that the gist of the challenged Statements was false. Indeed, Williams texted law enforcement about keeping Duke in the dark, and when Duke later found out about Williams's role in Sorokin's arrest, Duke said she was "shocked." CSF 53, 60.

As for the implication about personally benefitting from the criminal prosecution of Sorokin, *see* Ex. BB (Series Clips), at Episode_9.1.1 at 2:06, Williams admitted during Sorokin's criminal trial (as Williams has in this case) that she made money from selling her story about Sorokin in an article, a book, and an option to HBO. CSF 56. It is undisputed that Williams made multiples of the amount of that debt by selling her story. CSF 57. And, it is undisputed that the jury found that Williams was not the victim of a crime. D.I. 1 ¶ 21. Thus, even if the scenes in question may be viewed as implying that Williams profited from Sorokin's

arrest and the media frenzy surrounding Sorokin, that implication is amply grounded in fact.

*    *    *

In summary, Williams cannot prove by clear and convincing evidence at trial that any Netflix executive decided to publish any Statement with subjective awareness of its probable falsity or with the intent to imply the defamatory meaning that Williams ascribes to the Series.  Further, the undisputed evidence shows that all 16 Statements contain the essence of the true facts they are based on, and/or constitute protected opinion.  Williams cannot proceed to trial on any of the Statements.

**<u>CONCLUSION</u>**

Netflix respectfully requests that the Court grant its motion.

<table>
<tr>
<td>

OF COUNSEL:

Rachel F. Strom
Chelsea T. Kelly
Nimra H. Azmi
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rachelstrom@dwt.com
chelseakelly@dwt.com
nimraazmi@dwt.com
lindseycherner@dwt.com

</td>
<td>

<u>*/s/ Kelly E. Farnan*</u>
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant Netflix, Inc.*

</td>
</tr>
</table>

27

Kelly M. Klaus
Blanca F. Young
Rose Leda Ehler
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
kelly.klaus@mto.com
blanca.young@mto.com
rose.ehler@mto.com

Dated:  August 29, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2025, true and correct copies of the foregoing document were caused to be served on the following counsel of record as indicated:

**<u>BY ELECTRONIC MAIL</u>**
Brian E. Farnan
Michael J. Farnan
Farnan LLP
919 North Market St., 12th Floor
Wilmington, DE 19801

**<u>BY ELECTRONIC MAIL</u>**
Rodney Smolla
164 Chelsea Street
South Royalton, VT 05068

**<u>BY ELECTRONIC MAIL</u>**
Alexander Rufus-Isaacs
Rufus-Isaacs Acland & Grantham LLP
9440 Santa Monica Blvd.
Beverly Hills, CA 90210

**<u>BY ELECTRONIC MAIL</u>**
Dion G. Rassias
The Beasley Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)

1